UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

ORIGINAL

RECEIVED
MAY 17 2005
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **COXCOM, INC., d/b/a/ COX COMMUNICATIONS NEW ENGLAND,** <br><br> **Plaintiff,** <br><br> **v.** <br><br> **JON CHAFFEE, individually and d/b/a ELECTRONIC IMPORTS and CHAFFEE INTERNATIONAL, AMY CHAFFEE, IMPORTS individually and d/b/a, ELECTRONIC RAMALDA BOU, individually and d/b/a ELECTRONIC IMPORTS,** <br><br> **Defendants.** | **C.A. No.: 05-107 S** <br><br> **AFFIRMATION OF SHAUN K. HOGAN IN OPPOSITION TO DEFENDANTS' MOTION <u>TO AMEND</u>** |

I, **SHAUN K. HOGAN**, an attorney admitted *pro hac vice* to practice before the Bar of the United States District Court for the District of Rhode Island, affirms the following under penalties of perjury:

1. I am an attorney and a member of the law firm of Lefkowitz, Louis, Sullivan & Hogan, L.L.P., attorneys for the plaintiff, CoxCom Inc. d/b/a Cox Communications New England (hereinafter "CoxCom" or "Plaintiff"), in the above-captioned action. I submit this Affirmation in opposition to Defendants,' Jon Chaffee, individually and d/b/a Electronic Imports and Chaffee International, Amy Chaffee, individually and d/b/a Electronic Imports, and Ramalda Bou, individually and d/b/a Electronic Imports (hereinafter "Defendants"), Motion to Amend their counterclaims pursuant to Federal Rule 15(a).

2. CoxCom commenced this action against Defendants on March 8, 2005 (annexed hereto as Exhibit A is a copy of the Complaint). In the suit, CoxCom alleged, in part, the Defendants engaged in the sale and use of digital cable television filters, and had intercepted and assisted others in the interception of CoxCom's cable television programming services without CoxCom's

34

authorization in violation of the Communications Act 47 U.S.C. § 553(a)(1) and the Digital Millennium Copyright Act, 17 U.S.C. § 1201.

3. On March 11, 2005, the Honorable William E. Smith signed an "*Ex Parte* Order to Show Cause with Temporary Restraining Order" (annexed hereto as Exhibit B is a copy of the March 11, 2005 *ex parte* Order, hereinafter referred to as "*ex parte* Order"). The *ex parte* Order granted *inter alia*: (1) injunctive relief related to the sale of digital cable television filters; (2) injunctive relief from the destruction related records; (3) enjoining the Defendants from moving assets; (4) ordering the Defendants to identify their assets; (5) expedited discovery; and (6) ordering Defendants provide an accounting. Most relevant to the Defendants' Counterclaim, the *ex parte* Order directed the inspection of Defendants' premises and seizure of items related to Defendants' use/sale of digital cable television filters. Specifically, *ex parte* Order directed members of the United States Marshals Service for the District of Rhode Island, with the assistance of representatives of CoxCom, to (a) enter 206 Richard Drive, Tiverton, Rhode Island – i.e., the home of Defendants Jon and Amy Chaffee; (b) enter any other of Defendants' locations identified by them where digital cable television filters were kept/used/sold; (c) seize items related to the use/sale of digital cable television filters; and (d) "take all steps necessary to proceed in a lawful manner, including the reasonable use of force." Id.

4. On March 11, 2005, officers from the United States Marshals Service and two representatives from CoxCom appeared at 206 Richard Drive, Tiverton, Rhode Island and Jon Chaffee's office on Mineral Spring Avenue, North Providence, Rhode Island in executing the *ex parte* Order.

5. On or about March 30, 2005 the Defendants served their Answer and Counterclaims for intentional infliction of emotional distress, and what appeared to be claims of trespass to chattels

and abuse of process (annexed hereto as Exhibit C is a copy of the March 30, 2005 Answer and Counterclaims).

6. On or about April 4, 2005, CoxCom's counsel sent a letter to Defendants apprising them of the insufficiency of those claims and requesting that they be withdrawn (annexed hereto as Exhibit D is a copy of the April 4, 2005 letter).

7. Subsequently, on or about April 8, 2005, before CoxCom was required to respond to the counterclaims, the Defendants, apparently embracing CoxCom's arguments, served their Amended Counterclaims instead of dismissing those claims. Defendants now limited their counterclaims to the following: (1) intentional infliction of emotional distress and (2) what appeared to be trespass to chattels (annexed hereto as Exhibit E is a copy of the April 8, 2005 Answer and Counterclaims).

8. On April 12, 2005, counsel for CoxCom and Defendants signed a Preliminary Injunction on Consent, wherein it was agreed that all parties to the action would continue the relief granted in the *ex parte* Order which will remain in effect until the trial of the action or a decision on summary judgment (annexed hereto as Exhibit F is a copy of the Preliminary Injunction on Consent).

9. Thereafter, in response to Defendants' Amended Counterclaims, on April 27, 2005, CoxCom filed its Answer and a Motion to Dismiss the counterclaim of intentional infliction of emotional distress pursuant to Rule 12(b)(6).

10. On May 5, 2005, in response to the Motion to Dismiss, and again seemingly agreeing with CoxCom's legal arguments made in their memorandum of law, Defendants filed an Objection to the Motion to Dismiss Counterclaim and a Motion to Amend (annexed hereto as Exhibit G is a copy of Defendants' Objection to the Motion to Dismiss Counterclaim and Motion to Amend). In the Motion to Amend, Defendants: (1) sought to expand on their claim of intentional infliction of emotional distress by adding additional factual allegations [Count 1]; (2) maintained its claim for

trespass to chattels [Count 4]; and added claims of (3) negligent infliction of emotional distress [Count 2]; and (4) a claim under 42 U.S.C. § 1983, based upon alleged constitutional violations of the First and Fourth Amendments to the U.S. Constitution [Count 3].

11. On May 10, 2005 the parties appeared before the Court, wherein Defendants were informed that based upon their failure to submit their April 8, 2005 Amended Counterclaims with a signature by an attorney as required by Rule 11, the Court would not consider the Amended Counterclaims as filed with the Court. Thus, the only motion now before the Court is Defendants' May 5, 2005, Motion to Amend the original March 30, 2005 Answer and Counterclaims pursuant to Rule 15(a).

12. As set forth above, and in more detail in the accompanying memorandum of law, the Defendants' Motion to Amend should be denied.

Dated: Jericho, New York
May 16th, 2005

SHAUN K. HOGAN (SH-7227)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COXCOM, INC. d/b/a COX COMMUNICATIONS NEW ENGLAND,<br><br>Plaintiff,<br><br>vs.<br><br>JON CHAFFEE, individually and d/b/a ELECTRONIC IMPORTS and CHAFF[illegible] INTERNATIONAL, AMY CHAFFEE, individually and d/b/a ELECTRONIC IMPORTS, RAMALDA BOU, individually and d/b/a ELECTRONIC IMPORTS,<br><br>Defendants. | : | C.A. No. 05 107 |

FILED
MAR 08 2005
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

## COMPLAINT

The plaintiff CoxCom, Inc. d/b/a Cox Communications New England ("plaintiff"), by its attorneys, as and for its Complaint herein against the defendants, alleges the following:

1. This action seeks declaratory and injunctive relief and monetary damages on account of defendants' statutorily prohibited assistance in the unauthorized reception and enjoyment of Cox's cable television programming services. Defendants' manufacture, distribution and/or sale of digital cable television signal filters is intended to enable Cox's customers to view its pay-per-view services without payment or authorization. Such assistance in the circumvention of a copyright protection system, resulting in unauthorized reception of communications services offered over a cable system, violates the Communications Act, 47 U.S.C. § 553 (a)(1), and the Digital Millennium Copyright Act, 17 U.S.C. § 1201. This Complaint also alleges a supplemental state law claim for imposition of a constructive trust.

(A)

**Jurisdiction and Venue**

2. This action arises under 47 U.S.C. § 553 and 17 U.S.C. § 1201.

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claim. Venue is properly established in the District of Rhode Island pursuant to 28 U.S.C. § 1391(b), as the defendants reside in the District, and a substantial part of the events giving rise to the claim occurred in the District.

**Parties**

4. Cox is a Delaware corporation, authorized to do business in the State of Rhode Island, and it maintains a business address at 1320 Eddie Dowling Highway, Lincoln, Rhode Island.

5. At all times hereinafter mentioned, defendant Jon Chaffee is a resident of the State of Rhode Island, with a residential address at 206 Richard Drive, Tiverton, Rhode Island. He conducts business under the names Electronic Imports and Chaffee International.

6. At all times hereinafter mentioned, defendant Amy Chaffee is a resident of the State of Rhode Island, with a residential address at 206 Richard Drive, Tiverton, Rhode Island. She conducts business under the name Electronic Imports.

7. At all times hereinafter mentioned, defendant Ramalda Bou is a resident of the State of Rhode Island, with a residential address at 254 Grand Street, Woonsocket, Rhode Island. She conducts business under the name Electronic Imports.

## Factual Background

## The Cable Operator

8. Cox provides telecommunications services, including cable television services, to subscribers in, inter alia, Connecticut and Rhode Island, pursuant to franchise agreements with various municipalities.

9. In order to provide cable television services to its subscribers Cox pays fees to programmers. Cox then receives the programming from the programmers, mostly by way of interstate radio communications. Cox then transmits said programming over its system. The signals Cox transmits over its system are private communications not intended for public use.

10. Subscribers pay Cox based on the level of service they wish to receive.

11. In order to prevent unauthorized access to the services it provides to its customers, the vast majority of which are copyrighted works, Cox utilizes the technological measure of scrambling some of its signals so that they must first be decoded by electronic decoding equipment in order to be viewed clearly on a television receiver. Cox encodes or scrambles signals for premium channels, such as HBO, Showtime, and Cinemax, for which subscribers pay a separate monthly subscription fee, and pay-per-view events, such as a specific movie, concert or sporting event, for which subscribers pay a specific one time charge to view each event. Cox provides subscribers with set-top electronic decoding equipment (hereinafter referred to as "decoders") to decode these signals. These are essentially access-control devices used by cable companies to secure their signals. Cox programs these devices so that a subscriber may only view that level of service that the subscriber has purchased.

12. Cox's cable systems are "addressable," meaning that the electronic decoding equipment that Cox provides each subscriber who receives premium or pay-per-view services is

programmed, via the cable system, by a central computer to enable the reception of only those programming services specifically selected and purchased by individual subscribers.

13. It is possible for a dishonest individual to install an unauthorized or "pirate" digital signal filter onto the plaintiff's cable television system. Use of digital signal filters is a relatively recent form of piracy that has arisen along with cable companies' utilization of digital signals for transmission and security of their programming services. Digital filters interfere with Cox's addressability function on its digital set-top cable devices by preventing the set-top device in the customer's residence from conveying to Cox's central computers billing information pertaining to pay-per-view programs viewed at the residence where the filter is utilized. Without transmission to Cox's computers of data reflecting pay-per-view events watched, Cox is unable to bill the subscriber for his or her receipt of such programming; thus, the subscriber and/or other members of the subscriber's household view the programming free of charge.

