# In The Matter Of:

*Coxcom, Inc., et al v.*
*Jon Chaffee, et als*

---

*Mark Matteo*
*July 7, 2005*

---

*Reporting Associates*
*10 Dorrance Street*
*Westminster Square Building Suite 617*
*Providence, RI 02903*
*(401) 351-1660*

*Original File MATTEO.TXT, 56 Pages*
*Min-U-Script® File ID: 2194595512*

**Word Index included with this Min-U-Script®**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COXCOM, INC., et al
vs. C.A. No. 05-107 S
JON CHAFFEE, et als

Deposition of MARK MATTEO, a witness, taken on behalf of the Defendants, pursuant to the Federal Rules of Civil Procedure, on Thursday, July 7, 2005, at the offices of Attorney James A. Currier, 128 Dorrance Street, Suite 400, Providence, Rhode Island, before Dorothy M. Depointe, Registered Diplomate Reporter and Notary Public, convening at 3:02 p.m.

APPEARANCES:
Lefkowitz, Louis, Sullivan & Hogan, L.L.P.
BY: SHAUN K. HOGAN, ESQ.
Counsel for Plaintiff
JAMES A. CURRIER, ESQ.
Counsel for Defendants
IN ATTENDANCE: Jon Chaffee
Lucien T. Marcoux

REPORTING ASSOCIATES
Shorthand Reporters
10 Dorrance Street, Suite 617
Providence, Rhode Island 02903
(401) 351-1660



INDEX


| Witness | Examination By | Page |
|---|---|---|
| MARK MATTEO | | |
| | Mr. Currier | 3 |
| | Mr. Hogan | 47 |
| | Mr. Currier | 54 |




**MR. CURRIER:** Same stipulations?
**MR. HOGAN:** Yes.
MARK MATTEO, first having been duly sworn by the Notary Public, was examined and testified as follows:

**EXAMINATION BY MR. CURRIER:**

**Q:** Mr. Matteo, by whom are you employed?
**A:** Cox Communications.
**Q:** In what capacity?
**A:** I am the New England security supervisor.
**Q:** And have you read the depositions, before coming here today, of Mr. Marcoux and Mr. Allard?
**A:** Yes, I have.
**Q:** And before I forget about it, we have used the word "hit" here today in relation, as I understand it, to Cox's ability to send a signal to a consumer's box. Does the use of the word "hit" in that way mean anything to you?
**A:** Exactly what you described, yes.
**Q:** Does the Security Department at Cox have the ability to do that, do you know?
**A:** Yes, we do.
**Q:** Okay. Do you know if such a thing was done with respect to Chaffee's computer box?
**A:** Yes, it was.



**Q:** And what was the result?
**A:** The result was the box did not respond to the command that was sent to it.
**Q:** And do you remember when that was?
**A:** I would have to check my notes for the exact date.
**Q:** Just approximately when in relation to the day that everyone went into the house.
**A:** Prior.
**MR. HOGAN:** Just a good faith estimate. Don't speculate if you're uncomfortable.
**THE DEPONENT:** Yeah.
**A:** It may have been in February.
**Q:** Okay. Mid? Late? Again, any idea?
**A:** Again, you're asking me to speculate.
**Q:** Yes. Did you ever make a note, or would there —
**A:** Yes, I did.
**Q:** Okay. And where would that note be?
**A:** It's in my files.
**Q:** All right. In addition to the note would there be something at Cox that would reflect that that hit had been made?
**A:** Yes. I have a printout.
**Q:** Okay. Now, I think I've asked so many times that I think I know the answer, but. You're presently a supervisor in the Security Department.



**A:** Yes.
**Q:** And you've been supervisor for how long?
**A:** I have been a supervisor in the Security Department for approximately five years.
**Q:** And is Mr. Marcoux your supervisor?
**A:** Yes, he is.
**Q:** And is he the head of the department?
**A:** Yes, he is.
**Q:** Now, what did you do, if anything, at Cox prior to becoming a supervisor?
**A:** I was a service technician, and I was also an auditor for the Security Department, and I was an investigator for the Security Department, and currently my role is head supervisor in the Security Department.
**Q:** So how long all told have you been with Cox?
**A:** I have been with Cox Communications for nine years. Initially I've been in the industry for ten years.
**Q:** Always in the security end of it?
**A:** No.
**Q:** What other —
**A:** I was trained initially as a service and installation technician.
**Q:** Now, have you had any other training oth

Page 6

with Cox that prepared you for the position you have today?
A: Yes.
Q: What?
A: I have taken college courses in law. I have taken certifications in computers, computer technology, computer forensics, computer software, computer hardware. I have also taken certifications in the operation of telecommunications.
Q: And the law courses were taken where?
A: Johnson & Wales University.
Q: And the other courses, were they at a university or institution or were they online?
A: No, they were either at an institution or by one of our providers, one of our technology providers.
Q: Okay. Now, employmentwise what did you do before you got into this industry?
A: I was in construction.
Q: And is that the only work you've ever done in your adult life, construction and work in this industry?
A: I was in management as well.
Q: Managing what?
A: Retail and wholesale management.
Q: Anything else?

Page 7

A: No, sir.
Q: Now, I guess what we're talking about here is alleged cable piracy, for lack of a better phrase. Would you agree with that?
A: Yes.
Q: All right. And other than what you've told me about as far as your training, have you had any other specialized training as to investigations of cable piracy?
A: I have worked with local, federal and state law enforcement agencies throughout Rhode Island, Connecticut and several other locations in the U. S. regarding telecommunications theft and fraud. I have also attended many seminars regarding fraud and telecommunications fraud.
Q: So working with law enforcement, that would be on-the-job type?
A: Yes.
Q: And the courses would be obviously either in a room or over the Internet or both?
MR. HOGAN: Objection. You can answer.
A: Both.
Q: Okay.
A: Primarily in a room at a location by either a provider or a school.

Page 8

Q: Can you just approximate the amount of hours you spent on the job with law enforcement agencies?
A: I could not possibly approximate that. Within —
Q: Hundreds?
A: Within eight years that I have been working for the Security Department in an investigative capacity, hundreds, maybe thousands of hours.
Q: How many hours, as far as training, you know, instructional-type, book-type, seminar-type training?
A: Over a thousand.
Q: And as to filters like we're talking about here today, how many investigations have you done regarding filters?
A: Regarding filters? Around a dozen.
Q: So those have been for —. Have they all been for Cox?
A: Yes, they have.
Q: Okay. And that spans from what time to what time?
A: From the inception of the filter problem till currently.
Q: When was the inception of the filter problem?
A: Roughly in the year 2000.
Q: Was the first investigation you did the guy in Connecticut?

Page 9

A: No, it was not.
Q: All right. You did one for Cox —. Or how many did you do for Cox before then?
MR. HOGAN: Objection. Relevance. You can answer the question. Don't disseminate any information pertaining to any prior cases that's subject to any type of restrictive court ruling regarding confidentiality or any other matter.
MR. CURRIER: I just want numbers; I don't want names of anybody or anything like that.
MR. HOGAN: Just aggregate data.
A: Six, maybe seven.
Q: And did they involve the selling of filters for retail, —
A: Yes.
Q: — at retail? And at locations such as Chaffees sold them?
A: As in?
Q: Like computer shows and stuff like that?
MR. HOGAN: And parking lots?
A: Via the Internet; in person. Could be anywhere.
Q: Okay. Well, that's what I mean. Of the ones, the six that you're talking about, were they all of those things?
A: It was a culmination of all of them.

Page 10

Q: All right. And when you say "the inception of the filter problem," how did it come to your attention there was a filter problem?

A: When digital service was released, like any other product, we monitor and we look for issues or individuals offering products to compromise our systems.

Q: Okay. Prior to Cox taking any affirmative action, had you, through others in the field, been alerted to the potential problem?

A: Throughout our own project and investigation we did find that there would be, could be a problem.

Q: Okay. So Cox found it out. And did you disseminate that to the rest of the industry?

A: Yes, we did.

Q: Okay. So no one else in the industry found out about it and told Cox about it?

A: I can't speak —

MR. HOGAN: Objection. Beyond the scope of the witness's knowledge.

A: I can't speak for the other associations.

Q: As far as you know, the first you learned of it was from someone at Cox.

A: The first I learned of it was from myself.

Q: Okay. And how did you first learn of it?

Page 11

A: Through an investigation, like I spoke to you before.

Q: But what led you to do the investigation?

A: It's part of my job.

Q: I understand. But to go on an investigation you've got to know what you're investigating.

MR. HOGAN: Objection. Argumentative and it's not a question.

Q: Well, I mean, how did you find out to go investigate about a filter?

A: When we produce products in our industry, one of my jobs is to find out if there's going to be any potential issues with that product. While looking into those issues I came across the filters.

Q: How did you come across them?

A: I'm sorry, but you need to clarify the question. I think I just answered it.

Q: I mean, did you trip over one in the street? Did somebody throw one at you? How did you find out that even such a thing existed?

MR. HOGAN: Objection. Compound and argumentative.

MR. CURRIER: Well, I know, but it's —. Come on.

Q: How did you know there was such a thing as a

Page 12

filter?

A: I had discussions —

MR. HOGAN: Objection. Same grounds. You can answer again.

A: I started with discussions with the engineers that created the systems and the converters and the set tops, and we looked for any type of shortcomings in the system. Whilst doing those investigations, I was online in chat rooms talking to folks regarding digital cable, and I had found a dealer on eBay who was selling a filter that claimed it was a digital descrambler.

Q: Okay. And did you follow up on that to determine who it was, where it was located and so forth?

A: Yes, we did. We actually purchased a filter from him.

Q: And was that the one in Connecticut or another one?

A: No. I don't believe I can divulge the name of that individual.

Q: Well, just say if it wasn't.

A: It wasn't the individual in Connecticut, no.

Q: Okay. Now, did you then learn what these filters were capable of doing on your own other than what somebody claimed in a Web site?

Page 13

A: Yes.

Q: And how did you go about that?

A: Testing it practically by connecting it to a digital cable converter; following the instructions that were given to us with it.

Q: Testing one that you had purchased from a suspect?

A: Uh-huh. (Deponent nods in the affirmative.)

Q: Bringing it back to Cox's facility and have the technicians test it?

A: I tested it myself.

Q: Okay. And how did you gain the knowledge as to how to test it?

A: By following the instructions that came with the filter.

