UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COXCOM, INC. d/b/a COX COMMUNICATIONS NEW ENGLAND,<br><br>Plaintiff,<br><br>vs.<br><br>JON CHAFFEE, individually and d/b/a ELECTRONIC IMPORTS and CHAFFEE INTERNATIONAL, AMY CHAFFEE, individually and d/b/a ELECTRONIC IMPORTS, RAMALDA BOU, individually and d/b/a ELECTRONIC IMPORTS,<br><br>Defendants. | : | C.A. No. 05 107 S<br><br>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>ORIGINAL |

Plaintiff CoxCom, Inc. d/b/a Cox Communications New England ("Cox"), by its attorneys, hereby respectfully requests that the Court grant summary judgment to it and determine that defendants Chaffee, Amy, and Bou are jointly and severally liable to it for their violations of 47 U.S.C. § 553 and 17 U.S.C. § 1201 and grant to Cox (i) an award of statutory damages in the amount of $10,000.00 pursuant to Section 553 (c)(3)(A)(ii) or, in the alternative, statutory damages for each violation of Section 1201 in an amount between $200 and $2,500 per device distributed pursuant to Section 1203 (c)(3); (ii) an award of enhanced damages of up to $50,000.00 pursuant to Section 553 (c)(3)(B); (iii) a permanent injunction continuing the preliminary injunction, to prevent future violations of the Communications Act and DMCA; and (iv) a determination pursuant to 47 U.S.C. § 553 (c)(2)(C) and 17 U.S.C. § 1203 (b)(4) and (5) that Cox is entitled to recover its reasonable attorneys' fees and costs, in an amount to be determined at the conclusion of this action.

Cox requests this relief for the reasons stated in its accompanying Memorandum of Law, the Affidavits of Shaun K. Hogan, and Ronald Allard, and the exhibits annexed thereto.

Dated: Jericho, New York
September 23, 2005

Respectfully submitted for the Plaintiff CoxCom, Inc.
d/b/a Cox Communications New England
By Its Attorneys,

Shaun K. Hogan
**LEFKOWITZ, LOUIS, SULLIVAN & HOGAN, L.L.P.**
350 Jericho Turnpike, Suite 300
Jericho, New York 11753
(516) 942-4700

Dated: Newport, Rhode Island
September 26, 2005

Francis S. Holbrook II
**MILLER SCOTT & HOLBROOK**
122 Touro Street
Newport, Rhode Island 02840
(401) 847-7500

**CERTIFICATION**

I hereby certify that on the 26th day of September, 2005 I did send by first class mail a true and accurate copy of the within Plaintiff's Motion to: James A. Currier, Esquire, 128 Dorrance Street, Suite 400, Providence, RI 02903.

Francis S. Holbrook II

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **COXCOM, INC. d/b/a COX COMMUNICATIONS NEW ENGLAND,** | : | **C.A. No. 05 CV 107 S** |
| **Plaintiff,** | : | |
| **-against-** | : | |
| **JON CHAFFEE, individually and d/b/a, ELECTRONIC IMPORTS and CHAFFEE INTERNATIONAL, AMY CHAFFEE, Individually and d/b/a ELECTRONIC IMPORTS, RAMALDA BOU, individually and d/b/a ELECTRONIC IMPORTS,** | : | |
| **Defendants.** | : | |

# PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The plaintiff CoxCom, Inc. d/b/a Cox Communications New England (plaintiff or "Cox"), respectfully submits this Memorandum of Law in Support of its Motion for an Order granting Summary Judgment on its claims against defendants Jon Chaffee ("Chaffee"), individually and d/b/a Electronic Imports and Chaffee International,[1] Amy Chaffee ("Amy"), individually and d/b/a Electronic Imports, and Ramalda Bou ("Bou"), individually and d/b/a Electronic Imports ("collectively, "defendants") under 47 U.S.C. § 553 and 17 U.S.C. § 1201.

## PROCEDURAL HISTORY/BRIEF STATEMENT OF UNCONTESTED BACKGROUND FACTS

Cox submits herein an abbreviated summary of those uncontested facts most relevant to its claims for relief. A more complete recitation of all material facts in this action can be found in the affidavits and Expert Report submitted in support of this motion.[2]

### The Plaintiff and its Business

Cox owns, operates and maintains cable television systems throughout the United States, including parts of Connecticut and Rhode Island. Allard aff. ¶ 3. In order to secure its product, Cox utilizes the technological measure of encoding or scrambling the premium and pay-per-view cable services it provides to customers, and it provides each customer purchasing such services with

---

[1] During the initial conference in this action, defendants' counsel stated that Electronic Imports, LLC was a separate entity. However, he conceded that he did not challenge the Court's jurisdiction over his clients on the basis that it had been named incorrectly in the action.

[2] See affidavit of Shaun K. Hogan in support of motion for summary judgment sworn to on September 22, 2005 ("Hogan aff."), affidavit of Ronald Allard in support of motion for summary judgment sworn to on September 22, 2005 ("Allard aff."), and the Expert Report of Stan Durey dated September 12, 2005 ("Report") attached as Exhibit "A" to Hogan aff.

a set-top converter that is programmed or "addressed"[3] to descramble only those services that are purchased. Id. ¶¶ 6. In the past few years, Cox has begun providing cable services using digital technology to scramble the signals. While this scrambling itself seemingly cannot be directly compromised, and under normal circumstances fully protects the scrambled programming from unauthorized viewing, the digital cable signal filters ("digital filters") sold by defendants prevent one aspect of Cox's digital technology from functioning. Specifically, they prevent the addressable digital converters provided by Cox to subscribers from successfully transmitting billing information regarding pay-per-view events to Cox's central billing computer. Thus, a subscriber can circumvent Cox's digital scrambling technology, and view pay-per-view programming without receiving invoices from, or making payment to, Cox. Id. ¶ 8; see also Report at 3.

## The Defendants and their Business

Defendants engaged in the business of selling digital filters that enable the unauthorized viewing of pay-per-view events without remuneration to cable companies for profit. Defendants purchased large numbers of these devices and resold them at computer shows in states such as Rhode Island, New Jersey, and Connecticut. Defendants provided access to written instructions to customers for using the digital filters in this manner, and corresponded with their customers regarding the use of the digital filters for this purpose. See e.g. Hogan aff., Exhibits "L," "M," and "N"-"Q."

---

[3] Addressability is the link of communication between the cable operator's central computer and a converter-decoder utilized by a cable subscriber to access cable programming. The feature of addressability enables cable operators to authorize reception and billing of cable and pay-per-view programs and to upgrade or downgrade subscribers' authorized levels of cable services by issuing a command to that device to either begin or stop decoding a particular program service. See Allard aff. ¶ 8.

**The Plaintiff's Investigation of Defendants**

Defendants' digital filter sales operation came to Cox's attention as a result of information and e-mails obtained from the seized computer of a different digital filter distributor. These records reflected that Chaffee purchased approximately 100 digital filters per week from that other distributor. Allard Aff. ¶ 11. Cox commenced an investigation of defendants in or around November of 2004. The major thrust of the investigation involved undercover purchases of a total of 18 digital filters from the defendants on five separate occasions. Four of these transactions involved purchases at computer shows, and the final purchase of five digital filters was arranged by telephone and took place with defendant Chaffee in a parking lot. The devices were subsequently tested and found to prevent Cox's digital converters from conveying billing information regarding pay-per-view events to Cox's central billing computers. See generally Allard aff.; Report at 4-5.

After filing its Complaint, Cox moved ex parte for, and the Court subsequently entered, a Temporary Restraining Order providing for, inter alia, a seizure of defendants' business records and computers. As a result of the seizure thereafter conducted by the U.S. Marshal's Service, Cox obtained evidence confirming defendants' involvement in a large-scale digital filter sales business. Chaffee has admitted to receiving $3,500 in profits from the sale of digital filters over a fourteen month period (numbers that Cox does not accept as accurate but will accept for purposes of the present summary judgment motion).[4] See defendants' accounting of profits attached as Exhibit "B" to Hogan aff.

The parties thereafter prepared a preliminary injunction on consent that was subsequently entered by the Court. Both parties then participated in discovery, which is now closed.

[4] Cox subpoenaed PayPal, the internet payment company, and obtained records indicating that Jon and Amy Chaffee purchased approximately 4,045 digital filters for a total price of approximately $10,000.00. Given the size of the present submission, for liability purposes in the present motion, Cox will rely on the figures agreed to by Chaffee.

