UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COXCOM, INC. d/b/a COX COMMUNICATIONS NEW ENGLAND, Plaintiff, | : | C.A. No. 05 107 S |
| vs. | : | |
| JON CHAFFEE, individually and d/b/a ELECTRONIC IMPORTS and CHAFFEE INTERNATIONAL, AMY CHAFFEE, individually and d/b/a ELECTRONIC IMPORTS, RAMALDA BOU, individually and d/b/a ELECTRONIC IMPORTS, Defendants. | : | |

**PLAINTIFF'S LOCAL RULE 12.1(a)(1) STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE ARE NO GENUINE ISSUES TO BE TRIED**

Pursuant to Local Civil Rule 12.1(a)(1), plaintiff CoxCom, Inc. d/b/a Cox Communications New England ("Cox"), by its attorneys, respectfully submits that the following facts, material to its Motion for Summary Judgment, cannot be genuinely disputed by the defendants:

**Cox's Cable System**

1. Cox is a Delaware corporation, authorized to do business in the State of Connecticut, and it maintains a business address at 1320 Eddie Dowling Highway, Lincoln, Rhode Island. Affidavit of Ronald Allard of Cox ("Allard aff.") ¶ 2.

2. Cox provides telecommunications services, including cable television services to subscribers in, inter alia, Connecticut and Rhode Island, pursuant to franchise agreements with various municipalities. Id. ¶ 3.

3. In order to provide cable television services to its subscribers Cox pays fees to programmers. Cox then receives the programming from the programmers, primarily by way of interstate radio communications. Cox then transmits said programming over its system. Id. ¶ 4.

4. Subscribers pay Cox based on the level of service they wish to receive. Id. ¶ 5.

5. In order to protect its signals and maintain the value of its services, Cox electronically encodes or scrambles some of its signals so that they must first be decoded by electronic decoding equipment in order to be viewed clearly on a television receiver. Cox encodes or scrambles signals for premium channels, such as HBO, Showtime, and Cinemax, for which subscribers pay a separate monthly subscription fee, and pay-per-view events, such as a specific movie, concert or sporting event, for which subscribers pay a specific one time charge to view each event. Cox provides subscribers with set-top electronic decoding equipment (hereinafter referred to as "converter-decoders") to decode these signals. These are access-control devices used by cable companies to secure their signals. Cox programs these devices so that a subscriber may only view that level of service that the subscriber has purchased. Id. ¶ 7.

6. Cox's cable systems are "addressable," meaning that the electronic decoding equipment that Cox provides each subscriber who receives premium or pay-per-view services is programmed, via the cable system, by a central computer to enable the reception of only those programming services specifically selected and purchased by individual subscribers. Report at 2, 3; Allard aff. ¶ 8.

7. It is possible for a dishonest individual to install an unauthorized or "pirate" digital signal filter onto the plaintiff's cable television system. Use of digital signal filters is a relatively recent form of piracy that resulted from cable companies' utilization of digital technology

and signals for transmission and security of their programming services. Digital filters circumvent Cox's efforts to protect the copyrighted pay-per-view events it offers to customers through the technology of scrambling transmissions. The digital filters do this by interfering with Cox's addressability function with respect to its digital set-top cable devices by preventing the set-top devices from conveying to Cox's central computers billing information pertaining to pay-per-view programs viewed at the residence where set-top device is located (and where the filter is utilized). Without transmission to Cox's computers of data reflecting pay-per-view events watched, Cox is unable to bill the subscriber for his or her receipt of such programming; thus, the subscriber and/or other members of the subscriber's household view the programming free of charge. Report at 2-4; Allard aff. ¶ 8.

8. Cox's digital scrambling is a technological measure undertaken to provide conditional access to the copyright protected works it provides to its subscribers. Report at 2; Allard aff. ¶ 8.

9. Digital filters have no legitimate use on a digital cable system, and they cannot improve picture quality. They also have no ability to improve internet modem function. Used by cable customers in the manner described by defendants, the digital filters can have only one purpose – the unauthorized reception of pay-per-view events offered by Cox. Report at 8; Allard aff. ¶ 8.

