UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COXCOM, INC. d/b/a COX COMMUNICATIONS NEW ENGLAND,<br><br>Plaintiff,<br><br>vs.<br><br>JON CHAFFEE, individually and d/b/a ELECTRONIC IMPORTS and CHAFFEE INTERNATIONAL, AMY CHAFFEE, individually and d/b/a ELECTRONIC IMPORTS, RAMALDA BOU, individually and d/b/a ELECTRONIC IMPORTS,<br><br>Defendants. | : | C.A. No. 05 CV 107 S<br><br>**AFFIDAVIT OF RONALD ALLARD IN SUPPORT OF MOTION FOR <u>SUMMARY JUDGMENT</u>** |

STATE OF RHODE ISLAND)
) ss.:
COUNTY OF PROVIDENCE)

**RONALD ALLARD**, being duly sworn, deposes and says:

1. I am an Investigator for plaintiff CoxCom, Inc. d/b/a Cox Communications New England ("Cox"). I submit this affidavit in support Cox's Motion for Summary Judgment against defendants Jon Chaffee, individually and d/b/a Electronic Imports and Chaffee International, Amy Chaffee, individually and d/b/a Electronic Imports, and Ramalda Bou, individually and d/b/a Electronic Imports (collectively, "defendants"). I have been an investigator with Cox for seven years. Prior to that, I was a police officer in the City of Warwick from 1973 to 1997, when I retired. I am also a licensed private investigator. In my present capacity, I personally conduct investigations of, <u>inter alia</u>, cable piracy, including large-scale distributors of "pirate" cable television decoding devices and digital cable television filters. I have conducted cable piracy investigations similar to that described herein on several prior occasions. Consequently, I have considerable general experience in investigations, and am

familiar with the various aspects of the cable television business and unauthorized interception of cable television services. I have personal knowledge of the following, and if called as a witness, could and would testify to the same.

## Cox's Cable System

2. Cox is a Delaware corporation, authorized to do business in the State of Connecticut, and it maintains a business address at 1320 Eddie Dowling Highway, Lincoln, Rhode Island.

3. Cox provides telecommunications services, including cable television services to subscribers in, inter alia, Connecticut and Rhode Island, pursuant to franchise agreements with various municipalities.

4. In order to provide cable television services to its subscribers Cox pays fees to programmers. Cox then receives the programming from the programmers, primarily by way of interstate radio communications. Cox then transmits said programming over its system.

5. Subscribers pay Cox based on the level of service they wish to receive.

6. In order to protect its signals and maintain the value of its services, Cox electronically encodes or scrambles some of its signals so that they must first be decoded by electronic decoding equipment in order to be viewed clearly on a television receiver. Cox encodes or scrambles signals for premium channels, such as HBO, Showtime, and Cinemax, for which subscribers pay a separate monthly subscription fee, and pay-per-view events, such as a specific movie, concert or sporting event, for which subscribers pay a specific one time charge to view each event. Cox provides subscribers with set-top electronic decoding equipment (hereinafter referred to as "converter-decoders") to decode these signals. These are access-

control devices used by cable companies to secure their signals. Cox programs these devices so that a subscriber may only view that level of service that the subscriber has purchased.

7. Cox's cable systems are "addressable," meaning that the electronic decoding equipment that Cox provides each subscriber who receives premium or pay-per-view services is programmed, via the cable system, by a central computer to enable the reception of only those programming services specifically selected and purchased by individual subscribers.

8. It is possible for a dishonest individual to install an unauthorized or "pirate" digital signal filter onto the plaintiff's cable television system. Digital signal filters enable their users to receive Cox's pay per view programming without paying for it. It is my understanding, based upon my investigation, my discussions with defendants, my knowledge of Cox's cable system, the test results described in the report of Stan Durey, and the tests conducted by Cox employees (described herein), that digital filters interfere with Cox's addressability function and prevent its digital set-top cable devices from conveying to Cox's central computers billing information pertaining to pay-per-view programs viewed at the residence where the filter is utilized. Digital filters also circumvent Cox's efforts to protect the copyrighted pay-per-view events it offers to customers through the technology of scrambling transmissions. When used by cable customers in the manner described by defendants, the digital filters can have only one purpose – the unauthorized reception of pay-per-view events offered by Cox. Digital filters simply have no legitimate use on a digital cable system.

9. Pay-per-view, which is one of Cox's scrambled services, includes selections that typically range in price from approximately $3.95 to $49.52. Pay-per-view programming is available throughout the day on a per-event or per-movie basis. Each Cox system offers several pay-per-view channels. Hence, an individual could conceivably steal hundreds of dollars worth of Cox's pay-per-view services in one month through the use of a digital filter.

