UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COXCOM, INC. d/b/a COX COMMUNICATIONS NEW ENGLAND, Plaintiff, | : | C.A. No. 05 107 S |
| | : | EXPERT REPORT OF STAN DUREY |
| JON CHAFFEE, individually and d/b/a ELECTRONIC IMPORTS and CHAFFEE INTERNATIONAL, AMY CHAFFEE, individually and d/b/a ELECTRONIC IMPORTS, RAMALDA BOU, individually and d/b/a ELECTRONIC IMPORTS, Defendants. | : | |

Lefkowitz, Louis, Sullivan & Hogan, L.L.P.
Shaun K. Hogan, Esq.
350 Jericho Turnpike, Suite 300
Jericho, New York 11753
(516) 942-4700

Miller Scott & Holbrook
Francis S. Holbrook
122 Touro Street
Newport, Rhode Island 02840
(401) 847-7500

**Expert Report of Stan H. Durey**

Stan H. Durey has already been designated by plaintiff as an expert witness in this action. Mr. Durey is a consultant to the cable television industry and was formerly employed by Motorola Broadband Communications (formerly General Instrument Corporation) as its Director of Security Programs. Mr. Durey maintains an office at 73 Old Dublin Pike, Doylestown, Pennsylvania 18901. As discussed fully below, Mr. Durey's former employer, General Instrument Corporation, was engaged in the business of designing, manufacturing, and selling cable television products and systems, including addressable cable television converter decoders. These converter decoders were purchased by cable television system operators for use as access control devices. Mr. Durey is an expert on various types of cable signal theft, including through use of digital signal filters such as those sold by the defendants, Jon Chaffee, individually and doing business as Electronic Imports and Chaffee International, Amy Chaffee, individually and doing business as Electronic Imports, and Ramalda Bou, individually and doing business as Electronic Imports (hereinafter "defendants").

In general, Mr. Durey will testify as to the nature and capabilities of the filters, his examination and testing of the filters sold and distributed by the defendants, their effect on the plaintiff's cable television system, as well as the general effects cable piracy has on the cable television industry. Mr. Durey has been qualified as an expert on cable signal theft and related issues in Federal Courts throughout the United States.

**Expert Report**

A "pirate" cable television device is a device capable of enabling a user, when the user installs the device together with a cable television operator's coaxial cable, and the consumer's television set, to enable reception of certain scrambled cable television programming services available on that cable television system. Scrambling is a technological measure that effectively controls access to a cable company's programming the vast majority of which is copyrighted material. A pirate device will provide access to programming without the authorization or knowledge of the cable television operator transmitting or otherwise providing those signals.

a. The digital converter decoder devices that CoxCom, Inc., doing business as Cox Communications of New England (Cox) and other cable companies currently provide to their subscribers have the technology feature and function known as "addressability." By means of addressability, a cable operator's central computer can communicate with the descrambling and computer circuitry in each converter-decoder provided to its subscribers by transmitting a message via its cable system to the unique address encoded in each converter decoder. By use of addressability, a cable television operator can limit a subscriber's authorized reception to only those cable television programming services that a particular subscriber has purchased and is thereby authorized to receive. Addressability also enables a cable television operator to upgrade or downgrade a subscriber's authorized level or amount of programming service without having to mechanically alter or physically replace a converter decoder via a service call to a subscriber's residence.

Further, in the case of the digital encoding addressable system such as that deployed by Cox in Rhode Island and Connecticut, the addressable technology allows the cable system operator to authorize designated subscribers to purchase access to services offered on a pay-per-view basis. These services include movies and other special events that the consumer may purchase via the digital set top converter decoder provided to the consumer by the system operator.

When a consumer elects to view a pay-per-view service, and purchases the right to do so via the set top converter decoder, information specific to that purchase is stored in the digital set top converter decoder until the cable company's addressable control computer issues a command to the individual consumer's set top converter decoder. This command instructs the converter decoder to report any and all uncollected and unbilled purchases. In order for this business model, based on addressable digital set top converters, to succeed, the operator must be able to successfully collect the purchase data, match it to the appropriate consumer's billing record, bill the consumer, and receive payment.

