UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COXCOM, INC., et al

VS C. A. NO: 05 107 S

JON CHAFFEE, et als

## SUPPLEMENTAL MEMORANDUM

Defendants' submit this supplemental memorandum in support of their:

1. Motion for Summary Judgement
2. Motion for Leave to File a Counterclaim
3. Motion to Revoke Pro Hac Vice Privileges
4. Appeals of the Memorandum and Order dated January 20, 2006
5. Objection to Plaintiff's Motion for Summary Judgment

**SUPPLEMENTAL FACTS:**

Defendants have just discovered the report of an interview of Plaintiff's New England Security Manager, Lucien Marcoux. That interview was given to Steve Donahue of *Multichannel News* on March 8, 2004. Upon information and belief that publication is a reputable trade journal in the communications industry. Due to time constraints an internet reproduction is attached hereto. **(Exhibit A)** Defendants are attempting to obtain an actual copy of the edition in question from the publisher.

**ARGUMENT:**

As the Court knows, Plaintiff obtained an Ex Parte Order based in part on the affidavit of Lucien Marcoux.

The affidavit of Marcoux states:

> "Digital filters circumvent Cox's efforts to protect the copyrighted pay-per-view events it offers to customers through the technology of scrambling transmissions."

Yet the interview attributed to him in *Multichannel News* states:

> "Marcox (sic) called the filters a 'scam.' They might work for a while, but eventually the system can tell when it's not receiving a signal back fron the digital set-top in the field. These filters work in theory, but they are detectable."

That statement is in startling contrast to Mr. Marcoux' deposition testimony when he said:

> "It wouldn't reach a point where you could detect it."
> **(Exhibit B)**

**Defendants' Motion for Summary Judgment**

The Marcoux interview clearly supports the position taken by defendants all along: the filters are not "equipment" within the meaning of 47 USC 553.

**Motion for Leave to File a Counterclaim**

It is submitted that whether the proposed counterclaim is futile requires a quantitative–qualitative test. In light of the facts set forth in the answers to interrogatories of Jon Chaffee, the Declaration and Affidavit of Gerard Boisvert attached to the Motion to Revoke Pro Hac Vice privileges and the Marcoux interview; the burden is now met and the countercalim should be allowed.

**Motion to Revoke Pro Hac Vice Privileges**

It is submitted that Plaintiff's cvounsel knew or should have know of the Marcoux inteeview. Again, in light of the Declaration and Affidavit of Gerard Boisvert attached to the Motion to Revoke Pro Hac Vice privileges and the Marcoux interview, the Motion to Revoke should be granted.

**Appeals of the Memorandum and Order dated January 20, 2006**

The same arguments as set forth above applies to thie appeals.

**Objection to Plaintiff's Motion for Summary Judgment**

At the very least, the Marcoux interview creates a question of fact as to whether the filters are "equipment" within the meaning of 47 USC 553.

By their Attorney,

James A. Currier #953
128 Dorrance Street
Suite 400
Providence, RI 02903
(401) 274-3113 Fax (401) 274-3115

# CERTIFICATION

I hereby certify that on the 30th day of January, 2006, I faxed a true and accurate copy of the within to Francis S. Holbrook, II, Esq. (841-8534) and Shaun K. Hogan, Esq., 1 (516) 942-4705.

________________________

SUR FIN
INTERNATIONAL CONFERENCE FOR SURFACE FINISHING
MILWAUKEE, WISCONSIN SEPTEMBER 18 - 21, 200



MODERN MATERIALS HANDLING
MODERN MATERIALS HANDLING

MODER MATERIALS
MODER MATERIALS

To know what the Pros know

Web Sites

Search Manufacturing Net

Go

Sourcing

News & Economy

Features

FREE Print Subscriptions

Print-friendly version Email this story to a friend

# Hunting 'Passive' Pirates

**By Steve Donohue**
**Multichannel News**
**March 8, 2004**

**East Providence, R.I.**– Cox Communications Inc. field auditors Kirk Parken and Paul Fusco drive down a street in this blue-collar town, eyeing a sheet of paper listing every address on the block and whether or not the homes contained paying subscribers or disconnected ones.

After pulling up to the home of a customer who had downgraded service to broadcast basic, Parken uses a meter to check a tap on the side of the house, revealing the customer is still getting ESPN, Cable News Network and every other expanded-basic channel on the system — but isn't paying for them.

Two minutes later, Parken uses a ladder to climb a utility pole in front of the house, slipping a metal filter with a blue stripe the size of a lipstick container onto the line running to the home.

"When this guy comes home and tries to watch CNN, there's going to be snow — it's gone," said Cox New England director of security Lou Marcox, watching from the street below. "What we're hoping is that he calls up and orders [service], and we'll have to come back and take the filter off."

The term cable theft might bring images to mind of the illegal black boxes thousands of people use to get free cable, or of homeowners who tap into lines running to the house of a neighbor.

A



Marcox and his team handle many of those so-called "active theft" cases.

But on this day (Feb. 25), like most days, they're focused on eliminating "passive theft," which occurs when cable companies fail to shut off the signal running to the homes of subscribers that have disconnected their service.

