UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| COXCOM, INC. d/b/a COX COMMUNICATIONS NEW ENGLAND,<br><br>Plaintiff,<br><br>vs.<br><br>JON CHAFFEE, individually and d/b/a ELECTRONIC IMPORTS and CHAFFEE INTERNATIONAL, AMY CHAFFEE, individually and d/b/a ELECTRONIC IMPORTS, RAMALDA BOU, individually and d/b/a ELECTRONIC IMPORTS,<br><br>Defendants. | : | C.A. No. 05-107S<br><br>**AFFIDAVIT OF LUCIEN MARCOUX IN SUPPORT OF OBJECTION TO DEFENDANTS' SUPPLEMENTAL <u>MEMORANDUM</u>** |

STATE OF RHODE ISLAND)
) ss.:
COUNTY OF PROVIDENCE)

**LUCIEN MARCOUX**, being duly sworn, deposes and says:

1. I am the New England Security Manager for CoxCom, Inc. d/b/a Cox Communications New England ("Cox") and have served in this capacity for nine years. The remainder of my experience and qualifications are set forth in my prior affidavit submitted in this action. I submit this affidavit in support of Cox's objection to defendants' Supplemental Memorandum (sometimes referred to herein as "Supp."), and for two specific purposes: (i) to note that defendants' assertion that the <u>Multichannel News</u> article that underlies their submission is "just discovered," is demonstrably false; (ii) and to demonstrate that my prior statements about the detectibility of digital cable filters, both in the <u>Multichannel News</u> article and in my deposition testimony, have been taken out of context by defendants. Unless otherwise stated, I have personal knowledge of the following, and if called as a witness, could and would testify to the same.

**Defendants' False Assertion Regarding Newly-Discovered**
**<u>Evidence and Deceptive Attempt to Obtain Information from Me</u>**

2. Defendants' Supplemental Memorandum states that defendants "have just discovered the report of an interview of Plaintiff's New England Security Manager, Lucien Marcoux." Supp. at 1. However, this is demonstrably false. The Report of Gregory D. Girard, dated December 19, 2005, which states that Girard has "been retained by the law firm of James A. Currier," Report at 1, expressly considered that very article. Under the heading "Information Considered," Girard states, "In addition to the ongoing study of various periodicals and technical documents on the subject of digital cable networks, I have considered the following information in formulating the opinions expressed in this report:" <u>Id.</u> at 9. One such item, listed on the following page, is identified as "Hunting 'Passive' Pirates." Steve Donohue, <u>Multichannel News</u> (March 8, 2004). <u>Id.</u> at 10. A copy of that article is attached as Exhibit "A" to the Affirmation of Shaun K. Hogan ("Hogan Aff.") submitted herewith. Thus, at that time, defendants knew about the <u>Multichannel News</u> article for approximately 1½ months, and therefore characterizing the article to this Court as "just discovered" is clearly false.

3. In fact, Girard knew about the <u>Multichannel News</u> article even earlier than that -- at least as early as November of 2005. On November 28, 2005, Girard sent an e-mail to me, a copy of which is attached as Exhibit "C" to the Hogan Aff. In that e-mail, Girard stated, "I read an article on the subject of cable theft ("Hunting 'Passive' Pirates" by Steve Donohue. Multichannel News, Edition of 2-8-04) wherein you referred to the hype surrounding high pass filters (attempt to steal cable content) as a 'scam.'" Significantly, Girard, whom I had never heard of, did not identify himself to me as a prospective expert witness in this case, nor did he disclose that he had been retained by defendants' counsel. Indeed, Girard gave no indication of the purpose of his contact other than to state, "I am writing a report on methods of cable theft that target digital cable

networks." Exhibit "C" at 1. The "report" that Girard referred to is apparently the purported expert report defendants submitted in this action on behalf of defendants. Girard also wrote that "Whatever comments you make will be read carefully and with appreciation," id., again without disclosing that defendants and their counsel would be the ones who would be reading my comments "carefully," and to the extent such comments could be used against Cox herein, "with appreciation." Girard also blatantly misrepresented the purpose of his report by cagily stating the following: "My initial report is confidential, but derivative reports may result in a version published for distribution to a wider audience." Exhibit "C" at 2. Girard's deceptive communication with me is entirely consistent with defendants' counsel's now misrepresenting to the Court that the Multichannel News article was just discovered by them, when they and/or their purported expert witness knew about it for at least two months.

