IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

COPY

COXCOM, INC., et al

vs. C.A. No. 05-107 S

JON CHAFFEE, et als

Deposition of **MARK MATTEO**, a witness, taken on behalf of the Defendants, pursuant to the Federal Rules of Civil Procedure, on Thursday, July 7, 2005, at the offices of Attorney James A. Currier, 128 Dorrance Street, Suite 400, Providence, Rhode Island, before Dorothy M. Depointe, Registered Diplomate Reporter and Notary Public, convening at 3:02 p.m.

APPEARANCES:

Lefkowitz, Louis, Sullivan & Hogan, L.L.P.
BY: SHAUN K. HOGAN, ESQ.
Counsel for Plaintiff

JAMES A. CURRIER, ESQ.
Counsel for Defendants

IN ATTENDANCE: Jon Chaffee
Lucien T. Marcoux

REPORTING ASSOCIATES
Shorthand Reporters
10 Dorrance Street, Suite 617
Providence, Rhode Island 02903
(401) 351-1660

MR. CURRIER: Same stipulations?

MR. HOGAN: Yes.

**MARK MATTEO**, first having been duly sworn by the Notary Public, was examined and testified as follows:

**EXAMINATION BY MR. CURRIER:**

Q. Mr. Matteo, by whom are you employed?

A. Cox Communications.

Q. In what capacity?

A. I am the New England security supervisor.

Q. And have you read the depositions, before coming here today, of Mr. Marcoux and Mr. Allard?

A. Yes, I have.

Q. And before I forget about it, we have used the word "hit" here today in relation, as I understand it, to Cox's ability to send a signal to a consumer's box. Does the use of the word "hit" in that way mean anything to you?

A. Exactly what you described, yes.

Q. Does the Security Department at Cox have the ability to do that, do you know?

A. Yes, we do.

Q. Okay. Do you know if such a thing was done with respect to Chaffee's computer box?

A. Yes, it was.

A. Yes.
Q. And you've been supervisor for how long?
A. I have been a supervisor in the Security Department for approximately five years.
Q. And is Mr. Marcoux your supervisor?
A. Yes, he is.
Q. And is he the head of the department?
A. Yes, he is.
Q. Now, what did you do, if anything, at Cox prior to becoming a supervisor?
A. I was a service technician, and I was also an auditor for the Security Department, and I was an investigator for the Security Department, and currently my role is head supervisor in the Security Department.
Q. So how long all told have you been with Cox?
A. I have been with Cox Communications for nine years. Initially I've been in the industry for ten years.
Q. Always in the security end of it?
A. No.
Q. What other --
A. I was trained initially as a service and installation technician.
Q. Now, have you had any other training other than

Q. What does it mean to you?
A. It's a chip.
Q. Okay. Do you know who manufactures those?
A. For Cox Communications? For the Motorola box? No.
Q. Okay. You participated in the seizure, correct, at the Chaffee home?
A. Yes, I did.
Q. In relation to when entrance was first gained, were you --. As I understand it, there were four people? Is that your recollection?
A. Four people where?
Q. When you first initially gained entrance to the home.
A. There were three people initially gained entrance to the home.
Q. All right. And who were they?
A. The --. Two of the U. S. Marshals and Mr. Marcoux.
Q. Okay. And how long after they gained entrance did you gain entrance, or if you did?
A. Approximately ten minutes.
Q. All right. And when you went in there, what, if anything, did you do?
A. I proceeded to locate the computers with the help

company.

Q. Do you know the name of it?

A. I believe it's Nakai Electronics.

Q. How did you find that out?

A. I believe it was through a conversation with Mr. Chaffee with one of my investigators.

Q. Has, to your knowledge, has anyone on behalf of Cox ever tried to communicate with Nakai?

MR. HOGAN: You can answer that, actually.

A. No, I do not.

Q. Has anyone on behalf of Cox ever checked the Chaffees' credit report?

A. Not to my knowledge.

Q. Did you or anyone else, to your knowledge, ask the Chaffees for their tax returns?

MR. HOGAN: Objection.

A. I did not ask the Chaffees for their tax returns.

Q. Do you know if anyone else did?

MR. HOGAN: You can answer.

A. I believe so.

Q. Do you know who?

A. Mr. Marcoux.

Q. Did you ever say to the Chaffees or hear anyone else say words to the effect, "Don't let me subpoena the tax returns or you will be in a lot

Q. Did you ever say to Jon Chaffee or hear anyone else say that if he didn't show you where the filters were he would be in contempt?
A. No.
Q. Did you ever say or hear anyone else say, "This is a civil matter, don't make it criminal"?
MR. HOGAN: Objection. Asked and answered and compound.
A. No.
Q. Did you remove any papers or items from the house and refuse to let the Chaffees see what it was that was being removed?
MR. HOGAN: Objection. Compound.
A. Absolutely not.
Q. Do you know if anyone else did?
A. No.
Q. Did anyone make a list of the items that were taken?
A. Yes.
Q. And was that list signed by Chaffee, as far as you know?
A. I believe it was.
Q. And do you know who made the list?
A. It was a combination of myself and Mr. Marcoux.
Q. And when did that take place?

A. No, she did not.
Q. Did she voice any complaints with respect to your conduct while within the Chaffee home?
A. No, she did not.
Q. Did she voice any complaints with respect to the conduct of Mr. Marcoux while you were in the home?
A. No, she did not.
Q. Did she voice any complaints with respect to the conduct of the United States Marshals during the time that you were in the home?
A. No, she did not.
Q. And did she ever make any statements to you that suggested to you that she was unhappy with the way that she was treated?
A. No, she did not.
Q. And, to your knowledge, did she make those statements to anyone else including Cox, any other Cox employee?
A. No.
Q. Did you observe anyone at the time you were at the Chaffee home acting in a threatening manner toward Mrs. Chaffee?
A. No.
Q. Could you describe the treatment that Mrs. Chaffee received at the hands of the United States

Marshals Service.

A. Courteous.

Q. By the same token, could you describe, from what you observed, Mr. Marcoux's conduct with respect to Mrs. Chaffee.

A. Courteous as well.

Q. Did you observe anyone threaten Mr. Chaffee in any manner during the time that you were at the Chaffee home?

A. No, I did not.

Q. And did you yourself threaten Mr. Chaffee in any manner?

A. No, I did not.

Q. Was Mr. Chaffee --. Could you describe his demeanor during the time that you were with him both at the house and at the North Providence location.

A. Casual; a little -- he seemed in disarray.

Q. What do you mean by that?

A. Unfocused.

Q. Was that consistent with your other dealings with him prior to the time that the temporary restraining order was executed?

A. With my one meeting with him, yes.

Q. During your one meeting with Mr. Chaffee did he