UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

COXCOM, INC. d/b/a                     :
COX COMMUNICATIONS NEW                 :
ENGLAND                                :
                                       :
         v.                            :        C.A. No. 05-107S
                                       :
JON CHAFFEE, individually and d/b/a    :
ELECTRONIC IMPORTS, and                :
CHAFFEE INTERNATIONAL et al.           :

## REPORT AND RECOMMENDATION

Lincoln D. Almond, United States Magistrate Judge

Before the Court are Plaintiff's Motion for Summary Judgment (Document No. 77) and Defendants' Motion for Summary Judgment (Document No. 101).[1] The parties have filed various objections and replies to the Motions. These motions have been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and LR Cv 72. A hearing was held on March 9, 2006, and the Court has reviewed the Memoranda submitted by the parties and performed independent research. For the reasons discussed below, I recommend that Plaintiff's Motion for Summary Judgment be GRANTED and that Defendants' Motion for Summary Judgment be DENIED.

---

[1] The Scheduling Order set a deadline of September 26, 2005 for filing dispositive motions. (See Documents No. 26, 54). Defendants filed their Motion for Summary Judgment on December 19, 2005. Defendants never sought or received an extension of the deadline to file their Motion for Summary Judgment, which was submitted nearly three months late. Defendants' failure to comply with the Scheduling Order and other rules of this Court has substantially increased the volume of the parties' filings and diverted the parties' and Court's attention from the merits of the case, instead focusing attention on these procedural infirmities. Although exclusion of the untimely documents is an appropriate remedy for such untimeliness, the Court chooses to decide the case fully on the merits, and therefore will not strike the Defendants' Motion for Summary Judgment.

## I.    Background

CoxCom, Inc. ("Cox") alleges that Defendants violated the Communications Act, 47 U.S.C. § 553(a)(1), and the Digital Millennium Copyright Act, 17 U.S.C. § 1201.  In short, Cox claims Defendants illegally manufactured, sold and/or otherwise distributed "'pirate' digital cable television filters for profit...."  See Compl. ¶ 17.

## II.   Facts

The following facts are undisputed:[2] Cox is a telecommunications services provider that offers cable television services to subscribers in Connecticut and Rhode Island.  See Plaintiff's Statement of Undisputed Facts ("Pl.'s UF") ¶ 2.  Cox receives its programming from its providers via interstate radio communications and then transmits those signals over its system to its subscribers.  Id. ¶ 3.  Cox's subscribers pay for cable services based on the level of services or programming they wish to receive.  Id. ¶ 4.

Cable services that are pay-per-view require a special monthly subscription, and are encoded, or scrambled.  In order to view these programs, a subscriber must order the channel through Cox's set-top electronic decoding equipment (i.e., cable box).  Id. ¶ 5.  The cable box is programmed by Cox so that the subscriber may only view the programs for which they have paid.  Id. ¶¶ 5, 6.

Certain devices, such as the digital cable filters at issue in this case, are capable of interfering with the encoding of Cox's pay-per-view channels.  Typically, when a subscriber orders a pay-per-view program through the cable box, Cox's central computers decode the transmission and then

---

[2] Pursuant to this Court's local rules, Plaintiff submitted a Statement of Undisputed Facts with its Motion for Summary Judgment.  Defendants responded by filing a "Statement of Material Facts to be Litigated," which only addressed fourteen out of the fifty-one undisputed facts proposed by Plaintiff.  At the hearing, counsel for Defendants conceded that the remainder of the facts were not discussed because they are undisputed.

generate billing data for the subscriber. Digital filters interfere with Cox's encoding mechanism and allow the user to view pay-per-view programs without ordering the program through the process established by Cox. Id. ¶ 7. The filters also prevent communication between the user's cable box and Cox's central computers, so that no record of the viewed pay-per-view is generated by Cox. Id. ¶ 7. The cost of such pay-per-view programming typically ranges from $3.95 per event to $49.52 per event. Id. ¶ 10.

