A. He sold a few things, yeah.
Q. When you say he sold a few things, what do you mean by that?
A. He sold some of those things that are on that list, I guess.
Q. Referring to Plaintiff's 2?
A. Right.
Q. And now, I want to direct your attention to -- you read the last paragraph?
A. Right.
Q. And specifically I'll just -- you say with respect to the wireless pinhole camera: I had one guy this week tell me that he has it in his bedroom and every time a girl comes over he is videotaping their sex acts. You wrote that; right?
A. I must have.
Q. And this was in 2003; right?
A. Yes.
Q. It's dated December 12, 2003?
A. Yeah.
Q. And until very recently you were still selling these products?
A. Yes.
Q. Would you agree that this person's use of the camera in question is of questionable legality?



MR. CURRIER: I object. It's argumentative and it may not even state the law correctly but you can answer it.
A. Yes.
Q. You'd agree with that?
A. Based on that, yeah.
Q. You continued to sell these in 2004 and 2005 knowing that at least some of your clientele was violating the law with these products?
MR. CURRIER: Objection.
A. Yes, since 9/11 that was more for security for watching your cars and everything at night.
MR. HOGAN: Move to strike as nonresponsive.
Q. The question was you continued to sell these things?
A. Yes.
Q. And you knew that some of your clientele were using them for illegal purposes?
MR. CURRIER: Objection. Same objection.
MR. HOGAN: You can answer.
A. Well, I wouldn't really know what they use them for.
Q. Okay. In this case you talk about one of your customers using it to tape someone having their



sex acts?
A. That's what they told me.
Q. Do you believe that that is a legal use of the product?
MR. CURRIER: Objection. He's not an attorney.
A. No.
Q. Can you read the last sentence beginning with: People love the products.
MR. CURRIER: Let me see that again first, Jon.
A. People love the products we have because they are legal in the way you are supposed to use them so they are legal to sell such as cable filters but illegal in the way people think of using them. Can you really believe the clientele at a computer show would do anything illegal? No way. I don't believe it.
Q. That's an acknowledgment by you that people who come to these computer shows engage in some illegal conduct with respect to some of the products that are sold at these shows?
MR. CURRIER: Objection to form.
A. They could.
Q. And when you say: Can you really believe that the



clientele at a computer show would do anything illegal, with three question marks after it, and then: No way. I don't believe it! Was that you essentially tongue in cheek?
A. Yes, because --
MR. CURRIER: Listen to the question.
Q. That was tongue in cheek; right?
MR. CURRIER: Objection to the form.
MR. HOGAN: You can answer the question.
A. Yeah.
Q. Do you know what it means when something is said with tongue in cheek?
A. No. Explain what you mean exactly.
Q. It wasn't a sincere statement. You were in fact saying that you understood that people at these computer shows routinely do things like this that are illegal?
MR. CURRIER: Objection to form.
A. Not routinely.
Q. What's the significance of this the way you wrote it?
A. He always said that people at computer shows the introverted socially inept engineers, were --
Q. I'm sorry the introverted?
A. That introverted socially inept engineers that

Page 54

go to these shows are strange.
Q. How do we get to: Can you believe someone would do something illegal to purchase something from one of these cable shows?
A. It was based on that because he was making fun of some of the people.
Q. Being socially inept and introverted doesn't mean that someone is going to do something illegal, would you agree with that?
A. Oh, that's true, yeah.
Q. Mr. Chaffee, your statement to this effect basically: Can you believe the clientele at the computer show would do anything illegal, with three question marks; am I to understand that you were really surprised that that would happen or that this was meant to be somewhat humorous?
MR. CURRIER: Objection to form.
A. I don't know, that was a long time ago. That was a long time ago.
Q. It doesn't answer the question. You don't know whether or not this was intended to be humorous in some way?
A. No.
Q. But you wrote it?
A. I guess so.

Page 55

Q. But you don't have any reason to believe that anyone else wrote it using your identity?
A. No.
Q. Does Amy correspond by e-mail with Joe Fontaine?
A. No.
Q. You said Joe Fontaine only sold a few things for you; is that right?
A. I don't really know what he actually sells. He buys everything himself pretty much.
Q. But you have an association with him through your business?
A. I did, yeah, a while ago, yeah.
Q. When did that end?
A. Oh, a while back. I'm not sure exactly what day.
Q. You're not sure when, a while back?
A. Yeah.
Q. What's a while back? Is that a month ago? A week ago?
A. It's been four or five months ago.
Q. And what occurred to have the association between Chaffee International and Mr. Fontaine come to an end?
A. Oh, I don't know.
Q. But prior to that time, he routinely went to these

Page 56

cable shows for you and sold products for you?
A. No, he had his own company. He sold his own stuff.
Q. Did you provide digital cable filters to him?
A. I think I gave him a few but he got them himself. He got them himself.
Q. Did you ever give him digital cable filters to sell on your behalf?
A. I might have given him a few but he sold them himself.
Q. Going back to Fontaine, did you provide him with digital cable filters to sell?
A. At one point, yes.
Q. Do you know how many you provided him with?
A. Not many.
Q. Isn't it a fact that you provided him with digital cable filters and other products that he sold at these shows and he paid you back a percentage of what he sold?
A. Something like that, yes.
Q. Well, what is it, not something like that?
A. Because he had his own company, he sold his own stuff, he bought his own stuff. He bought flashlights from me. At one time he bought filters but then he bought them from somewhere

Page 57

else, off of eBay, I guess, he said.
Q. As it related to your, and I say your collectively, I mean, individually and Chaffee International, your interaction with him, you provided him with products to sell?
A. Right.
Q. And he sold them?
A. Right.
Q. Those products included digital cable filters?
A. Right.
Q. He sold some quantity of product at a particular show and then remitted to you a portion of those sales?
A. Right.
Q. And is that portion -- the way it worked with Mr. Fontaine and other people similarly situated was that you would make them buy the product from you; is that correct?
MR. CURRIER: Object to the form.
A. No.
Q. I'm breaking it down. With Mr. Fontaine, did he purchase equipment from you for resale?
A. No, he just asked me to send him some product and then he sent me back what he didn't sell and the money for what he sold.