clientele at a computer show would do anything illegal, with three question marks after it, and then: No way. I don't believe it! Was that you essentially tongue in cheek?
A. Yes, because --
MR. CURRIER: Listen to the question.
Q. That was tongue in cheek; right?
MR. CURRIER: Objection to the form.
MR. HOGAN: You can answer the question.
A. Yeah.
Q. Do you know what it means when something is said with tongue in cheek?
A. No. Explain what you mean exactly.
Q. It wasn't a sincere statement. You were in fact saying that you understood that people at these computer shows routinely do things like this that are illegal?
MR. CURRIER: Objection to form.
A. Not routinely.
Q. What's the significance of this the way you wrote it?
A. He always said that people at computer shows the introverted socially inept engineers, were --
Q. I'm sorry the introverted?
A. That introverted socially inept engineers that

go to these shows are strange.
Q. How do we get to: Can you believe someone would do something illegal to purchase something from one of these cable shows?
A. It was based on that because he was making fun of some of the people.
Q. Being socially inept and introverted doesn't mean that someone is going to do something illegal, would you agree with that?
A. Oh, that's true, yeah.
Q. Mr. Chaffee, your statement to this effect basically: Can you believe the clientele at the computer show would do anything illegal, with three question marks; am I to understand that you were really surprised that that would happen or that this was meant to be somewhat humorous?
MR. CURRIER: Objection to form.
A. I don't know, that was a long time ago. That was a long time ago.
Q. It doesn't answer the question. You don't know whether or not this was intended to be humorous in some way?
A. No.
Q. But you wrote it?
A. I guess so.

MR. CURRIER: Yeah.

MR. HOGAN: Yes, there's no question pending.

(Short recess was taken at this time.)

Q. BY MR. HOGAN: Which of Amy's sisters are you referring to, Christine or --

A. Sharon.

Q. Sharon McKenna?

A. Right.

Q. Did Christine?

A. No, neither one of them did.

Q. To your knowledge, did they ever respond to e-mails --

A. No.

Q. -- that were sent to Chaffee --

A. No.

Q. You've got to let me finish.

MR. CURRIER: Let him finish, Jon.

Q. Did either of Amy's sisters ever respond to any e-mail that was sent to support911@aol.com?

A. No.

Q. Who had access to the computers that would be used to respond to e-mails that were sent?

A. Just me.

Q. Just you?

A. Yeah.
Q. Did you use any assumed names during the time you corresponded with people as it related to products that you sold?
A. I used the secretary name as Sharon.
Q. So any time that I see Sharon among the e-mails that were downloaded from your computer, that's in fact you?
A. Yes.
Q. And why did you take on the name of Sharon?
A. Well, the problem was when I was on-line doing my work, they would instant message me and say, hey, one of my flashlights doesn't work or something. They would instant message me because you can instant message while you're doing other work and it is kind of annoying. So that's why I came up with the name of Sharon so if they e-mailed me while I was doing my work, I would say to send an e-mail.
Q. Who would you say send an e-mail?
A. To somebody that would send you an instant message. With AOL you can be on-line doing my work, my day job. Somebody can just come right in the middle and just instant message you.
Q. Now, when you say come right in the middle,

MR. CURRIER: Objection.
Q. You're speculating but about that, aren't you?
MR. CURRIER: Objection.
A. Yeah.
MR. HOGAN: Let's mark this Plaintiff's 10.
(Plaintiff's Exhibit 10 marked for ID.)
Q. Plaintiff's 10 is an e-mail dated August 2nd, 2003.
A. Right.
Q. Do you recognize that?
A. Yeah.
Q. Is that an e-mail?
A. Yes.
Q. Sir, do you recognize that to be an e-mail sent from support911?
A. Yeah, I'm not too sure.
Q. Where it says the subject item is Re: Filter from support911.
A. Right.
Q. That's your website; correct?
A. Yes, my e-mail address, sir.
Q. E-mail, I'm sorry. And the August 2nd, 2003 date, that's when -- you were in business at that time; correct?

A. Yeah.

Q. Selling filters; right?

A. Yeah.

Q. And it's to gareid@optonline.net. The e-mail reads: Hi, what channels? The filter only works for pay-per-views, On Demands, everything you need to order from the remote. It doesn't work for HBO, Showtime and other premium channels. You must reset the box before removing or you will be charged. You may be able to get information from the website www.digital-cable-filters.com. Best Regards, Mike?

