ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COXCOM, INC. d/b/a COX COMMUNICATIONS NEW ENGLAND,

Plaintiff,

vs.

JON CHAFFEE, individually and d/b/a ELECTRONIC IMPORTS, AMY CHAFFEE, individually and d/b/a ELECTRONIC IMPORTS, RAMALDA BOU, individually and d/b/a ELECTRONIC IMPORTS,

Defendants.

C.A. No. 05-107 S

FILED

JUL 31 '06

U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR STATUTORY DAMAGES, COSTS AND ATTORNEYS' FEES**

Shaun K. Hogan, Esq.
Lefkowitz, Hogan & Cassell, LLP
350 Jericho Turnpike, Suite 100
Jericho, New York 11753
(516) 942-4700

Francis Holbrook, Esq.
Miller Scott & Holbrook
122 Touro Street
Newport, Rhode Island 02840
(401) 847-7500

# PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR STATUTORY DAMAGES, COSTS AND ATTORNEYS' FEES

In accordance with this Court's Order of June 29, 2006, the plaintiff CoxCom, Inc. d/b/a Cox Communications New England (plaintiff or "Cox"), respectfully submits this Memorandum of Law in Support of its request for statutory damages, costs and attorneys' fees in this matter against defendants Jon Chaffee ("Chaffee"), individually and d/b/a Electronic Imports and Chaffee International,[1] Amy Chaffee ("Amy"), individually and d/b/a Electronic Imports, and Ramalda Bou ("Bou"), individually and d/b/a Electronic Imports (collectively, "defendants") under 47 U.S.C. § 553 and 17 U.S.C. § 1201. As discussed in more detail below, Cox seeks statutory damages of $60,000 pursuant to 47 U.S.C. § 553, statutory damages of at least $350,000 pursuant to 17 U.S.C. § 1201 and legal fees and costs of $193,630.11.

## STATEMENT OF RELEVANT FACTS

### The Plaintiff and its Business

Cox owns, operates and maintains cable television systems throughout the United States, including parts of Connecticut and Rhode Island. See April 25, 2006 Report and Recommendation ("R&R"), at 2. Cox provides cable television service throughout Rhode Island as well as 19 cities and towns in Connecticut and the town of Holland, Massachusetts (attached hereto as Exhibit "A" are area maps for Cox's New England system). In order to secure its product, Cox utilizes the technological measure of encoding or scrambling the premium and pay-per-view cable services it provides to customers, and it provides each customer purchasing such

---

[1] During the initial conference in this action, defendants' counsel stated that Electronic Imports, LLC was a separate entity. However, he conceded that he did not challenge the Court's jurisdiction over his clients on the basis that it had been named incorrectly in the action.

services with a set-top converter that is programmed or "addressed"[2] to descramble only those services that are ordered. Cox provides cable services using digital technology to scramble the signals. While this scrambling itself seemingly cannot be directly compromised, and under normal circumstances fully protects the scrambled programming from unauthorized viewing, the digital cable signal filters ("digital filters") sold by defendants prevent one aspect of Cox's digital technology from functioning. Specifically, they prevent the addressable digital converters provided by Cox to subscribers from successfully transmitting billing information regarding pay-per-view programming to Cox's central billing computer. Thus, a subscriber can circumvent Cox's digital scrambling technology, and view pay-per-view programming without receiving invoices from, or making payment to, Cox. Mark Matteo Dep. at 54.

**The Defendants and their Business**

Between April 2003 and March 2005, defendants engaged in the business of selling digital filters that enable the unauthorized viewing of pay-per-view programming without remuneration to cable companies for profit. This Court has already found that defendants' sales of filters violated 47 U.S.C. § 553 and 17 U.S.C. § 1201. See generally id.

It is evident, and the evidence at the hearing will show, that defendants were a major distributor of digital cable filters. In addition to Jon Chaffee and his wife, Amy, selling filters at computer/electronic shows, the information obtained by Cox demonstrates that Jon Chaffee had approximately 10 contractors/vendors working computer shows for him throughout the United States. Jon Chaffee was supplying each contractor/vendor with as many as 46 cable filters to sell at one time. Each contractor/vendors would sell as many as 32 cable filters at each show. Several of these computer shows were held in areas that Cox provides digital cable services.

[2] Addressability is the link of communication between the cable operator's central computer and a converter-decoder utilized by a cable subscriber to access cable programming.

Moreover, during the course of discovery in this action, Cox obtained records of Paypal that reflect defendants' purchases of filters. Most significantly, the records show that, in total, defendants purchased 4,053 filters for $10,000.50. Thus, on average, defendants paid $2.46 per filter. Specifically, defendant John Chaffee made the following purchases: 770 filters from Birddog for $2,193.00; 575 filters from NSCU for $1,518.00; 1848 filters from Orderbulk for $4,400.50; and 800 filters from Polarizedoptics for $1,720.00. Defendant Amy Chaffee purchased 60 filters from Birddog for $169.00. See PX-6.

Significantly, at the time Cox commenced the lawsuit against defendants, defendants were no longer in possession of any of the purchased filters. Thus, it can be reasonably concluded that defendants sold all 4,053 filters.