14. Pay-per-view, which is one of Cox's scrambled services, includes selections that typically range in price from approximately $3.95 to $49.52. Pay-per-view programming is available throughout the day on a per-event or per-movie basis. Each Cox system offers several pay-per-view channels. Hence, an individual could conceivably steal hundreds of dollars worth of Cox's pay-per-view services through the use of a digital filter.

15. Cox's signal is a private telecommunication not intended for public use.

16. By using a digital signal filter received from the defendant, a dishonest individual may view Cox's pay-per-view cable television programming services without paying the additional per-event fee for said programming, resulting in a loss to Cox for each such program viewed without remuneration to it. Moreover, the theft of Cox's cable television service not only causes direct monetary loss to Cox, but also adversely affects municipalities in those locations

throughout the country that grant franchises to Cox for operation of its cable television systems there. These municipalities and states receive and derive franchise fees and/or sales taxes based on Cox's gross revenues. Cox's residential customers also suffer as a result of the lost revenues to Cox, which impair its ability to purchase and offer a high quality selection of programming services. The interception of Cox's signals also result in losses to the creators and/or owners of the copyrighted works that are transmitted via the signals.

**Defendants' Misconduct**

17. The defendants have been engaged in a scheme to illegally manufacture, sell and/or otherwise distribute "pirate" digital cable television filters for profit from their business location in Tiverton, Rhode Island, as well as at numerous computer shows throughout New England. This illicit business is of regional, and likely national, scope.

18. Defendants have manufactured, sold and/or distributed "pirate" digital cable filters with the intent and specific knowledge that such devices would enable their ultimate users to receive plaintiff's pay-per-view cable television programming services, including numerous copyrighted works, without the authorization of the plaintiff or the owners and/or creators of the copyrighted works, and without having paid for those programming services.

19. The "pirate" digital cable television filters that defendants manufacture, sell and/or distribute are intended to circumvent Cox's scrambling and pay-per-view billing technology and practices. These "pirate" filters have the capability to assist in the unlawful viewing of pay-per-view cable television programming transmitted on Cox's system.

**Count I.**

**First Violation of the Communications Act of 1934, as amended (all Defendants)**

20. Plaintiff incorporates by reference paragraphs 1 through 19 inclusive as if fully set forth herein.

21. The defendants have been engaged and continue to be engaged in the manufacture, sale and/or distribution of "pirate" digital cable television filters, knowing or having reason to know that such equipment is used in the unauthorized decryption, interception and receipt of plaintiff's pay-per-view cable television programming services. Defendants' manufacture, sale and/or distribution of "pirate" digital cable television descrambling filters for the theft and unauthorized reception of plaintiff's pay-per-view cable television services violates section 553 (a)(1) of the Communications Act, Title 47 of the United States Code.

22. The "pirate" digital signal filters manufactured, sold and/or distributed by the defendants are specifically intended to enable the free viewing of the plaintiff's encoded pay-per-view programming services without authorization. Said conduct violates 47 U.S.C. section 553 (a)(1).

23. By using a "pirate" cable television digital signal filter received from the defendants, a dishonest individual may view plaintiff's pay-per-view cable television programming services without paying the additional per-event fee for said programming.

24. Plaintiff's cable television programming services which are viewed without payment or authorization by use of the "pirate" digital signal filters that the defendants have manufactured, distributed and/or sold are communications offered over a cable system under 47 U.S.C. section 553 (a) which are protected from unauthorized interception and theft thereunder.

25. The defendants violated the Communications Act willfully and for the purposes of their direct or indirect commercial advantage and/or private financial gain.

26. Plaintiff has not authorized or consented to the manufacturing, assembling, modifying, importing, exporting, marketing, selling, delivering, furnishing, shipping, renting, repairing, distributing, or leasing by the defendants of the aforementioned digital signal filters, nor has the plaintiff authorized or consented to the rendering of assistance by the defendants in the reception of its cable television programming services without its authorization.

27. The plaintiff is a "person aggrieved" by the defendants' violations of the Communications Act, and is authorized to institute this action against the defendants under 47 U.S.C. section 553 (c)(1) for violations of section 553 (a)(1) of the Communications Act.

28. The defendants' violations have injured and will continue to injure plaintiff's ability to maximize its revenues by depriving it of the benefit of subscribers to its pay-per-view programming services and by injuring its goodwill and reputation. As a further result of such violations, defendants have gained and will continue to gain unjust enrichment.

29. Upon information and belief, the defendants will continue to violate 47 U.S.C. section 553. The defendants knew or should have known that the sale and use of such digital signal filters was prohibited by law. Such violations of the Communications Act have caused and will continue to cause plaintiff irreparable harm. In addition to diminishing plaintiff's revenues, the defendants' unlawful conduct injures plaintiff's reputation and goodwill, its ability to attract and finance the future acquisition of quality services, and further impairs its ability to enhance its future growth and profitability.

## Count II.

**Additional Violation of the Communications Act of 1934, as amended (Defendants Jon Chaffee and Amy Chaffee)**

30. Plaintiff incorporates by reference paragraphs 1 through 29 inclusive as if fully set forth herein.

31. The defendants have been engaged and continue to be engaged in the unauthorized use of one or more "pirate" digital cable television filters, knowing or having reason to know that such equipment is used in the unauthorized decryption, interception and receipt of plaintiff's pay-per-view cable television programming services. Defendants' use of the digital filters for the unauthorized reception of plaintiff's pay-per-view cable television services violates section 553 (a)(1) of the Communications Act, Title 47 of the United States Code.

32. The "pirate" digital signal filters used by the defendants are specifically intended to enable the free viewing of the plaintiff's encoded pay-per-view programming services without authorization. Said conduct violates 47 U.S.C. section 553 (a)(1).

33. Plaintiff's cable television programming services which are viewed without payment or authorization by defendants' use of the "pirate" digital signal filters are communications offered over a cable system under 47 U.S.C. section 553 (a) which are protected from unauthorized interception and theft thereunder.

34. The defendants violated the Communications Act willfully and for the purposes of their direct or indirect commercial advantage and/or private financial gain.

35. Plaintiff has not authorized or consented to the defendants' use of the aforementioned digital signal filters to view its cable television programming services without its authorization.

36. The plaintiff is a "person aggrieved" by the defendants' violations of the Communications Act, and is authorized to institute this action against the defendants under 47 U.S.C. section 553 (c)(1) for violations of section 553 (a)(1) of the Communications Act.

37. The defendants' violations have injured and will continue to injure plaintiff's ability to maximize its revenues by depriving it of revenues due it for the pay-per-view programming services viewed by defendants Jon and Amy Chaffee without payment, and by injuring its goodwill and reputation. As a further result of such violations, defendants have gained and will continue to gain unjust enrichment.

38. Upon information and belief, the defendants will continue to violate 47 U.S.C. section 553. The defendants knew or should have known that the use of such digital signal filters to intercept Cox's programming services was prohibited by law. Such violations of the Communications Act have caused and will continue to cause plaintiff irreparable harm. In addition to diminishing plaintiff's revenues, the defendants' unlawful conduct injures plaintiff's reputation and goodwill, its ability to attract and finance the future acquisition of quality services, and further impairs its ability to enhance its future growth and profitability.

**Count III.**

**Violations of the Digital Millenium Copyright Act, 17 U.S.C. § 1201**

39. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 38, inclusive.

40. The normal result of Cox's digital scrambling of the copyrighted pay-per-view programming it offers is that such programming cannot be viewed unless Cox authorizes, by

means of a process of transmission of addressable digital signals, a subscriber's digital cable converter to allow viewing of such programming.

41. Plaintiff's digital scrambling of the copyrighted pay-per-view programming it offers to subscribers is a technological measure that effectively controls access to works protected under the Copyright Act.

42. The digital signal filters sold by defendants have the ability to circumvent Cox's digital scrambling of the copyrighted pay-per-view programming it offers, and to circumvent the protection to copyright holders afforded by this measure. They do this by impairing, deactivating, avoiding or bypassing the billing mechanism utilized by Cox's digital cable boxes for pay-per-view programming, thus enabling viewing of such programming without authorization and without payment to Cox.

43. By marketing and selling digital signal filters, and by referring customers to the instructions on the Internet regarding how to use the devices to steal Cox's pay-per-view services, defendants have offered to the public, provided, or otherwise trafficked in technology, products, devices and/or components that are primarily intended for the purpose of circumventing a technological measure, i.e., digital signal scrambling, that effectively controls access to copyrighted works transmitted by Cox over its cable system.

44. Defendants' digital signal filters have only limited commercially significant purposes or uses, if any, other than to circumvent digital scrambling of copyrighted pay-per-view programming.

45. Defendants have marketed their filters with the knowledge and intent that such digital signal filters would be used to circumvent digital scrambling of copyrighted pay-per-view programming.

46. Cox is a person injured within the meaning of 17 U.S.C. § 1203 (a) by defendants' violations of 17 U.S.C. § 1201.

47. Plaintiff has no adequate remedy at law to redress such violations.

**Count IV.**

**Supplemental Claim for Imposition of Constructive Trust**

48. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 47, inclusive.

49. The digital signal filters manufactured, sold and/or distributed by the defendants allow purchasers thereof to receive Cox's pay-per-view cable television programming services without payment to plaintiff therefor.

50. Defendants' sales and distributions of "pirate" digital signal filters to plaintiff's subscribers diverts to the benefit of the defendants those revenues and profits otherwise accruing to plaintiff from its provision of pay-per-view programming services to its subscribers.

51. All amounts received by defendants from their sales and/or distributions of "pirate" digital signal filters to plaintiff's subscribers represent revenues and profits otherwise accruing to plaintiff.

52. The defendants are unjustly enriched by the diversion of revenues and profits to them, as described in the preceding paragraph. This unjust enrichment is enjoyed at the expense of and to the detriment of the plaintiff.

53. The amount received by the defendants which represent diversion of profits and revenues due and owing to plaintiff, together with all gains received by defendants from their transfer or use, or any property substituted by defendants therefor, in equity and good conscience belong to plaintiff.