Q: And what was the method that you tested it?

A: I connected the filter to the digital converter in accordance to the instructions, I ordered a Pay-Per-View via the remote control, according to the instructions, and waited to see if I received the programming and if we were billed for it.

Q: By the way, how is, how can Cox tell how much to bill an individual customer for Pay-Per-View?

A: Cox Communications sends out a request to their converters, their digital set tops, asking the converter to tell it whether or not it had, has

Page 14

any purchases.
Q: Okay. By the word "converter," what do you mean?
A: Well, the digital set top, the digital box, the digital cable box.
Q: The thing that's in the person's home.
A: Yes.
Q: So somehow that box records the information as to how many movies were ordered; correct?
A: Yes.
Q: How does it do that, as far as you understand?
A: It's in internal memory.
Q: In a computer chip?
A: Yes.
Q: All right. And it can access —. How can access be gained to the information on that computer chip, if you know?
A: Our computer sends out a request to the set top, every set top that's out in the system, and asks it if it has any purchases.
Q: Is that done on a regular basis?
A: Yes, it is.
Q: And with what regularity?
A: I am not —
MR. HOGAN: That's proprietary information.

Page 15

A: — comfortable divulging that.
Q: Oh, all right. Okay. In any event, once that is sent up you can determine how many movies were shown on that particular television set?
A: If the set top is able to communicate back to us, yes.
Q: Okay. If it is, you can determine how many movies were shown on that television set?
A: Yes.
Q: And then you can correlate that to how much was billed?
A: That is the billing information.
Q: Okay. Now, if the box doesn't respond, what does that tell you, if anything?
A: That tells us the box is unable to communicate back to us.
Q: Okay. But there are other various reasons why the box is unable to communicate back to you?
A: Yes, there are.
Q: And you learned one of those ways is through the use of these filters?
A: Yes.
Q: So when a box doesn't communicate back, what, if anything, do you or anyone else at Cox Security Department do to determine why it's not responding

Page 16

back?
MR. HOGAN: Objection. Assumes facts not in evidence. You can answer that.
A: We will monitor —. We do monitor the system for nonresponders; we do send technicians out to determine the causes of the nonresponder on some occasions; we do attempt to contact the customers who are nonresponders, and we try to attempt to rectify the problem.
Q: Okay. And then suppose you don't get any cooperation from a customer; what, if anything, do you do?
A: It depends on the, the reasons we cannot contact the customer.
Q: All right. If you're not satisfied with the reasons as being legitimate, what, if anything, do you do?
MR. HOGAN: Objection as to form. It's incomprehensible and it's —. Well, objection to the term. Do you understand the question?
THE DEPONENT: No.
Q: If the reasons you're not getting any response back from the customer don't satisfy you, what, if anything, do you do?
MR. HOGAN: Objection. Vagueness. You

Page 17

can answer it if you're able.
A: We operate under strict guidelines by the PUC. We operate within those guidelines. If the guidelines allow us to discontinue service in certain situations, we will.
Q: Do you know of anything else the guidelines permit you to do?
A: No.
Q: All right. What if you suspect a filter is being used; what would Cox's procedure be then?
A: We would attempt to communicate with the converter. If we were unable to communicate with the converter, and we felt comfortable with the information that we had, depending on what it was, we would take steps to contact the customer, exchange the equipment. In the event that we were not able to exchange the equipment, we very well may proceed to disconnect that customer.
Q: Okay. Now, as I understand it, the boxes that Cox use are Motorola?
A: The digital converters that we use are Motorola.
Q: All right. And does the word "reset" in connection with the boxes have any meaning to you?
A: With regard to the digital filters, yes.
Q: Okay. And what meaning does it have to you?

Page 18

A: When we see individuals who are selling digital filters, they accompany the sale of the digital filter with instructions that they call reset instructions.
Q: Now, in the box itself is there any mechanism in which there is a time-stamping done?
A: Could you clarify that, please.
Q: Well, in connection with the box, does the word, the phrase "time stamp" mean anything to you?
MR. HOGAN: Excuse me. Hold your answer.
(Interruption in the proceedings)
MR. HOGAN: Excuse me.
A: Every purchase is essentially time-stamped.
Q: And how is that done?
A: The date and time that the program is shown is logged in along with the billing information.
Q: Logged in where?
A: Into the memory of the converter.
Q: And by the word "converter" you mean the box?
A: The box, the set top, yes.
Q: And that's recorded on a computer chip.
A: Yes.
Q: All right. Does the word EPRON, E-P-R-O-N, all capital letters, mean anything to you?
A: Yes.

Page 19

Q: What does it mean to you?
A: It's a chip.
Q: Okay. Do you know who manufactures those?
A: For Cox Communications? For the Motorola box? No.
Q: Okay. You participated in the seizure, correct, at the Chaffee home?
A: Yes, I did.
Q: In relation to when entrance was first gained, were you —. As I understand it, there were four people? Is that your recollection?
A: Four people where?
Q: When you first initially gained entrance to the home.
A: There were three people initially gained entrance to the home.
Q: All right. And who were they?
A: The —. Two of the U. S. Marshals and Mr. Marcoux.
Q: Okay. And how long after they gained entrance did you gain entrance, or if you did?
A: Approximately ten minutes.
Q: All right. And when you went in there, what, if anything, did you do?
A: I proceeded to locate the computers with the help

Page 20

of Mrs. Chaffee.
Q: And then what next?
A: I proceeded to examine some documents that were in the basement office of the home.
Q: And then what else?
A: We looked throughout the house for digital cable filters.
Q: Did you find any?
A: No, we did not.
Q: And then you later went to Mineral Spring Avenue?
A: Yes, we did.
Q: Did you find any filters there?
A: No, but we did find a set of instructions that was in a Lexite stand which described how to use the digital filters and how to connect them, and we also found a smaller stand with a sign in it that said "Digital filters," I believe it was $20.
Q: Now, you hadn't seen that Lexite stand sign before that, had you?
A: I had —
MR. HOGAN: Objection. You can answer.
A: I had seen those instructions in a laminated covering, not in the Lexite stand, at a —
Q: And that was at one of the computer shows?
A: Yes, it was.

Page 21

Q: Do you remember which one?
A: Yes, I do. It was the Southington, Connecticut.
Q: Now, while you were in the Chaffee home did you have any conversation with Mrs. Chaffee?
A: I had a very brief conversation with her regarding the computers and where they were located.
Q: As best you can recall, who initiated the conversations?
A: I believe it was Mrs. Chaffee. She said, "The computers are here, this is the one that Jon uses most."
MR. HOGAN: The witness indicating with his right hand with his finger extended.
Q: And do you recall what you said to her?
A: No, I do not.
Q: Did you have any conversation with Jon Chaffee when he returned home?
A: I had a very limited conversation with Jon Chaffee which consisted of the question, "Do you have an upcoming computer show?"
Q: Okay. Is that the only thing you can recall saying to him in the home that night?
A: Yes.
Q: Did he respond to you?
A: Yes, he did.

Page 22

Q: What did he say?
A: At first he responded, "No," and then he responded, "Yes, I believe I do," and I believe he said that Misty was going to be working it.
Q: Now, I think Mr. Allard and Mr. Clifford have told me about some videotaping and some audio recording and some reports that end up in a computer. Now, did you make any notes at any of these computer shows in writing?
A: Yes.
Q: And did you enter them into a computer at Cox?
A: Yes, I did.
Q: And did you throw your notes away?
A: Yes, I did.
Q: All right. And you're aware that there were some audio and some videotaping.
A: Yes.
Q: And just tell me what you remember about who did that and what they did and where.
A: Michael —
MR. HOGAN: Objection. Compound. But you can answer.
A: Michael Clifford was operating a videotape device at the Southington, Connecticut computer show. Michael Clifford was operating an audio recording

Page 23

device at, in the Lowe's parking lot purchase in Warwick, Rhode Island while Ron Allard was operating a video device. Ron Allard was operating an audio device at the West Warwick Convention Center.
Q: Do you know if there's ever been any attempt to file a complaint with any law enforcement agency with respect to the Chaffees?
A: No.
Q: Do you know why not?
A: I don't understand why we would.
Q: Well, you're alleging this is a theft, aren't you?
A: Yes.
Q: And you wouldn't want to report a theft to the police?
MR. HOGAN: Objection. Argumentative. You can answer.
A: We take each case on a case-by-case basis, and when we see an individual who is —. Taken on a case-by-case basis, if we feel the individual should not be prosecuted criminally, we choose another route.
Q: Okay. So you don't feel, no one at Cox feels Chaffee should be prosecuted criminally.
A: I cannot speak for anyone else at Cox

Page 24

Communications.
Q: Well, do you feel he should be prosecuted criminally?
MR. HOGAN: Objection. As to his personal opinion you're asking him?
Q: In your mind does Cox have enough evidence to warrant a filing of a criminal complaint?
MR. HOGAN: You can answer that.
A: Absolutely.
Q: Okay. So, then, why hasn't Cox filed a criminal complaint?
MR. HOGAN: Don't speculate.
A: That's not my call.
Q: Whose call is it?
A: It would be a culmination of my supervisor and anyone else he'd feel appropriate to discuss it with.
Q: Now, you at some point in time learned about the Web sites that talk about these filters?
A: Yes.
Q: Did you ever hear any of the Defendants in this case tell you they had actually gone to those Web sites?
A: I had Mr. Chaffee tell me, when I purchased a filter from him in Danbury, Connecticut, that if I

Page 25

e-mailed him at support911@aol.com, that he would give me the Web sites to go to to get the reset instructions on how to, which will explain to me how to avoid paying for any Pay-Per-View purchases that I make.
Q: Okay. But he didn't say expressly, I myself have gone to these Web sites, —
MR. HOGAN: Objection as to form.
Q: — here they are, or words to that effect.
A: I don't recollect.
Q: Okay. And, likewise, would you not remember — would you remember or not remember if he said to you, I've gone to the Web sites and I have read every single word on the Web sites about these filters?
MR. HOGAN: Same objection.
A: I don't recall.
Q: Did you ever hear Amy Chaffee say that she uses filters herself in her home?
A: On an audiotape, yes, I did.
Q: Okay. And that was done when?
A: I believe that was the audiotape from the West Warwick Convention Center.
Q: All right. Did you ever see any actual purchase of filters at any of these shows?