## ARGUMENT

### I. SUMMARY JUDGMENT SHOULD ISSUE BASED ON THE UNDISPUTED AND OVERWHELMING EVIDENCE

Fed.R.Civ.P. 56 provides that summary judgment should issue where the facts properly before the court show "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Celotex Court also noted:

> [s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.R.Civ.P. 1.

Id. 477 U.S. at 327.

The purpose of the summary judgment mechanism is to identify those genuine factual disputes (if any) that materially relate to a claim or defense of either party, and on account of which a trial is required. As the Court noted in Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), "The mere existence of **some** alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247 (emphasis in original). An issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit. Id. at 248. In Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), a companion case to Celotex and Anderson, the Court stated that an issue was "genuine" if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Id. at 587.

The First Circuit has held that, while evidence must be taken in the light most favorable to the non-moving party and all reasonable inferences drawn in its favor, "This does not mean,

however, that we must swallow the predicate for the non-movant's opposition hook, line and sinker; among other things, we may safely ignore conclusory allegations, improbable inferences and unsupported speculation." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003). The evidence presented by the non-moving party cannot be problematic or conjectural, LeBlanc v. Great American Insurance Co., 6 F.3d 836, 841 (1st Cir. 1993), and if a party rests only on conclusory allegations, improbable inferences, and speculation, summary judgment is proper even in cases where elusive concepts such as motive and intent are at issue. Id. at 841-42. Similarly, "brash conjecture coupled with earnest hope that something concrete may materialize" is insufficient to block summary judgment. J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1251 (1st Cir. 1996).

Cox submits that its factual showing herein demonstrates incontrovertible facts regarding Cox's cable system and business, and the nature of the digital filters defendants sold, as well as the understanding of both defendants and their customers as to the purpose for which such devices were being bought and sold. Together with defendants' deposition testimony, including Amy's assertion of her self-incrimination privilege in response to questions regarding her knowledge of the capabilities of the digital filters she sold, and whether she had submitted a false affidavit herein with respect thereto, Cox's factual presentation fully satisfies each element of its claims under 47 U.S.C. § 553(a)(1) and 17 U.S.C. § 1201, et seq. The policy behind the summary judgment rule, i.e., the expeditious resolution of litigation where no genuine issues of material fact exist that suggest a genuine need for a trial, see Matsushita, 475 U.S. at 586-7, would be well served by granting summary judgment to Cox.

## II. DEFENDANTS ARE LIABLE UNDER 47 U.S.C. § 553 AND 17 U.S.C. § 1201 FOR THEIR DISTRIBUTION AND SALES OF DIGITAL FILTERS

### A. Section 553 Applies to Distribution and Sales of Digital Filters Used to Steal Cable Programming

Section 553 of Title 47 of the United States Code proscribes theft of cable television programming services. In pertinent part, it provides:

> No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

47 U.S.C. § 553 (a)(1). Put simply, section 553 (a)(1) prohibits the interception and assisting in the interception of any communications service offered over a cable system. U.S. v. Coyle, 943 F.2d 424, 427 (4th Cir. 1991) ("[It] was enacted to protect the revenue of television cable companies from unauthorized reception of their transmissions[.]").

Subsection 553 (a)(2) defines the prohibition against "assisting" in this activity to include the manufacture and sale of devices intended to facilitate such unauthorized reception of cable television services:

> For the purpose of this section, the term `assist in intercepting or receiving' shall include the manufacture or distribution of equipment intended by the manufacturer or distributor of equipment (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1).

Proof that devices or equipment manufactured or distributed actually received any unauthorized cable services is irrelevant and not an element of liability. See CoxCom, Inc. d/b/a Cox Communications of New England v. Violette, No. C.A. 02-338, slip. op. at 8 (D.R.I. Jan. 6, 2004) (Lisi, J.) (copy attached as Exhibit "C" to Hogan aff.); United States v. Gardner, 860 F.2d 1391, 1397 (7th Cir. 1988) ("On its face, the statute does not require actual use by the distributor or purchaser."); United States v. Beale, 681 F.Supp. 74, 75 (D.Me. 1988) ("The language of section

553, its legislative history, the limited caselaw interpreting section 553, and similar precursor statutes, all lead to the conclusion that proof of *actual* interception or reception is unnecessary, provided there has been proof of willful manufacture or distribution of equipment intended for unauthorized use in the interception or reception of a cable communications service."); Time Warner Entertainment/Advance-Newhouse Partnership v. Worldwide Electronics, L.C., 50 F.Supp.2d 1288, 1293-94 (S.D.Fla. 1999) (discussing cases).

Legislative history confirms that subsection 553(a)(2) was "primarily aimed at preventing the manufacture and distribution of so-called `black boxes' and other unauthorized converters which permit reception of cable service without paying for the service." H.R. Rep. No. 934, 98th Cong., 2d Sess. 84 (1984), reprinted in, 1984 U.S.C.C.A.N. 4655, 4721. Federal courts, interpreting the statutory language and clear legislative directives of 47 U.S.C. § 553, have repeatedly held that the manufacture or distribution of devices intended to be used for the unauthorized reception of cable services is a violation. See United States v. Norris, 88 F.3d 462, 466 (7th Cir. 1996) ("Congress enacted § 553 in an effort to remedy 'a problem which was increasingly plaguing the cable industry--theft of cable services,' including 'the manufacture and sale of equipment intended to permit reception of cable services without paying for it . . ."), citing H.R. Rep. No. 934, 98th Cong., 2d Sess. 83, reprinted in, 1984 U.S.C.C.A.N. 4720.

Although the focus in most reported decisions has been "pirate" cable television decoding devices, which descramble the scrambled signals sent by cable companies to subscribers, the broad scope of Section 553 (a)(2) (including "equipment intended by the manufacturer or distributor (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1)") and decisions such as Norris demonstrate that Section 553

is equally applicable to digital filters. Indeed, the sale of the digital filters at issue in this case enable the identical result, i.e., unauthorized reception of cable television services without payment.

**B. Cox Can Establish Defendants' Violation of Section 553 (a)(1)**

To establish a violation of 47 U.S.C. § 553 (a)(1) arising from assistance in unauthorized reception of cable services, a plaintiff must prove that the defendant (1) assisted others in intercepting or receiving its programming services; (2) these services were communications services offered over a cable system; and (3) that such reception of its programming was without its authorization or otherwise specifically authorized. See 47 U.S.C. § 553(a)(1). If such assistance in unauthorized reception of services is rendered in the form of manufacture or distribution of equipment to be used to facilitate such unauthorized reception as described in subsection (a)(2), the plaintiff must prove that the manufacturer or distributor intended that result. See 47 U.S.C. § 553 (a)(2); Storer Communications, Inc. v. Mogel, 625 F.Supp. 1194, 1198 (S.D.Fla. 1985). However, as noted above, actual interception need not be proven for a violation based on distribution.

The second and third elements of defendants' Section 553 violation are readily established. With respect to the second element, it is well-established that a cable company's programming services are "communications services offered over a cable system" within the meaning of Section 553 (a)(1). Aside from a commonsense understanding of cable services amounting to "communications services offered over a cable system," as noted above, the Seventh Circuit's decision in Norris confirmed that Section 553 was enacted to deal with the problem of theft of cable service. See also Int'l. Cablevision, Inc. v. Sykes, 997 F.2d 998, 1003 (2d Cir. 1993) (noting that Section 553 was enacted to deal with theft of cable service, including

"gaining access to premium movie and sports channels without paying for receipt of those services"); Cablevision Sys. Corp. v. Maxie's North Shore Deli Corp., No. CV 88 2834, 1991 WL 58350, *1 (E.D.N.Y. Mar. 20, 1991) ("This section was meant to address the 'major problem' of theft of cable services."); TWC Cable Partners v. Cableworks, Inc., 966 F.Supp. 305, 308 (D.N.J. 1997) ("By its plain language, it is clear that this section was specifically designed to regulate the theft of cable services."). Thus Cox's cable television services at issue clearly falls within the scope of "communications offered over a cable system."

With respect to the third element of Cox's section 553 (a)(1) claim, the Allard affidavit confirms that defendants' sale and distribution of digital filters for use in free viewing of Cox's pay-per-view programming was without its authorization. Id. ¶ 27. In addition, the preceding paragraph's discussion of how Congress specifically targeted theft of cable services in Section 553 demonstrates that such is not otherwise authorized by law.

As for the first element, i.e., knowledge and intent to assist in the unauthorized reception of cable service by distribution of devices for such purpose, abundant evidence exists.