10. Pay-per-view, which is one of Cox's scrambled services, includes selections that typically range in price from approximately $3.95 to $49.52. Pay-per-view programming is available throughout the day on a per-event or per-movie basis. Each Cox system offers several pay-per-view channels. Hence, an individual could conceivably steal hundreds of dollars worth of Cox's pay-per-view services in one month through the use of a digital filter. Allard aff. ¶ 9.

11. Cox's signal is a private telecommunication not intended for public use. Id. ¶ 10.

**Cox's Investigation of Defendants**

**First Undercover Purchase of Digital Filter from Defendants**

12. On December 12, 2004, Cox investigators Michael Clifford and Ronald Allard purchased a digital filter from defendants Amy Chaffee and Ramalda Bou at the Cogan Computer Fair in Danbury, Connecticut. A sign behind the cable filter display described how to use the filters to order pay-per-view movies with a digital cable converter (provided by a cable company to a subscriber) without being billed for them. A copy is attached as Exhibit "L" to the Affidavit of Shaun Hogan ("Hogan aff."). Allard paid $20.00 for the filter and received a receipt with instructions for connecting the filter, as well as the names of two websites regarding instructions for resetting the device. Allard Aff. ¶ 12. See also Exhibit "D" to the Affidavit of Ronald Allard in Support of Motion for Temporary Restraining Order and Preliminary Injunction ("Prior Aff.").

13. On December 14, 2004, Cox tested the digital filter purchased on December 12, 2004 and verified that it removed all cable-borne signals below 50mhz, including 8.096mhz, which is the frequency used by Cox's digital cable converters to communicate with Cox's head-end billing system. Thus, use of the filter would prevent billing information from being transmitted from a digital cable converter located in a customer's home to Cox's central computers via Cox's cable system. Id. ¶ 13.

**Defendants' Internet Websites**

14. Defendants referred customers to reset instructions on two websites. Id. ¶ 14; Hogan aff. Exhibit "M."

15. The characterization of the filters as "testing" tools in the first website (Exhibit "M" at 2) is a standard practice used by cable pirates to disguise their illicit intent. Id. ¶ 15.

16. Cox's digital set-top cable television converter-decoder devices do not need to be tested by its cable customers. If the cable device allows the customer to receive what he or she orders and pays for, it is working properly, and whether all pay-per-view (PPV) services (whether paid for or not) can be received is irrelevant. If a cable company-provided device does not allow the customer to receive what he or she is authorized to receive, the customer need only call the cable company and request a repair or replacement at no charge. All a digital filter does is prevent signals containing billing information emanating from the set-top device from being transmitted to the cable company head-end. It does not facilitate any testing of the capabilities of the set-top devices and indeed impedes their full functioning. Id.

17. Defendants' other website (Exhibit "M" at 10-19) contains extensive instructions for (i) using the filter to block the customer's cable box from relaying billing information back to the cable company; and (ii) avoiding the cable company's communicating with its devices via the cable system in an attempt to identify any programming to be billed. Id. ¶ 16.

18. The second website also includes references to a trick for obtaining pay-per-view movies for free if the cable company has a call-in procedure for ordering such services. Exhibit "M" at 11. It also contains discussions about how to clear the cable company-provided device's billing memory by various means. Id. at 12-16.

19. Both websites also contain numerous disclaimers that note that the purchaser should pay for all cable services received and not use the device to steal cable services, and that the seller does not advocate its products being used for such purposes. Exhibit "M" at 1-4; 10. This type of disclaimer is commonly utilized by pirate decoder sellers to foist the blame for their illegal

conduct onto their customers, and the sellers' professed unwillingness to assist in theft of cable services is often juxtaposed with representations that the use of the devices cannot be detected or traced by the cable company. Id. at 2-4, 10.

**Second and Third Undercover Purchases of Digital Filters from Defendants**

20. On December 18, 2004, Cox investigators Clifford, Allard and Mark Matteo, attended the Cogan Computer Fair in Southington, Connecticut, which is within a Cox Cable service area, and Cox is the only cable company servicing Southington. Allard aff. ¶ 18.