10. Cox's signal is a private telecommunication not intended for public use.

**Cox's Investigation of Defendants**[1]

11. In August of 2004, Cox commenced an action in the U.S. District Court for the District of Connecticut against a different seller of digital filters, i.e., CoxCom, Inc. v. Burdsall, No. 3:04CV1370 (D.Conn. Sept. 2, 2004) (Kravitz, J.). In the course of that action, Cox obtained that defendant's records with respect to his digital signal filter sales operation. The records included e-mails dated February 25 and February 26, 2004 between that vendor (digitaltv4u) and Jon Chaffee. As discussed at length in my Affidavit in Support of Motion for Temporary Restraining Order and Preliminary Injunction ("Prior Affidavit"), that e-mail correspondence included Chaffe's statement that he purchased approximately 100 digital filters

[1] My prior affidavit contains considerable detail regarding surveillance of defendants while they sold digital filters at computer fairs. Much of that detail was included to support identification of the defendants, establish connections between each of them, their vehicles, their websites, etc. Many of those facts are no longer in dispute. Other facts, such as defendants' representations to me and other Cox investigators about the purpose of the digital filters, may be in dispute and thus are not set forth herein, although I reaffirm their accuracy. Consequently, this affidavit is restricted to uncontested or uncontestable facts such as Cox's cable system and business, and Cox's investigation to the extent it involves undisputed or verifiable purchases of devices, or the content of websites or reset instructions. In light of the numerous exhibits to the present Motion, and the undisputed facts in this case, such as the fact that Cox's investigators did purchase digital signal filters from the defendants, and that Chaffee used the Support911@aol.com website, only the most relevant exhibits from my Prior Affidavit are reproduced in the present Motion. The others, which pertain largely to uncontested matters, are incorporated by reference.

per week, and reflected that he used e-mail address Support911@aol.com. As a result, Cox decided to investigate Chaffee.

**First Undercover Purchase of Digital Filter from Defendants**

12. On December 12, 2004, Cox Technology Investigator Michael Clifford and I traveled to the Cogan Computer Fair in Danbury, Connecticut. A sign behind the cable filters described how to use the filters to order pay-per-view movies with a digital cable converter (provided by a cable company to a subscriber) without being billed for them. A copy is attached as Exhibit "L" to the Affidavit of Shaun Hogan ("Hogan aff."). There were two women behind the table whom I now know to be defendants Amy Chaffee and Ramalda Bou. I purchased a cable filter for $20.00, paying in cash, and received a receipt with instructions for connecting the filter, as well as the names of two websites regarding instructions for resetting the device. A photograph of the device, the instruction sheet with the handwritten e-mail address, and the invoice from Electronicimports.net were attached as Exhibit "D" to the Prior Affidavit.

13. I am advised that on December 14, 2004, investigator Mike Clifford met with Pierre Dubois, a Broadband Technician at the Cox Communications West Warwick Master Telecommunications Center. Dubois verified in Clifford's presence that the digital filter we purchased on December 12, 2004 removed all cable-borne signals below 50mhz, including 8.096mhz, which is the frequency used by Cox's digital cable converters to communicate with Cox's head-end billing system. Thus, use of the filter would prevent billing information from being transmitted from a digital cable converter located in a customer's home to Cox's central computers via Cox's cable system.

**Defendants' Internet Websites**

14. I subsequently visited the two websites provided by Amy Chaffee. A copy of a printout of part of http://home.comcast.net/sunglassesdirect/instruction.htm is attached as the first part of Exhibit "M" hereto. It contains many statements frequently utilized by sellers of "pirate" cable television equipment to pass their products off as legitimate equipment. For example, it claims:

> This unit is also a great tool for technicians to use on equipment they are repairing and testing. If the technician was to test the PPV buy option on the remote to see if the box is indeed working correctly, they could press they "Buy" button on the remote and the pay-per-view comes in, the box and TV are then shut off by the technician so no one was to watch that paid programming, and the customer is not billed for the PPV that was ordered.
>
> All programming that can be received by pressing the "Buy", "Order" or "Purchase" button on your remote can be viewed without the billing information from (sic) reaching the cable company by having device (sic) connected to your digital cable box as it blocks the billing information.

Exhibit "M" at 2.[2] After thus confirming that the digital filter allows free viewing of pay-per-view programming, the website goes on to caution the user, in tongue-in-cheek fashion, to notify the cable company of all programs viewed in this manner. Id.

15. The characterization of the filters as "testing" tools is a standard practice used by cable pirates to disguise their illicit intent. Cox's digital set-top cable television converter-decoder devices do not need to be tested by its cable customers. If the cable device allows the customer to receive what he or she orders and pays for, it is working properly, and whether all pay-per-view (PPV) services (whether paid for or not) can be received is irrelevant. If a cable company-provided device does not allow the customer to receive what he or she is authorized to receive, the customer need only call the cable company and request a repair or

replacement at no charge. All a digital filter does is prevent signals containing billing information emanating from the set-top device from being transmitted to the cable company head-end. It does not facilitate any testing of the capabilities of the set-top devices and indeed impedes their full functioning.