However, digital cable television filters like those distributed by the defendants, prevent a cable company's timely collection of purchase data by filtering or blocking the set top converter decoder's transmission of billing information to the cable company's addressable control computer. Thus, they allow consumers to view pay-per-view services without appropriate authorization or payment. In fact, the specific design and function of these filters serves to subvert and bypass the addressable function of the cable operator's access control system. Cox cannot limit or prevent the digital filters from

allowing consumers to obtain unauthorized access to Cox's pay per view programming services.

b. On the 29th and 30th days of August, 2005 I examined and tested the eighteen digital filters I was advised had been purchased from the defendants during the course of Cox's investigation. The tests I conducted demonstrated that, when installed in a subscriber's residence by following the instructions provided by the defendants, each of the eighteen filters has the capability of preventing Cox from collecting purchase data stored in the digital set top converter decoder. To accomplish the testing, I employed four different Motorola digital set top converter decoders. The four chosen represented the several generations of digital set top converter decoders deployed in the Cox system. To demonstrate that the digital filters do block data transmitted from the set top to the controller, we first connected the four test set top converter decoders to the Cox cable system. I then verified that each set top converter decoder would respond to commands sent from the control computer and that the response to the commands could be received by the control computer. Once I had established the communication baseline measurement, I then attached each of the filters to one of the four set top converter decoders in the manner prescribed by the defendants.

When the filters were in place, I again attempted to communicate with each set top converter decoder. In every instance, when I had a digital filter connected to the set top converter decoder, no set top converter decoder could communicate with the control computer. To further validate the results, I tested the communication path and verified that the set top converter decoder could communicate with the control computer both before and after each test of a filter. Each set top converter decoder could respond when

the filters were not in place. Each could not respond when the filters were in place. Thus, Cox was unable to collect billing data pertaining to the purchase of pay-per-view events. I have examined and tested dozens of similar digital cable filters during the course of my employment with Motorola and my subsequent consulting practice. The filters sold by the defendants performed in a fashion consistent with others I have tested.

c. I have also read the defendants' deposition transcripts and discovery responses, and the affidavit of plaintiff's representative, Ron Allard. I have also examined all of the plaintiff's exhibits produced during defendant Jon Chaffee's deposition. As a result of my review of the foregoing, I understand that the defendants assert that they sold the digital filters to consumers to allow consumers to use the filters to remove unspecified interference from their digital television signals. Defendant Chaffee makes numerous statements during the course of his deposition, including at pp. 84: 16-21, 120: 2-15, 133–139, 205–206, 221: 17–25, that can be distilled into three specific representations, summarized as follows: 1.) The individuals that purchase the digital filters are engineers. 2.) The engineers that purchase the filters do so to eliminate ham radio interference. 3.) Chaffee has no knowledge of the content of web sites to which he directs the purchasers of digital filters, which content tells the purchasers how to use the filters to obtain unauthorized access to pay-per-view services. Defendant Bou also claims in her deposition transcript, at 39-40, 61-63, 66, that the filters were sold to enhance a customer's access to the internet.

The representations of the defendants are incredible, and defy reason and common sense. For example, defendant Chaffee's assertions that his purchasers are engineers and that they purchase from him because they have the knowledge to use the filters to prevent

interference from ham radio and other sources of interference is at best disingenuous and belied by the fact that defendants sold them as "digital cable filters", and displayed plaintiff's exhibit 21. It contains a diagram showing a digital cable box and TV. There were no such documents or diagrams pertaining to eliminating ham radio interference.

An electrical engineer would know the following: 1.) the effective frequency range of the digital filters sold by the defendants is approximately 0MHz to 54MHz. Defendant Chaffee has asserted at p 84, 20-21, "They sell the same thing at Radio Shack for 54MHz to 90MHz." The frequencies used by the Motorola addressable access control system, to transmit data from the digital set top converter decoder back to the addressable control computer, all lie in the range of 0 MHz to 54 MHz, not 54MHz to 90MHz. This includes the addressable system utilized by Cox in Rhode Island on which I conducted the tests. The devices sold by the defendants ***do*** block the frequencies between 0MHZ and 54MHz, thereby preventing data collection. A device with an effective frequency of 54MHz to 90MHz ***would not*** prevent data collection. 2.) Further, an engineer would know that Radio Shack has sold so-called high pass filters, i.e., radio frequency filters that block frequencies below 54MHz and allow higher frequencies to pass. An engineer would also know that historically, a consumer that received television service via rooftop antenna might conceivably have a need to purchase such a filter. If said consumer lived in proximity to an amateur radio (HAM) operator, the proximate HAM transmitter could create interference that a high pass filter might relieve. 3.) An engineer would also know that while an antenna system is an open system, highly susceptible to such interference, a cable system, in contrast, is a closed system. As such, especially following the deployment of fiber optic cable, a closed system has significantly lower, if any, potential

for this type of interference. Moreover, if such interference did exist, it would be incumbent upon the cable system operator to eliminate the interference for the affected consumer, not the consumer suffering the interference. If such repairs were necessary, the cable system operator would perform the repair in a fashion that would not compromise the proper function of the addressable access control and billing system. Accordingly, I find untenable the claim that a consumer might seek out the defendants to purchase equipment to relieve interference that, if it existed, the cable operator would have responsibility to relieve.