About 11.5 million U.S. homes steal cable — the majority in the form of passive theft. That translates into $6.5 billion a year in lost revenue for the industry, according to the National Cable & Telecommunications Association.

That represents about 16% of the $40.8 billion in revenue the cable industry generated in 2000 — the last year cable-theft numbers were compiled. It's likely the number of homes receiving free cable will rise when the NCTA releases a new report on the problem this fall, according to Nilda Cid Gumbs, director of the trade group's office of cable-signal theft.

The auditors on Marcox's loss-prevention team, based in a Spartan office in Pawtucket, R.I., are made up of former cable installers that now spend their days driving around Cox's New England system, monitoring 7,000 miles of plant running through 34 communities in Rhode Island and 22 Connecticut towns.

Supervisor Jim Hankinson hands out the assignments to auditors, using a node map hanging on the wall of his cubicle that breaks out each town in Cox's service area into electrical quadrants.

For the passive-theft effort, each auditor focuses on a single node each day, checking on 100 to 150 disconnected homes to make sure subscribers aren't receiving channels they haven't paid for.

Cox auditors typically find that 10% to 20% of the disconnected homes they check on each day are still receiving signals.

"We're always our own worst enemy, as far as most of the time it's something that fell through the cracks, that for some reason it didn't get disconnected," Marcox said.

Marcox spent 20 years in law enforcement before joining the Rhode Island system, then owned by Tele-Communications Inc., in 1992. A veteran of the Lincoln, R.I., police department, he was hired by TCI after investigating a robbery at the system's office.

The Cox system regularly teams up with local law-enforcement agencies on active-theft cases.

When police agencies bust distributors of illegal cable converters, they send Cox and other cable companies invoices from the manufacturers that contain the addresses of people who bought the boxes.

"Even then, we don't just run right out and bang on the door," New England team supervisor Mark Matteo said. "We'll do some research on the account. If the date they bought the [converter] was June 22 and the last time they ever bought pay-per-view was June 21, that's a pretty good identifier right there."

Cox also has a tip line that it uses to get leads on the active theft cases. Officials said paying subscribers often turn in their neighbors; kids who were grounded will occasionally turn in their parents; domestic disputes sometimes lead to a call to the tip line.

"You name it. A girl got into a fight with her boyfriend, she'll flag down one of our guys on the street," Matteo said.

Marcox said Cox files civil suits against third-time active theft offenders, and penalties can range from $500 to $25,000.

Glo
Sup
Cha
Confer
This is the
compreh
event of
even
Thought
and lea
practitio
from ar
the wo
explore t
spectru
supply c
manage
strateg
Books for
Engine
Engi
Boo

[redacted]

Authorities file criminal charges against distributors of illegal converters.

Cox has dozens of analog black boxes retrieved from nearby homes stacked in a closet at the Pawtucket office. Owners of the boxes can use them to get free expanded-basic channels.

The boxes also allowed people to get premium channels until about two months ago, when Cox shifted premium channels on the New England system to digital.

The Cox system has also collected some of the new digital filters that are marketed widely on the Internet.

These devices, about the size of a credit card, allow paying digital customers to trick an operator's billing system so they can watch pay-per-view movies for free.

Marcox called the filters a "scam." They might work for a while, but eventually the system can tell when it's not receiving a signal back from the digital set-top in the field. "These filters work in theory, but they are detectable," he said.

With both active and passive theft cases, Marcox said the goal is to convert subscribers who've been illegally receiving cable into paying customers.

There are some happy endings to report along those lines. Marcox said roughly one-third of the homes auditors disconnect in passive-theft cases are converted to paying customers — and many former active-theft homes, after deactivation, also become paying subscribers.

"Reformed pirates are some of our best customers," Marcox said. "They have product, they know what it's like, they enjoyed it, and we have a very high rate of people that we've confronted with boxes that turn the box over and become very good customers."

© 2006, Reed Business Information, a division of Reed Elsevier Inc. All Rights Reserved.

FREE Print Subscriptions

Print-friendly version

Email this story to a friend

**Ads By Google**

**Spyware Remover Download**
Free Scan, awarded Spyware and Adware killer - 5 Stars Rated.
www.pctools.com

**Spyware Removers Reviewed**
Don't download any Spyware removers until you read these reviews.
www.DefeatSpyware.org

**Worcester area Service**
Onsite computer repair 1hr response Spyware/virus, wireless networking
FastTeks.com

is the data being sent back to what we call a controller and a head end, and this would make it impossible for us to download for billing purposes the information of the purchases in that box.

Q. All right. Could that go on indefinitely, that inability to download, or would it reach a point where you would detect it?

A. It wouldn't reach a point where you would detect it. What would happen was, all boxes are set with a maximum amount of purchases that can be stored in the box. Once it reaches that amount, the box will not take or process any more Pay-Per-View using the remote control, so you would have to find a way to purge that information from the box in order to continue using it.

Q. When you say "you" would have to find, you mean the person using it illegally would have to find a way?

A. Sure. If you didn't have a filter on there, that billing information would be downloaded every evening and it would purge itself, so your box would always have, after each purge, the box would have zero purchases on the box. So you could go on forever buying Pay-Per-View and paying for it. It's when you don't pay for it and it doesn't



B