**Context of Interview with Multichannel News**

4. The March 8, 2004 Multichannel News article cited by defendants discusses various aspects of cable television piracy, including unauthorized attachments to cable systems, use of "pirate" cable television decoding devices, and use of the digital signal filters that are the subject of the present action. After making an appointment with me in advance, the author of the article came to Cox's facility and interviewed me a few weeks before the article was published. The article quotes me, and also makes statements based on what I told Mr. Donohue. Incidentally, at the time I spoke with Mr. Donohue in February of 2004, Cox was not represented by its present lead counsel.

5. In agreeing to Mr. Donohue's interview, I knew in advance based on my discussions with him that he wanted to discuss the various aspects of cable television piracy that are the subject of his article. I viewed my role in answering his questions as two-fold. First, I wanted to assist him in writing his article, which emphasizes the extensive efforts that Cox takes to identify

persons who attempt to steal its services by various means. I believe that a fair reading of the article indicates that Cox has taken and continues to take numerous steps to detect cable pirates, stop the theft of its services, and obtain redress for its losses or assist in civil and criminal prosecutions so that such persons can be punished.

6. Second, I wanted to achieve some of Cox's (and the larger cable industry's) public relations goals by discouraging any readers of the article from believing that undertaking any of the means discussed in the article would result in free, undetectable access to cable services.[1] Thus, I sought to downplay the significance of digital filters, particularly as they have essentially become the next generation of piracy devices. See Cox's Memorandum of Law in Support of Summary Judgment Motion at 2 ("In the past few years, Cox has begun providing cable services using digital technology to scramble the signals. While this scrambling itself seemingly cannot be directly compromised, and under normal circumstances fully protects the scrambled programming from unauthorized viewing, the digital cable signal filters ("digital filters") sold by defendants prevent one aspect of Cox's digital technology from functioning."); Affidavit of Lucien Marcoux in Support of Cox's Motion for Temporary Restraining Order and Preliminary Injunction ¶ 9. Accordingly, I acknowledge that my statements to Mr. Donohue, made with the goal of dissuading readers from purchasing and using digital filters, were not made with an eye toward defining terms precisely and providing a detailed outline of the limits of Cox's capabilities for detecting digital filter use.

7. Specifically, while I stated in the article that the filters are "detectable," because eventually Cox's system can tell when it is not receiving an upstream communication from

[1] Although Multichannel News is a trade magazine, it has been my experience and that of other cable security personnel that in lawsuits against cable pirates, these defendants are aware of and have cited articles in Multichannel News and other periodicals of limited circulation in an effort to show that a cable company took a different position in the past or, to support a statute of limitations defense, that a cable company may have known about a particular defendant a long time before it sued that defendant. Thus, it is foreseeable that anything said in this industry magazine would come to the attention of cable pirates and possibly make its way into the larger media.

a subscriber's box, as discovery in this case has shown, Cox has no foolproof means to directly and specifically detect whether or not a digital signal filter is being utilized by a particular cable customer. As I told Mr. Donohue, any time a digital filter is being utilized, receipt by a cable company of an upstream communication from the set-top box is not possible. Significantly, however, use of a digital filter is not the only cause of a lack of upstream communication. Other causes include a break in the cable line, interference from stray signals, or the set top device in a customer's home simply being disconnected from either the cable system or from a power source. Cox's witnesses have already so testified during their depositions in this action many months ago. See Transcript of Deposition of Mark Matteo (relevant pages are attached as Exhibit "E" to Hogan Aff.) at 15 (noting that there are various reasons, apart from use of a filter, why a set top box would be unable to communicate with a cable system head end); Transcript of Deposition of Pierre Dubois (relevant pages are attached as Exhibit "F" to Hogan Aff.) at 9-10, 36 (there are many reasons, apart from use of a filter, including a break on a line, interference from stray radio frequency signals, and unplugging or disconnecting set top devices, why upstream communications with a cable system head end would not be possible). Thus, any use of a digital filter is, in one sense, detectable by means of a non-responding set-top device, but only indirectly and merely as one of a number of possible sources of a signal blockage.

8. Thus, putting aside these indirect means of knowing that one possible source of a particular communications breakdown is a digital filter, there is no direct electronic means for a cable company to determine specifically if a digital filter is being used in a given location. Mark Matteo testified consistently with this during his deposition, when he replied in the negative when

asked if Cox had the ability to electronically monitor households to know whether they're using a digital filter. See Exhibit "E" at 54.