### A.    Sale of Cable Filters by Defendants

Cox's undercover investigators purchased a single cable filter from Defendants Amy Chaffee and Ramoulda Bou on December 12, 2004 at a computer fair in Connecticut. Id. ¶ 12. A sign displayed at Defendants' table advertised the filter as capable of allowing a buyer to view pay-per-view events without ordering the program through the cable provider. Id. Although the sign indicated that the filter could improve reception, it also clearly explained that the filter would "block out pay-per-view and movie order charges from your cable company, giving you free pay-per-view." Id. After purchasing the cable filters, the investigators were given a receipt listing two web sites and instructions regarding how to reset the cable box. Id. The web site contained instructions for how to use a cable filter to block a cable box from relaying billing information to the cable provider. The web site also contained instructions regarding how to prevent the cable company from detecting the presence of the filter device. Id. ¶ 17. Further, the web site included disclaimers which reminded a purchaser of the obligation to pay for all cable transmissions received and stated that filters should not be used to steal cable. Id. ¶ 19.

Cox's undercover investigators made a second purchase of several digital filters from Defendant Jon Chaffee at a computer fair in Connecticut on December 18, 2004. Id. ¶ 20. Jon

-3-

Chaffee gave the investigators an email address, support911@aol.com, which he told them to use for further instructions or to purchase more filters. Id. ¶ 21.

Then, on January 16, 2005, Cox investigators purchased ten filters from Ramoulda Bou and Amy Chaffee at a computer fair in West Warwick, Rhode Island. Id. ¶ 24. Along with the receipt, the investigators were provided with contact information, including Jon Chaffee's cell phone number. Id. ¶ 26. Finally, on February 15, 2005, a Cox investigator agreed to purchase five more cable filters from Jon Chaffee. This transaction occurred over the telephone. Id. ¶ 27.

Following each of the purchases from Defendants, Cox tested the filters purchased to ensure that they are capable of intercepting pay-per-view transmissions. Id. ¶¶ 13, 23, 26, 29. Every filter purchased from Defendants is capable of intercepting pay-per-view transmissions. Id.

**B.    Defendants' Knowledge of the Uses of the Filters**

Each Defendant has admitted selling or assisting in the sale of digital filters. Id. ¶ 30. Each Defendant has admitted working together to sell filters in combination with other individuals. Id. ¶ 31. Jon Chaffee admitted knowing that the products he sold could be used for illegal purposes, i.e., stealing pay-per-view cable. Id. ¶ 33.

In addition to knowing that the filters could be used to intercept cable, Defendants knew that their customers planned to use the filters to intercept cable and that their customers actually did use them for that purpose. Jon Chaffee, for example, received one email stating that the filter worked "great with Pay-Per-Views...." Id. ¶ 35i. He received another email that requested instructions to "clear the cable box of previously viewed pay-per-view programs." Id. ¶ 35ii. Jon Chaffee also sent several emails to customers providing directions for use of the filter, id. ¶ 36i, and clarifying that the filter is "only for pay-per-view, not HBO and Showtime," id. ¶ 36i, and that it "only works for pay

-4-

per views...[y]ou must reset the box before removing or you will be charged." Id. ¶ 36ii; see also ¶¶ 37, 38. Jon Chaffee also admitted that he authored an email, stating that "[p]eople love the products we have because they are legal in the way you are supposed to use them so they are legal to sell such as cable filters but illegal in the way people think of using them." Id. ¶ 34. He also stated "tongue in cheek," Dep. of Jon Chaffee at pp. 52-53: "can you really believe the clientel [sic] at a computer show would do anything illegal? No way. I don't believe it." Pl.'s UF ¶ 34.

Amy Chaffee initially testified that she did not know that cable filters could be used to descramble pay-per-view, that she did not know customers used them for that reason, and that she never provided information to customers regarding using cable filters in that manner. Id. ¶ 41. When confronted with an audio recording of her telling a customer that he would risk being billed for pay-per-views if the cable filter was removed, Amy Chaffee recanted her previous testimony and admitted she knew that filters could enable a customer to receive pay-per-view without charge. Id. ¶ 42. Amy Chaffee then asserted her Fifth Amendment privilege against self-incrimination at her deposition when asked by Plaintiff's counsel about statements sworn to in her Affidavit. Dep. of Amy Chaffee at p. 68.

## III.    Standard of Review

A party shall be entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, the Court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997).