A. That was something that was probably copied from one of the bulletin boards.

Q. What do you mean?

A. From one of the searches. When you do a search, it comes up with thousands and thousands of bulletin boards and all the information on it because I didn't really have much knowledge of anything.

Q. You said at the outset very early in this deposition that -- that you were responsible for all the e-mail traffic?

A. Yeah, I was for the e-mail but I don't remember writing it like that.


94acaff4-1b8a-4932-b70e-9d1303206971

Q. Who's Mike? Is that another alter ego of yours?
A. No, I wonder what that's from. I think that was just copied from one of the bulletin boards and that's why.
Q. What do you mean when you say copied from a bulletin board?
A. Well, when somebody wrote me an e-mail, I just do a search on-line and that's how we get the websites. When you do a search, thousands and thousands of things come up and you type in a question and it comes back with an answer.
Q. So, you're saying you didn't type in the contents of this e-mail?
A. I don't know, I don't remember. I don't know who the person is.
Q. Did anyone -- does anyone work for you by the name of Mike?
A. Yeah, there was. There was a Mike. There was a Mike and he had to give them my e-mail address and he did handled some of the questions.
Q. Who's Mike?
A. He comes to some of the shows. He's from Massachusetts somewhere.
Q. You don't know his name?
A. No.

Q. I mean, you don't know his last name?
A. No.
Q. Do you know if Mike is even his real name?
A. I think so.
Q. You would have seen this e-mail -- are you saying that Mike prepared this or you prepared it?
A. I don't remember, that's from 8/2003, I'm not sure.
Q. So it's possible that you prepared it?
A. Yeah, I don't think that's my writing though.
Q. When you say your writing, what do you mean?
A. It was individually typed. I think it was just copied and pasted.
Q. What makes you say that?
A. Because that's what I did a lot. I just copied and pasted.
Q. But you don't know whether or not in this case you copied and pasted or whether you typed this in directly?
A. Right.
MR. HOGAN: Can we mark this Plaintiff's 11.
(Plaintiff's Exhibit 11 marked for ID.)
Q. We've just marked Plaintiff's 11, an e-mail message dated February 14th, 2004. Do you

mean, mine had this on the front and then underneath laid down on the plastic sheet was the disclaimer about everything.
Q. Do you have that disclaimer anywhere in your papers or in your computer?
A. Oh, I'm sure I do, yeah.
Q. I'm directing your attention again to the back sheet of Plaintiff's 21. Can you read aloud the portion which is under the header: Will this work with basic cable?
A. Will this work -- no. Unless you are subscribed to digital cable, you will not enjoy the benefits and quality enhancement of the digital cable filter.
Q. Now, going back up to the second sentence of what is a digital cable filter, under that header there's a -- it begins with a digital cable filter will also --
A. The digital cable filter is a simple device that connects to your main cable line going through --
Q. No, further down. Line four, a digital cable --
A. Oh, digital cable filter will also block out interference as well as block out pay-per-view movie order charges from your cable company,

giving you free pay-per-view. Therefore, it is mandatory that you notify your cable company of the extra orders.

Q. Now, you displayed that or a sign containing the same information at the shows where you sold cable --

A. At some of them, yeah.

MR. CURRIER: Jon, let him finish the question.

Q. -- filters. And those two sentences make it clear that this device can be used -- I'll rephrase that. And it indicates a digital cable filter will also block out interference as well as block out pay-per-view and movie order charges from your cable company.

A. Yeah.

Q. Now, you displayed that at the same time you were selling these filters; correct?

A. Sometimes, yes.

Q. And when other people were selling your filters, you gave them essentially the same sign to display; correct?

A. Some of them had these, yes.

Q. Well, who did?

A. Well, I don't know if Mercy did. I don't

know. I don't know who did or who didn't.
Q. You left it up to the individual seller to go out there and get a sign?
A. No. This was the only one that MarketPro approved. This is the only one I submitted to them and they approved it. They said that it's illegal to descramble.
Q. No, I'm not asking you about MarketPro's approval.
A. Okay.
Q. I'm asking you when your wife went out to sell filters for you, did she take this with her?
A. If she had it with her and she remembered to take it, she would have.
Q. And when Ramalda was out at these shows, would she have this?
A. Well, they only worked together, yes.
Q. Have you ever read that document?
A. Not really, not every word for word.
Q. You submitted it to MarketPro for approval on the question of whether or not these filters were legal?
A. Right.
Q. But you never read it?
A. Right.
Q. Do you know -- can you further narrow that date