Defendants' conduct has made it difficult to determine exactly how many devices they sold. For example when requested to identify each individual and entity that assisted the defendants in the sale of digital filters, defendant Jon Chaffee concealed the names of numerous such persons, whether to avoid identifying witnesses or to protect them from prosecution. Thus, in his discovery responses and initially during questioning at his deposition, Jon Chaffee named his wife and co-defendant Amy, co-defendant Bou, and three other persons. However, during his deposition, when pressed on the issue, he admitted having omitted the names of five other persons (Joe Fontaine, Richard Conti, Sharon McKenna, Christine McKenna, Stephen Sercu) who also sold digital filters on his behalf. Jon Chaffee Dep. at 59-61, 105. Lest these be characterized as oversights, Chaffee testified that Sharon and Christine McKenna were his sisters-in-law. Id. at 61. Jon Chaffee also testified that he had provided his mother (also not previously identified as a seller) with digital filters to sell at computer shows, but couldn't be sure that she sold any. Id. at 33-36.

Further, it is clear that defendants (likely intentionally) failed to keep records of the amount of filters sold. For example, defendant Amy Chaffee testified that she did not report the number of filters that she sold after a computer show. PX-46 Amy Chaffee Dep. at 26. Likewise, witnesses Sharon McKenna and Christine McKenna testified that they were not required nor did they prepare any inventory reports to show the number of filters that they sold. PX-50 Sharon McKenna Dep. at 36, PX-49 Christine McKenna Dep. at 16. Moreover, in defendants' discovery responses they acknowledged that "due to the way sales were made, no such documents exist."

Given defendants' lack of accurate record keeping it is even more difficult to determine exactly how many filters defendants sold to Cox's customers. Notwithstanding this, it is fair to conclude that a large portion of the at least 4,053 filters sold by defendants were sold to Cox's customers. Out of all of the filters sold, Cox was able to determine that defendants sold 465 of the filters at sales shows outside of Connecticut and Rhode Island, thus leaving, at least 3,500 filters that could have been sold in the Connecticut/Rhode Island area. During the relevant time period, Cox provided cable television services throughout Rhode Island and in 19 cities and towns in Connecticut. Cox services approximately 160,000 customers in Eastern and Central Connecticut. Thus, it is reasonable to conclude that defendants sold at least half of these filters (i.e. at least 1750 filters) to Cox's customers.

Moreover, the fact that defendants sold filters to Cox's customers that would allow for the free viewing of pay-per-views on Cox's system is corroborated by the fact that during Cox's investigation of defendants, defendants sold numerous filters to Cox's investigators in Connecticut and Rhode Island. Almost all of these sales took place within Cox's cable television geographic area. Specifically, Cox commenced an investigation of defendants in or around November of 2004.

The major thrust of the investigation involved undercover purchases of a total of 18 digital filters from the defendants on five separate occasions. Four of these transactions involved purchases at computer shows, and the final purchase of five digital filters was arranged by telephone and took place with defendant Chaffee in a parking lot. The sales prices of the filters sold by defendants to Cox's investigators were between $10.00 and $20.00 per filter, depending on how many filters were purchased at one time. The defendants offered discounts if the filters were purchased in bulk. The devices purchased by Cox's investigators from defendants were subsequently tested and found to prevent Cox's digital converters from conveying billing information regarding pay-per-view events to Cox's central billing computers. See R&R at 3-4

## ARGUMENT

### I. COX IS ENTITLED TO STATUTORY DAMAGES PURSUANT TO 47 U.S.C. § 553 AND 17 U.S.C. § 1201

#### A. Legal Standard

The Court has already found that defendants violated 47 U.S.C. § 553 and 17 U.S.C. § 1201. Significantly, courts addressing the issue of the appropriate amount of damages that should be awarded in a situation where the defendant has been found to have violated both of these statutes have held that a plaintiff is entitled to damages for **both** the violation of the Communications Act (i.e. 47 U.S.C. § 553) and the violation of the Copyright Act (i.e. 17 U.S.C. § 1201). See, e.g., Top Rank, Inc. v. Allerton Lounge, Inc., 96 Civ. 7864(SS)(RLE), 1998 U.S. Dist. LEXIS 2394, at *13 (S.D.N.Y. March 3, 1998) (in awarding damages under both the Copyright Act and the Communications Act, the court explained that "Plaintiff is not barred from recovering under more than one federal act when violations of separate federal acts are based on 'the same operative facts.'") (a copy of this decision is attached hereto as Exhibit "B"); Top Rank, Inc. v. Ortiz, 01 Civ.

8427(WHP)(FM), 2003 U.S. Dist. LEXIS 6607, at *9-*10 (S.D.N.Y. March 27, 2003) (awarding statutory damages pursuant to both the Communications Act and the Copyright Act) (a copy of this decision is attached hereto as Exhibit "C"); Spencer Promotions, Inc. v. 5th Quarter Enter., Inc., No. c 94-0988 CW, 1996 U.S. Dist. LEXIS, at *20-*21 (N.D. Cal. Feb. 21, 1996) (awarding plaintiffs damages under the Copyright Act and the Communications Act) (a copy of this decision is attached hereto as Exhibit D); see also Cable/Home Comm. Corp. v. Network Prods., Inc., 902 F.2d 829, 834-35, 851-52 (11th Cir. 1990) (affirming an award of damages pursuant to both the Communications Act and the Copyright Act relating to defendants' sales of computer chips and devices that allowed for the unauthorized reception of plaintiffs' encrypted pay television programming).