**WHEREFORE**, the plaintiff requests that this Court grant the following relief:

(1) Declare that the defendants' unauthorized manufacture, sale and/or distribution of "pirate" digital signal filters known or intended to circumvent Cox's digital scrambling technology and allow unauthorized receipt of Cox's copyright protected pay-per-view cable television programming signals without plaintiff's authorization violated 47 U.S.C. section 553(a)(1) and 17 U.S.C. § 1201, and that such violations were committed willfully and for purposes of defendants' direct or indirect commercial advantage and/or private financial gain;

(2) In accordance with 47 U.S.C. section 553(c)(2)(a) and 17 U.S.C. § 1203 (b)(1), enjoin the defendants, their agents, servants, employees, affiliated business entities, assigns and those controlled directly or indirectly by any of them from the manufacture, sale, distribution, advertisement for and/or use of electronic equipment known or intended for the unauthorized interception of cable television service, including digital signal filters;

(3) In accordance with 47 U.S.C. section 553(c)(2)(B), award the plaintiff against the defendants, either:

(a) the actual damages which the plaintiff has suffered, together with any additional profits earned by defendants as a result of defendants' unauthorized manufacture, sale and/or distribution of "pirate" digital cable signal filters; or alternatively at plaintiff's election,

(b) statutory damages in a total amount between $250 and $10,000 for all of the digital cable signal filters sold and/or distributed by the defendants in violation of 47 U.S.C. section 553(a)(1); and,

(4) In accordance with 47 U.S.C. section 553(c)(3)(A)(i), order an accounting of all profits and expenses realized by defendants in violation of the foregoing statutes, together with defendants' production of all records reflecting sales of their "pirate" digital signal filters; and,

(5) In accordance with 17 U.S.C. section 1203 (c), award the plaintiff against the defendants, either:

(a) the actual damages which the plaintiff has suffered, together with any additional profits earned by defendants as a result of defendants' sale or distribution of "pirate" digital cable signal filters; or alternatively at plaintiff's election,

(b) statutory damages in an amount between $200 and $2,500 for each of the digital cable signal filters sold and/or distributed by the defendants in violation of 17 U.S.C. section 1201; and,

(6) In accordance with the equitable remedy of constructive trust, order that the full value of services converted by virtue of defendants' "pirate" digital cable television signal filters be ordered returned by the defendants to plaintiff; and

(7) In accordance with 47 U.S.C. § 553(c)(2)(C) and 17 U.S.C. § 1203 (b)(4) and (5), direct defendants to pay plaintiff its full costs, including reasonable attorneys' fees and investigative expenses incurred in this action; and

(8) Grant such other and further relief as is just.

Dated: Newport, Rhode Island
March 7, 2005

Respectfully submitted for the Plaintiff CoxCom, Inc.
d/b/a Cox Communications New England
By Its Attorneys,

Daniel J. Lefkowitz
**LEFKOWITZ, LOUIS, SULLIVAN & HOGAN, L.L.P.**
350 Jericho Turnpike, Suite 300
Jericho, New York 11753
(516) 942-4700

Francis S. Holbrook II (3412)
**MILLER SCOTT & HOLBROOK**
122 Touro Street
Newport, Rhode Island 02840
(401) 847-7500

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COXCOM, INC. d/b/a COX COMMUNICATIONS NEW ENGLAND, | : | C.A. No. |
| Plaintiff, | : | |
| vs. | : | [redacted] 05 107 |
| JON CHAFFEE, individually and d/b/a ELECTRONIC IMPORTS and CHAFFEE INTERNATIONAL, AMY CHAFFEE, individually and d/b/a ELECTRONIC IMPORTS, RAMALDA BOU, individually and d/b/a ELECTRONIC IMPORTS, | : | |
| Defendants. | : | |

RECEIVED
MAR 08 2005
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

**<u>EX PARTE</u> ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER, INCLUDING ASSET FREEZE, ACCOUNTING, AND EXPEDITED DISCOVERY, INCLUDING INSPECTION AND SEIZURE OF DEFENDANTS' BUSINESS <u>RECORDS AND DEFENDANTS' INVENTORY OF DIGITAL SIGNAL FILTERS</u>**

**WHEREAS**, an <u>ex</u> <u>parte</u> application by Order to Show Cause has been made by the plaintiff CoxCom, Inc. d/b/a Cox Communications New England ("Cox" or "plaintiff") directed at defendants Jon Chaffee, individually and d/b/a Electronic Imports and Chaffee International, Amy Chaffee, individually and d/b/a Electronic Imports, and Ramalda Bou, individually and d/b/a Electronic Imports (hereinafter "defendants") for a Temporary Restraining Order and Preliminary Injunction pursuant to Fed.R.Civ.P. 65 and/or 47 U.S.C. § 553 (c)(2)(A) and 17 U.S.C. § 1203 (b)(1); an Order of Expedited Discovery pursuant to Fed.R.Civ.P. 30, 33, 34, 36 and 45; an Order directing an Accounting pursuant to 47 U.S.C. § 553 (c)(3)(A)(i) and 17 U.S.C. § 1203 (c)(2); a Temporary Restraining Order directed at defendants' assets pursuant to Fed.R.Civ.P. 64 and/or 65 and 47 U.S.C. § 553 (c)(2)(A) and (c)(3)(A)(i) and 17 U.S.C. § 1203 (b)(1) and (c)(2); an Order

pursuant to Fed.R.Civ.P. 34, 64 and/or 65 and 17 U.S.C. § 1203 (b)(2) authorizing the immediate entry upon and inspection of defendants Jon Chaffee and Amy Chaffee's home, which plaintiff's motion demonstrates is both a business location and the site where a digital signal filter is used on an ongoing basis to intercept Cox's pay-per-view programming, and seizure of digital signal filters in their possession which defendants possesses for current and future sales to cable subscribers, and seizure of defendants' business records, including computers and computer accessories such as tapes and disks on which records are stored; and

**WHEREAS,** the Court having read and duly considered the Complaint, the Affidavits of Daniel J. Lefkowitz, Lucien Marcoux, and Ronald Allard and the exhibits annexed thereto, and the Motion and Memorandum of Law submitted by the plaintiff in this matter, and having determined that the plaintiff has demonstrated (i) that it has a likelihood of success on the merits of its claims asserted against the defendants in this action, (ii) that absent this Court's grant of the relief sought, plaintiff would suffer substantial and ongoing irreparable harm in the form of, inter alia, lost profits, lost opportunities, and a diminishment in the value of its goodwill, as well as other irreparable harm, resulting from defendants' digital signal filter sales, if (a) such digital filter sales were permitted to continue, (b) with respect to sales already made, plaintiff was unable to obtain records of such sales, and (c) transfers of defendants' assets connected to or derived from Communications Act and Digital Millennium Copyright Act violations were not temporarily restrained, in order that plaintiff can avail itself of its remedies under 47 U.S.C. § 553 (c)(3)(A)(i) and 17 U.S.C. § 1203 (c)(2), and under its constructive trust claim asserted in the Complaint; (iii) the resulting harm to plaintiff in not granting this relief is far greater than any injury this relief will

cause to the defendants; and (iv) the relief sought would promote the public interest; and the Court determining that good cause has been shown,

**NOW, THEREFORE,** it is hereby,

**ORDERED, ADJUDGED AND DECREED** that, pending the preliminary injunction hearing to be held as set forth below, the defendants and those others named herein who receive notice of this Order are bound by the following:

**ORDERED, ADJUDGED AND DECREED** that the defendants, their agents, employees, affiliates, and any business entities and/or persons controlled directly or indirectly by them or acting on their behalf or in concert with them, are hereby enjoined and restrained from the sale, transfer, advertisement (including advertisement on the Internet or other on-line service), movement and/or offer for sale, modification, manufacture, storage and distribution of digital cable television signal filters and related equipment and/or the rendering of any assistance whatsoever in the sale, transfer, advertisement, movement, modification, manufacture, storage or distribution of such equipment; and it is further,

**ORDERED, ADJUDGED AND DECREED** that the defendants, their agents, employees, affiliates and any business entities and/or persons controlled directly or indirectly by them, acting on their behalf or acting in concert with them, are hereby restrained and enjoined from destroying, altering, removing or secreting any of the defendants' books and records, including but not limited to invoices, purchase orders, receipts, banking records, safe deposit box records, investment records, insurance policies, shipping labels, or tax returns, including all records stored on computer discs or tapes or within computer terminals, hard drives, servers or otherwise, which

contain any information whatsoever concerning the digital signal filter business or finances of the defendants or otherwise reflect transactions of any kind involving digital filters; and it is further,

**ORDERED, ADJUDGED AND DECREED** that the defendants, their agents, employees, affiliates and any business entities and/or persons controlled directly or indirectly by them, acting on their behalf or acting in concert with them, and any persons or other entities having joint ownership of assets with them, are hereby restrained from transferring, removing, encumbering or permitting the withdrawal of any assets or property, including the contents of any safe deposit boxes, belonging to the defendants, jointly or severally, whether real or personal, tangible or intangible, including but not limited to cash, bank accounts of any kind, stock and bond accounts, and title to defendants' property; and it is further,

**ORDERED, ADJUDGED AND DECREED** that no later than the first business day following service of this Order, the defendants, their employees, agents, bookkeepers and/or accountants are directed to provide the plaintiff written identification of all asset accounts and safe deposit boxes held in their name or any business names used to sell digital filters, or accounts or safe deposit boxes to or from which transfers have been made by any of them within the preceding twelve months which disclosure shall include name, address and account number in which such assets are held, the balance of such account (or the contents of such safe deposit box), the identity and location of the bank or other custodian holding such account, and the authorized signers or persons authorized to access such safe deposit boxes; and it is further,

**ORDERED, ADJUDGED AND DECREED** that plaintiff is granted expedited discovery from defendants, any of their accountants and other agent(s) or person(s) acting on their behalf, and any electronic mail or internet service providers regarding defendants' decoder sales

business and the location, nature and amount of defendants' assets, including discovery of business records, banking records and invoices, including all records stored on computer terminals, servers, hard drives, disks or tape or otherwise, regarding the purchase, sale, modification, storage and distribution of and payment for digital filters and related equipment by or from defendants or any of their agents, employees, servants, successors, assigns or any person and/or entity acting directly or indirectly on their behalf. This expedited discovery shall include depositions, interrogatories, requests for admissions, production of documents, and service of subpoenas pursuant to Fed.R.Civ.P. 30, 33, 34, 36 and 45; and it is further,

**ORDERED, ADJUDGED AND DECREED,** that defendants shall provide the plaintiff with an accounting, no later than two days (as days are counted in Fed.R.Civ.P. 6 (a), i.e., business days) prior to the hearing date set forth in this Order, listing the total number of sales and purchases of any and all digital filters made by or on behalf of the defendants to or from any person and/or entity; this accounting shall also include any and all profits, transfers or withdrawals of assets, property (including property in safe deposit boxes) or any other funds made by, to and/or from the defendants from January 1, 2002 to the present; and it is further,