Page 26

MR. HOGAN: By Cox or by other customers?
MR. CURRIER: Yes, I'm sorry, by a customer.
MR. HOGAN: Other than Cox.
MR. CURRIER: Right.
A: No, I've never, I haven't seen any other actual purchases.
Q: Okay. There was mention in I believe it was the affidavit of Mr. Allard using the word "charge-backs." Does that have any meaning to you?
A: You're going to have to clarify that a little more.
Q: I'm just taking one word out of his affidavit; it was the word "charge-backs."
A: Without the context, I don't recall.
Q: Okay. Were you —. Was it ever suggested to you that Chaffee was selling these things on a national basis?
A: Yes.
Q: Do you know where that information came from?
MR. HOGAN: Can I ask your client to knock it off with the pen.
MR. CHAFFEE: Oh, I'm sorry.
MR. HOGAN: It's irritating. I'm sorry.

Page 27

A: On an audiotape; I believe it was the Lowe's parking lot.
Q: And —
MR. HOGAN: Let him finish.
THE DEPONENT: Just give me one second.
MR. CURRIER: I didn't realize you weren't finished.
A: I'm trying to recall whether it was Mr. Chaffee or Amy Chaffee who made the statement that they sell these things everywhere. And right now I can't recall whether it was Mr. or Mrs. Chaffee.
Q: But the word was "everywhere" as opposed to "everywhere in the country" or "everywhere in the world"?
A: Everywhere in the country.
Q: Okay. And do you know if Cox ever instituted any investigation to determine where else in the country they were selling these filters?
A: We —
MR. HOGAN: Other than the present investigation?
MR. CURRIER: Right.
MR. HOGAN: Oh. Okay. You can answer that.
A: We —. Yes.

Page 28

Q: Okay. And what did the result of that reveal, if anything?
MR. HOGAN: You can answer.
THE DEPONENT: It's an ongoing investigation.
A: We have located other individuals who were —
Q: No, I mean Chaffee.
A: We have located other individuals who were selling digital cable filters for Mr. Chaffee at other shows throughout the United States.
Q: Okay. Can you name the states?
A: Ohio; Florida; California; Connecticut; Massachusetts.
Q: And do you know the names of the individuals who were selling them on his behalf?
A: Some of them off the top of my head, yes.
Q: Okay. Give me those first.
MR. HOGAN: I object to this to the extent that these may be sort of the future proceedings and these people are yet to be — they could be potentially added or amended into this case or separate cases.
Q: All right. Well, let me do it this way: Are those names recorded somewhere at Cox?
A: Yes, they are.

Page 29

Q: On a computer?
A: Yes.
Q: All right. Now, have you ever in your investigation regarding Chaffee uncovered anything that you consider an attempt to conceal or destroy evidence?
A: Evidence after he was notified by Cox Communications and the United States Marshals?
Q: All right, let's take that first.
A: No.
Q: How about before?
A: I don't understand how you could conceal evidence before the fact.
Q: Well, I mean, did you go to the trash can and find —
A: He throws things away, he deletes files, yes.
Q: You never found any filters in the trash can all damaged in such a way that disguised what they were or, you know, —
A: No.
MR. HOGAN: Objection as to form. But you can answer.
A: No.
Q: Taking it as far as the imagination can take one, you never found any evidence of any attempt to

conceal or destroy these filters.
A: We never found any filters in the trash, —
Q: Or evidence of.
A: — in the trash at Mr. Chaffee's.
MR. HOGAN: He's already testified that documentary evidence relating to filters was destroyed.
Q: But I mean, as to the filter itself, if someone was trying to destroy it and they didn't get rid of, say, part of it, you didn't find like part of it in his trash can.
A: No, we found packaging, we never found a filter in his trash.
Q: All right. Do you have any idea where the filters that we're talking about were manufactured?
A: Manufactured? No.
Q: Did anyone at Cox ever attempt to find that out?
A: We have —. There are no identifying marks on those filters that would allow us to find that out.
Q: Is there any other law enforcement agency you can share this information with that could try to track it down?
A: I don't believe so.
Q: Has anyone on behalf of Cox ever attempted to do



such a thing?
A: We have not notified any law enforcement agency regarding Mr. Chaffee and his filters.
Q: All right. Somewhere in this case is mentioned a Bird Dog Distributing.
A: Yes.
Q: Okay. Has there been any investigation on behalf of Cox as to determine who Bird Dog is, where they're located and so forth?
A: Yes.
Q: And what was done?
A: Currently it is an ongoing investigation.
Q: Okay. By Cox as opposed to somebody else?
A: By Cox Communications, yes.
Q: All right. On the night of the seizure did you ever use the words or did you ever hear the words spoken that the packet of papers from the court were, constituted a federal warrant?
MR. HOGAN: Objection as to form. You can answer.
A: I never heard that stated, no.
Q: At any time that night did you hear Amy Chaffee say she wanted to call her husband?
A: Not to the best of my recollection, no.
Q: Okay. So you never heard anyone tell her that she



couldn't call her husband.
A: No, I did not.
Q: And you never said that to her yourself.
A: No, I did not.
Q: Okay. Did you ever hear anyone say to her words to the effect, You can't call your husband because then he may not come home?
MR. HOGAN: Objection. Asked and answered.
A: No, I did not.
Q: Certainly you didn't say it yourself.
A: No, I did not.
Q: Did you say or hear anyone else say that if she failed to cooperate she'd be in contempt?
A: No, I did not.
MR. HOGAN: Objection. Compound.
Q: Did you at any time observe Amy Chaffee reading the packet of papers?
A: I don't recall.
Q: Did you yourself or hear anyone else say words to the effect to Amy Chaffee that she could make things easy on herself if she told where the filters were?
MR. HOGAN: Objection. Compound.
A: I did not hear those words.



Q: And you didn't say them yourself?
A: No, I did not.
Q: Did you —. I may have asked you this already; if I did, just tell me I already asked you. Did you ever hear her say she wanted to call her lawyer?
MR. HOGAN: You didn't ask that.
A: No. No, I did not hear her say that.
Q: Okay. Her child was there when you folks entered the home?
A: Yes.
Q: From what you can recall, how was the child acting?
A: Normally.
Q: During the time —. Normally?
A: Normally.
Q: Okay. How was Amy Chaffee acting?
A: Very casual.
Q: Did you ever say to Amy or did you ever hear anyone say to her that if she violated the court order she would be in contempt and in a lot of trouble?
A: No.
Q: Did you ever hear Amy say she had nothing to hide?
A: Could you ask that again, please.
Q: Did you ever hear Amy Chaffee say that she had

nothing to hide?
A: No.
Q: Did you ever say or hear anyone say to Jon Chaffee, say that —
MR. CURRIER: Strike that.
Q: Did you ever say or hear anyone say to Jon Chaffee, after he got home, that he was in a lot of trouble?
MR. HOGAN: Objection. Compound.
A: No, I did not.
Q: Did you say or hear anyone else say to Jon Chaffee that he could not talk to a lawyer?
MR. HOGAN: Objection. You can answer.
A: No, I did not.
Q: Did you say yourself or hear anyone else say to Jon Chaffee that he had to cooperate or he would be in contempt?
MR. HOGAN: Same objection.
A: No, I did not.
Q: Did you say to yourself — say yourself or hear anyone else say to Jon Chaffee that you had the right, you folks had the right to search his car?
A: No, I did not.
Q: And his car was in fact searched, though; right?
A: I do not know if it was searched.



Q: Did you say to him or did you hear anyone else say that if he didn't open the trunk of his car it wouldn't be a civil case anymore, it would become a criminal matter?
MR. HOGAN: Same objection. You can answer that.
A: No, I did not.
Q: Did you ever hear Jon Chaffee say in the home that night, "I don't have any filters, I never inventoried nor stocked them"?
MR. HOGAN: You can answer.
A: He may have.
Q: Do you recall, have a specific recollection of him saying anything like that?
A: He may have said he doesn't keep any on hand.
Q: Did you ever say or hear anyone else say to Jon Chaffee that if he had hidden the filters he could go to prison for contempt of court?
A: No, I did not.
MR. HOGAN: Same objection.
Q: Did you ever hear Jon Chaffee tell you folks that he did not have any filters in the home?
A: Yes.
MR. HOGAN: Asked and answered.
Q: Did you ever hear him say that he did not have any



filters anywhere?
A: No.
Q: Did you ever take Jon Chaffee alone into the family room?
A: No, I did not.
Q: Do you know if anybody else did?
A: No, I do not.
Q: Did you ever tell him he was being sued for half a million dollars?
A: No, I did not.
Q: Did you ever tell him he could settle the case for a hundred thousand?
A: No, I did not.
Q: Did you ever hear anyone else say that to him?
A: No, I did not.
Q: Did you ever say or hear anyone say to him that you knew he had a good-paying job, he runs a lucrative maid service, so that settling for a hundred thousand dollars would be a drop in the barrel for him?
MR. HOGAN: Objection.
A: No, I did not.
Q: Did you ever find out what his job was?
A: Mr. Chaffee owns a maid service, to the best of my knowledge, and he works for a, an overseas



company.
Q: Do you know the name of it?
A: I believe it's Nakai Electronics.
Q: How did you find that out?
A: I believe it was through a conversation with Mr. Chaffee with one of my investigators.
Q: Has, to your knowledge, has anyone on behalf of Cox ever tried to communicate with Nakai?
MR. HOGAN: You can answer that, actually.
A: No, I do not.
Q: Has anyone on behalf of Cox ever checked the Chaffees' credit report?
A: Not to my knowledge.
Q: Did you or anyone else, to your knowledge, ask the Chaffees for their tax returns?
MR. HOGAN: Objection.
A: I did not ask the Chaffees for their tax returns.
Q: Do you know if anyone else did?
MR. HOGAN: You can answer.
A: I believe so.
Q: Do you know who?
A: Mr. Marcoux.
Q: Did you ever say to the Chaffees or hear anyone else say words to the effect, "Don't let me subpoena the tax returns or you will be in a lot

Page 38

more trouble"?
MR. HOGAN: Objection. Compound.
A: No, I did not hear that.
Q: At some point in time did Cox learn where the Chaffees' assets were?
A: Could you clarify that question for me.
MR. HOGAN: I need a clarification myself. It was vague.
Q: At some point in time during this investigation someone on behalf of Cox learned where the Chaffees' assets were; correct?
MR. HOGAN: Are you talking about after the seizure?
MR. CURRIER: At any time.
MR. HOGAN: Oh.
A: We found out where some of Mr. Chaffee's assets were after the seizure.
Q: Okay. And when you say "we," who do you mean?
A: The investigators —. Cox Communications and myself.
Q: And how did you find out?
A: By information that was recovered from Mr. Chaffee's home.
Q: Any other way?
A: No.