### 1. Defendants' Digital Filters Did Enable Free Viewing of Pay-Per-View Services.

A very elementary but important fact demonstrating defendants' intent is the fact that the digital filters they sold did indeed enable free viewing of pay-per-view services. Each defendant has admitted selling or assisting in the sale of the digital filters. See selected pages of Transcript of Deposition of Jon Chaffee ("Tr."), attached as Exhibit "D" to Hogan aff., at 30-31, 84-85, 156-57; selected pages of Transcript of Deposition of Amy Chaffee ("Amy Tr."), attached as Exhibit "E" to Hogan aff., at 16, 25, and selected pages of Transcript of Deposition of Ramalda Bou ("Bou Tr."), attached as Exhibit "F" to Hogan aff., at 27, 31-32, 51-52, 76-77.

Cox's investigation, and the Report, both of which involved testing the digital filters Cox's investigators purchased from defendants, showed that the digital filters were capable of enabling viewing of pay-per-view without the corresponding billing information being sent to Cox's billing computer. Allard aff. ¶¶; Report at 3-5. Numerous courts have found that the ability of a product sold by an alleged cable pirate to permit free viewing of cable service is very significant evidence of the seller's intent. See e.g., Worldwide Electronics, 50 F.Supp.2d at 1293-94 (granting summary judgment against pirate device seller and finding that the devices' ability to permit free viewing of cable service was "the best evidence of the defendants' intent"). In granting summary judgment in Violette, this Court relied on Cox's technician's affidavit stating that the devices the defendant sold enabled free viewing of its cable services, and that they had no legitimate use. Slip Op. at 8-9.

At present, defendants cannot dispute, and seemingly do not seriously dispute, that the digital filters they sold could be used to obtain pay-per-view services without payment. Report at 3-5 (discussion of underlying technology and expert's tests of filters purchased by Cox's investigators); Allard Aff. ¶¶ 13, 20, 22, 25 (referencing separate tests of filters purchased); Amy Tr. 68-69 (admitting that she knew the digital filters could be used to assist people in receiving pay-per-view without payment); Bou Tr. 88-89.[5] Instead, defendants largely challenge Cox's assertions that they (i) knew this while they were selling the digital filters, (ii) intended to assist in the interception of cable service, or (iii) advised customers of the digital filters' capability vis a vis unauthorized viewing of pay-per-view services without payment to the cable company. As discussed below, these arguments are both completely unsupported and demonstrably meritless.

---

[5] As reflected in Bou's deposition transcript, after hearing recorded a conversation in which Amy advised an undercover Cox investigator regarding limitations on purchasing pay-per-view, and how removal of the filter could result in getting billed from cable company for $500.00, Bou admitted that she now understood that digital filters could be used to avoid payment for pay-per-view programming.

### 2. Defendants Knew that Customers Used the Digital Filters for Theft of Pay-Per-View Programming

Defendants unquestionably knew that the digital filters they sold could be used to enable free viewing of pay-per-view programming. Moreover, there is extensive evidence, including testimony and documents, establishing that defendants intended that they be used for this purpose. First, Chaffee admitted knowing that people who attended the computer shows at which he sold digital filters could engage in illegal conduct with some of the products sold. Tr. at 52. He also admitted writing the following in an e-mail:

> People love the products we have because they are legal in the way you are supposed to use them so they are legal to sell such as cable filters **but illegal (sic) in the way people think of using them**. Can you really believe the clientel (sic) at a computer show would do anything illegal (sic)? No way. I don't believe it.

Id. at 52 (emphasis added); see also e-mail from Support911 to joe.fountaine@verizon.net dated December 12, 2003 attached as Exhibit "G" to Hogan aff.[6] Thus, Chaffee manifested his knowledge and intent was that the filters would be used to receive pay-per-view services without payment. Chaffee confirmed the last three sentences of the quoted e-mail, i.e., "Can you really believe ..., etc." were made in a tongue-in-cheek manner. Tr. at 53.

Chaffee's knowledge of the ability of the digital filters to enable free viewing of pay-per-view was also acknowledged by Gerard Boisvert, a former employee and defendant Amy's uncle. See generally Declaration of Gerard Boisvert attached as Exhibit "H" to Hogan aff. Boisvert's declaration states that "When I began working for Jon Chaffee, he told me that digital cable television signal filters, once connected to a digital cable television system, could be used to enable the user to receive pay-per-view programming without the cable television provider being notified and the customer being charged." Id. ¶ 6.

---

[6] Chaffee admitted providing customers with the support911@aol.com website. Tr. at 37, 66.

Chaffee also admitted receiving the following e-mails, each of which clearly put him on notice of the use to which customers put the digital filters he sold:

i. E-mail from afuerte86@hotmail.com to support911@aol.com dated May 18, 2004 which stated, in pertinent part, "I (sic) purchased your cable "Filter" a few weeks back and it works great with Pay-Per-Views ..." Tr. 124-25; Hogan aff., Exhibit "I."

ii. E-mail from icemanseegers@yahoo.com to support911@aol.com dated May 29, 2004 that states, in pertinent part, "i (sic) purchased the digital cable filter from you at the show, and you informed me that if I would email you that you would email me back with the procedures to clear my digital box once it filled up with pay per view purchases. Tr. at 173-74; Hogan aff. Exhibit "J."

Federal courts have held that correspondence from customers regarding the capabilities of devices to receive cable services without payment is relevant as evidence of defendants' knowledge and intent in conducting a cable device manufacturing and sales business. See Intermedia Partners Southeast v. QB Distributors, 999 F.Supp. 1274, 1278 n. 3 (D.Minn. 1998). Given similar facts establishing a defendant's awareness of his products' ability to enable viewing of cable service for free, this Court granted summary judgment in favor of a cable company, concluding as follows: "Violette's intent to assist with the unauthorized interception may be presumed because he knew the purpose of the blackboxes when he ordered and resold the devices. Violette has not proffered any evidence to the contrary." Violette, slip. op. at 8.

Even Amy's sister, Sharon McKenna, who occasionally sold digital filters for the defendants, testified that she knew that at least some of the digital filters defendants sold were being used to receive pay-per-view services without payment or authorization. See pages 47-49 of Transcript of Deposition of Sharon McKenna (attached to Hogan aff. as Exhibit "K"). Given

this fact, it is impossible to believe that Chaffee and Amy, the principals of the business, did not know what they were selling.

Moreover, in this case in which defendants admit selling 1,300-1,500 digital filters, Tr. at 30; Exhibit "B" at 2, any argument that they did not know the capabilities of their products and thus lacked intent defies common sense. In affirming summary judgment in favor of DirecTV against a defendant alleged to have purchased and assisted in reselling a large quantity of pirate satellite equipment, the Fifth Circuit in DirecTV v. Budden, 420 F.3d 521, 531-32 (5th Cir. 2005) very recently approved an identical inference of knowledge:

> In total, Budden ordered (over the course of five separate orders), payed for (using Black's money), accepted shipment of, and distributed 115 bootloader devices. Budden's protestations of ignorance notwithstanding, whether or not he had actual knowledge, a person who undertakes such concerted and repeated efforts to secure and distribute these devices "ha[s] reason to know" what they are. Remaining willfully blind does not absolve Budden of the knowledge that a reasonable person would have acquired in these circumstances. In a different context the Supreme Court long ago remarked: "It should be remembered that a purchaser will have notice whenever he has the means of knowledge, although he may choose not to know; in other words whether it may fairly be presumed that he either knew or remained willfully ignorant." Such sentiments echo true today.

The same can be said of defendants' instruction/FAQs/disclaimer sheet ("Instruction Sheet"), a copy of which is attached as Exhibit "L" to the Hogan aff., and the Internet-based reset directions ("reset directions"), a copy of which is attached as Exhibit "M" to the Hogan aff., to which defendants referred customers, both of which Chaffee, Amy and Bou all testified incredibly they had never read. Tr. at 80-83, 87-88, 202-03, 206-07, 221-22; Amy Tr. 44; Bou Tr. 57-59. If defendants were utilizing them in their business, they must be charged with knowledge of their contents.[7]

---

[7] As for the layperson defendants' assertions that the digital filters were actually intended to clear up internet modem signals, Tr. 138-39; Amy Tr. 53-56; Bou Tr. 39-40, the affidavit of Ronald Allard, Cox's investigator, and the Expert Report of Stan Durey both confirm that as a matter of technology and logic, they could not be used for that purpose. Allard Aff. ¶ 8; Expert Report at 7. The Allard affidavit and the Expert Report also confirm that the

Finally, it should be noted that federal courts have granted summary judgment under 47 U.S.C. § 553, and found that defendants intended to assist in the unauthorized reception of cable service, even when such defendants submitted self-serving statements professing that they did not believe their sales of pirate cable television devices were illegal. See e.g. Worldwide Electronics, 50 F.Supp.2d at 1291 n.3 (granting summary judgment and referencing defendants' self-serving statements regarding their belief that they were not engaged in illegal conduct).