21. At that event, Matteo purchased one digital cable filter from defendant Jon Chaffee for $15.00 in cash. Jon gave him a piece of paper with the e-mail address of support911@aol.com handwritten on it and told him that he could use this address to obtain user instructions or to purchase more devices. Id. ¶ 18; Prior Aff., Exhibit "G."

22. That same day, Allard purchased another digital cable filter from Chaffee for $20.00. Allard aff., ¶ 19; Prior aff., Exhibit "H."

23. On December 22, 2004, Cox tested the digital cable filters that Matteo and Allard purchased from Jon Chaffee on December 18, 2004. It verified that both filters removed all cable-borne signals below 50mhz, including 8.096mhz, the frequency used by Cox's digital cable converters to communicate with Cox's head-end billing system. Thus, use of the filters would prevent billing information from being transmitted from a digital cable converter located in a customer's home to Cox's central computers. Allard Aff. ¶ 20.

**Fourth Undercover Purchase of Digital Filters from Defendants**

24. On January 16, 2005, Cox investigators Clifford and Allard went to the Cogan Computer Fair in West Warwick, Rhode Island. West Warwick is a town serviced by Cox, which is the only cable television company servicing that area. Id. ¶ 21.

25. Allard purchased ten filters from Amy Chaffee and Ramalda Bou for a total price of $100.00 in cash. In the receipt provided, Amy and Ramalda wrote contact information, including a cell phone number, for Jon Chaffee. Id. ¶ 21; Prior Affidavit, Exhibit "J."

26. On January 19, 2005, Cox tested the digital cable filters that Allard purchased from Amy Chaffee on January 16, 2005. Cox verified that all of the filters removed all cable-borne signals below 50mhz, including 8.096mhz, the frequency used by Cox's digital cable converters to communicate with Cox's head-end billing system. Thus, use of the filters would prevent billing information from being transmitted from a digital cable converter located in a customer's home to Cox's central computers. Id. ¶ 22.

**Fifth Undercover Purchase of Digital Filters from Defendants**

27. On February 15, 2005, at approximately 1:15 p.m., Cox investigator Michael Clifford called defendant Jon Chaffee, who agreed to sell five digital signal filters to him for $50.00. Id. ¶ 23.

28. At February 17, 2005, at approximately 11:20 a.m., Chaffee sold Clifford five digital cable filters for $50.00. Id. ¶ 34; Prior Affidavit Exhibit "L."

29. On February 21, 2005, Cox tested the digital cable filters that Clifford purchased from Jon Chaffee on February 17, 2005. Cox verified that the filters removed all cable-borne signals below 50mhz, including 8.096mhz, which is the frequency used by Cox's digital cable converters to communicate with Cox's head-end billing system. Thus, use of the filters would

prevent billing information from being transmitted from a digital cable converter located in a customer's home to Cox's central computers via Cox's cable system. Id. ¶ 25.

## Facts Obtained During Discovery

30. Each defendant has admitted selling or assisting in the sale of the digital filters. See selected pages of Transcript of Deposition of Jon Chaffee ("Tr."), attached as Exhibit "D" to Hogan aff., at 30-31, 84-85, 156-57; selected pages of Transcript of Deposition of Amy Chaffee ("Amy Tr."), attached as Exhibit "E" to Hogan aff., at 16, 25, and selected pages of Transcript of Deposition of Ramalda Bou ("Bou Tr."), attached as Exhibit "F" to Hogan aff., at 27, 31-32, 51-52, 76-77.

31. Defendants Chaffee, Amy and Bou admitted working together to sell digital filters in various combinations and with other persons. Tr. 166; Amy Tr. 16-18, 24-25; Bou Tr. 27, 35-36, 43, 57, 61-63.

32. The digital filters defendants sold did enable free viewing of pay-per-view services. Allard aff. ¶¶; Report at 3-5; Amy Tr. 68-69 Bou Tr. 88-89.

33. Chaffee admitted knowing that people who attended the computer shows at which he sold digital filters could engage in illegal conduct with some of the products sold. Tr. at 52.