16. Another website provided to us by defendants, i.e., http://digitaldiety.biz/reset, a copy of which is attached hereto as the second part of Exhibit "M," contains similarly revealing statements, including the following statements reflecting defendants' intent to assist in the unauthorized interception of a cable company's pay-per-view services by (i) using the filter to block the customer's cable box from relaying billing information back to the cable company; and (ii) avoiding the cable company's communicating with its devices via the cable system in an attempt to identify any programming to be billed:

> INITIAL TEST **First and foremost**: When you first install the filter, only order 1 movie and go through the reset procedures to find one that works for you. Do the reset, check purchase history, make sure its (sic) cleared, then remove the filter. If one method didn't clear it, another will so just go through them for your specific box. (This will be the longest period of your testing because you will need to wait about a week after resetting and removing the filter to see if the charge shows up on your bill.) This is why some people call it "testing" because before you use the filter freely you have to test and find the one method that will ALWAYS work for you so that you simplify things and never have to worry about it in the future. Some people are told to never remove the filter, and then 2 months later their box locks up, they don't know why, and get stuck with a huge bill, hence all the rumors that the filters don't work and people get stuck with huge bills at the end. You don't have to go through that, because if a reset ends up not working for you, all you loose (sic) is the price of one movie.
>
> Occasionally the cable companies call up your box to see if it responds. They attempt to do this about 2 or 3 times before they lock it up due to no response back to them (if the filter is on the box, the box cannot respond to the signal attempts). Your best bet is to occasionally reset the box and remove the filter (preferably after 5 movies OR about every two weeks) and remove the filter on the 3rd 17th and the 22nd of each month. **(JUST MAKE SURE THAT NO MATTER WHEN YOU FEEL LIKE DOING THE RESET NOT TO DO IT ON THE 3 DATES THAT THE CABLE**

[2] For ease of reference, the two sets or reset instructions in Exhibits "M" have been consecutively hand-paginated in the lower right-hand corner. Also, some sections are highlighted with hand-drawn arrows.

> **COMPANIES USE TO SEND THE SIGNAL WHICH ARE: 3rd, 17th, & 22nd)** The filter needs to be removed WHEN & IF and ONLY IF you have successfully reset the box and made sure of this by checking your box purchase history to see that everything was deleted (see below for instructions on checking your current memory) You remove it so that the box is open to the cable company signals. That is the only way the box can respond to the signals-IF & WHEN the filter is OFF. There are 2 reasons why your box may lock up: #1 If you go over your limit of unanswered movies (which is 5 or more) #2 If your box is not responding to the cable company signals. To eliminate both these problems just make sure you reset the box after ordering 5 movies and remove the filter for a day or 2 after each reset.

Exhibit "M" at 10-11. The website also includes references to a trick for obtaining pay-per-view movies for free if the cable company has a call-in procedure for ordering such services. Id. at 11. It also contains discussions about how to clear the cable company-provided device's billing memory by various means. Id. at 12-16.

17. Both websites also contain numerous disclaimers that note that the purchaser should pay for all cable services received and not use the device to steal cable services, and that the seller does not advocate its products being used for such purposes. Id. at 1-4; 10. This type of disclaimer is commonly utilized by pirate decoder sellers to foist the blame for their illegal conduct onto their customers, and the sellers' professed unwillingness to assist in theft of cable services is often juxtaposed with representations that the use of the devices cannot be detected or traced by the cable company. Id. at 2-4, 10.

**Second and Third Undercover Purchases of Digital Filters from Defendants**

18. On December 18, 2004, Cox investigators Mike Clifford, Mark Matteo, and I entered the Cogan Computer Fair in Southington, Connecticut. This town is within a Cox Cable service area, and Cox is the only cable company servicing Southington. Matteo proceeded to a table where five digital filters and a set of filter instructions were displayed. He started a conversation with the man we now know is defendant Jon Chaffee. Matteo purchased one digital

cable filter from Jon for $15.00 in cash. Jon gave him a piece of paper with the e-mail address of support911@aol.com handwritten on it and told him that he could use this address to obtain user instructions or to purchase more devices. A photograph of the device and the handwritten e-mail address are attached hereto as Exhibit "G" to the Prior Affidavit

19. Later the same day, I re-entered the computer fair and went to Chaffee's table. I purchased one digital cable filter for $20.00. Photographs of the device and a piece of paper serving as a handwritten invoice and containing Jon's initials and handwritten e-mail address are attached hereto as Exhibit "H" to the Prior Affidavit.