The assertion of defendant Bou, that consumers might purchase the devices to enhance reception of high-speed data via cable modem, also lacks credibility. Most cable modems employ frequencies in the same range as set top devices to communicate with the World Wide Web, typically between 15MHz and 40 MHz. A consumer could more easily ***prevent*** a modem connection through use of a digital cable filter than they could enhance it. Significantly, the defendants provided no instructions on how one might use a digital cable filter in a fashion that would enhance high-speed data service.

I have also reviewed the various reset instructions that the defendants provided to consumers who purchase digital cable filters from them. These instructions, attached as Exhibit E to Cox's motion for a temporary restraining order, clearly bespeak the defendants' intentions in that they provide clear instructions directed at enabling consumers to erase or otherwise alter the purchase data stored in the set top device, thereby preventing the cable operator from collecting the data and billing the consumer.

In sum, there is no conceivable legitimate consumer application for digital filters on an addressable digital cable television system.

Ultimately, the actions of the defendants manifest their intent. The defendants solicit the sales and promote the use of the filters by consumers to obtain unauthorized access to cable television services. See Plaintiff's Exhibit 21 from the deposition of Jon Chaffee (Instruction Sheet/FAQ/Disclaimer). They do so by providing the filters together with instructions on how to use the filters to obtain unauthorized access to programming provided by the plaintiff. At no time have the defendants demonstrated either the willingness or the capability to instruct purchasers in any supposed legitimate use of the digital filters they sell.

Based on the foregoing, and particularly the absence of any legitimate consumer need for a digital cable filter, I conclude that the defendants sold digital cable filters with the intent of assisting in the unauthorized reception of cable services in violation of 47 USC, Section 553.

Also based on the foregoing, I have concluded that defendants sold digital cable filters for the purpose of circumventing Cox's digital scrambling technology in violation of 17 USC, Section 1201. This technology is designed to prevent unauthorized access to copyrighted works. The digital filters have at best only limited commercially significant uses.

## A. Opinion and Bases Thereof

My opinions are based on my more than 21 years of experience in the cable television equipment industry, including the last 13 years devoted to combating signal piracy. In addition, my opinions are based on my examination and testing of dozens of digital cable filters including those sold by the defendants, my knowledge of the sales

practices of my former employer, and the operations procedures of my former employer's customers, including but not limited to the plaintiff.

**B. Data or Other Information Considered**

As discussed above, the data and information I considered in forming my conclusions are as follows:

1.) The equipment I have examined during my career, 2.) Devices and related documents obtained by the plaintiff in the course of their investigation of the defendants' illegal business, subsequently reviewed and/or tested by me, 3.) My understanding of encryption technology, addressable technology, and equipment, 4.) My attendance and participation in industry seminars, 5.) My study of the nature and practices of businesses that profit from the sale and distribution of pirate cable television devices, 6.) My review of defendant Chaffee's deposition transcript, 7.) My review of the defendants' responses to Cox's discovery requests.

**C. Exhibits to be used to Summarize or Support Opinion**

The exhibits I plan to use in support of my opinions are copies of receipts, instructions, diagrams displayed by defendants when selling digital cable filters and related documents that I examined. I also plan to use devices purchased from the defendants that I examined and tested and the test results from the testing I conducted. As may be necessary, I will also use frequency allocation charts and supporting documents from the Federal Communications Commission of the United States, or other appropriate federal departments or bureaus, and technical documentation related to

operation of the Motorola digital access control system employed by the plaintiff to both provide and control access to cable television programming.

**D. Curriculum Vitae**

See, Exhibit "A," which provides my qualifications.

**E. Compensation for Testimony**

I have not been paid to date, and will be paid my hourly fee of $125.00 if I appear at trial.

**F. List of Cases/Depositions in Last Four Years**

For a list of the cases and depositions in which I have testified an expert since 1996, please see Exhibit "A."

Dated: Doylestown, Pennsylvania

September 12, 2005

**STAN H. DUREY**

Respectfully submitted, Dated: 9-12-2005

By: ______________________________

**SHAUN K. HOGAN**

**ATTORNEYS FOR PLAINTIFF**

**LEFKOWITZ, LOUIS, SULLIVAN & HOGAN, L.L.P.**

350 Jericho Turnpike, Suite 300

Jericho, New York 11753

(516) 942-4700

**Stan H. Durey**
**Principal**
**S H Durey Consulting**
**73 Old Dublin Pike**
**Doylestown, PA 18901**

June 2001 - Current: S H Durey Consulting
Established S H Durey Consulting in June 2001 and specializes in broadband telecommunications security issues. Clients include major cable television and direct satellite operating companies, cable television programming companies, law enforcement agencies, and industry trade associations.