9. Further, I note that a review of the entire article reflects the concerns that Cox had even at that time regarding the use of digital signal filters. Indeed, as the article states, digital filters "allow a customer to trick a cable operator's billing system so that they can watch pay-per-view movies for free." Exhibit "A" at 3.[2] Significantly, this is precisely why the article also notes that Cox has been collecting digital filters in the same manner as it has collected pirate black box cable television decoding devices for years – to keep them out of the hands of prospective service thieves. Obviously, if the digital filters were not a security concern, Cox would have no reason to collect them.

**Defendants' Quotation from My Deposition**
**Transcript Was Taken Completely Out of Context**

10. Defendants' Supplemental Memorandum also quotes a part of my deposition transcript out of context. During my deposition, defendants' counsel asked me if a cable company's inability to retrieve billing information because of a customer's use of a filter could go on indefinitely, or whether it would reach a point where the lack of billing information could be detected. Because this question dealt with the transmission of specific billing information that might or might not exist on any given set-top box, as opposed to the completely different question of whether a cable system could "detect" that someone was using a digital filter, I responded in the negative, noting that if the digital filter user found a way to purge the billing information, it would

[2] The same sentence in the article describes the filters as being "about the size of a credit card." Exhibit "A" at 3. However, this is a mistake on the reporter's part, as everyone agrees that filters are cylindrical and roughly the size and shape of a pack of Life Savers candy or a lipstick. During the interview, we also spoke about satellite cable theft via smart cards, which are the size and shape of credit cards, and it appears that in writing his article, Mr. Donohue confused the two.

never be available to be "downloaded," or transmitted to the cable system head-end. See Supp. at 2; Transcript of Deposition of Lucien Marcoux at 12-13, copy attached as Exhibit "G" to Hogan aff. This would of course be true even if the filter was subsequently removed, because even though the upstream communications blockage ceased, the set-top device's memory would have been cleared of billing information. The Affidavit of Mark Matteo submitted in Further Support of Cox's Summary Judgment Motion indicates that such a loss of billing information could be effectuated either by keeping the billing information unavailable for 60 days, at which time it would be "orphaned," or effectively canceled, or by following the reset instructions on the website to which defendants referred their customers. Matteo Aff. ¶¶ 6-8, 10.

11. However, in the Supplemental Memorandum, defendants took my statements out of context, and suggest that I made the much broader, and false, assertion that use of filters was undetectable. Supp. at 2 ("It wouldn't reach a point where you could detect it."). However, the specific "it" I was referring to at that point in my deposition was uncollected billing information, and not the use of filters generally. I have quoted the relevant portion of the discussion below, and submit that it demonstrates that I was only speaking about detection or recovery of uncollected billing information, and not the separate issue of detection of filter usage.

> A. . . . and if you put [a filter] on the back of a digital cable box, you would interfere with the upstream, which is the data being sent back to what we call a controller and a head end, and this would make it impossible for us to download for billing purposes the information of the purchases in that box.
>
> Q. All right. Could that go on indefinitely, that inability to download, or would it reach a point where you would detect it?
>
> A. It wouldn't reach a point where you would detect it. What would happen was, all boxes are set with a maximum amount of purchases that can be stored in the box. Once it reaches that point, the box will not take or process any more Pay-Per-View using the remote control, so you would have to find a way to purge that information from the box in order to continue using it.

Exhibit "G" at 12-13. Inclusion of the context surrounding my statement quoted by defendants demonstrates that my remarks were specifically directed at a cable company's attempted retrieval of billing information, and what steps a filter user would take to thwart it. My statement was in no way directed at detecting use of filters.

**Conclusion**

12. Given these facts, even though some of my statements to Steven Donohue made two years ago were vague, and made in an effort to downplay the benefits of using digital signal filters and not provide a roadmap for their use without detection, they were consistent with prior statements made herein by myself and other Cox representatives, and with Cox's position in this action. Thus, I submit they do not create a genuine issue of material fact or demonstrate any inconsistent positions or bad faith by myself or anyone else at Cox. Similarly, my statement about detectability of billing information was taken completely out of context by defendants in their Supplemental Memorandum. It, too, creates no issues of material fact nor does it demonstrate any bad faith on behalf of Cox.

LUCIEN MARCOUX

Sworn to before me this
10 day of February, 2006

Notary Public