-5-

Summary judgment involves shifting burdens between the moving and the nonmoving parties. Initially, the burden requires the moving party to aver "an absence of evidence to support the nonmoving party's case."  Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  Once the moving party meets this burden, the burden falls upon the nonmoving party, who must oppose the motion by presenting facts that show a genuine "trialworthy issue remains."  Cadle, 116 F.3d at 960 (citing Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)).  An issue of fact is material if it might affect the outcome of the suit under the governing law.  Id. at 248.  An issue of fact is "genuine" if it "may reasonably be resolved in favor of either party."  Id. (citing Maldonado-Denis, 23 F.3d at 581).

To oppose the motion successfully, the nonmoving party must present affirmative evidence to rebut the motion.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57 (1986).  "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, [or] unsupported speculation."  Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).  Moreover, the "evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve."  Id. (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)).  Therefore, to defeat a properly supported motion for summary judgment, the nonmoving party must establish a trialworthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party."  Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing Anderson v. Liberty Lobby, 477 U.S. at 249).

**IV.   Discussion**

   **A.     Liability Under the Communications Act, 47 U.S.C. § 553**

   Section 553(a)(1), 47 U.S.C., states, "[n]o person shall intercept or receive or assist in

intercepting or receiving any communications service offered over a cable system, unless specifically

authorized to do so by a cable operator or as may otherwise be specifically authorized by law." In

order to state a claim under Section 553 for assistance with unauthorized reception, Cox must show

that: (1) Defendants assisted others in intercepting or receiving its programming services; (2) these

services were communications services offered over a cable system; and (3) such reception of its

programming was without its authorization or otherwise specifically authorized. See 47 U.S.C. §

553(a)(1).   Additionally, because Cox is attempting to demonstrate that the assistance was in the

form of distribution of equipment which facilitated unauthorized reception, Cox must also

demonstrate that Defendants intended that the filters be used for unauthorized cable reception. See

47 U.S.C. § 553(a)(2);  Storer Commc'ns, Inc. v. Mogel, 625 F. Supp. 1194, 1198 (S.D. Fla. 1985).

   There is no dispute that Cox's services are communications offered over a cable system and

that any reception resulting from the use of a filter is unauthorized. Rather, the primary issue before

the Court is whether Defendants "intended" to assist others in intercepting programs.

   Under Section 553, liability for assisting others will be imposed when "the seller possesses

specific knowledge or intent that the device will be used for unauthorized reception of cable

television programming services." Time Warner Entm't, et. al. v. Worldwide Elec., 50 F. Supp. 2d

1288, 1293 (S.D. Fla.1999); Intermedia Partners Se. Gen. P'ship v. QB Distrib. LLC, 999 F. Supp.

1274, 1280-81 (D. Minn. 1998) (collecting cases). Throughout discovery, Defendants claimed that

they did not "intend" that the filters be used for unauthorized cable reception.  In their argument,

Defendants focus on their claimed state of mind when selling the filters, asserting that the filters had legal uses, and that they did not intend (or want) the devices to be used illegally. This "head in the sand" defense is unpersuasive, however, when it is considered in conjunction with the legal and relevant definition of "intent" which states that "specific knowledge" of the planned illegal use is sufficient under the statute. See Intermedia Partners, 999 F. Supp. at 1290-91; Storer Commc'ns, 625 F. Supp. at 1198. In viewing the evidence and Defendants' actions under the established standard, it is clear that Defendants possessed specific knowledge concerning the illegal capabilities of the filters, and that Defendants, through their actions, specifically intended to assist others in using the filters for their illegal purpose.

### 1.    Evidence of Defendants' Intent to Assist

Defendants' argument that they lacked the intent to assist in cable theft is not novel. In fact, in many of the cable piracy cases, defendants have denied statutory liability by claiming that they lacked knowledge that the product they sold or manufactured would actually be used illegally by their customers. In response to this claimed ignorance defense, courts have discussed which evidence indicates that the seller "intended" that its product be used illegally.

First, courts analyzing the issue of intent have stated that the best evidence of a seller's intent to assist in intercepting cable is the product's capability for intercepting cable. See Time Warner, 50 F. Supp. 2d at 1293-94. In this case, Defendants do not dispute that the product was capable of intercepting cable. Defendants do, however, claim that the filter was capable of other permissible and legal uses.

Whether or not the product was capable of being used legally, Defendants admit that the product could be used illegally, and they also admit that they communicated the product's illegal use

to consumers. Defendants also admit that they supplied customers with web site information regarding unauthorized cable interception and then received several emails from customers praising the filter's ability to intercept pay-per-view.[3] Each of these facts support the finding that Defendants intended their products be used for an illegal purpose rather than a legal one. Int'l Cablevision, Inc., 997 F.2d at 1003-04 (defendants provided instructions on how to use devices illegally).