94acaff4-1b8a-4932-b70e-9d1303206074

that you submitted this to MarketPro? Obviously we know now that it is sometime prior to September of '04.
A. Yeah, probably a good -- it's probably like February or March of that year.
Q. Of '04?
A. Yeah. Oh, yeah.
Q. Did you -- where did you get the information to create Plaintiff's 21?
A. I got this -- I'm trying to think. I got it right off the Internet from doing a search, that's where I got it from.
Q. Do you know that to be a fact?
A. Yeah.
Q. So you got it off the Internet, then you typed on it? I'm sorry, when you printed it, it added this stuff on the bottom with the date and America OnLine?
A. No, that's very common. What happens is, you don't want to open up Microsoft Word, you can take -- when you copy and paste words -- like I do it for Japanese words, different characters. If you copy and paste it in Word, it messes up everything, but if you copy and paste it inside a window, an e-mail window, like for Windows, it



94acaff4-1b8a-4932-b70e-9d1303206971

doesn't ever change anything, it's always the same. But if you bring it into Word, you get translation problems. It brings in some characters improperly but if you put it into a window, it copies it exactly the way it is.

So what happens though is when you hit print from an open e-mail window, not that you're sending an e-mail to somebody, I just copy and paste everything into AOL because it stays the same when you print it out. It doesn't move all over so you have to adjust the margins and everything else. And that's why -- and it automatically prints out.

Q. So in the process of going on the Internet then, you obviously got more than one response when you typed in digital cable --

A. Right.

Q. You had to go through a series of web responses, whether they were --

A. It was one of the first ones --

MR. CURRIER: Jon.

Q. Did you have to go through a series of responses to your web search?

A. Could you clarify that a little bit more.

Q. Well, we'll step back. Did you type in certain

search terms to look for information in order to create this form that has been marked Plaintiff's 21?

A. I just typed in digital cable filter and I got a page like that and that's what we used.

Q. This was the first response?

A. This was to send something to MarketPro for approval.

Q. This was the first response that you received when you put digital cable filter in your web search?

A. That I don't remember. There's thousands that come up.

Q. My question, did you have to go through any other responses to your web search before you selected this one?

A. No, it might have been the first one. It wouldn't have been the first site but then you had to click page to page to page and I might not have stayed there doing that. I might have just gone on to the next one.

Q. Was there some process whereby you judged one group of directions for digital cable filters to be better than another?

A. No. Just -- that was the first one I ever saw.



94acaff4-1b8a-4932-b70e-9d1303206971

Q. So now it's the first one you ever saw?

A. Well, it's the first one I ever saw specifically with the directions. It's not the first site I went to because some sites might say that you've got to buy the filter and they give it to you or you've got to pay for it or whatever, but I wasn't getting the instructions. I just wanted something for MarketPro because they needed something to show -- what happened was from what I remember -- I remember since talking to you is somebody said you were selling a descrambler device to descramble cable, one of the other vendors. So they needed to make sure it wasn't a descrambler. That's how MarketPro came to me.

Q. So they approached you about it?

A. Yeah, that I remember. They said, one of the other vendors, they said -- it wasn't a customer -- they said one of the other vendors is selling a device that descrambles. So I said, it does not descramble. So they said, well, we need a sign or something.

So I went to a website, took this, printed it, sent it over to them and Paula said, they're going to give it to their legal department and let me know in two or three days. She never called me

back, I called her. She said, it's fine, you can sell them. The big thing is that it can't be something that descrambles.

Q. But you never read it?

A. I did it so quickly to get it over to her. I went right on-line.

Q. Yes or no, did you read this?

A. Not fully, not word for word.

Q. Have you read it to date?

A. I mean, I read the first paragraph, I know that because it mentioned firewall and ham signal, that I read.

Q. So you read the portions that are helpful to your defense?

MR. CURRIER: Objection.

A. No, because it's all in the first paragraph.

Q. The first paragraph also says it will block out pay-per-view and movie order charges from your cable company.

A. Yeah.

Q. Did you recall reading that before you started selling filters?

A. No, I guess I didn't. Well, when I sent it to them and they obviously didn't --

Q. I don't want to hear about them.



94acaff4-1b8a-4932-b70e-9d1303206971