Accordingly, as set forth in more detail below, Cox respectfully requests that the Court award it statutory damages for defendants' violations of the Communications Act, 47 U.S.C. § 553, and, in addition, statutory damages pursuant to the Digital Millennium Copyright Act, 17 U.S.C. § 1201.

### B. Cox is Entitled to Damages of $60,000 Pursuant to 47 U.S.C. § 553

#### 1. Statutory Damages

Section 553(c)(3)(A)(ii) provides that a court can award up to $10,000.00 in statutory damages for violations of 47 U.S.C. § 553:

> [T]he party aggrieved may recover an award of statutory damages for all violations involved in the action, in a sum of not less than $250 or more than $10,000 as the court considers just.

Significantly, numerous federal courts in addressing the issue of the proper amount of statutory damages to assess against a seller of unauthorized devices, such as defendants herein, have

found that it is completely warranted to award the maximum amount of statutory damages. See, e.g., General Instr. Corp. of Del. v. Nu-Tek Electr. & Mfg., Inc., Civil Action No. 93-3854, 1997 U.S. Dist. LEXIS 8239, at *1, *8 (E.D. Pa. June 4, 1997) (awarding $10,000.00 in statutory damages pursuant to section 553 for defendants' sales of cable descrambling devices) (a copy of this decision is attached hereto as Exhibit "E"), aff'd, 197 F.3d 83 (3d Cir. 1999); Time Warner Cable of New York City v. Burgess, No. A-00-CV-789 JN, slip. op. at 6 (W.D. Tex. Aug. 31, 2001) (indicating that $10,000.00 in statutory damages pursuant to section 553 was appropriate against a pirate decoder seller) (a copy of this decision is attached hereto as Exhibit "F").

In this matter, it is undisputed that defendants were in the business of selling filters. Indeed, defendants sold 18 filters to Cox's investigators. Moreover, it is reasonable to conclude that defendants sold hundreds, if not thousands, of cable filters to Cox's customers. Given this, Cox respectfully submits that it is proper to award Cox $10,000 in statutory damages pursuant to 47 U.S.C. § 553(c)(3)(A)(ii).

**2. Enhanced Damages**

Cox also requests that the Court award it enhanced statutory damages pursuant to 47 U.S.C. § 553(c)(3)(B). This Section provides that enhanced damages can be assessed in the court's discretion against pirate decoder sellers such as the defendants, who willfully committed violations of the Communications Act for purposes of commercial advantage or private financial gain.

As the Supreme Court noted in Trans World Airlines v. Thurston, 469 U.S. 111, 127, 105 S. Ct. 613, 624-5 (1985), the standard for willfulness in a civil case is lower, requiring proof only of "a disregard for the governing statute and an indifference to its requirements."

Courts addressing this issue have found that an entity that is in the business of selling pirate decoding devices is willfully violating the Communications Act for purposes of commercial

advantage or private financial gain. Thus, numerous courts have held that it is completely appropriate to award the maximum amount of enhanced damages (i.e. $50,000) when it is demonstrated that the defendant was in the business of selling pirate decoding devices. See, e.g., Comcast of Ill. X, LLC v. Platinum Elecs., Inc., 336 F.Supp.2d 957, 966 (D. Neb. 2004) (awarding $50,000.00 maximum enhanced damages to "give effect to Congress's intent that distributors of illegal descrambling equipment should bear substantial liability"); CSC Holdings, Inc. v. New Info. Tech., Inc., 148 F. Supp. 2d 755, 757, 762 (N.D. Tex. 2001) (awarding $50,000 in enhanced damages against a seller of pirate decoding devices who acknowledged selling at least 100 devices to CSC Holdings, Inc.'s customers); CSC Holdings, Inc. v. J.R.C. Products, Inc., 158 F. Supp. 2d 798, 814 (N.D. Ill. 2001) (awarding $50,000 in enhanced damages pursuant to § 553 (c)(3)(B)), aff'd in part and rev'd in part on other grounds, 309 F.3d 988 (7th Cir. 2002); Time Warner Entertainment/Advance-Newhouse P'Ship v. Worldwide Elects., 50 F. Supp. 2d 1288, 1301-02 (S.D. Fla. 1999); Nu-Tek Electr. & Mfg., Inc., 1997 U.S. Dist. LEXIS 8239, at *8-*9 (attached hereto as Exhibit "E"); Burgess, slip. op. at 6, n.7 (attached hereto as Exhibit "F").