**ORDERED, ADJUDGED AND DECREED** that the United States Marshal for the District of Rhode Island, his or her deputy and those persons acting under his or her supervision, including plaintiff's representatives, are hereby commanded within five days (as days are counted in Fed.R.Civ.P. 6 (a), i.e., business days) of the signing of this Order to enter upon the residence of defendants Jon and Amy Chaffee, located at 206 Richard Drive, Tiverton, Rhode Island, and any adjoining areas occupied by defendants, and seize any and all correspondence with customers, sales invoices, purchase orders, return forms, receipts, bank records, safe deposit box records, proceeds

of sales, safes, shipping labels and tax returns or other business records, including all computer terminals, hard drives, servers, disks and tapes in their possession, which plaintiff reasonably believes contain or indicate the names or addresses of defendants' agents, principals, employees, distributors, suppliers, manufacturers and/or purchasers of digital filters or any related equipment, or which contain, indicate or otherwise reflect or pertain to any transactions of any kind involving digital filters, and any and all illicit proceeds of the sales of such digital filters, and plaintiff is authorized to inspect, inventory, photograph and seize any and all digital filters and related equipment at this location (including any devices attached to Cox's cable system within the location) and any other locations identified by defendants pursuant to this Order, and that the plaintiff's representatives and their attorneys may assist the U.S. Marshal, his or her deputy and all persons acting under his or her supervision in their efforts to identify those items which fall within the scope of this Order, and that the United States Marshal, his or deputy and all persons acting under his supervision are further empowered to take all steps necessary to proceed in a lawful manner, including the reasonable use of force, in order to enter and secure the premises and examine, seize and remove said business records, illicit sales proceeds and digital filters as directed by this Order, and to deliver said business records, illicit sale proceeds, and digital filters after their having been inventoried, to the plaintiff for inspection and impoundment at a secured location or locations of plaintiff's choice, including plaintiff's or plaintiff's attorneys' offices; and it is further,

**ORDERED, ADJUDGED AND DECREED** that the defendants, their employees, and agents are, under pain of contempt, required to identify (by address) in writing at the time of the seizure any other locations at which digital filters are held, stored, manufactured, modified, received, shipped directly or indirectly to or by the defendants or their employees and agents, or

persons acting on their behalf or in concert with them, or locations where their records are kept or from which internet, telephone or other sales of digital filters are made, and the defendants shall provide immediate access to such locations to the U.S. Marshal and plaintiff's representatives, and defendants shall also immediately provide passwords or other access information to all computers which store information regarding sales, purchases, assets, inventory, etc.; and it is further

**ORDERED, ADJUDGED AND DECREED** that in the event defendants, at the time of the seizure provided for herein, identify any other locations where inventory or records are stored, the United States Marshal, his or her deputy and all persons acting under his or her supervision are directed to immediately go to such locations along with the plaintiff's representatives and, taking all steps necessary to proceed in a lawful manner, including the reasonable use of force, in order to enter and secure the premises, are directed, as provided for in this Order with respect to defendants' known residential/business location in the preceding paragraph, to seize and remove business records, computers and related items, illicit sales proceeds, and digital filters, and to deliver said items, after their having been inventoried, to the plaintiff for inspection and impoundment at a secured location or locations of plaintiff's choice, including plaintiff's or plaintiff's attorneys' offices; and it is further,

**ORDERED, ADJUDGED AND DECREED** that if, after this order is served on them, defendants or any of their agents, employees or others controlled by them or acting on their behalf or in concert with them, secure the possession or presently are in the possession, custody or control of any additional quantity of the above-described items (i.e., digital filters, business records, computers or proceeds from the sale of equipment), they will immediately notify the plaintiff's

attorneys, and retain without sale or other transfer such items or proceeds until further order of this Court; and it is further,

**ORDERED, ADJUDGED AND DECREED** that, pursuant to Fed.R.Civ.P. 65, the plaintiff shall file a bond with the Clerk of the Court in the amount of $ 25,000 ; and it is further,

**ORDERED, ADJUDGED AND DECREED** that defendants are Ordered to show cause at a hearing to be held at 22 ~~a.m./p.m. on~~ of March __, 2005 at 2PM in Courtroom 2 of the United States District Courthouse, District of Rhode Island, ________________, Providence, Rhode Island, why this Temporary Restraining Order should not be confirmed and a Preliminary Injunction entered in the above form; and it is further,

**ORDERED, ADJUDGED AND DECREED** that defendants shall file a responsive memorandum and any supporting documents not later than two days (as days are counted in Fed.R.Civ.P. 6 (a), i.e., business days) prior to the hearing set forth herein and serve a copy of said responsive papers on plaintiff's counsel for receipt by it on that day and plaintiff may file a reply memorandum and any supporting documents on the business day prior to the hearing; and it is further,

**ORDERED, ADJUDGED AND DECREED** that a copy of this Order and the papers submitted in support thereof shall be served upon defendants Jon and Amy Chaffee at their residence at the time of the seizure and Fed.R.Civ.P. 34 inspection ordered herein.

Dated: Providence, Rhode Island
March 11, 2005
Issued at 11:30 a.m.

**SO ORDERED:**

United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COXCOM, INC., et al

VS C. A. NO: 05 107 S

JON CHAFFEE, et als

## ANSWER

### FIRST DEFENSE

1. Defendants Jon Chaffee, Amy Chaffee and Ramalda Bou are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 2, 3, 4, 8, 9, 10, 11, 12, 13, 14, 15, 16, 27, 36, 40, 41 and 47 of the plaintiff's complaint and therefore leaves plaintiff to its proof.

2. Defendants deny the allegations contained in paragraphs 1, 17, 18, 19, 21, 22, 23, 24, 25, 26, 28, 29, 31, 32, 33, 34, 35, 37, 38, 42, 43, 44, 45, 46, 49, 50, 51, 52 and 53 of plaintiff's complaint.

3. Defendant Jon Chaffee admits he is a resident of the State of Rhode Island with a residential address at 206 Richard Drive, Tiverton, Rhode Island but denies the remainder of paragraph 5.

3. Defendant Amy Chaffee admits she is a resident of the State of Rhode Island with a residential address at 206 Richard Drive, Tiverton, Rhode Island but denies the remainder of paragraph 6.

4. Defendant Ramalda Rou admits she is a resident of the State of Rhode Island but denies the remainder of paragraph 7.

### SECOND DEFENSE

Plaintiff comes into this court with unclean hands.

WHEREFORE, defendants demand judgment against the plaintiff, plus costs.

## COUNTERCLAIM

1. The actions of the plaintiff's agents, servants and/or employees on March 11, 2005 and thereafter constituted an intentional infliction of emotional distress.

2. Agents, servants and/or employees of plaintiff caused damage to a lap top computer that was seized in the raid on my home March 11, 2005.

3. The complaint filed by plaintiff in this court constitutes an abuse of judicial process.

4. As a result defendants suffered emotional distress, lost earnings and earning capacity, and other recoverable damages.

WHEREFORE, defendants demand judgment against plaintiff for compensatory and punitive damages, attorney fees, interest and costs.

Defendants demand a trial by jury.

Defendants

By their Attorney,

JAMES A. CURRIER #953
128 Dorrance Street
Suite 400
Providence, Rhode Island 02903
(401) 274-3113 Fax (401) 274-3113

## CERTIFICATION

I hereby certify that on the 30th day of March, 2005, I faxed a true and accurate copy of the within to Francis S. Holbrook, II, Esq. (841-8534) and Shaun K. Hogan, Esq., 1 (516) 942-4705.

LEFKOWITZ, LOUIS, SULLIVAN & HOGAN
A LIMITED LIABILITY PARTNERSHIP
350 JERICHO TURNPIKE
SUITE 300
JERICHO, NEW YORK 11753

TELEPHONE: (516) 942-4700
TELECOPIER: (516) 942-4705
E-MAIL: llshllp.com

DANIEL J. LEFKOWITZ*
WAYNE R. LOUIS
PATRICK J. SULLIVAN
SHAUN K. HOGAN+

MICHAEL D. CASSELL■
MELINDA MAY DUS

WILLIAM B. JUNG, LLC▲
OF COUNSEL

NEW JERSEY OFFICE
744 BROAD STREET
FLOOR 16, ROOM 28
NEWARK, NEW JERSEY 07102
TELEPHONE: (973) 735-2700
TELECOPIER: (516) 942-4705

*ALSO ADMITTED IN FLORIDA
+ALSO ADMITTED IN MASSACHUSETTS
■ALSO ADMITTED IN NEW JERSEY
▲ALSO ADMITTED IN SOUTH CAROLINA

April 4, 2005

**VIA FAX (401) 274-3113 &**
**FIRST-CLASS MAIL**

James A. Currier, Esq.
128 Borrance Street, Suite 400
Providence, RI 02903

**Re: CoxCom, Inc. d/b/a Cox Communications New England v. Jon Chaffee**
**C.A. No.: 05-107-S**

Dear Mr. Currier:

This firm represents the plaintiff, CoxCom, Inc. d/b/a Cox Communications New England (hereinafter "Cox"), in the above-referenced action. Cox is in receipt of defendant's Answer and Counterclaim. Most significantly, in reviewing the counterclaim, it appears that it is fatally deficient in both law and fact and possibly was asserted without a "reasonable inquiry" as required by Fed. R. Civ. P. 11. Thus, this letter is being sent to provide you with an opportunity to amicably withdraw defendant's counterclaim before the parties have to needlessly incur time and costs associated with Cox's moving to dismiss, or possibly even seeking Rule 11 sanctions.

Chaffee's Answer appears to contain a counterclaim for the intentional infliction of emotional distress. The claim is insufficiently plead, being both wrong on the law and wrong on the facts. Specifically, Chaffee asserts that Cox caused him harm in allegedly damaging his laptop computer and in filing the instant lawsuit. In order to sufficiently plead a claim for the intentional infliction of emotional distress, the claimant must allege, with specific facts: (1) the conduct was intentional and reckless; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the wrongful conduct and the emotional distress; and (4) the distress was severe. See Wright v. Zielinski, 824 A.2d 494 (R.I. 2003). The Supreme Court of Rhode Island has adopted a very high standard with respect to what type of conduct will be considered extreme and outrageous: "conduct . . .so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Hoffman v. Davenport-Metcalf, 851 A.2d 1083, 1090 (R.I. 2004). The conduct alleged in Chafee's counterclaim, which fails to allege any intent or other culpable mental state, does not even come close. Without conceding that Cox's conduct was at all wrongful or that it caused any damage to defendant or his property, a computer allegedly damaged in an unspecified way and Cox's bringing a lawsuit based upon sufficient facts, simply do not meet the definition of extreme and outrageous conduct.

D

LEFKOWITZ, LOUIS, SULLIVAN & HOGAN
A LIMITED LIABILITY PARTNERSHIP

James A. Currier, Esq.
Page 2

April 4, 2005

Even an amendment to the counterclaim would not suffice because the entire basis for the counterclaim, which is manifestly a strike suit, is meritless. Defending a lawsuit does not cause distress of a nature that no reasonable person could be expected to endure. See Hoffman, 851 A.2d at 1090 (allegation of the filing of "false and malicious allegations of criminal conduct" does not rise to the level necessary to satisfy the pleading requirements for intentional infliction of emotional distress).