Page 39

Q: Did you ever say to Jon Chaffee or hear anyone else say that if he didn't show you where the filters were he would be in contempt?
A: No.
Q: Did you ever say or hear anyone else say, "This is a civil matter, don't make it criminal"?
MR. HOGAN: Objection. Asked and answered and compound.
A: No.
Q: Did you remove any papers or items from the house and refuse to let the Chaffees see what it was that was being removed?
MR. HOGAN: Objection. Compound.
A: Absolutely not.
Q: Do you know if anyone else did?
A: No.
Q: Did anyone make a list of the items that were taken?
A: Yes.
Q: And was that list signed by Chaffee, as far as you know?
A: I believe it was.
Q: And do you know who made the list?
A: It was a combination of myself and Mr. Marcoux.
Q: And when did that take place?

Page 40

A: Whilst the items were being collected.
Q: From the house and from North Providence?
A: Yes.
Q: And I assume that on the list there were line items; correct? Like, on a line on a piece of paper was a computer.
A: Yes.
Q: And the next line down, a notebook, or whatever. Just assuming.
A: Yes.
Q: All right? Were there any spaces between the lines or were they written in such a way that nothing could be written in between them at a later date?
A: I don't —
MR. HOGAN: Objection. Compound.
A: I don't recall.
Q: Did anyone, to your knowledge, pick the lock on the file cabinet in the North Providence office?
A: Pick the lock?
Q: Yes.
A: No.
Q: Do you know if access was gained to a file cabinet in North Providence?
A: Yes.

Page 41

Q: Do you know how access was gained?
A: The U. S. Marshals gained access; I don't know how.
Q: Did you say to Jon in North Providence or hear anyone else say that he was not cooperating and he was in contempt?
A: No.
Q: Did you —. Were you aware of a person that was in North Providence as being Jon Chaffee's mother?
A: Yes.
Q: How did you become aware of that?
A: I believe Mr. Chaffee said that that was his mother, or she may have introduced herself as his mother.
Q: Did you hear her say anything —. Well, did she say anything to you in North Providence?
A: They were both talking in circles whilst we were in North Providence. To tell you what the conversation consisted of, I couldn't.
Q: Okay. And would the same be true as to her saying anything to anyone else?
A: I don't know if she spoke with anyone, to anyone else.
Q: Do you recall her asking whether Jon would get a copy of the list of the items seized?

Page 42

A: I don't recall.
Q: Did you ever have any conversation with Jon Chaffee after that night?
A: After that night?
Q: Yes.
A: Yes.
Q: All right. Do you recall when?
A: I do not recall the date. I called Mr. Chaffee to ask him when he wanted to come and pick up his computer equipment.
Q: Okay. And what number did you call?
A: I believe I called his cell phone number.
Q: Is that the only time you've ever spoken to him since?
A: Yes, it is.
Q: Have you ever spoken to Amy Chaffee since that night?
A: Amy Chaffee answered the telephone when I called Mr. Chaffee on that date.
Q: Is that the only time you've ever spoken to her since?
A: Yes, it is.
Q: Did you ever say to Jon Chaffee or hear anyone else say that if it ever comes out that he destroyed information or is still hiding filters

Page 43

"you will be in contempt and will face jail time"?
MR. HOGAN: Objection. Compound.
A: No, I did not.
Q: Did you ever say or hear anyone else say to Jon Chaffee that he was in a lot of trouble and he would only be paying a huge settlement — not only would he be paying a huge settlement, he would be paying his own attorney and he would also be paying for Cox's attorneys, or words to that effect?
MR. HOGAN: Objection.
A: No, I did not.
Q: Did you ever say to Jon or hear anyone say words to the effect that, "You are dumb"?
MR. HOGAN: Objection.
A: No, I did not.
Q: Did you ever ask Jon Chaffee's mother for her address?
A: No, I did not.
Q: Are you aware of anyone acting on behalf of Cox gaining access to Jon Chaffee's mother's home?
A: No, I do not.
Q: And how about her mail?
A: No, I do not.
Q: Now, in any other of the investigations, not just

Page 4

of filters but of any cable piracy that you've been involved in, would suspects be selling equipment out in the public at shows like Chaffees?
MR. HOGAN: Objection. Relevance. You can answer, if you understand the question.
A: I'm —. No, I do not understand the question.
Q: All right. Chaffees sold filters in public.
A: Yes.
Q: In any other investigations you've been involved in did you ever see anyone sell anything such as filters or other devices that could be used for cable piracy out in the public?
A: We have investigated people selling filters out in the public, yes.
Q: Okay. And, obviously, you obtained Chaffee's real name; correct?
A: Yes, we obtained Chaffee's real name.
Q: From him; right?
A: I'm confused on the question.
Q: Well, how did you find out his name?
A: When we initially started the investigation?
Q: At any time.
A: From a previous investigation.
Q: Okay. Now, in any of the investigations that

Page 45

you've conducted in your career as to cable piracy, have you been able to learn the real names of the suspects?
A: Yes.
Q: All right. And would you learn it through a source like Chaffee or would you learn it directly from the people themselves?
A: We would learn it through investigative means.
Q: And that would include what?
A: That would include through information coming from individuals who were telling us who these people were; from introduction to the people themselves; through records, public records; through superfluous materials.
Q: Now, the information you learned about Chaffee in the Connecticut case, did that just reveal his name or his home address as well?
A: His name; his home address; some shipping records.
Q: Any phone numbers?
A: I believe there was a phone number.
Q: All right. How about e-mail address?
A: Yes.
Q: All in that same packet of information that you got from Connecticut.
A: From the Connecticut investigation, yes.

Page 46

Q: Okay. Whose idea was it to have him meet in a public place to sell filters?
MR. HOGAN: I'm —
A: Mr. Chaffee's.
Q: Yes. What was it?
A: He was at the shows selling filters.
Q: So he said, "I want you to meet at Lowe's parking lot to sell you some filters."
MR. HOGAN: He's talking about the —
A: You're speaking about one particular purchase.
MR. CURRIER: Yes.
MR. HOGAN: The Lowe's purchase; is that what you're talking about?
MR. CURRIER: Yes.
Q: Let me make myself more clear. Obviously, you know he sold filters I think it was to Clifford at the Lowe's parking lot.
A: Yes.
Q: All right. Whose idea was it to set that up?
A: I believe it was Mr. Chaffee's.
Q: Okay. And what was said in order to set that up?
A: I believe Mr. Clifford stated to Mr. Chaffee that he had bought some filters at a show and Amy Chaffee had given them his cell phone number to call Mr. Chaffee if they wanted to purchase more

Page 47

digital cable filters.
Q: Okay. And then what transpired next, as far as you know?
A: Mr. Clifford contacted Mr. Chaffee and they set up and arranged the meeting to —.
Q: Did you know from Clifford who said what in what order or are you just giving a summary of what —
A: I'm just giving you a summary of what happened.
Q: Okay. And you weren't there when these conversations took place.
A: No, I was not.
Q: You didn't overhear the conversations.
A: No, I did not.
MR. CURRIER: Anything else?
MR. CHAFFEE: I don't have anything.
MR. CURRIER: Good. I don't feel like asking any more questions.

EXAMINATION BY MR. HOGAN:

Q: Just a few brief questions to clarify a few things.
During Mr. Currier's examination, Mr. Matteo, you were asked about discovering assets of the Defendants in connection with this case. Could you describe the type of information that related to assets that you discovered.

Page 48

A: We recovered bank statements, credit card statements, and I believe some investment statements.
Q: Okay. And perhaps cancelled checks as well?
A: Yes.
Q: Some of these things revealed just account numbers without telling you anything about the extent of the asset; is that fair to say?
A: Yes.
Q: And was it your understanding you were entitled to recover that information pursuant to the terms of the temporary restraining order?
A: Yes, it was.
Q: And by the same token, is it your understanding that Cox has the right to seize Mr. Chaffee's tax returns?
A: Yes.
Q: Turning your attention to the date on which the TRO was executed at the Defendants' home, could you describe the demeanor of Mrs. Chaffee, Amy Chaffee, during the time you were in the home.
A: Mrs. Chaffee's demeanor was casual, sociable.
Q: Did she exhibit any stress or cry or do anything to suggest to you that she was experiencing some degree of mental anguish?

Page 49

A: No, she did not.
Q: Did she voice any complaints with respect to your conduct while within the Chaffee home?
A: No, she did not.
Q: Did she voice any complaints with respect to the conduct of Mr. Marcoux while you were in the home?
A: No, she did not.
Q: Did she voice any complaints with respect to the conduct of the United States Marshals during the time that you were in the home?
A: No, she did not.
Q: And did she ever make any statements to you that suggested to you that she was unhappy with the way that she was treated?
A: No, she did not.
Q: And, to your knowledge, did she make those statements to anyone else including Cox, any other Cox employee?
A: No.
Q: Did you observe anyone at the time you were at the Chaffee home acting in a threatening manner toward Mrs. Chaffee?
A: No.
Q: Could you describe the treatment that Mrs. Chaffee received at the hands of the United States

Page 50

Marshals Service.
A: Courteous.
Q: By the same token, could you describe, from what you observed, Mr. Marcoux's conduct with respect to Mrs. Chaffee.
A: Courteous as well.
Q: Did you observe anyone threaten Mr. Chaffee in any manner during the time that you were at the Chaffee home?
A: No, I did not.
Q: And did you yourself threaten Mr. Chaffee in any manner?
A: No, I did not.
Q: Was Mr. Chaffee —. Could you describe his demeanor during the time that you were with him both at the house and at the North Providence location.
A: Casual; a little — he seemed in disarray.
Q: What do you mean by that?
A: Unfocused.
Q: Was that consistent with your other dealings with him prior to the time that the temporary restraining order was executed?
A: With my one meeting with him, yes.
Q: During your one meeting with Mr. Chaffee did he

Page 51

say anything to you which would suggest that he understood the devices that he was selling, the filters, could be used to receive Pay-Per-View programming without paying for it?
A: Yes. At the show that I made my purchase from Mr. Chaffee, I initially asked him if these were the devices that I would get sent to me on my computer by spam; he stated yes. I asked him if they would work on a Cox Communications system; he proceeded to tell me that he lived in Rhode Island, which is a Cox Communications system, and that they do work there, that they are very simple to use, and if you follow the instructions you can purchase Pay-Per-Views without being charged for it.
Q: And at the time were you also given an e-mail address from which you could obtain reset instructions?
A: Yes. The e-mail address was support911@AOL.com.
Q: And did you eventually go to that Web site and obtain those reset instructions?
A: We did send him an e-mail and requested for him to send us the instructions, which he did.
Q: And did you follow those instructions?
A: Yes, we did.