**3. Defendants Intended that their Customers Would Use the Digital Filters for Free Viewing of Pay-Per-View Events.**

Apart from the capabilities of the digital filters they sold, and defendants' knowledge of their capabilities, there is abundant evidence that defendants intended their customers to use the digital filters for free viewing of pay-per-view services. This is confirmed in the Boisvert declaration (Exhibit "H"), Chaffee's former employee and current relative, confirms that "Jon Chaffee made it clear to me that he knew and intended that people who purchased digital cable television filters could and would use them to view pay-per-view programming without paying for it." Id. ¶ 7.

**a. E-Mails to Customers**

Chaffee admitted authoring several e-mails that explicitly manifest his intention that his digital filter customers use the digital filters to receive pay-per-view programming. One such e-mail stated, "It is only for pay-per-view, not HBO and Showtime. Here is (sic) the directions." See e-mail from Support 911 to Celyn68 dated February 14, 2004 attached as Exhibit "N" to Hogan

devices have no commercially significant purpose or reason to be purchased by an individual subscriber, as their only function is to stop signals from leaving a residence, not to prevent, filter, or otherwise modify cable-borne signals entering a residence. Allard Aff. ¶ 8; Expert Report at 7. Significantly, neither the Instructions or the reset instructions contained any information about using the devices for this purpose, Report at 7, or for any purpose other than to view pay-per-view services without payment.

aff.; Tr. at 88. The e-mail also referred the customer to the instructions attached hereto as Exhibit "M." Similarly, Chaffee sent an e-mail dated August 2, 2003 to gareid@optonline.net, a copy of which is attached to the Hogan aff. as Exhibit "O," that acknowledges the intended use of the devices and the need to reset the cable box so as to not be charged for pay per view events. It states, "The filter only works for pay per views ... It doesn't work for HBO, Showtime and other premium channels. You must reset the box before removing or you will be charged."

Even more tellingly, Chaffee received an e-mail dated February 14, 2004 that stated, "I bought today a plug to connect to my cable and cable box in order to receive the PPV [Pay Per View] channels. I was also told that after a while it wont (sic) work cause the cable box will have been clogged up and it will require a code to release it.. (sic) Can you pls advise of the code and instructions as to how to use it." See e-mail dated February 14, 2004 from rca16@msn.com to support911@aol.com attached as Exhibit "P" to Hogan aff. (bracketed material added). Chaffee's response, also dated February 14, 2005, states, "Hi. RC, Thank you for your e-mail. Here is (sic) the instructions for the cable filter. Sorry it only works for pay-per-view." See e-mail from Support911 to rcal6@msn.com dated February 14, 2004 attached as Exhibit "R" to Hogan aff.; Tr. at 80. This dialogue demonstrates beyond peradventure that the defendants knew and intended that the digital filters they sold would be used to obtain pay-per-view services without payment.

### b. Instruction/FAQ/Disclaimer Sheet and Reset Directions

These representations are consistent with defendants' Instruction Sheet (Hogan aff., Exhibit "L"), that defendants admit was located on the defendants' display table at computer shows. Tr. 196-97; Amy Tr. 40-41; Bou Tr. 56-57. Each defendant has admitted displaying or providing the Instruction sheet to customers and/or advising customers about the websites that

contain the reset directions. Tr. 133-34, 195-96; Amy Tr. 52, 64; Bou Tr. 56-57, 59 ("Q. So, if someone said, can I use one of these to get pay-per-view, you would hand them the sign? . . . A. Exactly.").

Defendants' Instruction Sheet provides additional evidence of their intent to assist in the unauthorized interception of cable services. In the middle of the second paragraph on the first page, the Instruction Sheet states, "By having this filter connected to your digital cable box any and all programming that can be received by pressing the 'Buy', 'Order' or 'Purchase' button on your remote will be viewed without the billing information reaching the cable company." Exhibit "L." The first paragraph of the FAQ/disclaimer on the reverse side states in part that "A digital filter will also block out interference as well as block out pay per view and movie order charges from your cable company, giving you free pay per view. Therefore, it is mandatory that you notify your cable company of the extra orders." Id. It also states in the sixth paragraph that "Once you install the filter, you should not remove it. This may cause problems with the memory card and will also flood your cable company with the programs you ordered." Id. In other words, if you remove the digital filter that is filtering out the billing signals, then those signals can go through to the cable company, and you will be billed for the pay-per-view programs you watched. Finally, the seventh paragraph is expressly directed toward avoiding being charged for pay-per-view. It states as follows:

> How do I know I'm not being charged?
>
> All ordered programs should be tracked and reported. You can easily order a program and in a couple days call your cable company to find out the current balance and if any programs have been ordered. If not, then you know the filter is blocking out signals.

Similarly, defendants reset directions (Exhibit "M" to Hogan aff.) provide additional evidence of defendants' intent. As discussed in detail in the Allard Aff. ¶ 15, the reset directions include many statements frequently used by sellers of "pirate" cable television equipment to pass their products off as legitimate equipment. These include identifying the filters as "test devices," when the only thing they test is whether they permit the user to obtain free pay per view services. Other reset instructions expressly instruct the user on how to use the digital filter to block the customer's cable box from relaying billing information back to the cable company. Allard Aff. ¶ 16; Exhibit "M." The reset instructions also include references to a trick for obtaining pay-per-view movies for free if the cable company has a call-in procedure for ordering such services. Allard Aff. ¶ 16; Exhibit "M" at 11, and discussions about how to clear the cable company-provided device's billing memory by various means. Exhibit "M" at 12-16.

Many courts have found that distribution of instructions for using pirate cable devices is evidence demonstrating the defendant's intent to assist others in receiving cable services without authorization in violation of 47 U.S.C. § 553. See Comcast of Illinois X, LLC v. Platinum Electronics, 336 F.Supp.2d 957, 962 (D.Neb. 2004) ("The defendants' instructions on how to install the descrambler are additional evidence of their intent that the descrambler would be used for theft of cable services."); Worldwide Electronics, 50 F.Supp.2d at 1294 n. 4 (provision of instructions explaining how to install device and access premium and pay-per-view services "is additional evidence of [defendants'] intent that their devices would facilitate the theft of services); Columbia Cable TV Co., Inc. v. McCary, 954 F.Supp. 124, 128 (D.S.C. 1996); TKR Cable Co. v. Cable City Corp., No. 96-2877, 1996 WL 465508 at *2 (D.N.J. July 29, 1999) (Brown, J.), aff'd in part and rev'd in part on other grounds, 267 F.3d 196 (3d. Cir. 2001) (noting that provision of such instructions is evidence of intent). Significantly, in Storer Communications v. Mogel, 625 F.Supp.

at 1198, the court noted that even the mere provision of instructions for installation of pirate cable television devices, apart from the actual sale or distribution of such devices, violated Section 553(a)(1)'s prohibition of assistance in receiving or intercepting cable services.

Amy Chaffee initially testified that (i) she was unaware that the digital filters had the ability to circumvent cable companies' pay-per-view billing mechanisms; (ii) she was unaware that customers purchased them for that reason; and (iii) she never told customers they could be used for that reason or gave them any instructions regarding that. Amy Tr. at 39-40, 43-44, 56-57. However, when she was confronted with a tape recording of her telling a customer (one of Cox's investigators) that if he removed the filter from the cable line, the cable box might send a signal and he would risk being billed $500.00, Amy Tr. at 65-66, she admitted it was her voice. Id. at 66, 69. When asked if her affidavit, a copy of which is attached as Exhibit "R" to the Hogan aff, which stated "I never said to anyone that if ... one did not reset the cable box the cable company could bill for the pay-per-view movies ordered," was false, Amy twice asserted her privilege against self-incrimination. Id. at 67-68. She then recanted her prior false testimony in the following exchange:

> Q. And the reason you made statements about how to reset a box on this tape was that you knew that these filters could be used to assist people in receiving pay-per-view without paying for it; correct?
>
> MR. CURRIER: Objection to form.
>
> A. Yes.

Amy Tr. at 68.