34. Chaffee also admitted writing the following in an e-mail:

> People love the products we have because they are legal in the way you are supposed to use them so they are legal to sell such as cable filters **but illegal (sic) in the way people think of using them**. Can you really believe the clientel (sic) at a computer show would do anything illegal (sic)? No way. I don't believe it.

Tr. at 52 (emphasis added); e-mail from Support911 to joe.fountaine@verizon.net dated December 12, 2003 attached as Exhibit "G" to Hogan aff.[1] Chaffee confirmed the last three sentences of the quoted e-mail, i.e., "Can you really believe ..., etc." were made in a tongue-in-cheek manner. Tr. at 53.

35. Chaffee also admitted receiving the following e-mails referencing that the digital filters he sold were used to receive pay-per-view programming without authorization:

i. E-mail from afuerte86@hotmail.com to support911@aol.com dated May 18, 2004 which stated, in pertinent part, "I (sic) purchased your cable "Filter" a few weeks back and it works great with Pay-Per-Views ..." Tr. 124-25; Hogan aff., Exhibit "I."

ii. E-mail from icemanseegers@yahoo.com to support911@aol.com dated May 29, 2004 that states, in pertinent part, "i (sic) purchased the digital cable filter from you at the show, and you informed me that if I would email you that you would email me back with the procedures to clear my digital box once it filled up with pay per view purchases. Tr. at 173-74; Hogan aff. Exhibit "J."

36. Chaffee admitted authoring several e-mails regarding the use of the digital filters defendants sold to receive free pay-per-view programming, including the following:

i. E-mail stating, "It is only for pay-per-view, not HBO and Showtime. Here is (sic) the directions." See e-mail from Support 911 to Celyn68 dated February 14, 2004 attached as Exhibit "N" to Hogan aff.; Tr. at 88.

ii. E-mail to gareid@optonline.net dated August 2, 2003 that acknowledges the intended use of the devices and the need to reset the cable box so as to not be charged for pay per view events. It states, "The filter only works for pay per views ... It doesn't work for HBO, Showtime and

---

[1] Chaffee admitted providing customers with the support911@aol.com website. Tr. at 37, 66.

other premium channels. You must reset the box before removing or you will be charged." Hogan aff. as Exhibit "O."

37. Chaffee received an e-mail dated February 14, 2004 that stated, "I bought today a plug to connect to my cable and cable box in order to receive the PPV [Pay Per View] channels. I was also told that after a while it wont (sic) work cause the cable box will have been clogged up and it will require a code to release it.. (sic) Can you pls advise of the code and instructions as to how to use it." See e-mail dated February 14, 2004 from rca16@msn.com to support911@aol.com attached as Exhibit "P" to Hogan aff. (bracketed material added).

38. Chaffee's response, also dated February 14, 2005, states, "Hi. RC, Thank you for your e-mail. Here is (sic) the instructions for the cable filter. Sorry it only works for pay-per-view." See e-mail from Support911 to rcal6@msn.com dated February 14, 2004 attached as Exhibit "R" to Hogan aff.; Tr. at 80.

39. Defendants admit that the Instruction Sheet (Hogan aff., Exhibit "L"), was located on the defendants' display table at computer shows. Tr. 196-97; Amy Tr. 40-41; Bou Tr. 56-57.

40. Defendants Chaffee, Amy and Bou all testified they had never read the Instruction Sheet (Exhibit "L") or the Internet-based reset directions ("Exhibit "M") to which they directed customers. Tr. at 80-83, 87-88, 202-03, 206-07, 221-22; Amy Tr. 44; Bou Tr. 57-59.

41. Amy Chaffee initially testified that (i) she was unaware that the digital filters had the ability to circumvent cable companies' pay-per-view billing mechanisms; (ii) she was unaware that customers purchased them for that reason; and (iii) she never told customers they could be used for that reason or gave them any instructions regarding that. Amy Tr. at 39-40, 43-44, 56-57.