20. On December 22, 2004, investigator Mike Clifford met with Cox Communications Broadband Technician Pierre Dubois at Cox's West Warwick Master Telecommunications Center. Dubois tested the digital cable filters that Mark Matteo and I purchased from Jon Chaffee on December 18, 2004. Dubois verified in Clifford's presence that both filters removed all cable-borne signals below 50mhz, including 8.096mhz, the frequency used by Cox's digital cable converters to communicate with Cox's head-end billing system. Thus, use of the filters would prevent billing information from being transmitted from a digital cable converter located in a customer's home to Cox's central computers.

**Fourth Undercover Purchase of Digital Filters from Defendants**

21. On January 16, 2005, Cox investigator Mike Clifford and I went to the Cogan Computer Fair in West Warwick, Rhode Island. West Warwick is a town serviced by Cox, which is the only cable television company servicing that area. When we went inside, we found defendants Amy Chaffee and Ramalda Bou sitting behind a table that had several digital filters and a set of instructions on top. I purchased ten filters for a total price of $100.00 in cash.

In the receipt provided, Amy and Ramalda wrote contact information, including a cell phone number, for Jon Chaffee, her husband. A photograph of the receipt, lists of websites for instructions, and the ten digital filters purchased, is attached hereto as Exhibit "J" to the Prior Affidavit.

22. On January 19, 2005, investigator Mike Clifford met with Cox Communications Broadband Technician Jim Webb at Cox's West Warwick Master Telecommunications Center. Webb tested the digital cable filters that Clifford and I purchased from Amy Chaffee on January 16, 2005. Webb verified in Clifford's presence that all of the filters removed all cable-borne signals below 50mhz, including 8.096mhz, the frequency used by Cox's digital cable converters to communicate with Cox's head-end billing system. Thus, use of the filters would prevent billing information from being transmitted from a digital cable converter located in a customer's home to Cox's central computers.

**Fifth Undercover Purchase of Digital Filters from Defendants**

23. On February 15, 2005, at approximately 1:15 p.m., Cox investigator Michael Clifford called defendant Jon Chaffee at (401) 743-1940. This was the cell phone number that Amy Chaffee had given to Clifford and I at the Cogan Computer Fair in West Warwick on January 16, 2005, when we purchased digital signal filters from her. During the call, Jon agreed to sell five digital signal filters for $50.00.

24. At February 17, 2005, at approximately 11:20 a.m., Clifford and Chaffee met in a parking lot in Warwick, Rhode Island. Clifford approached Jon Chaffee and gave him $50.00 in cash, and Chaffee gave Clifford five digital cable filters. A copy of a photograph of the transaction is attached as the first picture in Exhibit "L" of the Prior Affidavit. Chaffee is the

man in the left of the picture. A photograph of the five filters that Chaffee sold to Clifford is attached as the second picture in Exhibit "L" of the Prior Affidavit.

25. On February 21, 2005, investigator Mike Clifford met with Pierre Dubois, a Broadband Technician at the Cox Communications West Warwick Master Telecommunications Center. Clifford requested that Pierre test the digital cable filters that he had purchased from Jon Chaffee on February 17, 2005. Dubois verified in Clifford's presence that the filters removed all cable-borne signals below 50mhz, including 8.096mhz, which is the frequency used by Cox's digital cable converters to communicate with Cox's head-end billing system. Thus, use of the filters would prevent billing information from being transmitted from a digital cable converter located in a customer's home to Cox's central computers via Cox's cable system.

**Harm Caused by the Sale and Use of Digital Signal Filters**

26. By using a digital signal filter received from the defendants, a dishonest individual may view Cox's pay-per-view cable television programming services without paying the additional per-event fee for said programming, resulting in a loss to Cox for each such program viewed without remuneration to it. Moreover, the theft of Cox's cable television service not only causes direct monetary loss to Cox, but also adversely affects states and municipalities in those locations throughout the country that grant franchises to Cox for operation of its cable television systems there. These governmental entities receive and derive franchise fees and/or sales taxes based on Cox's gross revenues. Cox's residential customers also suffer as a result of the lost revenues to Cox, which impair its ability to purchase and offer a high quality selection of programming services. The interception of Cox's signals also result in losses to the creators

and/or owners of the copyrighted works that are transmitted via the signals. I respectfully urge this Court to enter an injunction against the defendants' continued sale or distribution of digital filers to protect Cox's interests during the pendency of this action and to send a strong message to defendants herein and to those who would assist in the circumvention of Cox's digital security technology and interception of cable television services that such conduct is not and will not be tolerated.

27. Cox has not consented to any defendant's selling or using digital filters on its cable system. Cox has not authorized any subscriber to do so. Any use of a digital filter on its cable system in the manner at issue herein would be without Cox's authorization.

Ronald Allard

Sworn to before me this
23 day of September, 2005

Notary Public