1992 - 2001: General Instrument Corporation
(Effective January 5, 2000, General Instrument became a wholly owned subsidiary of Motorola Corporation and now does business as Motorola Broadband Communications Sector.)
As Director, Security Programs, assumed world wide responsibility for anti-piracy operations on behalf of General Instrument and its customers. Developed effective liaison with federal law enforcement entities, including the United States Department of Justice, Federal Bureau of Investigation, United States Customs Service and the United States Secret Service.

Developed and implemented standardized processes for technical analysis of cable signal theft devices and for presentation of test results as evidence in civil and criminal court proceedings.

Provided expert testimony and delivered other presentations supporting anti-piracy legislation in numerous state venues in the United States, as well as in Latin America, and Europe.

Invited speaker and instructor on the nature and extent of the signal theft problem in front of dozens of audiences including cable television system operators, legislative bodies, law enforcement groups and industry trade associations.

Guest lecturer on cable signal theft, FBI Academy, Quantico, VA, 1998-2001.

During tenure at General Instrument, served as Executive Committee Member of the Coalition Opposing Signal Theft, a committee of the National Cable and Telecommunications Association, served as a member of the Cable Theft Committee of Pennsylvania Cable and Telecommunications Association, member of the American Society of Industrial Security and Chairman of the ASIS Cable and Satellite Committee, member of AEPOC, an association representing intellectual property issues before the European Parliament and member of the Society of Cable Television Engineers.

Qualified as expert and/or provided expert testimony on cable signal theft in cases including the following since January 1, 1995:

State of Florida vs. Carlos Menendez
CC No. 97-4023
OSWP no. 1998-016NFA (Tallahassee, Leon County, FL)

State of Florida vs. Jose Alberto Menendez
CC No. 97-4023
OSWP No. 1998-016NFB (Tallahassee, Leon County, FL)

State of Florida vs. Jose Alberto Menendez

CC No. 97-4023
OSWP No. 1998-016NFB (Tallahassee, Leon County, FL) November, 1999.

Community Television Systems, Inc., D/B/A TCI Cablevision of South Central Connecticut, et. al. V. Angelina (A/K/A Julie) Caruso, Michael Caruso, Philip Demilo, Sally Demilo, Charles Mingrone, Michelle White, Thomas White, et. al. Civ. No. 3:97CV1447 (AWT) (District of Connecticut), August, 1999.

Commonwealth of PA v. Louis De Franco,
CP 9810-0399, Philadelphia, PA, December, 1998.

Showtime Networks, Inc. and SET (Showtime Events Television) Pay-per-View, a division of Viacom International, Inc. v. Bears & Bows, Inc. d/b/a/Millennium Enterprises and Brenda Abboud, Civ. No. A97 CA 712 SS (W.D., TX., Austin).

InterMedia Partners Southeast v. QB Distributors L.L.C., Civ. No. 98-830 (JRT/RLE) 999 F Supp 1274 (D. Minn. 1998).

Columbia Pictures Industries, Inc. v. Allstar Electronics Equipment Corp., Civ. No. 97/CV/5636 (ARR) (E.D. N.Y., Brooklyn, 1998).

Time Warner Cable of New York City v. M.D. Electronics, Inc., No. 96 Civ. 3391 (DGT) (See also 101 F 3d 278) (2nd Cir. 1996).

State of Florida v. Lonny Keith McDougal, No. 96-94-E (Pre-trial Deposition, 1996).

1987 - 1991: GI Communications Division, General Instrument Corporation
As Director, Customer Product Support, directed efforts of over fifty support professionals, including engineers, customer service representatives, order entry personnel and technicians. Group functions included processing orders for all integrated systems and finished goods, coordinating product recalls, front line contact with customers for all product support issues, including system installation and customer training. Developed methodology for tracking all reports of product faults for escalation to appropriate engineering groups to effect timely resolution. Supervised the development and implementation of anti-piracy countermeasures at dozens of customer cable systems.

1983 – 1987: Cable Services Group, American Express Corporation
As Product Manager, Addressable Systems supervised the development and implementation of secure, efficient high speed data communications network to maintain on line communications between the Cable Services Group business management computer system and the addressable control computers manufactured and sold to cable system operators by manufacturers such as General Instrument, Zenith Electronics, Pioneer and Scientific Atlanta.