Moreover, the fact that Defendants supplied their customers with disclaimers concerning the illegal use of the product is further evidence of the required intent. See Time Warner Cable of New York City v. Freedom Elec., Inc., 897 F. Supp. 1454, 1459 (S.D. Fl. 1995) ("[the] fact that disclaimers were enclosed with shipments of descramblers which advised customers to contact their local cable television provider and advise it of their purchase and use of device did not exculpate [them] from otherwise illegal conduct"). Plaintiff also presented other evidence, which, viewed in isolation, is not indicative of intent; but when viewed as part of the pattern of behavior, indicates an awareness of some wrongdoing. For example, in responding to discovery, Defendant Jon Chaffee omitted the names of certain people who sold filters on his behalf, including some who were family members. Pl.'s UF ¶ 43. Further, Defendant Jon Chaffee often used the aliases of "Sharon" and "Mike" in certain emails to customers concerning the use and sale of the filters. Id. ¶ 44.

---

[3] Defendants also claim, in essence, that they were unaware that their actions violated Section 553. For example, Defendants claimed that they were unaware of the content of the web site they referred their customers to, see Defs.' Statement of Facts ¶ 14, and also that Jon Chaffee was so busy with his other businesses that he did not know the nature of the products sold. (See Defs.' Opp'n to Pl.'s Motion.) Defendants also assert that they were told by an employee of a computer show that the filters were "not descramblers nor decoders" and that they were therefore legal to sell. (See Defs.' Motion for Summ. J.) While it is possible that these facts may be relevant to the extent that the Court has some discretion in assessing damages, the facts have no bearing on whether Defendants violated Section 553. Under the Communications Act, there is no defense based on the "good faith" of the seller. See, e.g., Int'l Cablevision, v. Sykes, 997 F.2d 998, 1004 (2d Cir. 1993) ("there is no suggestion in § 553(a)(1) that an unaware person...is exempted from liability, much less any suggestion of such an exemption for one who 'foolishly' sold the unauthorized device with the knowledge and intent that it would be used for a prohibited purpose.")

Finally, the Court must address the Affidavits of Gerard Boisvert. Mr. Boisvert, the uncle of Defendant Amy Chaffee, also sold filters for Defendants at computer/electronics shows. Plaintiff interviewed Mr. Boisvert and then obtained and submitted the Declaration of Gerard Boisvert dated July 9, 2005. Paragraph 7 of the Declaration states, "Jon Chaffee made it clear to me [Mr. Boisvert] that he knew and *intended* that people who purchased digital cable television filters could and would use them to view pay-per-view programming without paying for it." (emphasis added.)  In response to the Declaration, Defendants obtained their own statement from Mr. Boisvert and submitted the Affidavit of Gerard Boisvert dated November 2, 2005. In the Affidavit, Mr. Boisvert claimed he had never used the word "intended" in his discussions with Plaintiff.  However, Mr. Boisvert also clarified that, "[Jon Chaffee] also told me that people who have digital cable could use these filters to get pay-per-view without paying for it." Aff. of Boisvert, ¶ 5.

At the time Defendants submitted the Affidavit of Boisvert, they requested that the Court revoke the Pro Hac Vice privileges of Plaintiff's out-of-state counsel, arguing that Plaintiff's submission of the Declaration with the word "intended" included was a "fraud upon the court." (See Document No. 102).  After throughly reviewing all of the parties' submissions, the Court declined to revoke the Pro Hac Vice privileges of Plaintiff's out-of-state counsel. (See Document No. 124).

At the present time, the dispute concerning the Boisvert statements is a non-issue, because even the Affidavit submitted by Defendants provides evidence in support of a finding of a violation of the Communications Act. As outlined above, specific knowledge of the intended use of the filters is sufficient under the statute. Even according to the later Boisvert Affidavit, Jon Chaffee knew that his customers could use the filters to obtain unauthorized cable television.  Because even the later

Boisvert Affidavit indicates that Jon Chaffee was aware that his customers would use the filters illegally, the Boisvert Affidavits support a finding that Defendants violated Section 553.