In Burgess, the court, in assessing the full value of enhanced damages noted that such damages were clearly appropriate in light of the fact that defendants were in the business of selling pirate devices:

> The reason the Court is awarding the maximum amounts allowed by § 553(c)(3)(A)(ii) and § 553(c)(3)(B) is that it is hard for the Court to imagine a more egregious violation of § 553. Defendants were in the business of selling illegal cable decoders over the Internet to customers across the nation. If this situation does not merit the maximum penalties, the Court would have no idea what would.

Burgess, slip. op. at 6, n.7 (attached hereto as Exhibit "F").

Likewise, in Worldwide Elecs., the court explained that it was clear that the legislative intent behind Section 553(c)(3)(B) was to allow the court to impose "substantial liability, if not punitive-type damages" against entities who are engaged in the business of selling pirate devices:

> In assessing the full measure of enhanced damages against the defendants herein under Section 553(c)(3)(B), the Court has considered the legislative intent embodied by this provision that commercial enterprises conducted, as here, for private financial gain should be assessed substantial liability, if not punitive-type damages.

50 F. Supp. 2d at 1302. Thus, the court held that it was appropriate to award $50,000 in enhanced damages. 50 F. Supp. 2d at 1302. Id.

Similar to the defendants in above cases, it cannot seriously be disputed that defendants violated 47 U.S.C. § 553 willfully and for purposes of financial advantage or private financial gain. As this Court has already found, defendants were in the business of selling devices with the knowledge that the devices could be used to steal pay per view cable from Cox. R&R at 4. The Court also found that Defendants had "specific knowledge concerning the illegal use of the filters and that Defendants knew that their customers planned to (and did) use the filters for illegal purposes." Id. at 11. Moreover, given the sheer number of filters that defendants purchased and sold, it cannot be disputed that defendants sold hundreds, if not thousands, of filters to Cox's customers for purposes of commercial advantage or private financial gain. Indeed, in one e-mail Jon Chaffee stated that he sold $100,000 in filters in one month and defendants themselves acknowledge that they made a profit (albeit one that is clearly severely underestimated by defendants) from their sales of filters. See PX-10, PX-3. Thus, the maximum award of $50,000 in enhanced damages is warranted in this matter.

Accordingly, Cox respectfully requests that the Court assess $60,000 in statutory damages for defendants' violations of 47 U.S.C. § 553.

### C. Cox is Entitled to Damages of at Least $350,000 Pursuant to 17 U.S.C. § 1201

As noted above, when a party is found to have engaged in conduct violating both the Communications Act and the Copyright Act, the injured party is entitled to damages pursuant to both Acts. Damages for a violation of 17 U.S.C. § 1201 are set forth in 17 U.S.C. § 1203. Pursuant to this section, a party can elect to recover statutory damages for each violation in an amount between $200 and $2,500:

> (3) Statutory damages.
> (A) At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1201 in the sum of not less than $200 or more than $2,500 per act of circumvention, device, product, component, offer, or performance of service, as the court considers just.

17 U.S.C.S. § 1203(c)(3)(A).

An exhaustive search has only located one case, to date, that has specifically addressed the issue of how to calculate damages pursuant to 17 U.S.C. § 1203, Sony Computers Ent. America, Inc. v. Filipiak, 406 F. Supp. 2d 1068 (N.D. Cal. 2005).

In Filipiak, Sony Computers Entertainment America, Inc. ("SCEA") sued Filipiak for damages under the Digital Millennium Copyright Act ("DMCA") relating to defendant's sales of devices that would allow a person to play unauthorized and illegal copies of Playstation video games. Filipiak stipulated to liability and the main issue for the court to decide was the amount of damages to impose. 406 F. Supp. 2d at 1069-71.

Initially, in determining the amount of damages, the court explained that pursuant to section 1203(c)(3)(A), a plaintiff is entitled to an award of statutory damages for **each** device sold by defendant. Thus, the court found that the appropriate amount of damages should be calculated by multiplying the number of devices sold by a statutory amount between $200 and $2,500. To

determine the appropriate amount of statutory damages to assess, the court explained that it should take into account such factors as profits reaped by the defendant, the willfulness of the defendant's conduct and the goal of discouraging wrongful conduct. Id. at 1074-75. The court readily accepted SCEA's request to award it statutory damages of $800 for each device sold by Filipiak prior to Filipiak's agreement to stop selling the devices and $2,500 for each device that Filipiak sold post-agreement. Id. at 1075.

Then, to determine the amount of damages, the court addressed the issue of the number of devices that Filipiak sold. Significantly, in addressing this issue, the court explained that plaintiff need not provide the court with an exact number of devices sold by the defendant. Rather, the plaintiff was only required to provide the court with a "reasonable estimate" of the number of devices sold. In reaching a reasonable estimate of the number of devices sold by the defendant, the court deemed it significant that Filipiak's own conduct had made it difficult to determine the amount of the devices that he sold. Thus, the court implicitly gave SCEA the "benefit of the doubt" when determining the number of devices sold by defendant. Id.

The court found that it was appropriate to award SCEA over six million dollars in damages. The court noted that even though the resulting damages amount was "substantial," such an amount was consistent with Congress's intent to dissuade people from selling devices that violate the DMCA:

> While this award of damages is substantial, the Court concludes that it is both consistent with Congressional intent and necessary to discourage wrongful conduct by other potential retailers who might be tempted to engage in what might otherwise appear to be a lucrative business selling illegal contravention devices.