Furthermore, defendants' vaguely stated claim for abuse of process also is not supported by the facts and the law. Abuse of process arises when (1) a legal proceeding is instituted against a party; and (2) the proceeding is perverted to accomplish an ulterior or wrongful purpose for which it was not designed to accomplish. See Butera v. Boucher, 798 A.2d 340, 353 (R.I. 2002). Other than the filing of the instant lawsuit, which on its face is directed toward the legitimate goal of combating theft of Cox's programming services, defendant fails to allege any fact(s) that show a perversion of the action in order to serve some wrongful purpose. As in the Complaint, Cox filed this action as against Chaffee based upon his violations of 47 U.S.C. § 553(a)(1). Cox chiefly seeks monetary damages and injunctive relief, which remedies are specifically prescribed by statute. Therefore, it seems inconceivable that any court would ever conclude that Cox sued Chaffee for some ulterior motive. This especially true in this case, in light of the fact, that Judge Smith signed the Temporary Restraining Order which authorized the plaintiff to seize evidence of the defendants' sales of digital cable television filters.

Accordingly, defendant's counterclaim(s) is/are wholly unsupported by law and frivolous. In light of the above, please be advised that if Chaffee does not withdraw his counterclaim(s) by April 7, 2005, Cox will serve a Rule 11 Motion along with its motion to dismiss. Please feel free to contact me to discuss.

Very truly yours,

LEFKOWITZ, LOUIS, SULLIVAN & HOGAN, L.L.P.

Shaun K. Hogan

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COXCOM, INC., et al

VS C. A. NO: 05 107 S

JON CHAFFE, et als

## MOTION TO AMEND

Now come the defendants Jon Chaffee, Amy Chaffee and Ramalda Bou and move for lea to serve and file an amended counterclaim in the form as attached hereto.

FILED
APR 08 2005
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

By their Attorney,

James A. Currier #953
128 Dorrance Street
Suite 400
Providence, RI 02903
(401) 274-3113
Fax (401) 274-3115

CERTIFICATION

I hereby certify that on the 8th day of April, 2005, I faxed a true and accurate copy of the within to Francis S. Holbrook, II, Esq. (841-8534) and Daniel J. Lefkowitz, Esq., 1 (516) 942-4705.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COXCOM, INC., et al

VS C. A. NO: 05 107 S

JON CHAFFEE, et als

**AMENDED COUNTERCLAIM**

**COUNT 1**

1. On Friday night March 11, 2005 at about 9:00 PM four adult males identifying themselves as U.S. Marshalls and representatives of Cox Communications came to the Chaffee residence at 206 Richard Dr., Tiverton, RI. Amy Chaffee had been home about 5 minutes with her 3 yr old daughter when they rang the doorbell. When Amy Chaffee opened the door one of the men said Jon Chaffee was running a cable filter business out of their home and that they had a "federal warrant" that gave them the right to search and seize computers and personal assets. They then proceeded to enter the house. At that time, Amy said she wanted to call her husband Jonathan and she was told she couldn't. Federal marshals said, "You can't call your husband because then he may not come here." The marshals and Cox representatives were threatening towards Amy and treated her as if she was a criminal and they were the police. The Cox Representative who was in charge, apparently his name is Lou, handed Amy Chaffee a packet of several dozen photocopied pages and repeated that it was a "federal warrant signed by a federal Judge" and that she had to cooperate with them or be found in contempt. That was repeated several times to both Amy and Jon Chaffee during the course of the raid. Lou told Amy that the warrant gave them the right to search and seize items from Amy's home and the maid's business office at 1360 Mineral Spring Ave, North Providence. Amy Chaffee was not given a chance to read the packet of photocopied papers before the men started searching and going through the house. Cox representatives first went to the TV

and cable box in the living room, there was no filter on that TV. They then proceeded to the TV in the family room. There was no filter on that TV either. They checked for other TVs then started their detailed search. Lou told Amy that she could make things easy on herself if she told them where the filters were. Amy said she didn't understand or know what was going on and then said she wanted to call her attorney. One of the marshals said that would be ok. The intrusion by the marshals and Cox representatives had greatly distressed the Chaffee's 3 yr old daughter and Amy needed to get her daughter's blanket from her car. Lou wouldn't let her retrieve it without taking a marshal and a Cox representative with her and when she did, they then proceeded to search her car. By this time, Lou and the other Cox representative were going through Jon Chaffee's office on the lower level of the house searching through all his papers and personal items. About .20 minutes later two additional Cox representatives arrived at the house while a New York attorney and 3 or 4 other men remained outside. The search included going through every room in the house. Amy tried to observe everything they were doing but they kept brushing her away. Lou continued to threaten her telling her that she better show him where everything was right then or she would be violating the court order and would be in contempt and in a lot of trouble. Amy kept repeating that she had nothing to hide. Jon Chaffee called Amy to tell her he was on his way home. A marshal got on the phone and told Jon he was a federal marshal and that he was there to see that a federal search warrant was carried out. Jon arrived home around 10-10:30 to see seven cars parked on the street in front of his house. Some of the cars were occupied. When Jon entered his house Lou met him and told Jon he "was in a lot of trouble." Lou handed Jon what he said was a federal search warrant and told Jon that he could not talk with an attorney that the warrant said Jon has to cooperate with Lou and tell them everything or Jon would be in contempt. Lou then said the warrant gives Lou the right to search Jon's car and made Jon go back outside and open the doors of his car. After searching his car he told Jon to open the trunk. Lou threatened Jon that if he didn't open the trunk Jon would be in contempt and it wouldn't be civil any more it would become a criminal matter. Jon opened the trunk and Lou took a bin that had Jon's personal papers, bills and auto registration forms in it. Going back to the house Lou again asked Jon where the filters were. Jon kept saying, "I don't have any, I never inventoried or stocked them." Lou threatened that if they find out later that Jon has them hidden Jon would go to prison for contempt of court. Jon repeated over and over that he don't have any filters. Lou then took Jon alone to the family room and told the marshal to leave the room. Lou backed Jon into a corner of the room and told Jon that he was

"being sued for $500,000 and that Jon could make it easy on himself by settling for $100,000." Lou said "I know you have a good paying job and run a lucrative maids service so know that would be a drop in the barrel for you." Jon asked Lou if they checked his credit report. Lou then asked Jon for his tax returns for the last 3 years. Lou threatened, "don't let me subpoena them or you will be in a lot more trouble." Lou told Jon, "we got a tip in November 2004 that you were the biggest distributor of cable filters around." Lou again told Jon he didn't have the right to talk with a lawyer that "by the time it takes Jon to talk to an attorney, he will already be in contempt." Lou said Jon had to tell them where the filters were right then or he was in contempt and threatened that "this is a civil matter, don't make it criminal." Jon kept telling Lou he didn't stock them in inventory. Lou then told Jon that all his assets would be frozen as of Monday. During this time there were Cox representatives going through all Jon and Amy's belongings filing several bins with confiscated papers, receipts and items from Jon's office, den, guest bedroom, storage room and upstairs family room. They tore apart the whole house going through every room, closet, drawer, desk, and storage and filing bins. One marshal told Jon that Cox did that all the time and if Jon didn't tell them where the stuff was, it would be a lot worse for Jon. Jon told the marshal I can't give you something don't have. Cox representatives removed several bins with papers and items that they wouldn't let Jon see. Lou listed many items taken as miscellaneous and had Jon sign the list that had blank spaces between each notation. There is no way Jon and Amy could know exactly what was taken from their house that night. Known items removed from Jon's house and car: 4 desktop computers (1 HP, 3 Sonys); 3 laptop computers (Sony, Averic, Gateway); 3 external hard drives; 1 music media player; 2 cell phones; a palm pilot; a boat registration; 3 auto registration forms; Jon Chaffee's passport, credit card charge slips and purchase receipts and tax returns. There were no cable filters anywhere in the Chaffee House. After completing the search at Jon and Amy's home, the marshals and Cox representatives proceeded to the maid service office in North Providence. Jon Chaffee drove to the office location with his mother who had arrived at Jon's house during the raid. After arriving at the office on Mineral Spring Ave, North Providence, everyone waited outside for one of the marshals whom Jon's mother overheard him tell one of the other men that he stopped off to get a beer. Once arriving at the maid cleaning service office Lou went through a few bags that Jon had brought up from his car trunk to the office earlier that day and he and the other Cox representatives searched the office, picking a lock on a file cabinet that Jon di not have a key for all the while badgering Jon to tell him where the filters were. Down the hall from Jon's office are two other

offices Jon had sub-leased to two girls who are currently being sued in a civil matter by Jon. Jon explained the girls changed the locks and that he didn't have the keys and legally he couldn't go into those offices. The Cox representatives were excited at the prospect of finding two locked doors that Jon wouldn't supply the keys to. Lou again badgered and threatened Jon saying Jon was not cooperating with the warrant and that he was in contempt. Jon's mother then spoke up and told Lou they could contact North Providence police for confirmation. Lou said he wasn't contacting anyone and they proceeded to pick both locks and entered each office . The first office had a big box in the center of the room filled with small gadgets that was immediately seized upon by the Cox representatives and emptied out. No filters were inside. The other room was empty except for a few papers left by the landlord. Back in the maids office, Jon's mother observed one of the marshals laughing and joking around and drinking a beer. Again Cox representatives took several items labeled miscellaneous along with 2 office desktop computers. Jon's mother, concerned that there were various blank lines between each item on the handwritten list asked Lou "doesn't Jon get a copy of the list?" Lou did not respond to her.

2. On March 13, 2005 Sunday afternoon, Jon called Lou to mention that there were 2 cell phones in the bag with his laptop that was taken from his car that hadn't been written on the list. Lou again repeated to Jon that he was not to talk with an attorney, that in accordance with the federal court order Jon is to talk with them only or Jon would be in contempt. He further stated, "Let me tell you if it ever comes out that you destroyed information or are still hiding filters you will be in contempt and will face jail time."

3. On March 14, 2005, Monday, all Jon and Amy Chaffee's and Ramalda Bou's accounts and assets were frozen.

4. On March 18, 2005, Friday, Lou called to return another computer and a hard drive of Jon's daughters pictures. Lou asked if his lawyer had told him what he talked about with Cox' lawyers. Lou told Jon he was in a lot of trouble and that he won't only be paying a huge settlement and his own attorney, he would also be paying for Cox's attorneys. He was shaking his head and threatening Jon, "You are done."

5. A few days before the hearing scheduled for March 22, 2005, Lou told Jon that he had only a few more days before the court date on the 22nd and that he must have everything ready even if his lawyer was not there and if he did not he would be in contempt of court.

6. The actions of the plaintiff's agents, servants and/or employees as aforesaid constitute an intentional infliction of emotional distress.

7. As a result the defendant-counterclaim plaintiffs suffered emotional distress, lost earnings and earning capacity, and other recoverable damages.

WHEREFORE, the defendant-counterclaim plaintiffs demand judgment against plaintiff-counterclaim defendant for compensatory and punitive damages, attorney fees, interest and costs.

**COUNT 2**

1. Agents, servants and/or employees of plaintiff caused damage to a lap top computer owned by the Chaffee defendant-counterclaim plaintiffs that was seized on March 11, 2005.

WHEREFORE, the Chaffee defendant-counterclaim plaintiffs demand judgment against plaintiff-counterclaim defendant for compensatory damages, interest and costs

Defendant-counterclaim plaintiffs demand a trial by jury.