Page 52

Q: And what resulted?
A: The, after purchasing a Pay-Per-View event and following the instructions, the digital converter was rendered inoperable and the Pay-Per-View purchase information was not recoverable.
Q: So the reset instructions are in a sense a way to cover the tracks of the person using a cable filter so that the cable company doesn't know about it.
MR. CURRIER: Objection.
A: Yes.
Q: And were all —. Well, can you tell me how many devices, how many filters, digital cable television filters did Cox purchase from the Defendants in this case?
A: We purchased 18 in total.
Q: And do you know the total amount that was paid to the Defendants for those 18 devices or filters?
A: I believe it was a total of $205.
Q: Was Ramalda Bou at the Chaffee home at the time the TRO was executed?
A: No, she was not.
Q: And was Ramalda Bou at the North Providence location at the time the search was done there?
A: No, she was not.

Page 53

Q: You said that the Chaffees were planning on attending or that they were, there was going to be a cable show — withdrawn, I'm sorry — that there was going to be a computer show the day after the TRO was executed?
A: I believe he stated that weekend, yes.
Q: The locations where filters were purchased from the Defendants in this case, were they all serviced by Cox Communications?
A: The Danbury, Connecticut location is not serviced by Cox Communications. The Southington, Connecticut location is serviced by Cox Communications. West Warwick and Warwick, Rhode Island are both serviced by Cox Communications.
Q: And with respect to the Lowe's purchase was in which of those?
A: Warwick, Rhode Island.
Q: Were all the devices —. I keep saying that. Were all the filters that were purchased from the Defendants in this case tested on a set top box at Cox's facility?
A: Yes, they were.
Q: And by whom were they tested?
A: Michael Clifford.
Q: And did you observe those tests?

Page 54

A: I did observe some of those tests, yes.
Q: And, to your knowledge, did each of the devices, each of the filters that the Defendants sold have the ability to block out Cox's ability to monitor Pay-Per-View purchases?
A: Yes.
Q: Does Cox have the ability to electronically monitor households to know whether they're using a digital filter?
A: No.
MR. HOGAN: Anything else? Just give me a second with the witness.
(Discussion outside the hearing room between Mr. Hogan and the deponent.)
MR. HOGAN: That's all the questions I have for Mr. Matteo.
MR. CURRIER: Okay. Just hopefully one quick one.

FURTHER EXAMINATION BY MR. CURRIER:

Q: During the entire time you were at the Chaffee home that night as well as the North Providence location, and I'm talking about every single second, were you close enough to Chaffee to hear everything he said and everything that was said to him?

Page 55

A: Absolutely not.
MR. CURRIER: Okay. That's all I have.

FURTHER EXAMINATION BY MR. HOGAN:

Q: Well, just to follow up. At any point the entire night, whether at the Chaffee home or at the Lincoln address, did you see anyone do anything that you would consider to be in any way improper?
A: Absolutely not.
Q: Did anyone, the U. S. Marshals, Cox, or anyone else who may or may not have been present, do anything which, based upon your view of the situation, was intended to intimidate the Defendants in this case?
A: No.
Q: Did you observe the U. S. Marshals drinking beer at the North Providence address?
A: No, I did not.
Q: Did you observe beer at any of the locations where the — either the Chaffees' address or the North Providence location?
A: No, I did not.
MR. HOGAN: That's all I have.
MR. CURRIER: Okay.
(The deposition adjourned at 4 p.m.)

Page 56

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
PROVIDENCE, Sc.

I do hereby certify that I am expressly approved as a person qualified and authorized to take depositions pursuant to the Rules of Civil Procedure of this Court, especially, but without restriction thereto, under Rule 30 (e) of said Rules; that the witness was first sworn by me; that the transcript contains a true recording of the proceedings.

I further certify that the deponent requested a review of the transcript.

IN WITNESS WHEREOF I have hereunto set my hand this 21st day of July, 2005.

DOROTHY M. DEPOINTE
SHORTHAND REPORTER

# $

**$20** 20:17
**$205** 52:19

# 1

**18** 52:16, 18

# 2

**2000** 8:23

# 4

**4** 55:24

# A

**ability** 3:16, 21; 54:4, 4, 7
**able** 15:5; 17:1, 17; 45:2
**Absolutely** 24:9; 39:14; 55:1, 8
**access** 14:14, 14; 40:23; 41:1, 2; 43:21
**accompany** 18:2
**accordance** 13:17
**according** 13:18
**account** 48:6
**across** 11:14, 15
**acting** 33:12, 16; 43:20; 49:21
**action** 10:8
**actual** 25:24; 26:6
**actually** 12:15; 24:22; 37:9
**added** 28:21
**addition** 4:19
**address** 43:18; 45:17, 18, 21; 51:17, 19; 55:6, 16, 19
**adjourned** 55:24
**adult** 6:20
**affidavit** 26:9, 14
**affirmative** 10:8; 13:7
**Again** 4:13, 14; 12:4; 33:24
**agencies** 7:11; 8:2
**agency** 23:7; 30:21; 31:2
**aggregate** 9:11
**agree** 7:4
**alerted** 10:9
**Allard** 3:12; 22:5; 23:2, 3; 26:9
**alleged** 7:3
**alleging** 23:12
**allow** 17:4; 30:19
**alone** 36:3
**along** 18:16
**Always** 5:20
**amended** 28:21
**amount** 8:1; 52:17
**Amy** 25:18; 27:9; 31:22; 32:17, 21; 33:16, 18, 23, 25; 42:16, 18; 46:23; 48:20
**anguish** 48:25
**answered** 11:17; 32:9; 35:24; 39:7; 42:18
**anymore** 35:3
**appropriate** 24:16
**approximate** 8:1, 3
**approximately** 4:6; 5:4; 19:22
**Argumentative** 11:7, 22; 23:16
**Around** 8:15
**arranged** 47:5
**asset** 48:8
**assets** 38:5, 11, 16; 47:23, 25
**associations** 10:21
**assume** 40:4
**Assumes** 16:2
**assuming** 40:9
**attempt** 16:7, 8; 17:11; 23:6; 29:5, 25; 30:17
**attempted** 30:25
**attended** 7:14
**attending** 53:2
**attention** 10:2; 48:18
**attorney** 43:8
**attorneys** 43:9
**audio** 22:6, 16, 25; 23:4
**audiotape** 25:20, 22; 27:1
**auditor** 5:12
**Avenue** 20:10
**avoid** 25:4
**aware** 22:15; 41:8, 11; 43:20
**away** 22:13; 29:16

# B

**back** 13:8; 15:5, 16, 18, 23; 16:1, 23
**bank** 48:1
**barrel** 36:20
**based** 55:11
**basement** 20:4
**basis** 14:20; 23:18, 20; 26:19
**become** 35:3; 41:11
**becoming** 5:10
**beer** 55:15, 18
**behalf** 28:15; 30:25; 31:7; 37:7, 11; 38:10; 43:20
**best** 21:7; 31:24; 36:24
**better** 7:3
**Beyond** 10:19
**bill** 13:22
**billed** 13:20; 15:11
**billing** 15:12; 18:16
**Bird** 31:5, 8
**block** 54:4
**book-type** 8:9
**both** 7:20, 22; 41:17; 50:16; 53:14
**Bou** 52:20, 23
**bought** 46:23
**box** 3:17, 24; 4:2; 14:3, 4, 7; 15:13, 15, 18, 23; 18:5, 8, 19, 20; 19:4; 53:20
**boxes** 17:19, 23
**brief** 21:5; 47:19
**Bringing** 13:8