In Mitchell v. United States, 526 U.S. 314, 328, 119 S.Ct. 1307, 1315 (1999), the Supreme Court, citing its earlier decision in Baxter v. Palmigiano, 425 U.S. 308, 96 S.Ct. 1551 (1976), reaffirmed that a court could permissibly draw an adverse inference from a party's assertion of his or her privilege against self-incrimination in a civil case. Thus, in this case, the Court can and

should draw a negative with respect to Amy's assertion of her privilege against self-incrimination in this civil case, and thereby conclude (i) that she did submit a false affidavit herein (Exhibit "R") and (ii) that Amy knew, and told customers, that the digital filters defendants sold could be used to obtain pay-per-view programming without payment.[8] This evidence supports the finding that there are no triable issues of fact with respect to defendants' knowledge of the capabilities of the digital filters they sold, their customers' intended uses of them, and defendants' own representations to customers about the intended uses of the digital filters they sold.

### c. Defendants' Use of Disclaimers Manifests Their Awareness of the Illegality of their Business

The Instruction Sheet displayed by defendants (Exhibit "L") contained a disclaimer that advises customers, in tongue-in-cheek fashion, that defendants were not "suggesting or implying that anyone who purchases this tool participate in any theft of cable programming [and] therefore, it is imperative that you notify your cable company of any programs that you view while using the filter so that they will know to bill you accordingly." Id. at 2. Not only does every reported decision under Title 47 regarding such "disclaimers" hold that they don't shield cable piracy sellers from liability, see, e.g., Platinum Electr., 336 F.Supp.2d at 964; QB Distributors, 999 F.Supp. at 1282; Time Warner Cable of New York City v. Freedom

[8] Many courts, including this Court, have done exactly this in Communications Act cases. TCI Cablevision of New England v. Pier House Inn, Inc., 930 F.Supp. 727, 728 fn. 1 (D.R.I. 1996) (permitting adverse inferences from defendants' assertions of their privileges against self-incrimination), citing Arthurs v. Stern, 560 F.2d 477, 478 (1st Cir. 1977), cert. denied, 434 U.S. 1034 (1978); see also CSC Holdings, Inc. v. J.R.C. Products, Inc., 78 F.Supp.2d 794, 801-02 (N.D.Ill. 1999), aff'd in part and rev'd in part on other grounds, 309 F.3d 988 (7th Cir. 2002) (defendants' respective assertions of privilege against self-incrimination, coupled with similar documentary evidence of pirate decoder sales business, was sufficient to support grant of summary judgment); CSC Holdings, Inc. v. KDE Electronics, Inc., No. 99 1556, 2000 WL 284005 at *5 (N.D.Ill. March 13, 2000) (Pallmeyer, J.) (drawing negative inference from assertion of privilege against self-incrimination); Century ML-Cable Corp. v. Carrillo Diaz, 43 F.Supp.2d 176, 181 fn. 5 (D.P.R. 1998) (court draws adverse inference regarding timing of defendant's destruction of records of cable decoder modifications from his assertion of privilege against self-incrimination in response to questions regarding such records); Cablevision Sys. Corp. v. DePalma, No. 87-3528, 1989 WL 8165 at *5 (E.D.N.Y. Jan. 17, 1989) (Caden, M.J.) ("in proper circumstances silence in the face of accusation is a relevant fact not barred from evidence by the Due Process Clause[,]" citing Baxter.

Electronics, Inc., 897 F.Supp. 1454, 1459 (S.D.Fla. 1995), many courts have expressly found that such disclaimers affirmatively evidence a cable pirate's awareness of the illegality of its conduct. See Gardner, 860 F.2d at 1396 ("Whatever the attempted legal effect of the defendant's disclaimer, the ultimate trier of fact could easily find that **it was a transparent attempt to deny the patent illegality of the defendant's acts** . . ." (emphasis added); Platinum Electr., 336 F.Supp.2d at 964; McCary, 954 F.Supp. at 127 ("This court does not find that the disclaimer negates any intent to assist others in the unauthorized access of cable programming. **In fact, the court finds that the disclaimer demonstrates knowledge of the most probable if not only use of the devices**") (emphasis added). Defendants' use of disclaimers with their digital filter sales provides even more evidence of their awareness of the illegal nature of their business.

#### d. Chaffee's Evasive Discovery Responses Regarding Filter Sellers Manifests His Awareness of the Illegality of Defendants' Conduct

Even Chaffee's discovery responses manifest his awareness of the illegality of his conduct. When requested to identify each individual and entity that assisted the Defendants in the sale of digital filters, Chaffee concealed the names of numerous such persons, whether to avoid identifying witnesses or to protect them from prosecution. Thus, in his responses, Chaffee named his wife and co-defendant Amy, co-defendant Bou, and three other persons. However, during his deposition he admitted having omitted the names of five other persons (Joe Fontaine, Richard Conti, Sharon McKenna, Christine McKenna, Stephen Sercu) who also sold digital filters on his behalf. Tr. at 59-61, 105. Lest these be characterized as oversights, Chaffee testified that Sharon and Christine McKenna were his sisters-in-law. Tr. at 61. Chaffee also

testified that he had provided his mother (also not previously identified as a seller) with digital filters to sell at computer shows, but couldn't be sure that she sold any. Tr. at 33-36.

#### e. Chaffee's Use of An Alias While Conducting Defendants' Business Manifests His Awareness of the Illegality of Defendants' Conduct

Chaffee also admitted to using the alias of "Sharon" on his e-mails with customers. Tr. 64-67, 88. In Budden, the Fifth Circuit very recently held that use of an alias in connection with a pirate device business manifests knowledge of the illegality of the conduct. Id. at 532 (granting summary judgment pirate satellite equipment reseller, noting that defendant's use of alias when placing orders for equipment "strengthens our conclusion that he had reason to know the nature of the devices").[9] As previously noted, Chaffee admitted providing customers with the reset instruction websites (Exhibit "M"). A review of those websites demonstrates that it contains the instructions for utilizing digital filters to view pay-per-view programming without payment.

Chaffee also admitted to using another alias of "Mike." An August 2, 2003 e-mail sent from his Support911 e-mail address from "Mike" stated, in pertinent part:

> The filter only works for pay per views, on demands, everything you need to order from the remote. It doesn't work for HBO, Showtime and other premium channels. You must reset the box before removing or you will be charged.

Tr. at 128-29; Hogan aff. Exhibit "O." When asked who Mike was, Chaffee initially denied that it was another pseudonym for himself, and stated that Mike was yet another previously

[9] See also U.S. v. Morales, 577 F.2d 769, 772 (2d Cir. 1977) ("Of course, appellant's use of a false name on her lost baggage report was admissible to show consciousness of guilt, i.e., that she knew she was doing something wrong or illegal."); U.S. v. Glass, 128 F.3d 1398, 1408 (10th Cir. 1997) ("A defendant's use of an alias to conceal his or her identity from law enforcement officers is relevant as proof of consciousness of guilt."); U.S. v. Ramos, 839 F.Supp. 781, 788 (D.Kan. 1993) ("The use of a false or altered name may indicate consciousness of guilt in the associated conduct. In other words, if the government shows the defendant used aliases while performing his role in the alleged drug conspiracy, then the aliases would suggest the defendant was aware his actions were unlawful.").

undisclosed person who was selling digital filters for the defendants who somehow had Chaffee's e-mail address. However, when asked more about Mike, Chaffee was unable to identify Mike's last name. Tr. 130-31. Chaffee finally admitted that it was possible it might have been him (Chaffee) who wrote the e-mail signed by Mike. Tr. at 131.

Pursuant to the foregoing, Cox submits that there can be no genuine dispute that defendants knew the capabilities of the digital filters they sold, that they knew and intended that customers would use them for this purpose, and that they knew their business was illegal.

## C. Cox is an Aggrieved Party under 47 U.S.C. Section 553 (c)(1)

Finally, Cox is an "aggrieved person" within the meaning of 47 U.S.C. section 553 (c)(1). It is a cable operator that had its programming services intercepted by use of the digital filters promoted and sold by defendants, and it suffers the loss of cable customers, income and theft of its services, in which it has proprietary rights. The defendants have sold digital filters at computer shows in areas serviced by Cox. Allard Aff. ¶¶ 18, 21. Cox's tests confirmed that the devices had this capability. Id. ¶¶ 13, 20, 22, 25; Report at 3-5. These facts have previously been found to support a finding that the cable company is an aggrieved party. See e.g. Violette, slip. op. at 8-9 (granting summary judgment) (Exhibit "C"); QB Distributors, 999 F.Supp. at 1282 (finding that evidence of sales of pirate decoders into plaintiff's cable system areas were sufficient to give cable company standing as an aggrieved party under 47 U.S.C. § 553); Freedom Electronics, 897 F.Supp. at 1459.