42. However, when confronted with a tape recording of her telling a customer (one of Cox's investigators) that if he removed the filter from the cable line, the cable box might send a signal and he would risk being billed $500.00, Amy Tr. at 65-66, Amy admitted it was her voice. Id. at 66, 69. When asked if her affidavit, a copy of which is attached as Exhibit "R" to the Hogan aff, which stated "I never said to anyone that if ... one did not reset the cable box the cable company could bill for the pay-per-view movies ordered," was false, Amy twice asserted her privilege against self-incrimination. Id. at 67-68. She then recanted her prior false testimony in the following exchange:

> Q. And the reason you made statements about how to reset a box on this tape was that you knew that these filters could be used to assist people in receiving pay-per-view without paying for it; correct?
>
> MR. CURRIER: Objection to form.
>
> A. Yes.

Amy Tr. at 68.

43. In Chaffee's responses to Cox's written discover demands, Chaffee named his wife and co-defendant Amy, co-defendant Bou, and three other persons as persons who sold digital filters. However, during his deposition he admitted having omitted the names of five other persons (Joe Fontaine, Richard Conti, Sharon McKenna, Christine McKenna, Stephen Sercu) who also sold digital filters on his behalf. Tr. at 59-61, 105. Lest these be characterized as oversights, Chaffee testified that Sharon and Christine McKenna were his sisters-in-law. Tr. at 61.

44. Chaffee also admitted to using the aliases of "Sharon" and "Mike" while conducting his digital filter sales business. Tr. 64-67, 88 (Sharon); Tr. at 128-31; Hogan aff. Exhibit "O" (Mike).

45. The Declaration of Gerard Boisvert, a former employee of Jon Chaffee, states that "When I began working for Jon Chaffee, he told me that digital cable television signal filters, once connected to a digital cable television system, could be used to enable the user to receive pay-per-view programming without the cable television provider being notified and the customer being charged." Exhibit "H" ¶ 6.

46. Boisvert also stated, "Jon Chaffee made it clear to me that he knew and intended that people who purchased digital cable television filters could and would use them to view pay-per-view programming without paying for it." Id. ¶ 7.

47. Sharon McKenna, who occasionally sold digital filters for the defendants, testified that she knew that at least some of the digital filters defendants sold were being used to receive pay-per-view services without payment or authorization. See pages 47-49 of Transcript of Deposition of Sharon McKenna (attached to Hogan aff. as Exhibit "K").

48. The defendants sold digital filters at computer shows in areas serviced by Cox. Allard Aff. ¶¶ 18, 21.

49. Chaffee has admitted to receiving $3,500 in profits from the sale of digital filters over a fourteen month period. See defendants' accounting of profits attached as Exhibit "B" to Hogan aff.

**Harm Caused by the Sale and Use of Digital Signal Filters**

50. By using a digital signal filter received from the defendants, a dishonest individual may view Cox's pay-per-view cable television programming services without paying the additional per-event fee for said programming, resulting in a loss to Cox for each such program viewed without remuneration to it. Moreover, the theft of Cox's cable television service not only

causes direct monetary loss to Cox, but also adversely affects states and municipalities in those locations throughout the country that grant franchises to Cox for operation of its cable television systems there. These governmental entities receive and derive franchise fees and/or sales taxes based on Cox's gross revenues. Cox's residential customers also suffer as a result of the lost revenues to Cox, which impair its ability to purchase and offer a high quality selection of programming services. The interception of Cox's signals also result in losses to the creators and/or owners of the copyrighted works that are transmitted via the signals. Id. ¶ 26.

51. Cox has not consented to any defendant's selling or using digital filters on its cable system. Cox has not authorized any subscriber to do so. Any use of a digital filter on its cable system in the manner at issue herein would be without Cox's authorization. Id. ¶ 27.

Dated: Newport, Rhode Island
September 23, 2005

Respectfully submitted for the Plaintiff CoxCom, Inc.
d/b/a Cox Communications New England
By Its Attorneys,

Shaun K. Hogan
**LEFKOWITZ, LOUIS, SULLIVAN & HOGAN, L.L.P.**
350 Jericho Turnpike, Suite 300
Jericho, New York 11753
(516) 942-4700

Francis S. Holbrook II
**MILLER SCOTT & HOLBROOK**
122 Touro Street
Newport, Rhode Island 02840
(401) 847-7500