After a thorough review of the facts and the arguments presented, the Court concludes that the overwhelming, undisputed evidence supports a finding that Defendants had specific knowledge concerning the illegal use of the filters and that Defendants knew that their customers planned to (and did) use the filters for illegal purposes. "The fact that [defendant's devices] had legal uses does not insulate [them] from civil liability where the evidence establishes that [defendants] knew and intended the [devices] to be used for the unauthorized reception of cable television programming." Cont'l Cablevision, Inc. v. Poll, 124 F.3d 1044, 1048 (9th Cir. 1997).

### 2.   The Delayed Billing Theory

The Court next considers Defendants' claim that they are not liable under Section 553 because the use of the filters they sold does not result in cable theft, but only in a "billing delay." The basic premise of the theory is that Cox's technology *could* detect that a subscriber has used a filter to view an otherwise unauthorized pay-per-view programs. Defendants claim that once Cox detects a viewed program, Cox sends the filter-using subscriber a bill for the viewed program. Because Defendants claim Cox could detect the use of a filter, Defendants assert that any person using a filter will eventually be caught and sent a bill, and therefore, permanently stealing cable with a filter is impossible.

In support of their billing delay theory, Defendants submitted the Expert Report of Gregory D. Girard. As discussed below, Defendants' Expert Report suffers from several fatal procedural violations, and Plaintiff's Motion to Strike Defendants' Expert Report is therefore GRANTED. (Document No. 109). Further, as outlined below, even if the Court did not strike the Report because

of these procedural flaws, the substance of the Report does not alter the Court's determination that Defendants violated the Communications Act.

First, there are several procedural violations which make consideration of the Expert Report improper. During the discovery period for this case, the parties exchanged standard interrogatories, requesting, among other things, basic information concerning the identity and opinion of any expert witness. Initially, neither Plaintiff nor Defendants had retained an expert, and both parties responded to the others' interrogatory by indicating that no expert witness had been retained. Subsequently, however, both parties did retain an expert witness. On or about August 4, 2005, Plaintiff retained Stan Durey, and thereafter informed Defendants that Mr. Durey had been retained. Mr. Durey's Expert Report was provided to Defendants on September 12, 2005 – the same day that discovery closed. See Document No. 54.

It is unclear when Defendants retained their expert, Mr. Girard. Jon Chaffee's mother submitted an Affidavit stating that she first contacted Mr. Girard on September 23, 2005. See Document No. 136, Defs.' Supplemental Affs., Tab B, ¶ 5. Despite contacting an expert in September, Defendants never provided Plaintiff with any information concerning Mr. Girard, nor did they supplement their answers to interrogatories as they are required to do under Fed. R. Civ. P. 26(e)(2). Then, on December 19, 2005, over two months after the close of discovery, Defendants filed their Expert Report as an Exhibit to their Opposition to Plaintiff's Motion for Summary Judgment, as well as an Exhibit to their own untimely Motion for Summary Judgment. Defendants' Objection to the Motion to Strike (Document No. 117) argues that the Court's Pretrial Order does not require disclosure of expert reports until thirty days after a decision on a dispositive motion. Then, in a subsequent reply memorandum, Defendants change their strategy, and argue that Plaintiff

-12-

has not been prejudiced by their tardy disclosure. The Court disagrees with each of Defendants'
arguments and finds Plaintiff's Motion to Strike persuasive. Defendants' tardy disclosure is a
violation of the Federal Rules of Civil Procedure, and the appropriate sanction is to strike the Report.
See Thibeault v. Square D Co., 960 F.2d 239, 246 (1st Cir. 1992).

Even assuming the Court considered the content of the Report, however, the substance of the
Report would not have altered the Court's decision to recommend that Plaintiff's Motion for
Summary Judgement be granted. To begin, both the Report, and subsequent submissions by the
proposed expert, a non-lawyer, closely tread the line of arguing legal points rather than presenting
expert opinion on technical issues. Defendants' counsel, not their expert, is the proper individual
to argue legal issues before the Court. In fact, Mr. Girard described his assignment on page 1 of his
Report as providing "expert analysis of technical and legal aspects of the allegations" in this case.
(emphasis added). Further, in response to Plaintiff's Motion to Strike, Defendant's counsel
submitted a Memorandum and Supplemental Memorandum, each containing less than two pages of
text. The bulk of Defendants' opposition came in the form of an eleven-page "Response to Cox
Memorandum to Strike Expert Report" prepared by Mr. Girard which responds in detail to the legal
arguments made by Plaintiff in Support of its Motion to Strike and includes Mr. Girard's
interpretation of the Federal Rules of Evidence.