Id. at 1075-76.

Likewise, here, the Court has already found the defendants liable for violating the DMCA

and, thus, the issue before the Court is the proper amount of damages to award to Cox. As in the above-referenced case, Cox seeks that the Court award it statutory damages for each device sold by defendants. Even if the Court was to find that Cox was only entitled to the statutory minimum, Cox would still be entitled to at least $200 per device sold by defendants.

With regard to the number of devices the defendants sold, Cox submits that a "reasonable estimate" is that defendants sold 1,750 devices to Cox's customers. During the course of discovery in this action, Cox obtained records of Paypal that reflect defendants' purchases of filters. Importantly, the records show that, in total, defendants purchased 4,045 filters for $10,000.50. At the time Cox commenced the lawsuit against defendants, they were no longer in possession of any of the purchased filters. Thus, it can be reasonably concluded that defendants sold all 4,045 filters.

As in Filipiak, Cox should be given the "benefit of the doubt" when determining the number of devices sold by defendants because as discussed in detail in the Statement of Facts section above, defendants' conduct has made it difficult to determine exactly how many devices they sold. For example, defendants concealed the names of their salespeople, repeatedly failed to comply with the Court-ordered accounting and (likely intentionally) failed to keep records of the amount of filters sold.

Given defendants' lack of accurate record keeping it is even more difficult to determine exactly how many filters defendants sold to Cox's customers. Notwithstanding this, it is fair to conclude that a large portion of the at least 4,045 filters sold by defendants were sold to Cox's customers. Out of all of the filters sold, Cox was able to determine that defendants sold 465 of the filters at sales shows outside of Connecticut and Rhode Island, thus leaving, at least 3,500 filters that could have been sold in the Connecticut/Rhode Island area. During the relevant time period (between 2002 and 2005), Cox was the largest cable television provider in Rhode Island. Also,

during the relevant time period, Cox, along with at least one other cable company, provided cable television service in Connecticut. Overall, during the relevant time period, Cox provided cable television service to all of Rhode Island and Eastern and Central Connecticut. Thus, it is reasonable to conclude that defendants sold at least half of these filters (i.e. at least 1750 filters) to Cox's customers. Moreover, the fact that defendants sold filters to Cox's customers that would allow for the free viewing of pay-per-views on Cox's system is corroborated by the fact that during Cox's investigation of defendants, defendants sold numerous filters to Cox's investigators. Almost all of these sales took place within Cox's cable television geographic area.

In light of the above, Cox respectfully submits that it is reasonable to estimate that defendants sold 1,750 devices to Cox's customers. Thus, Cox seeks damages of at least $350,000 (i.e. $200 x 1,750) pursuant to the DMCA.

## II. THE COURT SHOULD ENJOIN DEFENDANTS FROM FUTURE CONDUCT THAT VIOLATES THE COMMUNICATIONS ACT AND THE DMCA

As expressly authorized by 47 U.S.C. § 553(c)(2)(A), this Court may "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain violations." Identically, 17 U.S.C. § 1203(b) states that "In an action brought under subsection (a), the court – (1) may grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation." These authorizations of such injunctive relief manifests Congress's intent that courts be given a broad directive to issue injunctions not only to restrain, but expressly to prevent such violations. Moreover, courts in Communications Act cases have held that when express authority for issuance of "statutory" injunctions is provided by legislative enactment, an

injunction may issue without resort to the traditional "equitable" prerequisites of such relief. See J.R.C. Products, Inc., 158 F.Supp.2d at 815; Worldwide Elecs., 50 F. Supp. 2d at 1302-03; General Instr. Corp. of Del. v. Nu-Tek Electr. & Mfg., Inc., 197 F.3d 83, 89-91 (3d Cir. 1999) (affirming the issuance of an injunction); General Instr. Corp. of Del. v. Nu-Tek Electr. & Mfg., Inc., 3 F. Supp. 2d 602, 607-08 (E.D. Pa. 1998) ("The underlying fact is that Nu-Tek's business essentially facilitated cable theft in violation of § 553. To stop such an operation is a primary purpose of the injunction. It forecloses none of Nu-Tek's remaining legitimate business because, from the start, no identifiable legitimate business existed."); New Info. Tech., Inc., 148 F. Supp. 2d at 763.

In Worldwide, the court explained the basis behind issuing an injunction against defendants, like defendants herein, that were in the business of selling pirate decoding devices:

> The defendants' entire business was based upon undermining the industry's integrity while providing tools for dishonest persons to steal cable operators' products. Moreover, there is a clear risk that defendants will continue such criminal conduct in the future. The defendants' recidivist conduct and denial of any wrongdoing in the face of overwhelming proof amply demonstrates that they are likely to commence such an illegal operation again. Accordingly, the defendants will be enjoined from entering this illegal market in any capacity in the future. Any lesser measure would require each of the thousands of cable operators in the United States to commence separate actions against the defendants in order to protect their respective interests, a wholly unnecessary result given the manifestly illegal nature of their business and the injunctive power provided for by Section 553.