Defendant-counterclaim plaintiffs
By their Attorney,

JAMES A. CURRIER #953
128 Dorrance Street
Suite 400
Providence, Rhode Island 02903
(401) 274-3113 Fax (401) 274-3113

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COXCOM, INC., et al

VS

JON CHAFFE, et als

C. A. NO: 05 107 S

**RULE 16 STATEMENT**

1. Plaintiff has alleged a violation of 47 USCS § 553. Subsection (a) (2) of the statute expressly states a violation of same must be ***"...intended..."*** (emphasis ours).

It is submitted that plaintiff will not be able to prove intent as there **never was such intent.**!

2. The proposed amended counterclaim alleges: (a) an intentional infliction of emotional distress and (b) property damage.

The substantive law of Rhode Island indicates that to sufficiently plead a claim for emotional distress the claimant must allege, with specific facts: (1) the conduct was intentional and reckless; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the wrongful conduct and the emotional distress; and (4) the distresses severe. See Wright v. Zielinski, 284 A. 2d 494 (R.I. 2003)

Extreme and outrageous conduct has been defined conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in an civilized community. Hoffman v. Davenport-Metcalf., 851 A.2d 1083, 1090 (R.I. 2004)

A.2d 1083, 1090 (R.I. 2004)

It is respectfully submitted that the proposed amended counterclaim meets all such pleading criteria.

It it further submitted that the property damage allegation is clearly a properly stated claim for relief.

Defendant-counterclaim plaintiffs
By their Attorney,

James A. Currier #953
128 Dorrance Street
Suite 400
Providence, RI 02903
(401) 274-3113
Fax (401) 274-3115

CERTIFICATION

I hereby certify that on the 8th day of April, 2005, I faxed a true and accurate copy of the within to Francis S. Holbrook, II, Esq. (841-8534) and Daniel J. Lefkowitz, Esq., 1 (516) 942-4705.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COXCOM, INC. d/b/a COX COMMUNICATIONS NEW ENGLAND, : C.A. No. 05 107

Plaintiff,

vs.

JON CHAFFEE, individually and d/b/a ELECTRONIC IMPORTS and CHAFFEE INTERNATIONAL, AMY CHAFFEE, individually and d/b/a ELECTRONIC IMPORTS, RAMALDA BOU, individually and d/b/a ELECTRONIC IMPORTS,

Defendants.

**PRELIMINARY INJUNCTION ON CONSENT**

**WHEREAS**, plaintiff CoxCom, Inc. d/b/a Cox Communications New England ("Cox" or "plaintiff") commenced this action and moved for a Temporary Restraining Order directed at defendants Jon Chaffee, Amy Chaffee and Ramalda Bou, individually and d/b/a Electronics Imports and Chaffee International (hereinafter "defendants"); and

**WHEREAS,** on March 8, 2005, the Court entered an order granting plaintiff's ex parte application for a Temporary Restraining Order (the "TRO"); and

**WHEREAS,** the parties having reported that to the Court that they have agreed to continue the relief granted in the TRO in a Preliminary Injunction on Consent,

**NOW, THEREFORE,** the following Preliminary Injunction on Consent, the terms of which shall govern the parties and the course of this action pending resolution of this matter by trial, summary judgment, settlement or otherwise, is hereby entered:

**NOW, THEREFORE,** it is hereby,

F

**ORDERED, ADJUDGED AND DECREED** that the defendants, their agents, employees, affiliates, and any business entities and/or persons controlled directly or indirectly by them or acting on their behalf or in concert with them, are hereby enjoined and restrained from the sale, transfer, advertisement (including advertisement on the Internet or other on-line service), movement and/or offer for sale, modification, manufacture, storage and distribution of digital cable television signal filters and related equipment and/or the rendering of any assistance whatsoever in the sale, transfer, advertisement, movement, modification, manufacture, storage or distribution of such equipment; and it is further,

**ORDERED, ADJUDGED AND DECREED** that the defendants, their agents, employees, affiliates and any business entities and/or persons controlled directly or indirectly by them, acting on their behalf or acting in concert with them, are hereby restrained and enjoined from destroying, altering, removing or secreting any of the defendants' books and records, including but not limited to invoices, purchase orders, receipts, banking records, safe deposit box records, investment records, insurance policies, shipping labels, or tax returns, including all records stored on computer discs or tapes or within computer terminals, hard drives, servers or otherwise, which contain any information whatsoever concerning the digital signal filter business or finances of the defendants or otherwise reflect transactions of any kind involving digital filters; and it is further,

**ORDERED, ADJUDGED AND DECREED** that the defendants, their agents, employees, affiliates and any business entities and/or persons controlled directly or indirectly by them, acting on their behalf or acting in concert with them, and any persons or other entities having joint ownership of assets with them, are hereby restrained from transferring, removing, encumbering or permitting the withdrawal of any assets or property, including the contents of any

safe deposit boxes, belonging to the defendants, jointly or severally, whether real or personal, tangible or intangible, including but not limited to cash, bank accounts of any kind, stock and bond accounts, and title to defendants' property;[1] and it is further,

**ORDERED, ADJUDGED AND DECREED** that no later than April 15, 2005, the the defendants, their employees, agents, bookkeepers and/or accountants are directed to provide the plaintiff written identification of all asset accounts and safe deposit boxes held in their name or any business names used to sell digital filters, or accounts or safe deposit boxes to or from which transfers have been made by any of them within the preceding twelve months which disclosure shall include name, address and account number in which such assets are held, the balance of such account (or the contents of such safe deposit box), the identity and location of the bank or other custodian holding such account, and the authorized signers or persons authorized to access such safe deposit boxes; and it is further,

**ORDERED, ADJUDGED AND DECREED** that plaintiff is granted expedited discovery from defendants, any of their accountants and other agent(s) or person(s) acting on their behalf, and any electronic mail or internet service providers regarding defendants' decoder sales business and the location, nature and amount of defendants' assets, including discovery of business records, banking records and invoices, including all records stored on computer terminals, servers, hard drives, disks or tape or otherwise, regarding the purchase, sale, modification, storage and distribution of and payment for digital filters and related equipment by or from defendants or any of

---

[1] This continuing restraint on transfers on defendants' assets is subject to one exception: Defendant Ramalda Bou may access an account held in her name which account is to be specifically identified in writing by her counsel. Ms. Bou may transfer or withdraw up to $150.00 held in this account. Plaintiff's counsel must approve the transfer or withdrawal of the funds in writing.

their agents, employees, servants, successors, assigns or any person and/or entity acting directly or indirectly on their behalf. This expedited discovery shall include depositions, interrogatories, requests for admissions, production of documents, and service of subpoenas pursuant to Fed.R.Civ.P. 30, 33, 34, 36 and 45; and it is further,

**ORDERED, ADJUDGED AND DECREED,** that defendants shall provide the plaintiff with an accounting by April 15, 2005 listing the total number of sales and purchases of any and all digital filters made by or on behalf of the defendants to or from any person and/or entity; this accounting shall also include any and all profits, transfers or withdrawals of assets, property (including property in safe deposit boxes) or any other funds made by, to and/or from the defendants from January 1, 2002 to the present; and it is further,

**ORDERED, ADJUDGED AND DECREED** that the defendants, their employees, and agents are, under pain of contempt, required to identify (by address) by April 15, 2005 in writing any other locations at which digital filters are held, stored, manufactured, modified, received, shipped directly or indirectly to or by the defendants or their employees and agents, or persons acting on their behalf or in concert with them, or locations where their records are kept or from which internet, telephone or other sales of digital filters are made, and defendants shall also immediately provide passwords or other access information to all computers which store information regarding sales, purchases, assets, inventory, etc.; and it is further

**ORDERED, ADJUDGED AND DECREED** that if, after this Order is served on them, defendants or any of their agents, employees or others controlled by them or acting on their behalf or in concert with them, secure the possession or presently are in the possession, custody or control of any additional quantity of the above-described items (i.e., digital filters, business records,

computers or proceeds from the sale of equipment), they will immediately notify the plaintiff's attorneys, and retain without sale or other transfer such items or proceeds until further order of this Court.

Dated: Providence, Rhode Island
April __, 2005

Plaintiff CoxCom, Inc. d/b/a
Cox Communications New England
By Its Attorneys,

Shaun K. Hogan
**LEFKOWITZ, LOUIS, SULLIVAN & HOGAN, L.L.P.**
350 Jericho Turnpike, Suite 300
Jericho, New York 11753
(516) 942-4700

Francis S. Holbrook II
**MILLER SCOTT & HOLBROOK**
122 Touro Street
Newport, Rhode Island 02840
(401) 847-7500

Defendants Jon Chaffee, individually and d/b/a Electronic Imports and Chaffee International, LLC Amy Chaffee, individually and d/b/a Electronic Imports, and Ramalda Bou, individually and d/b/a Electronic Imports
By their Attorney

James A. Currier #593
128 Dorrance Street, Suite 400
Providence, RI 02903
(401) 274-3113

**SO ORDERED:**

United States District Judge
4/12/05

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COXCOM, INC., et al

VS C. A. NO: 05 107 S

JON CHAFFEE, et als

# MOTION TO AMEND

Now come the defendants Jon Chaffee, Amy Chaffee and Ramalda Bou and move for leave to serve and file a second amended counterclaim in the form as attached hereto.

By their Attorney,

James A. Currier #953
128 Dorrance Street
Suite 400
Providence, RI 02903
(401) 274-3113
Fax (401) 274-3115

CERTIFICATION

I hereby certify that on the 5th day of May, 2005, I hand delivered a true and accurate copy of the within to Francis S. Holbrook, II, Esq. and Shaun K. Hogan, Esq.