# C

**cabinet** 40:19, 23
**cable** 7:3, 9; 12:10; 13:4; 14:4; 20:6; 28:9; 44:1, 13; 45:1; 47:1; 52:7, 8, 13; 53:3
**California** 28:12
**call** 18:3; 24:13, 14; 31:23; 32:1, 6; 33:5; 42:11; 46:25
**called** 42:8, 12, 18
**came** 11:14; 13:13; 26:21
**can** 7:21; 8:1; 9:5; 12:4, 19; 13:21; 14:14, 14; 15:3, 7, 10; 16:3; 17:1; 20:21; 21:7, 21; 22:22; 23:17; 24:8; 26:22; 27:23; 28:3, 11; 29:14, 17, 22, 24; 30:11, 21; 31:19; 33:11; 34:13; 35:5, 11; 37:9, 19; 44:6; 51:13; 52:12
**cancelled** 48:4
**capable** 12:24
**capacity** 3:9; 8:7
**capital** 18:24
**car** 34:22, 24; 35:2
**card** 48:1
**career** 45:1
**case** 23:18; 24:22; 28:21; 31:4; 35:3; 36:11; 45:16; 47:24; 52:15; 53:8, 20; 55:13
**case-by-case** 23:18, 20
**cases** 9:6; 28:22
**casual** 33:17; 48:22; 50:18
**causes** 16:6
**cell** 42:12; 46:24
**Center** 23:5; 25:23
**certain** 17:5
**Certainly** 32:11
**certifications** 6:6, 8
**Chaffee** 19:7; 20:1; 21:3, 4, 9, 16, 18; 23:24; 24:24; 25:18; 26:18, 24; 27:8, 9, 11; 28:7, 9; 29:4; 31:3, 22; 32:17, 21; 33:16, 25; 34:4, 7, 11, 16, 21; 35:8, 17, 21; 36:3, 24; 37:6; 39:1, 20; 41:12; 42:3, 8, 16, 18, 19, 23; 43:5; 45:6, 15; 46:22, 24, 25; 47:4, 15; 48:20, 21; 49:3, 21, 22, 24; 50:5, 7, 9, 11, 14, 25; 51:6; 52:20; 54:20, 23; 55:5
**Chaffee's** 3:24; 30:4; 38:16, 23; 41:9; 43:17, 21; 44:16, 18; 46:4, 20; 48:15, 22
**Chaffees** 9:16; 23:8; 37:12, 15, 17, 23; 38:5, 11; 39:11; 44:4, 8; 53:1; 55:19
**charge-backs** 26:10, 15
**charged** 51:14
**chat** 12:9
**check** 4:5
**checked** 37:11
**checks** 48:4
**child** 33:8, 11
**chip** 14:12, 16; 18:21; 19:2
**choose** 23:21
**circles** 41:17
**civil** 35:3; 39:6
**claimed** 12:11, 25
**clarification** 38:7
**clarify** 11:16; 18:7; 26:12; 38:6; 47:19
**clear** 46:15
**client** 26:22
**Clifford** 22:5, 23, 25; 46:16, 22; 47:4, 6; 53:24
**close** 54:23
**collected** 40:1
**college** 6:5
**combination** 39:24
**comfortable** 15:1; 17:13
**coming** 3:11; 45:10
**command** 4:3
**communicate** 15:5, 15, 18, 23; 17:11, 12; 37:8
**Communications** 3:8; 5:17; 13:23; 19:4; 24:1; 29:8; 31:14; 38:19; 51:9, 11; 53:9, 11, 13, 14
**company** 37:1; 52:8
**complaint** 23:7; 24:7, 11
**complaints** 49:2, 5, 8
**Compound** 11:21; 22:21; 32:16, 24; 34:9; 38:2; 39:8, 13; 40:16; 43:2
**compromise** 10:6
**computer** 3:24; 6:6, 7, 7, 7; 9:19; 14:12, 15, 17; 18:21; 20:24; 21:20; 22:7, 8, 11, 24; 29:1; 40:6; 42:10; 51:8; 53:4
**computers** 6:6; 19:25; 21:6, 10
**conceal** 29:5, 12; 30:1
**conduct** 49:3, 6, 9; 50:4
**conducted** 45:1
**confidentiality** 9:8
**confused** 44:20
**connect** 20:15
**connected** 13:16
**Connecticut** 7:12; 8:25; 12:17, 22; 21:2; 22:24; 24:25; 28:12; 45:16, 24, 25; 53:10, 12
**connecting** 13:3
**connection** 17:23; 18:8; 47:23
**consider** 29:5; 55:7
**consisted** 21:19; 41:19
**consistent** 50:21
**constituted** 31:18
**construction** 6:18, 20
**consumer's** 3:17
**contact** 16:7, 13; 17:15
**contacted** 47:4
**contempt** 32:14; 33:20; 34:17; 35:18; 39:3; 41:6; 43:1
**context** 26:16
**control** 13:18
**Convention** 23:5; 25:23
**conversation** 21:4, 5, 16, 18; 37:5; 41:19; 42:2
**conversations** 21:8; 47:10, 12
**converter** 13:4, 16, 25; 14:2; 17:12, 13; 18:18, 19; 52:3
**converters** 12:6; 13:24; 17:21
**cooperate** 32:14; 34:16
**cooperating** 41:5
**cooperation** 16:11
**copy** 41:25
**correlate** 15:10
**country** 27:13, 15, 18
**courses** 6:5, 10, 12; 7:19
**court** 9:7; 31:17; 33:19; 35:18
**Courteous** 50:2, 6
**cover** 52:7
**covering** 20:23
**Cox** 3:8, 20; 4:20; 5:9, 16, 17; 6:1; 8:17; 9:2, 3; 10:8, 13, 17, 23; 13:21, 23; 15:24; 17:19; 19:4; 22:11; 23:23, 25; 24:6, 10; 26:1, 4; 27:16; 28:24; 29:7; 30:17, 25; 31:8, 13, 14; 37:8, 11; 38:4, 10, 19; 43:20; 48:15; 49:17, 18; 51:9, 11; 52:14; 53:9, 11, 12, 14; 54:7; 55:9
**Cox's** 3:16; 13:8; 17:10; 43:9; 53:21; 54:4
**created** 12:6
**credit** 37:12; 48:1
**criminal** 24:7, 10; 35:4; 39:6

**criminally** 23:21, 24; 24:3
**cry** 48:23
**culmination** 9:25; 24:15
**currently** 5:14; 8:21; 31:12
**CURRIER** 3:1, 6; 9:9; 11:23; 26:2, 5; 27:6, 22; 34:5; 38:14; 46:11, 14; 47:14, 16; 52:10; 54:17, 19; 55:2, 23
**Currier's** 47:21
**customer** 13:22; 16:11, 14, 23; 17:15, 18; 26:3
**customers** 16:7; 26:1

# D

**damaged** 29:18
**Danbury** 24:25; 53:10
**data** 9:11
**date** 4:5; 18:15; 40:14; 42:8, 19; 48:18
**day** 4:6; 53:4
**dealer** 12:10
**dealings** 50:21
**Defendants** 24:21; 47:23; 48:19; 52:15, 18; 53:8, 20; 54:3; 55:13
**degree** 48:25
**deletes** 29:16
**demeanor** 48:20, 22; 50:15
**Department** 3:20; 4:25; 5:4, 7, 12, 13, 15; 8:6; 15:25
**depending** 17:14
**depends** 16:13
**DEPONENT** 4:11; 13:7; 16:21; 27:5; 28:4; 54:14
**deposition** 55:24
**depositions** 3:11
**descrambler** 12:12
**describe** 47:24; 48:20; 49:24; 50:3, 14
**described** 3:19; 20:14
**destroy** 29:5; 30:1, 9
**destroyed** 30:7; 42:25
**determine** 12:13; 15:3, 7, 25; 16:6; 27:17; 31:8
**device** 22:23; 23:1, 3, 4
**devices** 44:12; 51:2, 7; 52:13, 18; 53:18; 54:2
**digital** 10:4; 12:10, 12; 13:4, 16, 24; 14:3, 3, 4; 17:21, 24; 18:1, 2; 20:6, 15, 17; 28:9; 47:1; 52:3, 13; 54:9
**directly** 45:6
**disarray** 50:18
**disconnect** 17:18
**discontinue** 17:4
**discovered** 47:25
**discovering** 47:22
**discuss** 24:16
**Discussion** 54:13
**discussions** 12:2, 5
**disguised** 29:18
**disseminate** 9:5; 10:14
**Distributing** 31:5
**divulge** 12:19
**divulging** 15:1
**documentary** 30:6
**documents** 20:3
**Dog** 31:5, 8
**dollars** 36:9, 19
**done** 3:23; 6:19; 8:13; 14:20; 18:6, 14; 25:21; 31:11; 52:24
**down** 30:23; 40:8
**dozen** 8:15
**drinking** 55:15
**drop** 36:19
**duly** 3:3
**dumb** 43:14
**During** 33:14; 38:9; 47:21; 48:21; 49:9; 50:8, 15, 25; 54:20

# E

**e-mail** 45:21; 51:16, 19, 22
**e-mailed** 25:1
**E-P-R-O-N** 18:23
**easy** 32:22
**eBay** 12:11
**effect** 25:9; 32:6, 21; 37:24; 43:10, 14
**eight** 8:5
**either** 6:14; 7:19, 24; 55:19
**electronically** 54:7
**Electronics** 37:3
**else** 6:25; 10:16; 15:24; 17:6; 20:5; 23:25; 24:16; 27:17; 31:13; 32:13, 20; 34:11, 15, 21; 35:1, 16; 36:6, 14; 37:14, 18, 24; 39:2, 5, 15; 41:5, 21, 23; 42:24; 43:4; 47:14; 49:17; 54:11; 55:10
**employed** 3:7
**employee** 49:18
**employmentwise** 6:16
**end** 5:20; 22:7
**enforcement** 7:11, 16; 8:2; 23:7; 30:21; 31:2
**engineers** 12:5
**England** 3:10
**enough** 24:6; 54:23
**enter** 22:11
**entered** 33:8
**entire** 54:20; 55:4
**entitled** 48:10
**entrance** 19:9, 13, 15, 20, 21
**EPRON** 18:23
**equipment** 17:16, 17; 42:10; 44:3
**essentially** 18:13
**estimate** 4:9
**even** 11:20
**event** 15:2; 17:16; 52:2
**eventually** 51:20
**everyone** 4:7
**everywhere** 27:10, 12, 13, 13, 15
**evidence** 16:3; 24:6; 29:6, 7, 12, 25; 30:3, 6
**exact** 4:5
**Exactly** 3:19
**EXAMINATION** 3:6; 47:18, 21; 54:19; 55:3
**examine** 20:3
**examined** 3:4
**exchange** 17:16, 17
**Excuse** 18:10, 12
**executed** 48:19; 50:23; 52:21; 53:5
**exhibit** 48:23
**existed** 11:20
**experiencing** 48:24
**explain** 25:3
**expressly** 25:6
**extended** 21:13
**extent** 28:18; 48:7

# F

**face** 43:1
**facility** 13:8; 53:21
**fact** 29:13; 34:24
**facts** 16:2
**failed** 32:14
**fair** 48:8
**faith** 4:9
**family** 36:4
**far** 7:7; 8:8; 10:22; 14:10; 29:24; 39:20; 47:2
**February** 4:12
**federal** 7:10; 31:18
**feel** 23:20, 23; 24:2, 16; 47:16
**feels** 23:23
**felt** 17:13
**few** 47:19, 19
**field** 10:9
**file** 23:7; 40:19, 23
**filed** 24:10
**files** 4:18; 29:16
**filing** 24:7
**filter** 8:20, 22; 10:2, 3; 11:10; 12:1, 11, 15; 13:14, 16; 17:9; 18:3; 24:25; 30:8, 12; 52:8; 54:9
**filters** 8:12, 14, 15; 9:13; 11:14; 12:23; 15:21; 17:24; 18:2; 20:7, 12, 15, 17; 24:19; 25:15, 19, 25; 27:18; 28:9; 29:17; 30:1, 2, 6, 14, 19; 31:3; 32:23; 35:9, 17, 22; 36:1; 39:3; 42:25; 44:1, 8, 12, 14; 46:2, 6, 8, 16, 23; 47:1; 51:3; 52:13, 14, 18; 53:7, 19; 54:3
**find** 10:12; 11:9, 12, 19; 20:8, 12, 13; 29:15; 30:10, 17, 19; 36:23; 37:4; 38:21; 44:21
**finger** 21:13
**finish** 27:4
**finished** 27:7
**first** 3:3; 8:24; 10:22, 24, 25; 19:9, 13; 22:2; 28:17; 29:9
**five** 5:4
**Florida** 28:12
**folks** 12:9; 33:8; 34:22; 35:21
**follow** 12:13; 51:13, 24; 55:4
**following** 13:4, 13; 52:3
**follows** 3:5
**forensics** 6:7
**forget** 3:14
**form** 16:18; 25:8; 29:21; 31:19
**forth** 12:14; 31:9
**found** 10:13, 16; 12:10; 20:16; 29:17, 25; 30:2, 12, 12; 38:16
**four** 19:10, 12
**fraud** 7:14, 15, 15
**FURTHER** 54:19; 55:3
**future** 28:19