## D. Defendants' Conduct Violates 17 U.S.C. § 1201

The DMCA, 17 U.S.C. § 1201, proscribes copyright infringement involving circumvention of technological copyright protection systems. Section 1201 (a)(1)(A) provides, in pertinent part,

that "No person shall circumvent a technological measure that effectively controls access to a work protected under this title." Section 1201 (a) also provides as follows:

> (2) No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that –
>
> (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;
>
> (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title [17 U.S.C. § 1 et seq.]; or
>
> (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title.

The elements of a DMCA violation are as follows: (1) defendant trafficked in a technology; and (2) the technology was primarily designed or produced to circumvent conditional access controls to protected works, or has limited commercially significant use other than such circumvention. See DirecTV, Inc. v. Little, No. 03-2407, 2004 WL 1811153, at * 6 (N.D.Cal. Aug. 12, 2004); see also 321 Studios v. Metro Goldwyn Mayer Studios, Inc., 307 F.Supp.2d 1085, 1094-99 (N.D.Cal. 2004).

The DMCA has repeatedly been applied in actions against persons assisting in the interception of copyright-protected communications offered over a cable system or via satellite. See Little, 2004 WL 1811153, at *6; DirecTV, Inc. v. Mars, No. 2004 WL 1057752, at *3 (E.D.Mich. Apr. 16, 2004) (in case against alleged reseller of pirate satellite signal theft equipment, court finds that proposed amendment to complaint to add DMCA claim to Communications Act claim would not be futile); CSC Holdings, Inc. v. Greenleaf Electronics, Inc., No. 99 C 7249, 2000 WL 715601, * 6 (N.D.Ill. June 2, 2000) (plaintiff cable company was a person injured by

defendants' sale of modified cable converters used to circumvent plaintiff's technological measure of encryption of cable services).

In Comcast of Illinois X, LLC. v. Hightech Electronics, Inc., No. 03 C 3231, 2004 WL 1718522 (N.D.Ill. July 28, 2004), the Northern District of Illinois found as follows (equally applicable to Cox herein):

> Regarding the sufficiency of Comcast's claim in 17 U.S.C. § 1201 (a)(2), the DMCA explicitly states that a violation of the statute occurs when descrambling equipment circumvents a measure that "effectively controls access" to a protected work. Measures based on encryption or scrambling effectively control access to copyrighted works. *Universal City Studios, Inc. v. Reimerdes*, 111 F.Supp.2d 294, 318 (S.D.N.Y. 2000). Comcast is indisputably not the copyright holder of the programs on the networks which it provides to its subscribers. However, those programs are copyrighted material, and Comcast controls access to such protected material through the descrambling method described in its complaint. Similarly, under 17 U.S.C. § 1201 (b)(1), although the "controlled access" language of 17 U.S.C. § 1201 (a)(2) is not stated, a violation of the statute also occurs when a technological measure that effectively protects the right of a copyright owner is circumvented. Comcast does control the technological measure that protects the copyrighted material. Moreover, pursuant to 17 U.S.C. § 1203 (a) "any person injured by a violation of section 1201 or 1202 may bring a civil action in an appropriate United States district court for such violation." The civil remedies provided in the statute do not explicitly state that recovery is limited to the copyright holder. Therefore, as Comcast controls access to copyrighted material and is a person injured from a violation of 17 U.S.C. § 1201, we conclude that it can bring suit pursuant to the DMCA.

Id. at *6.

Much of the preceding discussion of the defendants' liability under 47 U.S.C. § 553 also supports the conclusion that defendants also violated subsections (a)(1)(A) and (a)(2) of 17 U.S.C. § 1201. Cox's digital scrambling is unquestionably a technological measure undertaken to provide conditional access to the copyright protected works it provides to its subscribers. Report at 2. With respect to subsection (a)(2)(B), as discussed above, defendants have distributed digital filters that have only limited commercially significant purposes or uses (and none by a cable customer as opposed to a cable company) other than to circumvent cable companies' digital encryption of their

pay-per-view services. Report at 5-8. With respect to subsection (a)(2)(C), the preceding section's discussion of the overwhelming evidence of defendants' knowledge and intent to assist in the interception of pay-per-view services establishes that defendants market their digital filters knowing that they will be used to circumvent the technological measure of digital scrambling.

To summarize, Cox has shown: (i) defendants' knowledge, representations to customers, and provision of instruction to customers indicating that the digital filters they sold would permit free viewing of pay-per-view services; (ii) defendants' sale of an enormous quantity of such digital filters, see Exhibit "B" at 2; Chaffee Tr. 30-31 (at least 1,300-1,500 sold), (iii) the expert testimony of Stan Durey regarding the digital filters he examined having no commercially significant use for cable subscribers devices he examined (Hogan Aff., Ex. "A" at 5-8); and (iv) defendants' testimony about their knowledge and intent regarding the expected use of the digital filters they sold (including Amy's telling assertion of her self-incrimination privilege when asked if she had submitted a false affidavit regarding whether she advised digital filter customers how to reset cable boxes used in tandem with digital filters that so that the filter user could view services without being billed for them). Given this overwhelming evidence, Cox submits that the conclusions that defendants (i) distributed digital filters with knowledge and intent to assist in the unauthorized interception of Cox's cable services in violation of 47 U.S.C. § 553, and (ii) distributed digital filters that had only limited commercially significant purpose or use other than to circumvent Cox's technological measure of digital scrambling that effectively controls access to copyrighted works, and that were marketed by defendants with the knowledge that they would be used to circumvent a technological measure that effectively controls access to copyrighted works in violation of 17 U.S.C. § 1201, are inescapable. Consequently, Cox's claims are ripe for summary judgment.

**E. Defendants are Jointly and Severally Liable for their Violations of the Communications Act and Digital Millennium Copyright Act**

Cox submits that defendants Chaffee, Amy and Ramalda, individually and doing business as Chaffee International and/or Electronic Imports, as the case may be, should be held jointly and severally liable for all damages awarded. It is well-established that joint tortfeasors are each liable for the full amount of a plaintiff's damages, and the plaintiff can recover full redress from any defendant, even if that defendant's actions were not solely responsible for the plaintiff's actions. Numerous courts have so held in Communications Act cases. See Platinum Electronics, 336 F.Supp.2d at 965 ("Where the defendants act in concert to sell decoders, they can be held jointly and severally liable for the resulting damages. Further, defendants also may be held jointly and severally liable because damages may be impossible to apportion among the defendants in proportion to their respective levels of involvement."); J.R.C. Products, 78 F.Supp.2d at 801 (holding all defendants, except one against whom an insufficient showing was made, liable for damages resulting pirate decoder sales enterprise during the time each was involved); Worldwide Electrs., 50 F.Supp.2d at 1300 (individual and corporate defendants jointly and severally liable).

As discussed above, the evidence herein establishes that each defendant participated in the wrongful conduct, i.e., sales of digital filters with intent to assist in circumventing Cox's technological measures that restricted access to copyrighted works, thus enabling interception of cable services, and their provision of digital filter instructions to customers. They also admitted working together in various combinations and with other persons. Tr. 166; Amy Tr. 16-18, 24-25; Bou Tr. 27, 35-36, 43, 57, 61-63. Given these facts, defendants clearly are joint tortfeasors, and each can and should be held personally liable for harm that any of them caused to Cox.

## III. COX IS ENTITLED TO RECOVERY OF THE MAXIMUM SUM OF STATUTORY DAMAGES FROM DEFENDANTS, AS WELL AS THE MAXIMUM SUM OF ENHANCED DAMAGES

### A. Statutory Damages

Cox seeks the Court's determination that it is entitled to an award, to be quantified after a future submission, of up to the maximum of $10,000.00 in statutory damages pursuant to 47 U.S.C. 553 (c)(3)(A)(ii), and an award of between $200.00 and $2,500.00 per digital filter sold to each of its customers pursuant to 17 U.S.C. § 1203 (b)(3) and (c)(3). Such award will compensate it for the harm it suffered from defendants' actions.

47 U.S.C. section 553 (c)(3)(A)(ii) states the following:

> [T]he party aggrieved may recover an award of statutory damages for all violations involved in the action, in a sum of not less than $250 or more than $10,000 as the court considers just.