Moreover, the Expert Report itself impermissibly relies upon a hearsay telephone
conversation that purportedly took place between two employees of Motorola and Mr. Girard. (See
Expert Report, p. 25.) Mr. Girard asserts twice in his Expert Report that Motorola, which designs
and manufacturers the set-top boxes for Cox, is "by far the most authoritative source of information
with respect to the capabilities of the set-top box and the effects of devices such as a High Pass

-13-

Filter." Girard Report at pp. 13 and 21. In support of his opinions, Mr. Girard relies heavily on information he received by phone from the two Motorola employees on November 14, 2005. Id. pp. 12 and 25.[4] In particular, Mr. Girard asserts that he spoke with two employees of Motorola's development facility where set-top boxes, including those used by Cox, are designed and tested. Id. p. 25. One of these employees reportedly informed Mr. Girard that there is "'nothing that can be done to the [Motorola] set-top boxes – no sequence of button presses, power cycles or combinations of the two – that can erase...' or render inaccessible the pay-per-view billing records stored inside." Id. pp. 25-26. This information relates to Defendants' delayed billing theory discussed previously.

Mr. Girard's first legal argument in his Response is that the hearsay conversation with the Motorola employees contained in his Expert Report is admissible pursuant to Fed. R. Evid. 803(6) – the so-called business records exception. Mr. Girard is wrong. The hearsay exception contained in Fed. R. Evid. 803(6) applies only to business records "if kept in the course of a regularly conducted business activity." Mr. Girard's conversation with the two Motorola employees does not qualify as a business record. See Vanderpoel v. A-P-A Transport Corp., No. 90-5866, 1992 WL 158426 at *1-2 (E.D. Pa. July 1, 1992) (business records exception not applicable to statement from witness not acting in regular course of his/her business). Further, while it may be Mr. Girard's practice to consult with more knowledgeable individuals, it is not a regular part of the Motorola employees' job duties to consult with litigation experts.

This issue is more properly analyzed under Fed. R. Evid. 703 which permits experts to rely upon inadmissible evidence, such as hearsay, in rendering an opinion if the evidence is "of a type

_____

[4] It does not appear from Mr. Girard's Report that he examined the set-top boxes or tested the filters or reset procedures. It also does not appear from his Report that he had any prior experience in cable/pay-per-view technology and that his primary area of expertise is in the telecommunications field.

reasonably relied upon by experts in the particular field." Defendants have offered no basis for this Court to conclude that telecommunications experts, such as Mr. Girard, typically and reasonably rely on telephone conversations with employees of electronics manufacturers in rendering opinions. See Montgomery County v. Microvote Corp., 320 F.3d 440, 448 (3rd Cir. 2003) (expert opinion excluded under Fed. R. Evid. 703 when data underlying expert's opinion is so unreliable that no reasonable expert would rely on such data). Mr. Girard's opinions rely heavily upon the information obtained from the two Motorola employees. However, there is nothing in Mr. Girard's Report regarding how he came into contact with these two employees and how he assured himself that they were who they said they were. Even if the Motorola employees were truthful in identifying themselves and their job duties, they are not independent witnesses and could be biased, as they work for a cable industry vendor. If the set-top boxes had any vulnerability to the filter devices and reset procedures, it would not be in Motorola's business interest to disclose that fact and presumably not in the personal interest of the Motorola employees contacted who were reportedly responsible for set-top box design and testing. See Dallas & Mavis Forwarding Co. v. Stegall, 659 F.2d 721 (6th Cir. 1981) (expert opinion excluded when it unreasonably relied upon information obtained from a potentially biased witness). Defendants have not shown that such hearsay information is of a type reasonably relied upon by experts in the field. See Dreyer v. Ryder Auto. Carrier Group, Inc., 367 F. Supp. 2d 413, 424-25 (W.D.N.Y. 2005) (proponent of expert testimony bears burden of establishing that proffered testimony satisfies requirements for admissibility). Thus, since Mr. Girard's opinions depend in large part on the truth of the information obtained from the two Motorola employees over the phone, the inherent unreliability of the manner in which such information was obtained and the lack of any reliable corroboration requires exclusion of Mr. Girard's Expert Report.