Id., 50 F. Supp. 2d at 1303; see also Platinum Elecs., 336 F. Supp.2d at 966-67 (finding that risk of recidivism exists due to defendants' denials of wrongdoing and assertions that conduct was not illegal in the face of overwhelming legal precedent and factual proof, and seeking to spare other cable companies the need to bring separate actions).

In the present case, Cox requests the Court's entry of a permanent injunction prohibiting defendants from, inter alia, any further manufacture, possession, sale or distribution of digital

filters or other devices designed or intended to intercept cable services. Cox submits that defendants should be completely and forever barred from further sales of digital filters.

## III. COX IS ENTITLED TO AN AWARD OF ITS ATTORNEYS' FEES AND INVESTIGATIVE COSTS

### A. Legal Standard

Under 47 U.S.C. § 553(c)(2)(C), the court may award recovery of full costs, including reasonable attorneys' fees, to a prevailing aggrieved party. Numerous courts have granted such relief in similar actions against pirate cable television devices sellers. See, e.g., Platinum Elecs., 336 F. Supp. 2d at 966 (awarding attorneys' fees and costs); J.R.C. Products, Inc., 158 F. Supp. 2d at 815 (awarding attorneys' fees and costs); Worldwide Elecs., 50 F. Supp. 2d at 1302; Cablevision Systems Corp. v. Cohen (In re Cohen), 121 B.R. 267, 269 (Bankr. E.D.N.Y. 1990) (award of investigative fees pursuant to section 553 is part of overall damage assessment against similar pirate decoder distributor). 17 U.S.C. § 1203 (b)(4) and (5) similarly provide for awards of attorneys' fees and costs to the prevailing party.

It is well-settled that in the First Circuit a court should apply a "lodestar" approach to determine the appropriate amount of attorneys' fees. This requires the court to determine a "reasonable" amount of hours expended by the attorneys and then multiply this amount by a "reasonable" hourly rate. See, e.g., Charter Comm. Entertainment I, LLC v. Burdulis, 367 F. Supp. 2d 16, 34 (D. Mass. 2005); Comcast of Mass. I, Inc. v. Naranjo, 303 F. Supp. 2d 43, 50 (D. Mass. 2004).

### B. Cox's Attorneys' Rates are "Reasonable"

In this matter, in general, Cox's attorneys' hourly rate was $200 per hour. It cannot seriously be disputed that such a rate is reasonable. Notably, courts have readily approved such

rates for prosecution of cases under the Communications Act. See, e.g., Naranjo, 303 F. Supp. 2d at 50 (in awarding attorneys' fees pursuant to 47 U.S.C. § 553, the court explained that "[p]laintiff's counsel avers in his affidavits that he charges an hourly rate of $200 for his services. Based on my experience with attorneys in this bar, I conclude that $200 per hour is a reasonable hourly rate"); Garden City Boxing Club, Inc. v. Rodriguez, CV-05-3692(SJ)(JMA), 2006 U.S. Dist. LEXIS 21537, at *14-*15 (E.D.N.Y. Mar. 20, 2006) (finding that the attorney's rate of $200 per hour was reasonable) (a copy of this decision is attached hereto as Exhibit "G"); Entertainment by J&J, Inc. v. Miraldo Restaurant, Inc., 01 Civ. 10832(RMB), 2003 U.S. Dist. LEXIS 9624, at *2, n.2 (S.D.N.Y. June 10, 2003) (noting that the lower court awarded attorney's fees at $200 per hour) (a copy of this decision is attached hereto as Exhibit "H"). Likewise, such a rate is consistent with rates allowed in this Court. See, e.g., Carlow v. Mruk, CA 02-538ML, 2005 U.S. Dist. LEXIS 7258, at *32 (D.R.I. Mar. 31, 2005) (finding that the attorney's rate of $200 per hour was reasonable) (a copy of this decision is attached hereto as Exhibit "I").

The experience and rates charged by the attorneys and the paralegals who worked on this matter are set forth in detail in the accompanying affirmations of Francis Holbrook ("Holbrook Aff.") and Shaun Hogan ("Hogan Aff.").

Given the experience of Cox's attorneys and paralegals and the above case law, Cox respectfully submits that the Court should find that the rates charged by Cox's attorneys and paralegals are reasonable.

**C. Cox's Attorneys' Spent a "Reasonable" Amount of Time on this Matter**

In determining a "reasonable" amount of hours expended on a matter, courts can take into consideration the results achieved by the attorney. Thus, when a plaintiff succeeds on its claims, a court should be hesitant to award attorneys' fees that are less than the full lodestar amount. See, e.g., Resolution Trust Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1148-1150 (11th Cir. 1993) (noting that no reduction in the lodestar was made because the plaintiff was successful on its claims); Mruk, 2005 U.S. Dist. LEXIS 7258, at *17-*19, *32 (in awarding plaintiffs the full value of the attorneys' fees sought the court noted that plaintiffs achieved "the majority of the relief [they] were seeking in the lawsuit") (a copy of this decision is attached hereto as Exhibit "I."