6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COXCOM, INC., et al

VS C. A. NO: 05 107 S

JON CHAFFEE, et als

**SECOND AMENDED COUNTERCLAIM**

**COUNT 1**

1. On Friday night March 11, 2005 at about 9:00 PM four adult males identifying themselves as U.S. Marshals and representatives of Cox Communications came to the Chaffee residence at 206 Richard Dr., Tiverton, RI. Amy Chaffee had been home about 5 minutes with her 3 year old daughter when they rang the doorbell. When Amy Chaffee opened the door one of the men said Jon Chaffee was running a cable filter business out of their home and that they had a "federal warrant" that gave them the right to search and seize computers and personal assets. They then proceeded to enter the house. At that time, Amy said she wanted to call her husband Jonathan and she was told she couldn't. Federal marshals said, "You can't call your husband because then he may not come here." The marshals and Cox representatives were threatening towards Amy and treated her as if she was a criminal and they were the police. The Cox Representative who was in charge, apparently his name is Lou, handed Amy Chaffee a packet of several dozen photocopied pages and repeated that it was a "federal warrant signed by a federal Judge" and that she had to cooperate with them or be found in contempt. That was repeated several times to both Amy and Jon Chaffee during the course of the raid. Lou told Amy that the warrant gave them the right to search and seize items from Amy's home and the maid's business office at 1360 Mineral Spring Ave, North Providence. Amy Chaffee was not given a chance to read the packet of photocopied papers before the men started searching and going through the house. Cox representatives first went to the TV

and cable box in the living room, there was no filter on that TV. They then proceeded to the TV in the family room. There was no filter on that TV either. They checked for other TVs then started their detailed search. Lou told Amy that she could make things easy on herself if she told them where the filters were. Amy said she didn't understand or know what was going on and then said she wanted to call her attorney. One of the marshals said that would be ok. The intrusion by the marshals and Cox representatives had greatly distressed the Chaffee's 3 year old daughter and Amy needed to get her daughter's blanket from her car. Lou wouldn't let her retrieve it without taking a marshal and a Cox representative with her and when she did, they then proceeded to search her car. By this time, Lou and the other Cox representative were going through Jon Chaffee's office on the lower level of the house searching through all his papers and personal items. About .20 minutes later two additional Cox representatives arrived at the house while a New York attorney and 3 or 4 other men remained outside. The search included going through every room in the house. Amy tried to observe everything they were doing but they kept brushing her away. Lou continued to threaten her telling her that she better show him where everything was right then or she would be violating the court order and would be in contempt and in a lot of trouble. Amy kept repeating that she had nothing to hide. Jon Chaffee called Amy to tell her he was on his way home. A marshal got on the phone and told Jon he was a federal marshal and that he was there to see that a federal search warrant was carried out. Jon arrived home around 10-10:30 to see seven cars parked on the street in front of his house. Some of the cars were occupied. When Jon entered his house Lou met him and told Jon he "was in a lot of trouble." Lou handed Jon what he said was a federal search warrant and told Jon that he could not talk with an attorney that the warrant said Jon has to cooperate with Lou and tell them everything or Jon would be in contempt. Lou then said the warrant gives Lou the right to search Jon's car and made Jon go back outside and open the doors of his car. After searching his car he told Jon to open the trunk. Lou threatened Jon that if he didn't open the trunk Jon would be in contempt and it wouldn't be civil any more it would become a criminal matter. Jon opened the trunk and Lou took a bin that had Jon's personal papers, bills and auto registration forms in it. Going back to the house Lou again asked Jon where the filters were. Jon kept saying, "I don't have any, I never inventoried or stocked them." Lou threatened that if they find out later that Jon has them hidden Jon would go to prison for contempt of court. Jon repeated over and over that he don't have any filters. Lou then took Jon alone to the family room and told the marshal to leave the room. Lou backed Jon into a corner of the room and told Jon that he was

"being sued for $500,000 and that Jon could make it easy on himself by settling for $100,000." Lou said "I know you have a good paying job and run a lucrative maids service so know that would be a drop in the barrel for you." Jon asked Lou if they checked his credit report. Lou then asked Jon for his tax returns for the last 3 years. Lou threatened, "don't let me subpoena them or you will be in a lot more trouble." Lou told Jon, "we got a tip in November 2004 that you were the biggest distributor of cable filters around." Lou again told Jon he didn't have the right to talk with a lawyer that "by the time it takes Jon to talk to an attorney, he will already be in contempt." Lou said Jon had to tell them where the filters were right then or he was in contempt and threatened that "this is a civil matter, don't make it criminal." Jon kept telling Lou he didn't stock them in inventory. Lou then told Jon that all his assets would be frozen as of Monday. During this time there were Cox representatives going through all Jon and Amy's belongings filing several bins with confiscated papers, receipts and items from Jon's office, den, guest bedroom, storage room and upstairs family room. They tore apart the whole house going through every room, closet, drawer, desk, and storage and filing bins. One marshal told Jon that Cox did that all the time and if Jon didn't tell them where the stuff was, it would be a lot worse for Jon. Jon told the marshal I can't give you something don't have. Cox representatives removed several bins with papers and items that they wouldn't let Jon see. Lou listed many items taken as miscellaneous and had Jon sign the list that had blank spaces between each notation. There is no way Jon and Amy could know exactly what was taken from their house that night. Known items removed from Jon's house and car: 4 desktop computers (1 HP, 3 Sonys); 3 laptop computers (Sony, Averic, Gateway); 3 external hard drives; 1 music media player; 2 cell phones; a palm pilot; a boat registration; 3 auto registration forms; Jon Chaffee's passport, credit card charge slips and purchase receipts and tax returns. There were no cable filters anywhere in the Chaffee House. After completing the search at Jon and Amy's home, the marshals and Cox representatives proceeded to the maid service office in North Providence. Jon Chaffee drove to the office location with his mother who had arrived at Jon's house during the raid. After arriving at the office on Mineral Spring Ave, North Providence, everyone waited outside for one of the marshals whom Jon's mother overheard him tell one of the other men that he stopped off to get a beer. Once arriving at the maid cleaning service office Lou went through a few bags that Jon had brought up from his car trunk to the office earlier that day and he and the other Cox representatives searched the office, picking a lock on a file cabinet that Jon di not have a key for all the while badgering Jon to tell him where the filters were. Down the hall from Jon's office are two other

offices Jon had subleased to two girls who are currently being sued in a civil matter by Jon. Jon explained the girls changed the locks and that he didn't have the keys and legally he couldn't go into those offices. The Cox representatives were excited at the prospect of finding two locked doors that Jon wouldn't supply the keys to. Lou again badgered and threatened Jon saying Jon was not cooperating with the warrant and that he was in contempt. Jon's mother then spoke up and told Lou they could contact North Providence police for confirmation. Lou said he wasn't contacting anyone and they proceeded to pick both locks and entered each office . The first office had a big box in the center of the room filled with small gadgets that was immediately seized upon by the Cox representatives and emptied out. No filters were inside. The other room was empty except for a few papers left by the landlord. Back in the maids office, Jon's mother observed one of the marshals laughing and joking around and drinking a beer. Again Cox representatives took several items labeled miscellaneous along with 2 office desktop computers. Jon's mother, concerned that there were various blank lines between each item on the handwritten list asked Lou "doesn't Jon get a copy of the list?" Lou did not respond to her.

2. On March 13, 2005 Sunday afternoon, Jon called Lou to mention that there were 2 cell phones in the bag with his laptop that was taken from his car that hadn't been written on the list. Lou again repeated to Jon that he was not to talk with an attorney, that in accordance with the federal court order Jon is to talk with them only or Jon would be in contempt. He further stated, "Let me tell you if it ever comes out that you destroyed information or are still hiding filters you will be in contempt and will face jail time."

3. On March 14, 2005, Monday, all Jon and Amy Chaffee's and Ramalda Bou's accounts and assets were frozen.

4. On March 18, 2005, Friday, Lou called to return another computer and a hard drive of Jon's daughters pictures. Lou asked if his lawyer had told him what he talked about with Cox' lawyers. Lou told Jon he was in a lot of trouble and that he won't only be paying a huge settlement and his own attorney, he would also be paying for Cox's attorneys. He was shaking his head and threatening Jon, "You are done."

5. A few days before the hearing scheduled for March 22, 2005, Lou told Jon that he had only a few more days before the court date on the 22nd and that he must have everything ready even if his lawyer was not there and if he did not he would be in contempt of court.

6. As a result of the above, Jon Chaffee suffered on going chest pains since March 12, 2005. He went to the St. Ann's Hospital Emergency Room on March , 2005. His blood pressure was 170/116. It had been 116/73 in February 2005 when he had a physical for Life Insurance. He was prescribed Atenolol for high blood pressure and Xanex for anxiety by Geoffrey Hamilton, MD following the hospital visit. He has had two sets of EKG's March 11, 2005 and is scheduled for a stress test. He has not been able to get a good nights sleep since. He has trouble eating and has lost fifteen pounds since March 11, 2005. He is no longer happy and his attitude is always negative. He no longer feels comfortable in his home. He is embarrassed because his neighbors saw what happened. He feels his possessions are no longer his and is almost afraid to touch anything. He is afraid to use the telephone. He constantly worries that he is being watched. He fears leaving his home. His work production and efficiency has been hurt He makes mistakes in his work that he never did before. He has been unable to travel and visit accounts due to anxiety and lack of interest and concern that he may be needed for something due to this case. He is afraid of losing his job. He is also greatly concerned about his assets being frozen. He had perfect credit until the assets were frozen. His embarrassed to face the people in his bank and does not want to see his stockbrokers for the same reason.

7. Amy Chaffee was confused and scared for herself and her three year old child when the men came in on March 11, 2005 as she did not know who they were and whether they had a right to be there. Her child kept crying. The dog kept barking. She was afraid because they would not let her call her husband. She felt out of control of everything happening in her home. She feels she has been invaded and no longer feels comfortable in her home. She constantly worries that she is being watched. She is embarrassed because her neighbors saw what happened. She has had to explain to an elderly neighbor what happened. She has not been able to get a good nights sleep since. She feels afraid every time she hears noises outside her home. She is afraid to use the telephone. She feels pressure financially and worries she will not be able to make enough money in her business to support her family. Her employees can see it when she is fearful. Ever night at

about the time the men came to her home she fears that someone is coming. She feels relieved when that time passes each night. She is afraid every time she hears her doorbell ring. She is afraid to go into her home if her husband is not there.

8. As a result of the freezing of the Chaffee defendant assets, they are unable to borrow against their stock accounts which they would do when they were unable to make the payroll in Amy Chaffee's business. Also, the value of one of the stocks went down and they were given a margin call. They tried to sell the margin portion and we were unable to do so. As a result they have lost $8,000.00 in equity to date. They can not even get statements from Price Waterhouse as the value of their stock.

9. As a result of the freezing of the Bou assets she, a single mother of three children ages ten, eight and four, has been unable to provide for her children as her child support checks can not be deposited in her bank account. She has had to borrow money from her friends and relatives. She has never been employed by nor received money from Jon Chaffee or Chaffee International & Electronic Imports, LLC. She has had to resume taking Zoloft for anxiety. She now gets migraine headaches that last three to four days each week. Before March 11, 2005 she would get migraine headaches once or twice a month. She is unable to get a good nights sleep. She is afraid the Amy Chaffee will go out of business and she will lose her job. When Amy Chaffee called her the night of March 11, 2005 to tell her what happened she was afraid her home was going to be raided. She hardly slept the next several nights. She was afraid to go home alone for two weeks. She is afraid that people are following her. She is fearful when she gets to work as she is the first one there each morning. Her children are effected by her nervousness and bad moods. The employees she supervises at work know that she is stressed and ask her why and she does not want to tell them.

10. The actions of the plaintiff's agents, servants and/or employees as aforesaid constitute an intentional infliction of emotional distress.

11. As a result the defendant-counterclaim plaintiffs suffered severe emotional distress, lost earnings and earning capacity, and other recoverable damages.

WHEREFORE, the defendant-counterclaim plaintiffs demand judgment against plaintiff-counterclaim defendant for compensatory damages, sufficient to satisfy the provisions of 28 U.S.C. § 1331 (a); punitive damages; attorney fees; interest and costs.

## COUNT 2

1. Paragraphs 1-10 of Count 1 are incorporated by reference herein.

2. The actions of the plaintiff's agents, servants and/or employees as aforesaid constitute an negligent infliction of emotional distress.