# G

**gain** 13:11; 19:21
**gained** 14:15; 19:9, 13, 15, 20; 40:23; 41:1, 2
**gaining** 43:21
**given** 13:5; 46:24; 51:16
**giving** 47:7, 8
**good** 4:9; 47:16
**good-paying** 36:17
**grounds** 12:3
**guess** 7:2
**guidelines** 17:2, 3, 4, 6
**guy** 8:24

# H

**half** 36:8
**hand** 21:13; 35:15
**hands** 49:25
**happened** 47:8
**hardware** 6:8
**head** 5:7, 14; 28:16
**hear** 24:21; 25:18; 31:16, 22; 32:5, 13, 20, 25; 33:5, 7, 18, 23, 25; 34:3, 6, 11, 15, 20; 35:1, 8, 16, 21, 25; 36:14, 16; 37:23; 38:3; 39:1, 5; 41:4, 15; 42:23; 43:4, 13; 54:23
**heard** 31:21, 25
**hearing** 54:13
**help** 19:25
**herself** 25:19; 32:22; 41:13
**hidden** 35:17
**hide** 33:23; 34:1
**hiding** 42:25
**hit** 3:15, 17; 4:20
**HOGAN** 3:2; 4:9; 7:21; 9:4, 11, 20; 10:19; 11:7, 21; 12:3; 14:24; 16:2, 18, 25; 18:10, 12; 20:21; 21:12; 22:21; 23:16; 24:4, 8, 12; 25:8, 16; 26:1, 4, 22, 25; 27:4, 20, 23; 28:3, 18; 29:21; 30:5; 31:19; 32:8, 16, 24; 33:6; 34:9, 13, 18; 35:5, 11, 20, 24; 36:21; 37:9, 16, 19; 38:2, 7, 12, 15; 39:7, 13; 40:16; 43:2, 11, 15; 44:5; 46:3, 9, 12; 47:18; 54:11, 14, 15; 55:3, 22
**Hold** 18:10
**home** 14:5; 19:7, 14, 16; 20:4; 21:3, 17, 22; 25:19; 32:7; 33:9; 34:7; 35:8, 22; 38:23; 43:21; 45:17, 18; 48:19, 21; 49:3, 6, 10, 21; 50:9; 52:20; 54:21; 55:5
**hopefully** 54:17
**hours** 8:1, 7, 8
**house** 4:7; 20:6; 39:10; 40:2; 50:16
**households** 54:8
**huge** 43:6, 7
**hundred** 36:12, 19
**Hundreds** 8:4, 7
**husband** 31:23; 32:1, 6

# I

**idea** 4:13; 30:14; 46:1, 19
**identifying** 30:18
**imagination** 29:24
**improper** 55:7
**inception** 8:20, 22; 10:1
**include** 45:9, 10
**including** 49:17
**incomprehensible** 16:19
**indicating** 21:12
**individual** 12:20, 22; 13:22; 23:19, 20
**individuals** 10:6; 18:1; 28:6, 8, 14; 45:11

industry 5:18; 6:17, 21; 10:14, 16; 11:11
information 9:6; 14:7, 15, 25; 15:12; 17:14; 18:16; 26:21; 30:22; 38:22; 42:25; 45:10, 15, 23; 47:24; 48:11; 52:5
Initially 5:18, 23; 19:13, 15; 44:22; 51:6
initiated 21:7
inoperable 52:4
installation 5:24
instituted 27:16
institution 6:13, 14
instructional-type 8:9
instructions 13:5, 13, 17, 19; 18:3, 4; 20:13, 22; 25:3; 51:13, 18, 21, 23, 24; 52:3, 6
intended 55:12
internal 14:11
Internet 7:20; 9:21
Interruption 18:11
intimidate 55:12
into 4:7; 6:17; 11:14; 18:18; 22:11; 28:21; 36:3
introduced 41:13
introduction 45:12
inventoried 35:10
investigate 11:10
investigated 44:14
investigating 11:6
investigation 8:24; 10:11; 11:1, 3, 5; 27:17, 21; 28:5; 29:4; 31:7, 12; 38:9; 44:22, 24; 45:25
investigations 7:8; 8:13; 12:8; 43:25; 44:10, 25
investigative 8:6; 45:8
investigator 5:13
investigators 37:6; 38:19
investment 48:2
involve 9:13
involved 44:2, 10
irritating 26:25
Island 7:11; 23:2; 51:11; 53:14, 17
issues 10:5; 11:13, 14
items 39:10, 17; 40:1, 5; 41:25

## J

jail 43:1
job 8:2; 11:4; 36:17, 23
jobs 11:12
Johnson 6:11
Jon 21:10, 16, 18; 34:3, 6, 11, 16, 21; 35:8, 16, 21; 36:3; 39:1; 41:4, 9, 24; 42:2, 23; 43:4, 13, 17, 21

## K

keep 35:15; 53:18
knew 36:17
knock 26:22
knowledge 10:20; 13:11; 36:25; 37:7, 13, 14; 40:18; 49:16; 54:2

## L

lack 7:3
laminated 20:22
Late 4:13
later 20:10; 40:14
law 6:5, 10; 7:10, 16; 8:2; 23:7; 30:21; 31:2
lawyer 33:5; 34:12
learn 10:25; 12:23; 38:4; 45:2, 5, 6, 8
learned 10:22, 24; 15:20; 24:18; 38:10; 45:15
led 11:3
legitimate 16:16
letters 18:24
Lexite 20:14, 18, 23
life 6:20
likewise 25:11
limited 21:18
Lincoln 55:6
line 40:4, 5, 8
lines 40:12
list 39:17, 20, 23; 40:4; 41:25
little 26:12; 50:18
lived 51:10
local 7:10
locate 19:25
located 12:14; 21:6; 28:6, 8; 31:9
location 7:24; 50:17; 52:24; 53:10, 12; 54:22; 55:20
locations 7:12; 9:16; 53:7; 55:18
lock 40:18, 20
logged 18:16, 17
long 5:2, 16; 19:20
look 10:5
looked 12:7; 20:6
looking 11:13
lot 23:1; 27:2; 33:20; 34:7; 37:25; 43:5; 46:8, 17
lots 9:20
Lowe's 23:1; 27:1; 46:7, 12, 17; 53:15
lucrative 36:18

## M

maid 36:18, 24
mail 43:23
management 6:22, 24
Managing 6:23
manner 49:21; 50:8, 12
manufactured 30:15, 16
manufactures 19:3
many 4:23; 7:14; 8:8, 13; 9:2; 14:8; 15:3, 7; 52:12, 13
Marcoux 3:12; 5:5; 19:19; 37:22; 39:24; 49:6
Marcoux's 50:4
MARK 3:3
marks 30:18
Marshals 19:18; 29:8; 41:2; 49:9; 50:1; 55:9, 15
Massachusetts 28:13
materials 45:14
MATTEO 3:3, 7; 47:22; 54:16
matter 9:8; 35:4; 39:6
may 4:12; 17:18; 28:19; 32:7; 33:3; 35:12, 15; 41:13; 55:10, 10
maybe 8:7; 9:12
mean 3:18; 9:22; 11:9, 18; 14:2; 18:9, 19, 24; 19:1; 28:7; 29:14; 30:8; 38:18; 50:19
meaning 17:23, 25; 26:10
means 45:8
mechanism 18:5
meet 46:1, 7
meeting 47:5; 50:24, 25
memory 14:11; 18:18
mental 48:25
mention 26:8
mentioned 31:4
method 13:15
Michael 22:20, 23, 25; 53:24
Mid 4:13
million 36:9
mind 24:6
Mineral 20:10
minutes 19:22
Misty 22:4
monitor 10:5; 16:4, 4; 54:4, 8
more 26:13; 38:1; 46:15, 25; 47:17
most 21:11
mother 41:9, 13, 14; 43:17
mother's 43:21
Motorola 17:20, 21; 19:4
movies 14:8; 15:3, 7
Mrs 20:1; 21:4, 9; 27:11; 48:20, 22; 49:22, 24; 50:5
much 13:21; 15:10
myself 10:24; 13:10; 25:6; 38:7, 20; 39:24; 46:15

## N

Nakai 37:3, 8
name 12:19; 28:11; 37:2; 44:17, 18, 21; 45:17, 18
names 9:10; 28:14, 24; 45:2
national 26:19
need 11:16; 38:7
New 3:10
next 20:2; 40:8; 47:2
night 21:22; 31:15, 22; 35:9; 42:3, 4, 17; 54:21; 55:5
nine 5:17
nods 13:7
nonresponder 16:6
nonresponders 16:5, 8
nor 35:10
Normally 33:13, 14, 15
North 40:2, 19, 24; 41:4, 9, 16, 18; 50:16; 52:23; 54:21; 55:16, 20
Notary 3:4
note 4:15, 17, 19
notebook 40:8
notes 4:5; 22:8, 13
notified 29:7; 31:2
number 42:11, 12; 45:20; 46:24
numbers 9:9; 45:19; 48:6