Federal courts have previously awarded the maximum of statutory damages against a large-scale pirate decoder seller such as the defendants herein. See General Instr. Corp. of Del. v. Nu-Tek Electr. & Mfg., Inc., 1997 WL 325804 at *3 (E.D.Pa. June 4, 1997), aff'd., 197 F.3d 83 (3d Cir. 1999) (awarding $10,000.00 in statutory damages pursuant to § 553 in light of the cable theft that occurred as a result of defendants' devices, which caused economic harm to plaintiff and forced it to bring expensive lawsuits to abate the piracy); Comcast Cablevision of Philadelphia, L.P. v. Roselli, 1997 WL 36957 (E.D.Pa. Jan. 30, 1997) (awarding $8,500.00 in statutory damages under § 553 against defendant who had modified only five devices into pirate decoders, and who had already been ordered to pay $1,500.00 in criminal restitution to plaintiff); see also Time Warner Cable of New York City v. David Burgess d/b/a Covert Electr. a/k/a CE, No. A-00-CV-789 JN (Aug. 31, 2001) (W.D.Tex.) (Nowlin, C.J.) slip op. at 6, attached as Exhibit "S" to Hogan aff.

(indicating that $10,000.00 in statutory damages pursuant to § 553 was appropriate against a similar pirate decoder seller).[10]

17 U.S.C. § 1203 (c) provides that in an action brought under Section 1203 (a), "At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1201 in the sum of not less than $200 or more than $2,500 per act of circumvention, device, product, component, offer, or performance of service, as the court considers just." Cox will submit proof of the number of devices sold

Pursuant to the foregoing, Cox respectfully requests the Court's determination that it is entitled to an award of statutory damages in an amount to be quantified after future submissions regarding the precise number of devices sold for use by its subscribers.

## B. Enhanced Damages

The requested award of statutory damages under § 553 (c)(3)(A)(ii) is exclusive of Cox's request for an award of enhanced damages of up to $50,000.00 under Section 553 (c)(3)(B) that can be assessed in the Court's discretion against sellers of cable theft devices such as the defendants, who willfully committed violations of the Communications Act for purposes of commercial advantage or private financial gain.

As the Supreme Court noted in Trans World Airlines v. Thurston, 469 U.S. 111, 127, 105 S.Ct. 613, 624-5 (1985), the standard for willfulness in a civil case is lower, requiring proof only of

---

[10] Indeed, some courts award this amount, or nearly this amount in actions against individual subscribers. See In re Feiner, 254 B.R. 266, 271 (Bankr.D.Kan. 2000) (referencing district court's award of $5,000.00 in statutory damages under Section 553 against residential subscriber who used two devices in succession). See also Community Tel. Sys., Inc. v. Caruso, 134 F.Supp.2d 455, 461-62 (D.Ct. 2000), aff'd in part and rev'd in part on other grounds., 284 F.3d 430 (2d Cir. 2002) (awarding maximum of $10,000.00 in statutory damages each against various pirate decoder users pursuant to 47 U.S.C. § 605 (e)(3)(C)(i)(II) in light of (i) harm caused to cable company, (ii) defendants' defense of case, which the district court found involved employing a strategy of making it as difficult as possible for cable company to vindicate its rights, and (iii) defendants' assertions of privilege against self-incrimination); Time Warner Cable of New York City v. Fland, 1999 WL 1489144 at *4 (S.D.N.Y. Dec. 3, 1999)

"a disregard for the governing statute and an indifference to its requirements." This standard of willfulness has been adopted in cases under the Communications Act. See Cable/Home Prods. Corp., 902 F.2d 829, 851 (11th Cir. 1990); Platinum Electronics, 336 F.Supp.2d at 966; Worldwide Electr., 50 F.Supp.2d at 1301-02. In Nu-Tek Electr. & Mfg., 1997 WL 325804 at *3, the court awarded the maximum enhanced damages, making observations about the unquestionable illegality of defendants' business applicable to this case:

> As for the punitive damages here, anything less than $50,000 would be uncalled for. The defendant, speaking through its president and CEO, Mr. David J. Abboud, made huge sums of money, well knowing that it was--and he was--repeatedly and brazenly flouting the law in so doing. Mr. Abboud's testimony at trial, in which he sanctimoniously sought to profess ignorance of that reality, was an exercise in rank perjury. At $50,000, he gets off cheap.

In this case, private financial gain and willfulness are easily established.

1. **Private Financial Gain**

With respect to private financial gain, there is no dispute that defendants charged for the filters they sold, and that they made a profit over the cost of such filters. Defendant Chaffee testified that they received profits of $3,500.00. See defendant Chaffee's accounting attached to Hogan Aff. as Exhibit "B" at 2. Although Cox submits that Chaffee's unsupported accounting is dubious at best, and very likely substantially understated, even assuming arguendo it is accurate, it establishes the defendants' financial gain.[11]

(Grubin, M.J.) (finding that a figure of $225.00 per month in statutory damages under Section 605 for a residential user of a decoder would fairly compensate identical cable company and deter defendants).

[11] See also Sykes I, 997 F.2d at 1004 (observing that there was no suggestion in Section 553 (c)(3)(B) that "gain" means only a net gain. Therefore, even if the filters had been sold at a loss, so long as some value was received, the requirement of gain would be met).

2. Willfulness

Turning to the willfulness prong of Section 553 (c)(3)(B), overwhelming evidence manifesting defendants' willfulness is already in the record. First, defendants' Instruction Sheet, and their e-mails attached as Exhibits "N," "O," and "Q," show that defendants represented to customers that the filters they sold could permit free viewing of all pay-per-view services. Second, the defendants' instructions demonstrating how to avoid detection and avoid paying for pay-per-view events, Exhibits "L" and "M," clearly manifest their knowledge that the filters they sold were used to engage in illegal conduct, and their intent that their customers not get caught.

Third, as previously noted, the disclaimer language set forth on the Instruction Sheet provides further support for a finding of willfulness, as similar statements have repeatedly been recognized by federal courts not only to be insufficient to support a defense to Communications Act claims, but to affirmatively manifest intent to assist in theft of services. See Gardner, 860 F.2d at 1396 ("Whatever the attempted legal effect of the defendant's disclaimer, the ultimate trier of fact could easily find that **it was a transparent attempt to deny the patent illegality of the defendant's acts** . . ."); McCary, 954 F.Supp. at 127 ("This court does not find that the disclaimer negates any intent to assist others in the unauthorized access of cable programming. **In fact, the court finds that the disclaimer demonstrates knowledge of the most probable if not only use of the devices**") (emphasis added). In sum, there is more than enough evidence of defendants' willfulness to support a maximum award of enhanced damages pursuant to 47 U.S.C. § 553 (c)(3)(B).

In light of this indisputable showing of willfulness and financial gain, Cox submits that, in assessing the range of enhanced damages to be awarded against defendants under section 553 (c)(3)(B), the Court should consider the legislative intent embodied by these provisions that

commercial enterprises conducted for private financial gain should be assessed substantial liability, if not punitive-type damages. Defendants' efforts directed against Cox, conducted despite their unquestionable knowledge of the illegality of their actions, mandates that the maximum assessment of in enhanced damages be imposed. See Platinum Electronics, 336 F.Supp.2d at 966 (awarding $50,000.00 maximum enhanced damages to give effect to Congress's intent that distributors of descrambling equipment bear substantial liability); CSC Holdings, Inc. v. New Information Techs., Inc., 148 F.Supp.2d 755, 762-63 (N.D.Tex. 2001) (awarding $50,000 in enhanced damages pursuant to § 553 (c)(3)(B), citing nationwide distribution of devices and court's belief that defendants would not have ceased illegal business had cable company not intervened); Worldwide Electronics, 50 F.Supp.2d at 1302 (awarding $50,000 in enhanced damages pursuant to § 553 (c)(3)(B)); CSC Holdings, Inc. v. J.R.C. Products, Inc., 158 F.Supp.2d 798, 814 (N.D.Ill. 2001), aff'd in part and rev'd in part on other grounds, 309 F.3d 988 (7th Cir. 2002) (awarding $50,000 in enhanced damages pursuant to § 553 (c)(3)(B)); Covert Electronics, (Exhibit "S" at 6) (awarding $50,000 in enhanced damages pursuant to § 553 (c)(3)(B)).

## IV. COX IS ENTITLED TO AN AWARD OF ITS ATTORNEYS' FEES AND INVESTIGATIVE COSTS

Under 47 U.S.C. § 553 (c)(2)(C), the court may award recovery of full costs, including reasonable attorneys' fees, to a prevailing aggrieved party. Numerous courts have granted such relief in similar actions against pirate cable television devices sellers. Platinum Electronics, 336 F.Supp.2d at 966 (awarding attorneys' fees and costs); J.R.C. Products, 158 F.Supp.2d at 815 (awarding attorneys' fees and costs); Worldwide Electronics, 50 F.Supp.2d at 1302. Full costs include recovery of investigative expenses. Platinum Electronics, 336 F.Supp.2d at 966; J.R.C. Products, 158 F.Supp.2d at 815; Worldwide Electronics, 50 F.Supp.2d at 1302; Cablevision

Systems Corp. v. Cohen (In re Cohen), 121 B.R. 267, 269 (Bankr.E.D.N.Y. 1990) (award of investigative fees pursuant to section 553 is part of overall damage assessment against similar pirate decoder distributor). 17 U.S.C. § 1203 (b)(4) and (5) similarly provide for awards of attorneys' fees and costs to the prevailing party.