Additionally, the delayed billing theory presented is simply untenable. The Report states, for example, that with a filter installed, "[a]ttempts by the cable management system to instruct the set-top box to transmit its billing records are thwarted." Expert Report p. 23.    Mr. Girard also indicates that the filter-user will only be detected upon the filter being removed, or the cable box being returned to the cable company. Id. p. 24. Further, Mr. Girard points out that the cable box will store a preset amount of viewed pay-per-view programs. Therefore, it is entirely plausible that even accepting Mr. Girard's theory, any user of a filter could indefinitely steal a preset number of pay-per-view programs by keeping the filter in place, or by destroying the cable box entirely. It appears that the "delayed billing" theory, therefore, is simply an argument that, while the filters allow a subscriber to steal cable, it is not a particularly reliable method. Simply because the would-be thief may ultimately be caught does not shield these Defendants from liability.

Moreover, there is no evidence that Defendants knew of this delayed billing theory when they sold the cable filters. Instead, Defendants sold the filters to people with the instructions for how to obtain free cable and even offered technical support through email. For all of these reasons, the substance of Mr. Girard's Expert Report, if considered, would not have had any impact on the Court's decision to recommend that summary judgment be granted in Plaintiff's favor.

Accordingly, the facts presented convince this Court that there are no genuine issues of material fact, and the Court recommends that Plaintiff's Motion for Summary Judgment be GRANTED on its claims under Section 553. Similarly, the Court rejects Defendants' arguments, and recommends that their Motion for Summary Judgment be DENIED.

### B.     Liability Under the Digital Millennium Copyright Act, 17 U.S.C. § 1201

Section 1201 of the Digital Millennium Copyright Act ("DMCA") generally prohibits circumvention of "a technological measure that effectively controls access to" a protected work. Section 1201(a)(2) states that it is a violation of the statute to sell a device which "(A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title; (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title."

In order to prevail on a claimed violation of this statute, "two elements must be shown: (1) defendant trafficked in a technology; and (2) the technology was primarily designed or produced to circumvent conditional access controls to protected works, or has limited commercially significant use other than such circumvention." See Directv Inc. v. Little, No. Cv-03-2407-RMV, 2004 WL 1811153, at *6 (N.D. Cal. Aug. 12, 2004) (citing 321 Studios v. Metro Goldwyn Mayer Studios, Inc., 307 F. Supp. 2d 1085, 1094-95 (N.D. Cal. 2004)). The case most relevant to this dispute is Comcast of Illinois X, LLC v. Hightech Electronics, No. 03 C 3231, 2004 WL 1718522 (N.D. Ill. July 28, 2004). In this case, the Court held that, although Comcast is not the copyright holder of the material broadcasted, it "controls access to such protected material through the descrambling method described in the complaint [and that] a violation of the statute also occurs when a technological measure that effectively protects the right of a copyright owner is circumvented." Id. at *6. The same reasoning applies here. Cox is the entity which controls access to copyrighted material; the

-17-

filters sold by Defendants circumvented the descrambling technology used by Cox and invaded the rights of the owners of the copyrighted pay-per-view programs.

Defendants provide only very cursory discussion of this statute, and essentially claim that the filters sold do not circumvent Cox's descrambling technology. The undisputed facts show that, without a cable filter, a Cox subscriber cannot view pay-per-view programs without ordering those programs through Cox, and that with a cable filter, a Cox subscriber can view a pay-per-view program without payment. Based on these facts, it is evident that the sale of the cable filters is also a violation of the DMCA. Accordingly, I recommend that Plaintiff's Motion be GRANTED as to its DMCA claim and that Defendants' Motion be DENIED.

## V.    Conclusion

For the foregoing reasons, I recommend that Plaintiff's Motion for Summary Judgment (Document No. 77) be GRANTED and that Defendants' Motion for Summary Judgment (Document No. 101) be DENIED. I further recommend that the District Court conduct an evidentiary hearing concerning damages. Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within ten (10) days of its receipt. See Fed. R. Civ. P. 72(b); LR Cv 72. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

LINCOLN D. ALMOND
United States Magistrate Judge
April 25, 2006

-18-