It cannot seriously be disputed that Cox's attorneys were extremely successful in obtaining the relief that Cox was seeking. Indeed, in this matter Cox succeeded in a finding on summary judgment that the defendants were liable to Cox under both 47 U.S.C. § 553 and 17 U.S.C. § 1201. As detailed in the Hogan Aff., in order to obtain this result Cox's attorneys had to undertake an extensive amount of legal work, which included the following: 1) drafting and filing the complaint (Docket Entry ("DE") 1); 2) drafting and filing a motion for a restraining order, temporary injunction and seizure (DE 2); 3) appearing at numerous Court conferences; 4) drafting and filing motions to compel discovery responses (DE 52, 56; 4) drafting and responding to written discovery; 5) conducting and defending depositions; 6) and drafting and filing a motion for summary judgment (DE 77-80). See generally Holbrook Aff.; see also Hogan Aff. (detailing extensive work done to prosecute Cox's claims).

Further, it is well settled that when a defendant vigorously defends an action, the defendant cannot thereafter complain about the legal fees incurred by plaintiff in response to defendant's efforts:

> Those who elect a militant defense in the face of a statute allowing attorney's fees if they are defeated must take into account the time and effort they exact from their opponents.

Perkins v. New Orleans Athletic Club, 429 F. Supp. 661, 667 (E.D. La. 1976); see also Catanzano v. Doar, 378 F. Supp. 2d 309, 322 (W.D.N.Y. 2005) (in awarding over 1 million dollars in attorneys' fees the court noted that "The State contested everything, usually unsuccessfully . . . the State should not now be heard to complain because its own tactics necessitated plaintiffs' use of multiple attorneys, or forced plaintiffs' counsel to expend additional time on the case."); Dobson v. The Hartford Financial Servs. Group, Inc., No. 3:99cv2256(JBA), 2002 U.S. Dist. LEXIS 17682, at *10 (D. Conn. Aug. 2, 2002) ("Defendants 'cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response.'") (a copy of this decision is attached hereto as Exhibit "J").

As in the above cases, defendants in this matter undertook a "militant defense" that resulted in Cox expending a substantial amount of time and attorneys' fees defending and responding to defendants' numerous motions, filings, and counterclaims, almost all of which were outright denied by the Court. Defendants' over litigation of this matter was so blatant that even the Court itself noted that defendants' conduct in this action has "substantially increased" the amount of legal work that plaintiff's attorneys have had to do:

> Defendants' failure to comply with the Scheduling Order and other rules of this Court has substantially increased the volume of the parties' filings and diverted the Court's attention from the merits of the case, instead focusing attention on these procedural infirmities.

R&R at n.1.

For example, on March 30, 2005, defendants filed their answer with counterclaims for intentional infliction of emotional distress, and what appeared to be claims for trespass and abuse of process relating to Cox's Court-ordered inspection and seizure (DE 21). Cox immediately sent a letter to defendants pointing out the numerous deficiencies in the counterclaims. Apparently in response to Cox's letter, on April 8, 2005 defendants served an amended counterclaim (DE 23). On April 27, 2005, Cox filed a motion to dismiss the amended counterclaim (DE 27). On May 5, 2005, in reaction to the motion to dismiss, defendant filed an objection to the motion to dismiss and another motion to amend the counterclaim (DE 29, 30). After Magistrate Judge Lincoln D. Almond recommended that defendants' motions to amend be substantially denied (DE 39), defendants then filed an objection to the report and recommendation (DE 41). The Court denied the objections and adopted the recommendation on August 10, 2005 (DE 55). Undeterred, on December 19, 2005, defendants made yet another motion to amend the counterclaim (DE 105). On January 20, 2006, Magistrate Judge Lincoln D. Almond denied defendants' motion to amend the counterclaim (DE 124). Once again, defendants appealed the decision to the District Court (DE 126). The Court denied the appeal (DE 129).

Defendants also filed the following motions, all of which Cox was necessarily forced to respond to and all of which were denied by the Court:

1. On July 14, 2005, defendants filed a motion to release attachment (DE 37). The motion was denied on August 8, 2005 (DE 53).

2. On August 4, 2005, defendants filed a motion to compel (DE 49). The motion was denied on September 13, 2005 (DE 65).

3. On September 22, 2005, defendants filed a motion to compel (DE 73). The motion was denied as moot on October 11, 2005 (DE 83).

4. On September 26, 2005, defendants filed a motion to compel (DE 76). The motion was denied on October 13, 2005 (DE 86).

5. On November 8, 2005, defendants filed an appeal to Magistrate Judge Almond's decision denying their motion to compel (DE 92). The appeal was denied on December 14, 2005 (DE 100).

6. On December 19, 2005, defendants filed a motion for summary judgment (DE 101). The motion was denied on April 25, 2006 (DE 140).

7. On December 19, 2005, defendants filed a motion to revoke the pro hac vice status of Cox's lead attorneys (DE 104). This motion was denied on January 20, 2006 (DE 124).

8. On January 9, 2006, defendants filed a motion to release the attachment (DE 118). The motion was denied on April 25, 2006 (DE 139).