3. As a result the defendant-counterclaim plaintiffs suffered severe emotional distress, lost earnings and earning capacity, and other recoverable damages.

WHEREFORE, the defendant-counterclaim plaintiffs demand judgment against plaintiff-counterclaim defendant for compensatory damages, sufficient to satisfy the provisions of 28 U.S.C. § 1331 (a), interest and costs.

## COUNT 3

1. Paragraphs 1-10 of Count 1 are incorporated by reference herein.

2. The actions of the plaintiff-counterclaim defendant's agents, servants and/or employees as aforesaid constitute a violation of defendant-counterclaim plaintiffs constitutional rights as protected by the First and Fourth Amendment to the Constitution of the United States and 42 U. S.C. § 1983.

3. As a result the defendant-counterclaim plaintiffs suffered severe emotional distress, lost earnings and earning capacity, and other recoverable damages.

WHEREFORE, the defendant-counterclaim plaintiffs demand judgment against plaintiff-

counterclaim defendant for compensatory damages, sufficient to satisfy the provisions of 28 U.S.C. § 1331 (a); punitive damages; attorney fees; interest and costs.

## COUNT 4

1. Agents, servants and/or employees of plaintiff caused damage to a lap top computer owned by the Chaffee defendant-counterclaim plaintiffs that was seized on March 11, 2005.

WHEREFORE, the Chaffee defendant-counterclaim plaintiffs demand judgment against plaintiff-counterclaim defendant for compensatory damages, interest and costs

Defendant-counterclaim plaintiffs demand a trial by jury.

Defendant-counterclaim plaintiffs
By their Attorney,

JAMES A. CURRIER #953
128 Dorrance Street
Suite 400
Providence, Rhode Island 02903
(401) 274-3113 Fax (401) 274-3113

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COXCOM, INC., et al

VS C. A. NO: 05 107 S

JON CHAFFEE, et als

**OBJECTION TO MOTION TO DISMISS COUNTERCLAIM**

Now come the defendants Jon Chaffee, Amy Chaffee and Ramalda Bou and object to plaintiffs' motion to dismiss defendants' counterclaim.

By their Attorney,

James A. Currier #953
128 Dorrance Street
Suite 400
Providence, RI 02903
(401) 274-3113
Fax (401) 274-3115

CERTIFICATION

I hereby certify that on the 5th day of May, 2005, I hand delivered a true and accurate copy of the within to Francis S. Holbrook, II, Esq. and Shaun K. Hogan, Esq.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COXCOM, INC., et al

VS C. A. NO: 05 107 S

JON CHAFFEE, et als

## MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS COUNTERCLAIM

ARGUMENT:

Plaintiff blithely suggests after "fleshing out" defendants claim, that the purported "extreme and outrageous" conduct can be summed up in nine, apparently to it, innocuous acts. (Memorandum of Plaintiff p. 4)

Defendants do not contest, for the purposes of this motion, that the application for and execution of the ex parte Order, nor a *reasonable* search of the house and cars was "extreme and outrageous" conduct.

Defendants do contend that the manner in which their home, cars and office were "raided" as set forth more fully in paragraph one of Count 1 of the proposed counterclaim and the comments and conduct of plaintiff's employee, Lucien Marcoux, was "extreme and outrageous" conduct.

Same includes:

1. Conducting the search at about 9:00 PM on a Friday night.

2. Conducting the search in front of a 3 year old child.

3. Telling Amy Chaffee that she could not call her husband.

4. Handing Amy a packet of several dozen photocopied pages which she was not given a chance to read and telling her that it was a "federal warrant signed by a federal Judge" and that she had to cooperate with them or be found in contempt.

5. Lucien Marcoux telling Amy that she could make things easy on herself if she told them where the filters were.

6. The brushing of Amy away when she tried tried to observe everything that was being done.

7. Lucien Marcoux' continued threats that Amy better show him where everything was right then or she would be violating the court order and would be in contempt and in a lot of trouble.

8. Lucien Marcoux' threats to Jon Chaffee that he "was in a lot of trouble."

9. Lucien Marcoux' telling Jon that he could not talk with an attorney that the warrant said Jon has to cooperate with him and tell him everything or he (Jon) would be in contempt.

10. Lucien Marcoux' threats to Jon that if he didn't open the trunk of his car he would be in contempt and it wouldn't be civil any more it would become a criminal matter.

11. Lucien Marcoux' threats that if they found out later that Jon had hidden the filters he would go to prison for contempt of court.

12. Lucien Marcoux' taking Jon alone to the family room and telling the marshal to leave the room then backing Jon into a corner of the room and telling him that he was "being sued for $500,000 and that he could make it easy on himself by settling for $100,000."

13. Lucien Marcoux' asking Jon for his tax returns for the last 3 years then

threatening, "Don't let me subpoena them or you will be in a lot more trouble."

14. Lucien Marcoux' again telling Jon he didn't have the right to talk with a lawyer that "By the time it takes him to talk to an attorney, he will already be in contempt."

15. Lucien Marcoux' again telling Jon had to tell them where the filters were right then or he was in contempt and threatened that "this is a civil matter, don't make it criminal."

16. Cox representatives picking a lock on a file cabinet that Jon did not have a key for all the while badgering Jon to tell them where the filters were.

17. Cox representatives picking locks and entering offices that Jon could not enter pending resolution of a civil suit he brought against the occupants of those offices.

18. Lucien Marcoux' again telling Jon that he was not to talk with an attorney, that in accordance with the federal court order Jon is to talk with them only or Jon would be in contempt.

19. Lucien Marcoux' again telling Jon "Let me tell you if it ever comes out that you destroyed information or are still hiding filters you will be in contempt and will face jail time."

20. Lucien Marcoux' telling Jon he was in a lot of trouble and that he won't only be paying a huge settlement and his own attorney, he would also be paying for Cox's attorneys.

21. Lucien Marcoux' threatening Jon, "You are done."

Needless to say, no filters were ever found!

Furthermore, it would appear that plaintiff counsel have been preparing this case since November 2004. Defendants' attorney has only been involved in the matter since March 11, 2005. Most lawyers need time to, hopefully, fully comprehend their case. It is submitted that defendants' counsel has been trying to do that amidst a swirl of activity all the while having to contend with and

try to assuage defendants due to the fact that their assets are frozen.

While trying to understand this case, as well as deal with other pressing matters, defendants attorney has tried to frame a proper counterclaim. The first counterclaim clearly was not artfully pleaded. Perhaps the proposed amended complaint was not either. For that reason a motion to file a second amended complaint had been filed.

It is respectfully requested that the Court rule on the latter motion before considering plaintiff's motion to dismiss.

The proposed second amended complaint contains additional alegations:

22. A few days before the hearing scheduled for March 22, 2005, Lucien Marcoux told Jon that he had only a few more days before the court date on the 22nd and that he must have everything ready even if his lawyer was not there and if he did not he would be in contempt of court.

23. As a result of the above, Jon Chaffee suffered on going chest pains since March 12, 2005. He went to the St. Ann's Hospital Emergency Room on March , 2005. His blood pressure was 170/116. It had been 116/73 in February 2005 when he had a physical for Life Insurance. He was prescribed Atenolol for high blood pressure and Xanex for anxiety by Geoffrey Hamilton, MD following the hospital visit. He has had two sets of EKG's March 11, 2005 and is scheduled for a stress test. He has not been able to get a good nights sleep since. He has trouble eating and has lost fifteen pounds since March 11, 2005. He is no longer happy and his attitude is always negative. He no longer feels comfortable in his home. He is embarrassed because his neighbors saw what happened. He feels his possessions are no longer his and is almost afraid to touch anything. He is afraid to use the telephone. He constantly worries that he is being watched. He fears leaving his home. His work production and efficiency has been hurt He makes mistakes in his work that he never did before. He has been unable to travel and visit accounts due to anxiety and lack of interest and concern that he may be needed for something due to this case. He is afraid of losing his job. He is also greatly concerned about his assets being frozen. He had perfect credit until the assets were frozen. His embarrassed to face the people in his bank and does not want to

see his stockbrokers for the same reason.

23. Amy Chaffee was confused and scared for herself and her three year old child when the men came in on March 11, 2005 as she did not know who they were and whether they had a right to be there. Her child kept crying. The dog kept barking. She was afraid because they would not let her call her husband. She felt out of control of everything happening in her home. She feels she has been invaded and no longer feels comfortable in her home. She constantly worries that she is being watched. She is embarrassed because her neighbors saw what happened. She has had to explain to an elderly neighbor what happened. She has not been able to get a good nights sleep since. She feels afraid every time she hears noises outside her home. She is afraid to use the telephone. She feels pressure financially and worries she will not be able to make enough money in her business to support her family. Her employees can see it when she is fearful. Ever night at about the time the men came to her home she fears that someone is coming. She feels relieved when that time passes each night. She is afraid every time she hears her doorbell ring. She is afraid to go into her home if her husband is not there.

24. As a result of the freezing of the Chaffee defendant assets, they are unable to borrow against their stock accounts which they would do when they were unable to make the payroll in Amy Chaffee's business. Also, the value of one of the stocks went down and they were given a margin call. They tried to sell the margin portion and we were unable to do so. As a result they have lost $8,000.00 in equity to date. They can not even get statements from Price Waterhouse as the value of their stock.

25. As a result of the freezing of the Bou assets she, a single mother of three children ages ten, eight and four, has been unable to provide for her children as her child support checks can not be deposited in her bank account. She has had to borrow money from her friends and relatives. She has never been employed by nor received money from Jon Chaffee or Chaffee International & Electronic Imports, LLC. She has had to resume taking Zoloft for anxiety. She now gets migraine headaches that last three to four days each week. Before March 11, 2005 she would get migraine headaches once or twice a month. She is unable to get a good nights sleep. She is afraid the Amy Chaffee will go out of business and she will lose her job. When Amy Chaffee called her the night

of March 11, 2005 to tell her what happened she was afraid her home was going to be raided. She hardly slept the next several nights. She was afraid to go home alone for two weeks. She is afraid that people are following her. She is fearful when she gets to work as she is the first one there each morning. Her children are effected by her nervousness and bad moods. The employees she supervises at work know that she is stressed and ask her why and she does not want to tell them.

26. The actions of the plaintiff-counterclaim defendant's agents, servants and/or employees as aforesaid constitute a violation of defendant-counterclaim plaintiffs constitutional rights as protected by the First and Fourth Amendment to the Constitution of the United States and 42 U. S.C. § 1983.

It is submitted that the proposed second amended complaint meets the tests required by the cases cited by plaintiff.

Defendant-counterclaim plaintiffs
By their Attorney,

James A. Currier #953
128 Dorrance Street
Suite 400
Providence, RI 02903
(401) 274-3113
Fax (401) 274-3115

CERTIFICATION

I hereby certify that on the 5th day of May, 2005, I hand delivered a true and accurate copy of the within to Francis S. Holbrook, II, Esq. and Shaun Hogan, Esq.