## O

object 28:18
Objection 7:21; 9:4; 10:19; 11:7, 21; 12:3; 16:2, 18, 19, 25; 20:21; 22:21; 23:16; 24:4; 25:8, 16; 29:21; 31:19; 32:8, 16, 24; 34:9, 13, 18; 35:5, 20; 36:21; 37:16; 38:2; 39:7, 13; 40:16; 43:2, 11, 15; 44:5; 52:10
observe 32:17; 49:20; 50:7; 53:25; 54:1; 55:15, 18
observed 50:4
obtain 51:17, 21
obtained 44:16, 18
obviously 7:19; 44:16; 46:15
occasions 16:7
off 26:23; 28:16
offering 10:6
office 20:4; 40:19
Ohio 28:12
on-the-job 7:17
once 15:2
one 6:14, 15; 9:2; 10:16; 11:11, 18, 19; 12:17, 18; 13:6; 15:20; 20:24; 21:1, 10; 23:23; 26:14; 27:5; 29:24; 37:6; 46:10; 50:24, 25; 54:17, 18
ones 9:22
ongoing 28:4; 31:12
online 6:13; 12:9
only 6:19; 21:21; 42:13, 20; 43:6, 6
open 35:2
operate 17:2, 3
operating 22:23, 25; 23:3, 4
operation 6:9
opinion 24:5
opposed 27:12; 31:13
order 33:20; 46:21; 47:7; 48:12; 50:23
ordered 13:17; 14:8
others 10:9
out 10:13, 16; 11:9, 12, 19; 13:23; 14:17, 18; 16:5; 26:14; 30:17, 20; 36:23; 37:4; 38:16, 21; 42:24; 44:3, 13, 14, 21; 54:4
outside 54:13
over 7:20; 8:11; 11:18
overhear 47:12
overseas 36:25
own 10:11; 12:24; 43:8
owns 36:24

## P

p.m 55:24
packaging 30:12
packet 31:17; 32:18; 45:23
paid 52:17
paper 40:6
papers 31:17; 32:18; 39:10
parking 9:20; 23:1; 27:2; 46:7, 17
part 11:4; 30:10, 10
participated 19:6
particular 15:4; 46:10
Pay-Per-View 13:18, 22; 25:4; 51:3; 52:2, 4; 54:5
Pay-Per-Views 51:14
paying 25:4; 43:6, 7, 8, 9; 51:4
pen 26:23
people 19:11, 12, 15; 28:20; 44:14; 45:7, 11, 12
perhaps 48:4
permit 17:6
person 9:21; 41:8; 52:7
person's 14:5

personal 24:4
pertaining 9:6
phone 42:12; 45:19, 20; 46:24
phrase 7:3; 18:9
pick 40:18, 20; 42:9
piece 40:5
piracy 7:3, 9; 44:1, 13; 45:2
place 39:25; 46:2; 47:10
planning 53:1
please 18:7; 33:24
point 24:18; 38:4, 9; 55:4
police 23:15
position 6:1
possibly 8:3
potential 10:10; 11:13
potentially 28:21
practically 13:3
prepared 6:1
present 27:20; 55:10
presently 4:24
previous 44:24
Primarily 7:24
printout 4:22
Prior 4:8; 5:9; 9:6; 10:8; 50:22
prison 35:18
problem 8:20, 22; 10:2, 3, 10, 12; 16:9
procedure 17:10
proceed 17:18
proceeded 19:25; 20:3; 51:10
proceedings 18:11; 28:19
produce 11:11
product 10:5; 11:13
products 10:6; 11:11
program 18:15
programming 13:20; 51:4
project 10:11
proprietary 14:24
prosecuted 23:21, 24; 24:2
Providence 40:2, 19, 24; 41:4, 9, 16, 18; 50:16; 52:23; 54:21; 55:16, 20
provider 7:25
providers 6:15, 15
Public 3:4; 44:3, 8, 13, 15; 45:13; 46:2
PUC 17:2
purchase 18:13; 23:1; 25:24; 46:10, 12, 25; 51:5, 14; 52:5, 14; 53:15
purchased 12:15; 13:6; 24:24; 52:16; 53:7, 19
purchases 14:1, 19; 25:4; 26:7; 54:5
purchasing 52:2
pursuant 48:11

**Q**

quick 54:18

**R**

Ramalda 52:20, 23
read 3:11; 25:13
reading 32:17
real 44:16, 18; 45:2
realize 27:6
reasons 15:17; 16:13, 16, 22
recall 21:7, 14, 21; 25:17; 26:16; 27:8, 11; 32:19; 33:11; 35:13; 40:17; 41:24; 42:1, 7, 8
receive 51:3
received 13:19; 49:25
recollect 25:10
recollection 19:11; 31:24; 35:13
recorded 18:21; 28:24
recording 22:6, 25
records 14:7; 45:13, 13, 18
recover 48:11
recoverable 52:5
recovered 38:22; 48:1
rectify 16:9
reflect 4:20
refuse 39:11
regard 17:24
regarding 7:13, 15; 8:14, 15; 9:8; 12:10; 21:5; 29:4; 31:3
regular 14:20
regularity 14:22
related 47:25
relating 30:6
relation 3:15; 4:6; 19:9
released 10:4
Relevance 9:4; 44:5
remember 4:4; 21:1; 22:18; 25:11, 12, 12
remote 13:18
remove 39:10
removed 39:12
rendered 52:4
report 23:14; 37:12
reports 22:7
request 13:23; 14:17
requested 51:22
reset 17:22; 18:3; 25:2; 51:17, 21; 52:6
respect 3:24; 23:8; 49:2, 5, 8; 50:4; 53:15
respond 4:2; 15:13; 21:24
responded 22:2, 3
responding 15:25
response 16:22
rest 10:14
restraining 48:12; 50:23
restrictive 9:7
result 4:1, 2; 28:1
resulted 52:1
Retail 6:24; 9:14, 16
returned 21:17
returns 37:15, 17, 25; 48:16
reveal 28:1; 45:16
revealed 48:6
Rhode 7:11; 23:2; 51:10; 53:13, 17
rid 30:9
right 4:19; 7:6; 9:2; 10:1; 14:14; 15:2; 16:15; 17:9, 22; 18:23; 19:17, 23; 21:13; 22:15; 25:24; 26:5; 27:10, 22; 28:23; 29:3, 9; 30:14; 31:4, 15; 34:22, 22, 24; 40:11; 42:7; 44:8, 19; 45:5, 21; 46:19; 48:15
role 5:14
Ron 23:2, 3
room 7:20, 24; 36:4; 54:13
rooms 12:9
Roughly 8:23
route 23:22
ruling 9:7
runs 36:17

**S**

S 7:13; 19:18; 41:2; 55:9, 15
sale 18:2
Same 3:1; 12:3; 25:16; 34:18; 35:5, 20; 41:20; 45:23; 48:14; 50:3
satisfied 16:15
satisfy 16:23
saying 21:22; 35:14; 41:20; 53:18
school 7:25
scope 10:19
search 34:22; 52:24
searched 34:24, 25
second 27:5; 54:12, 23
security 3:10, 20; 4:25; 5:3, 12, 13, 15, 20; 8:6; 15:24
seemed 50:18
seize 48:15
seized 41:25
seizure 19:6; 31:15; 38:13, 17
sell 27:9; 44:11; 46:2, 8
selling 9:13; 12:11; 18:1; 26:18; 27:18; 28:8, 15; 44:2, 14; 46:6; 51:2
seminar-type 8:9
seminars 7:14
send 3:16; 16:5; 51:22, 23
sends 13:23; 14:17
sense 52:6
sent 4:3; 15:3; 51:7
separate 28:22
service 5:11, 23; 10:4; 17:4; 36:18, 24; 50:1
serviced 53:9, 10, 12, 14
set 12:6; 13:24; 14:3, 17, 18; 15:4, 5, 8; 18:20; 20:13; 46:19, 21; 47:4; 53:20
settle 36:11
settlement 43:6, 7
settling 36:18
seven 9:12
several 7:12
share 30:22
shipping 45:18
shortcomings 12:7
show 21:20; 22:24; 39:2; 46:23; 51:5; 53:3, 4
shown 15:4, 8; 18:15
shows 9:19; 20:24; 22:9; 25:25; 28:10; 44:3; 46:6
sign 20:16, 18
signal 3:16
signed 39:20
simple 51:12
single 25:14; 54:22
site 12:25; 51:20
sites 24:19, 23; 25:2, 7, 13, 14
situation 55:12
situations 17:5
Six 9:12, 23
smaller 20:16
sociable 48:22
software 6:7
sold 9:17; 44:8; 46:16; 54:3
somebody 11:19; 12:25; 31:13
somehow 14:7
someone 10:23; 30:8; 38:10
somewhere 28:24; 31:4
sorry 11:16; 26:2, 24, 25; 53:3
sort 28:19
source 45:6
Southington 21:2; 22:24; 53:11
spaces 40:11
spam 51:8
spans 8:19
speak 10:18, 21; 23:25
speaking 46:10
specialized 7:8
specific 35:13
speculate 4:10, 14; 24:12
spent 8:2
spoke 11:1; 41:22
spoken 31:17; 42:13, 16, 20
Spring 20:10
stamp 18:9
stand 20:14, 16, 18, 23
started 12:5; 44:22
state 7:10
stated 31:21; 46:22; 51:8; 53:6
statement 27:9
statements 48:1, 2, 3; 49:12, 17
States 28:10, 11; 29:8; 49:9, 25
steps 17:15
still 42:25
stipulations 3:1
stocked 35:10
street 11:18
stress 48:23
strict 17:2
Strike 34:5
stuff 9:19
subject 9:7
subpoena 37:25
sued 36:8
suggest 48:24; 51:1
suggested 26:17; 49:13
summary 47:7, 8
superfluous 45:14
supervisor 3:10; 4:25; 5:2, 3, 5, 10, 14; 24:15
support911@aol.com 25:1; 51:19
suppose 16:10
suspect 13:6; 17:9
suspects 44:2; 45:3
sworn 3:3
system 12:8; 14:18; 16:4; 51:9, 11
systems 10:7; 12:6

**T**

talk 24:19; 34:12
talking 7:2; 8:12; 9:23; 12:9; 30:15; 38:12; 41:17; 46:9, 13; 54:22
tax 37:15, 17, 25; 48:15
technician 5:11, 24
technicians 13:9; 16:5
technology 6:6, 15
telecommunications 6:9; 7:13, 15
telephone 42:18
television 15:4, 8; 52:14
telling 45:11; 48:7
tells 15:15
temporary 48:12; 50:22

**CERTIFICATION**

I hereby certify that on the 16th day of August, 2005 I did send by first class mail a true and accurate copy of the within Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Compel, Rule 30(b)(6) Deposition to James A. Currier, Esquire, 128 Dorrance Street, Suite 400, Providence, RI 02903.

Francis S. Holbrook II