Cox submits that the clear need to stop defendants' large-scale distribution of digital filters for the purpose of enabling theft of its pay-per-view service, and to recover its losses resulting therefrom, supports an award of attorneys' fees and investigation expenses to it. CSC Holdings, Inc. v. KDE Electronics, No. 99 C 1556, 2000 WL 284005, *6 (N.D.Ill. Mar. 13, 2000) (holding that plaintiff cable company should not have to bear the burden of investigating and prosecuting defendants' illegal conduct), cited in J.R.C. Products, 158 F.Supp.2d at 815; Worldwide Electronics, 50 F.Supp.2d at 1302. Consequently, Cox seeks a determination that it is entitled to an award of reasonable attorneys' fees and its costs, in an amount to be determined at the conclusion of this action.

## V. PERMANENT INJUNCTIVE RELIEF MUST ISSUE ENJOINING DEFENDANTS FROM FURTHER DISTRIBUTION OF DIGITAL FILTERS OR OTHER ACTIONS DIRECTED AT ASSISTING IN INTERCEPTION OF CABLE SERVICES OR CIRCUMVENTING TECHNOLOGICAL MEASURES THAT PROTECT COPYRIGHTED WORKS

As expressly authorized by 47 U.S.C. § 553 (c)(2)(A), this Court may "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain violations." Identically, 17 U.S.C. § 1203, providing for a private right of action under the DMCA, 17 U.S.C. § 1203(a), states that "In an action brought under subsection (a), the court – (1) may grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation." Section 1203 (b). These authorizations of such injunctive relief manifests Congress' intent that

courts be given a broad directive to issue injunctions not only to restrain, but expressly to prevent such violations. Moreover, courts in Communications Act cases have held that when express authority for issuance of "statutory" injunctions is provided by legislative enactment, an injunction may issue without resort to the traditional "equitable" prerequisites of such relief. See J.R.C. Products, 158 F.Supp.2d at 815; Worldwide Electronics, 50 F.Supp.2d at 3102; Freedom Electronics, 897 F.Supp. at 1460; KDE Electronics Corp., 2000 WL 284005 at *7; TKR Cable Co., 1996 WL 465508 at *10.[12]

Given these guidelines, federal courts have repeatedly entered permanent injunctions against pirate decoder sellers under Section 553. See e.g., Platinum Electronics, 336 F.Supp.2d at 966-67; J.R.C. Products, 158 F.Supp.2d at 815; New Information Techs., 148 F.Supp.2d at 153 (permanently enjoining defendants under § 553 from conduct prohibited in preliminary injunction); KDE Electronics, 2000 WL 284005 at *7 (permanent injunction against pirate decoder seller under § 553); McCary, 954 F.Supp. at 128.

In the present case, Cox requests the Court's entry of a permanent injunction prohibiting defendants from, inter alia, any further manufacture, possession, sale or distribution of digital

[12] Apart from the proven violations of Section 553 committed by defendants, the injunction sought is clearly in the public interest, as defendants' conduct is unquestionably criminal in nature, and the public's interest in preventing such conduct is evident. See Securities Indus. Ass'n., 628 F.Supp. at 1443 (in cases where injunctive relief is sought to prevent continuing violations of federal statutes, "the equities to be balanced are not simply those of the private litigants, but also the interests of the public as defined by Congress"). See also Century Cable v. Carrillo Diaz, 43 F.Supp.2d at 174 ("The Court finds that the illegal modification and/or distribution of cable television decoding devices with the intent that they be used for the unauthorized interception of programming services without payment of subscription fees constitutes conduct which is criminal in nature, and the public's interest in prohibiting such conduct is evident"); Cox Cable Cleveland Area v. King, 582 F.Supp. 376, 381 (N.D.Ohio 1983) ("Congress and the Courts have recognized and protected Cox's interest in cable television communications").

Numerous other courts have also noted that the entry of an injunction against defendants' continued sale and distribution of unauthorized cable television decoding devices does not harm and, in fact, will promote the public interest. TKR Cable Co., 1996 WL 465508 at * 11 (noting that cable piracy undermines intellectual property rights of creators and owners of stolen programming); Freedom Electronics, 897 F.Supp. at 1460 (noting that cable piracy may result in FCC-prohibited "signal leakage" and creates an unfair subsidy to "freeloaders"). See also Storer Communications, 625 F.Supp. at 1203 (noting loss of franchise fees to municipalities from cable piracy); Kaufmann, 606 F.Supp. at 1546; Cox Cable, 582 F.Supp. at 381 (noting that lost cash flow to cable operators adversely affects their ability to purchase and maintain a higher quality of programming services for their subscribers).

filters or other devices designed or intended to intercept cable services. See Nu-Tek, 3 F.Supp.2d at 607-08 ("The underlying fact is that Nu-Tek's business essentially facilitated cable theft in violation of § 553. To stop such an operation is a primary purpose of the injunction. It forecloses none of Nu-Tek's remaining legitimate business because, from the start, no identifiable legitimate business existed."). Cox submits that defendants should be completely and forever barred from further sales of digital filters. Stated plainly, defendants have operated as a pollutant in the industry, and their business is identical to that in Worldwide, where the court stated:

> The defendants' entire business was based upon undermining the industry's integrity while providing tools for dishonest persons to steal cable operators' products. Moreover, there is a clear risk that defendants will continue such criminal conduct in the future. The defendants' recidivist conduct and denial of any wrongdoing in the face of overwhelming proof amply demonstrates that they are likely to commence such an illegal operation again. Accordingly, the defendants will be enjoined from entering this illegal market in any capacity in the future. Any lesser measure would require each of the thousands of cable operators in the United States to commence separate actions against the defendants in order to protect their respective interests, a wholly unnecessary result given the manifestly illegal nature of their business and the injunctive power provided for by Section 553.

Id., 50 F.Supp.2d at 1303; see also Platinum Electronics, 336 F.Supp.2d at 966-67 (finding that risk of recidivism exists due to defendants' denials of wrongdoing and assertions that conduct was not illegal in the face of overwhelming legal precedent and factual proof, and seeking to spare other cable companies the need to bring separate actions).

Given defendants' large-scale illegal business, and the high profits realized therefrom, there is a clear risk that they will continue such criminal conduct. Cox should be relieved of the difficult and expensive task of policing their activities, and it urges the Court to utilize the injunction power Congress granted to ensure defendants' lawful conduct under pain of contempt.

**Conclusion**

Pursuant to the foregoing, Cox respectfully requests that the Court grant summary judgment to it and determine that defendants Chaffee, Amy, and Bou are jointly and severally liable to it for their violations of 47 U.S.C. § 553 and 17 U.S.C. § 1201 and grant to Cox (i) an award of statutory damages in the amount of $10,000.00 pursuant to Section 553 (c)(3)(A)(ii) or, in the alternative, statutory damages for each violation of Section 1201 in an amount between $200 and $2,500 per device distributed pursuant to Section 1203 (c)(3); (ii) an award of enhanced damages of up to $50,000.00 pursuant to Section 553 (c)(3)(B); (iii) a permanent injunction continuing the preliminary injunction, to prevent future violations of the Communications Act and DMCA; and (iv) a determination pursuant to 47 U.S.C. § 553 (c)(2)(C) and 17 U.S.C. § 1203 (b)(4) and (5) that Cox is entitled to recover its reasonable attorneys' fees and costs, in an amount to be determined at the conclusion of this action.

Dated: Newport, Rhode Island
September 26, 2005

Respectfully submitted for the Plaintiff CoxCom, Inc.
d/b/a Cox Communications New England
By Its Attorneys,

Shaun K. Hogan
**LEFKOWITZ, LOUIS, SULLIVAN & HOGAN, L.L.P.**
350 Jericho Turnpike, Suite 300
Jericho, New York 11753
(516) 942-4700

Francis S. Holbrook II
**MILLER SCOTT & HOLBROOK**
122 Touro Street
Newport, Rhode Island 02840
(401) 847-7500