9. On January 25, 2006, defendants filed an appeal to Magistrate Judge Almond's decision denying their motion to revoke (DE 126). The appeal was denied on February 14, 2006 (DE 129).

10. On May 4, 2006, defendants filed objections to Magistrate Judge Almond's April 25, 2006 report and recommendation (DE 141). The objections were denied on June 26, 2006 (DE 148).

There are also numerous examples of defendants seeking relief of the Court and then abandoning that relief. For example, the defendants moved to compel Cox's production of Stan Durey for a deposition. The defendants were granted this relief but then elected not to take his deposition.

And, Cox was forced to respond to defendants' belatedly filed and wholly improper "expert" reports (DE 109, 110, 122, 134, 135), which reports were ultimately stricken by the Court. See R&R at 12-13; see also DE 137, 138 (striking Defendants' Expert Report and the Second Supplemental Memorandum and Affidavits).

Simply put, defendants should not now be entitled to complain because their own tactics forced Cox to expend additional time and monies on this case. Cox respectfully requests that the Court find that the hours that Cox's attorneys spent on this matter, as set forth in detail in the Holbrook Aff. and Hogan Aff., are reasonable. Thus, Cox requests that the Court award it reimbursement for all of the costs and attorneys' fees as set forth in the Holbrook Aff. and Hogan Aff. pursuant to 47 U.S.C. § 553(c)(2)(C) and/or 17 U.S.C. § 1203(b)(5).[3] Accordingly, Cox respectfully requests that the Court award it reimbursement of $193,630.11 in costs and fees.

## IV. DEFENDANTS ARE JOINTLY AND SEVERLY LIABLE

Defendants should be held jointly and severally liable for all damages, costs and attorneys' fees awarded. It is well-established that joint tortfeasors are each liable for the full amount of a plaintiff's damages, and that the plaintiff can recover full redress from any defendant, even if that defendant's actions were not solely responsible for the plaintiff's injuries. Numerous courts have so held in Communications Act cases. See Platinum Elecs., 336 F. Supp. 2d at 965 ("Where the defendants act in concert to sell decoders, they can be held jointly and severally liable for the resulting damages. Further, defendants also may be held jointly and severally liable because damages may be impossible to apportion among the defendants in proportion to their respective levels of involvement."); J.R.C. Products, 78 F. Supp. 2d at 801 (holding all defendants, except one

[3] In addition, Cox respectfully submits that given that defendants' attorney's conduct and tactics have clearly unnecessarily and unreasonably increased the amount of attorneys' fees incurred by Cox, that it would be appropriate to find defendants' attorney responsible for such "excess" fees pursuant to 28 U.S.C. § 1927.

against whom an insufficient showing was made, liable for damages resulting pirate decoder sales enterprise during the time each was involved); Worldwide Elecs., 50 F. Supp. 2d at 1300 (individual and corporate defendants jointly and severally liable).

As discussed above, the evidence herein establishes that each defendant participated in the wrongful conduct, i.e., sales of digital filters with intent to assist in circumventing Cox's technological measures that restricted access to copyrighted works, thus enabling interception of cable services, and their provision of digital filter instructions to customers. They also admitted working together in various combinations and with other persons. PX-45 Jon Chaffee Dep. at 166; PX-46 Amy Chaffee Dep. at 16-18, 24-25; PX-47 Bou Dep. at 27, 35-36, 43, 57, 61-63. Given these facts, defendants clearly are joint tortfeasors, and each can and should each be held personally liable for harm that any of them caused to Cox.

## CONCLUSION

Pursuant to the foregoing, Cox respectfully requests that the Court (1) award statutory damages in the amount of $10,000.00 pursuant to Section 553(c)(3)(A)(ii); (2) award enhanced damages in the amount of $50,000.00 pursuant to Section 553(c)(3)(B); (3) award statutory damages in the amount of $350,000 pursuant to Section 1203(c)(3); (4) enter a permanent injunction to prevent defendants' future violations of the Communications Act and the DMCA; (5) award Cox reimbursement of its reasonable attorneys' fees and costs in the amount of $193,630.11 and (6) determine that defendants Jon Chaffee, Amy Chaffee, and Ramalda Bou are jointly and severally liable to Cox for their violations of 47 U.S.C. § 553 and 17 U.S.C. § 1201.

Dated: Newport, Rhode Island
July 27, 2006

Respectfully submitted for the Plaintiff CoxCom, Inc.
d/b/a Cox Communications New England
By Its Attorneys,

Shaun K. Hogan
**LEFKOWITZ, HOGAN & CASSELL, LLP**
350 Jericho Turnpike, Suite 100
Jericho, New York 11753
(516) 942-4700

Francis S. Holbrook II
**MILLER SCOTT & HOLBROOK**
122 Touro Street
Newport, Rhode Island 02840
(401) 847-7500

**CERTIFICATION**

I hereby certify that on the 31st day of July, 2006 I did send by first class mail a true and accurate copy of the within Memorandum of Law to: James A. Currier, Esquire, 128 Dorrance Street, Suite 400, Providence, RI 02903

Corinne S. Blank