UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COXCOM, INC., et al

VS C. A. NO: 05 107 S

JON CHAFFEE, et als

**POST HEARING SUBMISSION**

Plaintiff filed a Complaint against defendant, Jon Chaffee in March of 2005. That Complaint was filled with custom crafted allegations, misrepresentations and fabricated claims of cable theft related to the sale of a federally approved, legal electronics part, a high-pass filter, that is manufactured and sold nationwide and used for many non-cable related applications. Plaintiff's entire case is built upon an unproven, hypothetical form of cable theft, without any proof or evidence to validate their claims other than their word that the alleged cable theft had occurred. Plaintiff has not provided any physical evidence; industry research, technical reports or any other documentation, disinterested 3rd party test results; or information of any kind to validate their claims and allegations that high-pass filters allow the unauthorized access to Plaintiff's digital cable programming and copyrighted works. The claims and allegations in Plaintiff's Complaint were deliberately contrived to convince the court into granting Plaintiff's ex parte search and seizure request, and most have been refuted by Plaintiff's own statements and testimony.

The damages claimed by the Plaintiffs have been continually evolving as to the point they have little to do with the original complaint. The Complaint accused the Defendant of damages related to cable theft through the use of a high-pass filter and said nothing about unbillable/uncollectable "orphaned" Pay-per-view billing records and damaged set-top boxes.

**1. Communications Act, 17 U.S.C.§ 553**

According to Title 47 U.S.C.§ 553, no person "*shall intercept, receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law*...*the term 'assist' in intercepting or receiving shall include the manufacture or distribution of equipment intended by the manufacturer or distributor for unauthorized reception of any communications service*... "

There is a fundamental absurdity of Plaintiff's claim that filters enable cable theft while at the same time alleging that it is the "resetting" of the set-top box that they say alters the billing information stored inside. Because the collection of billing records by Cox central billing computers occurs only periodically, if one was to believe Plaintiff's theory of cable theft via "resetting" the set-top box, the need to use a filter is unnecessary. As Mr. Matteo agreed with the Defendant during cross-examination, all a subscriber has to do is just watch the pay-per-view feature without a filter then perform the reset!

More to the point, any allegation of "intent to assist" is mute even if the reset instructions from the 2 websites involved in this case did in fact; describe some method by which an individual may steal cable programming from a digital cable network. Those 2 websites contain information, not the "equipment" that is addressed by the statutes governing unauthorized access to cable. There exist no laws that make it a crime to direct a person to any information resource in the public domain, regardless of what type of information it is. There are no statues that could, by even the broadest possible interpretation, construe that providing references to information available in the public domain equates to an "intent to assist" a person to gain unauthorized access to cable programming, regardless of whether or not that information did or did not disclose an effective method of cable theft.

In summary, the timeline of this case reveals that Cox has repeatedly abandoned allegations and replaced them with substantially revised allegations [Exhibit "A"] as they realized their previous allegations could not be proven. Each time Plaintiff abandoned allegations to embrace new revised allegations, they were implicitly admitting the inability to prove the allegations they abandoned. This ongoing revision by Plaintiff continued to stray

further and further from their original Complaint until they reached a point where their allegations against the Defendant, even if proven true, would not prove that any U.S. law had been violated. At the current time, Plaintiff alleges that Defendant referred customers to 2 websites that describes an unworkable method of deleting set-top box billing records, and the method does not in any way rely on the use of filters. Therefore Defendant's sale of high-pass filters was not in violation of Title 47 U.S.C.§ 553

Whether or not Mr. Matteo or anyone else is able to do something to Motorola's set-top box to steal cable is irrelevant to the issue of filters in this case unless the method employed is enabled by those filters. By Mr. Matteo's testimony, filters have no capacity to enable or assist in this activity. Indeed, one has to challenge Plaintiffs as to how the use of a filter could be used to affect the outcome of taking apart or tampering with the cable box. The filter is not used in any of the reset instructions, it is not used to press button sequences or to unplug the set-top box, nor is the filter used to remove the battery from the set-top box: the filter is not used to perform any action in the reset instructions! Any method used to gain unauthorized access to cable programming that does not rely on the use of filters is completely irrelevant to the case!

Mr. Matteo's statements under oath, that removing the battery erases billing information are not just irrelevant to Plaintiff's allegations, but incorrect from a technical perspective as well. The battery in a set-top box has virtually nothing to do with storing billing information, but relates to other functions, such as enabling the unit to receive an "ON" signal from the remote control while the set-top box is shut off and it supports the operation of a real-time clock device in the set-top box, just the same as for a desktop computer. For at least the last ten years, computerized devices of all kinds, from desktop computers, to cell phones, to cable modems; all have critical information stored on a small "non-volatile storage device" such as an EEPROM (Electrically Erasable Read Only Memory) module or a Compact Flash memory module, which is the same technology used to hold megabytes of image data (pictures) in digital cameras. These small, inexpensive devices do not require any power source of any kind to store large amounts of information indefinitely and the removal of the battery does not affect the data stored on these devices in any way. A good example would be if the battery was to be removed from one's cell phone;

contact information, pictures, text messages and all other information remains stored and unaffected in the cell phone to be easily retrieved when the battery is restored. These memory devices are widely used throughout the electronics industry, particularly in cell phones, digital cameras, digital Dictaphones, personal computers, and Motorola's digital set-top boxes.

It must be assumed from his testimony, that Mr. Matteo is either profoundly ignorant of the most basic modern computer technologies in use today, or he knowingly and deliberately provided false testimony to mislead the court, knowing that Defendant's expert had been removed from the case leaving no means for an authoritative rebuttal of his claims and allegations.

By citing aspects of the law that prohibits manufacturing or distributing equipment designed specifically to enable unauthorized access to cable programming, Plaintiff has been unable to demonstrate or describe any verifiable method by which a filter may be used to steal cable programming. Mr. Matteo's testimony about removing batteries refers to methods that he claims enables unauthorized access to cable programming by erasing billing records stored in the device. Apart from the fact that the method he describes is incapable of enabling unauthorized access to cable programming, by his own testimony during cross, it does not require filters to achieve its claimed objective of deleting billing records! When it comes to the "intent" and "assist" aspects of the law that Plaintiffs has alleged Defendant to have violated, the law only refers to *"equipment"*. According to Title 47 § 553, no person *"shall intercept, receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law…the term 'assist' in intercepting or receiving shall include the manufacture or distribution of equipment intended by the manufacturer or distributor for unauthorized reception of any communications service… "* the law only refers to <u>equipment</u>, not methods, which constitute information, so thus the law would not apply to Defendant's referring a customer to a website that contained information about resetting set-top boxes.

The two websites at issues in this case that contain information regarding an unworkable method to delete billing records from a set-top box is deceptively presented by

Plaintiff as the "equipment" that Defendant is distributing, thus establishing Defendant's "intent" to "assist" in enabling a person to gain unauthorized access to cable programming. The information on the cited websites are equally as faulty as Mr. Matteo's testimony regarding the resetting of set-top boxes as a means to delete billing records; therefore not only is the website "information", not equipment so it is not in violation of any cable theft law, but also, any referral by Defendant to those websites cannot be used to prove Defendant's *"intent to assist a person gaining unauthorized access to cable programming"* because the method described doesn't work! Ultimately, Plaintiff's revision of their allegations and damages has drifted so far from the requirements of the cable theft laws that Plaintiff ended up alleging actions by Defendant that, even if proven true, would not prove that any law had been violated. Therefore the sale of high-pass filters do not meet the criteria necessary to be found in violation of Title 47 U.S.C.§ 553 as a matter of law.

**2. Ongoing Revision of Plaintiff's Allegations and Claims for Damages**

After Mr. Girard's Expert Report, Plaintiffs, unable to establish that filters enable a person to illegally *"intercept, receive or assist in intercepting or receiving any communications service offered over a cable system."* determined that relying on their Complaint and their "intent to assist" allegations without a substantive means of cable theft, would make it impossible to show any damages of any kind resulting from the theft of cable using filters. As a result, Plaintiff was forced to abandon arguments that Defendant's efforts to sell these filters could be construed as any attempt to *"assist"* a person to illegally *"intercept, receive or assist in intercepting or receiving any communications service offered over a cable system."* In fact, Plaintiff could not demonstrate any direct violation of the statutes cited, so they subsequently had to revise their allegations, thus the $300.00 pay-per-view purchase limit; the 60-day self-imposed billing policy where Plaintiff's choose not to bill subscribers for billing transactions over 60 days old so allegedly those greater than 60-day purchases become unbillable, uncollectable "orphaned" billing records (that also occurs when a subscriber unplugs or turns off the power to the set-top box for extended periods of time as Mr. Matteo testified during cross) and the claims of damaged set-top boxes were borne to create the cable theft damages Plaintiffs were alleging. These revised damages first

surfaced in Mr. Matteo's Jan. 6, 2006 "damage control" affidavit [Exhibit "B"] that was submitted to the court as a response to Mr. Girard's Expert Report.

The argument of the newly revised damages that includes the $300.00 pay-per-view purchase limit and the greater than 60 day delayed billing with "orphaned" transactions, like that of damaged boxes, is a contrivance constructed in response to a complete failure on the part of Plaintiff to demonstrate any damages that would support the original Complaint. Plaintiff brought to this court a Complaint for damages by means of a particular method of cable theft through the use of a high-pass filter, yet has been unable prove the existence of any damages of any kind, and has been unable to prove the method of cable theft, or any means, by which the alleged damages might have occurred. So plaintiffs came up with their new theories and damages that have no more merit than the original allegation of stealing cable content directly using filters. However it clearly demonstrates that Plaintiff believed the "cable theft" and "intent" arguments had become inadequate as the sole basis for their case, otherwise, there would be no reason to introduce the shift in damages theory.

Plaintiff's and Mr. Matteo's testimony that Cox's pay-per-view purchase limit is, and was, during the years this case involves, $300.00. This is a deliberate attempt to mislead the court by creating a dollar amount to make the "benign billing delay" Mr. Girard mentions appear to cause Plaintiffs substantial revenue losses and to jack up the damages. This "newly revealed" $300.00 pay-per-view limit is a direct contradiction to Mr. Marcoux's sworn testimony in his May 25, 2005 deposition where Mr. Marcoux states that *"The maximum* PAY-PER-VIEW limit *here in New England is 20 purchases"* [Exhibit "C" pg. 14:11-12] Obviously either Mr. Marcoux or Mr. Matteo lied under oath! It is most likely that Plaintiffs will attempt to explain away the discrepancy by claiming 20 purchases equals about $300.00, however that would mean the average subscriber would be paying about $15.00 per pay-per-view movie, something that is quite farfetched as it would be less costly to just go out and purchase the movie rather than watch it through pay-per-view. Mr. Marcoux also states in his deposition that pay-per-view features start at $3.95, so 20 purchases at $3.95 is about $80.00, a much more reasonable and believable occurrence.

Since a set-top box has built-in security features that will not deliver Pay-per-view programming beyond the pre-authorized purchase limit, *"all boxes are set with a maximum*

*amount of purchases that can be stored in the box. Once it reaches that amount, the box will not take or process any more Pay-per-view"* (Lou Marcoux deposition pg.13:9-12 Exhibit "C"), therefore, unauthorized access to any Pay-per-view cable programming is not possible whether from filter usage or unplugging the set-top box until the collection of those purchases occurs from Cox's billing computers. It was not possible for Plaintiff to demonstrate or describe or provide evidence of any actual incidence of cable theft by using a filter, nor could they even provide a plausible mechanism of cable theft by this method. It is not possible for any delay in billing purchase collection whether from filter usage or from a subscriber unplugging their set-top box, to defeat the set-top box's built-in security features that deny access to pay-per-view purchases when it detects that it has reached its programmed limit of pre-authorized selections. So Plaintiffs came up with their greater than 60-day billing policy whereby they allege that billing purchases stored in the set-top box for more than 60 days would become unbillable and uncollectable "orphaned" billing records thus causing Cox to lose revenues in those hypothetical situations.

Mr. Matteo testified during cross at the damages trial that Cox's 60-day billing policy is not a "policy" but a "limitation". No doubt Plaintiffs, being very well aware that there are no Federal laws that protect billing policies as they are all speculative and based on individual company needs, are attempting to disguise their 60-day billing policy by calling it another name. However it is stated in both Mr. Matteo's affidavit and Plaintiffs claims for statutory damages that "*the decision to only hold billing information for 60 days was borne out of both financial concerns regarding accelerating revenues, pragmatic concerns regarding collectability of old charges and customer relations concerns...*" . [Matteo Jan 6, 2006 affidavit Exhibit"B" pg.4:6 and Plaintiff Claims for Statutory Damages] In modern day business, the implementation of certain procedures within a company for reasons exclusive to that company makes those procedures a company policy. Mr. Matteo can call it a billing "limitation", however it is still a billing policy created by, implemented by, and specific to Cox. Perhaps Plaintiffs are suggesting that a whole new class of Federal laws be written to protect their particular billing system with it's 60-day billing policy and other laws to protect Comcast's billing system with it's billing policies and another for Time Warner and so on until each and every cable provider gets their own laws!

With regard to Plaintiff's billing policy/"limitation" and filter usage causing billing delays for greater than 60 days creating those unbillable, uncollectable "orphaned" billing records, Mr. Matteo testified that customers unplugging their set-top boxes when traveling south for the winter months would also generate those unbillable, uncollectable "orphaned" billing records, as would any customer who unplugged their set-top box for extended periods of time. It is common for subscribers to have multiple boxes in various rooms and vacation homes, and those boxes are often left powered off for months on end. Therefore Plaintiffs' allegations asserting damages suffered as a result of delayed billing collection are without merit inasmuch as any delay in billing collection resulting from the use of filters is indistinguishable from what occurs regularly when cable subscribers happen to shut off and unplug their cable boxes and even televisions when they are not actively watching them. And it may be days, weeks, or months until these electronics are turned back on again so those subscribers are directly causing delays in Plaintiff's billing and revenue losses because of Plaintiff's self imposed 60-day billing policy. Are Plaintiffs going to start demanding that subscribers keep their set-top boxes continuously powered up, consuming power and generating heat, or are these energy conscious individuals going to be the next target for Plaintiffs contrived allegations for damages?

More to the point is that allegations of revenue losses due to any of those alleged greater than 60 days unbillable, uncollectable "orphaned" billing records is mute because Plaintiffs have their system set up so it will never occur! Cox's set-top boxes are set to only hold 60 days of billing information, *"Cox's digital set-top boxes were set to hold billing information for 60 days. The decision to **only hold billing information for 60 days** was borne…"* [Matteo Jan 6, 2006 affidavit Exhibit"B" pg.4:6 and Plaintiff Claims for Statutory Damages] and as testified to by Mr. Matteo during cross. Therefore there can never be any greater than 60 days "orphaned" records when their set-top box is set with a limitation to only hold 60 days of billing information. The set-top box will not accept the 61st day that would be necessary to generate the unbillable, uncollectable "orphaned" billing record that Plaintiffs allege *"when the filter ultimately was removed, the billing information would be sent, but due to its age would not be "recognized" by Cox's central computers."* [Matteo Jan 6, 2006 affidavit Exhibit"B" pg.4:7 and Plaintiff Claims for Statutory Damages] Obviously in Plaintiff's attempt to create a scenario where they could show damages, Plaintiff's didn't

think it through clearly enough to make sure they weren't contradicting themselves in the process!

Another change from Plaintiff's original Complaint is the allegation of damaged set-top boxes. The Complaint accused the Defendant of damages related to cable theft and said nothing about damaged equipment. The allegation regarding the damages done to the Motorola set-top box by subscribers following the reset instructions from the 2 websites involved in this case was a contrivance that again, first surfaced in Mr. Matteo's Jan 6,2006 affidavit in response to Mr. Girard's Expert Report and was obviously a work around Mr. Girard's findings that the reset does not in any way affect the billing information stored in side the set-top box. Therefore Plaintiff had to come up with a new means to show damages and thus the "damaged equipment" was borne.

The assertion that set-top boxes can be rendered inoperable by unplugging the set-top box and pressing buttons on the front of the box runs counter to every authoritative industry resource, defies logic and common sense, has never been demonstrated for the court, has never been replicated by any third party testing, and Plaintiff has not produced any documentation, receipts, repair logs, repair bills, or information of any kind from Motorola to support statements made under oath that a single Motorola set-top box has ever at any time been rendered inaccessible and inoperable where it had to be returned to Motorola for repairs from someone attempting to reset the set-top box by following the directions as described in the 2 websites involved in this case.

During testimony at the damages trial, Mr. Matteo again altered Plaintiff's allegations about damages to the set-top box by first testifying that it was the removal of the battery that damaged the set-top box to the extent it needed to be repaired. The reset instructions issue has been discussed in previous paragraphs, however it is pertinent to restate Mr. Matteo's testimony again to show Plaintiff's continual evolving allegations. After stating that removing the battery damaged the set-top box, Mr. Matteo then testified that removing the battery removed the billing information. As stated before, there is a fundamental absurdity of Plaintiff's claim that filters enable cable theft while at the same time alleging that it is the "resetting" of the set-top box that they say alters the billing information stored inside. Because the collection of billing records by Cox central billing computers occurs only

periodically, possibly early every morning, if one was to believe Plaintiff's theory of cable theft via "resetting" the set-top box, the need to ever use a filter is unnecessary. As Mr. Matteo agreed with the Defendant during cross-examination, all a subscriber has to do is just watch the pay-per-view feature without a filter then perform the reset!

Any claims by plaintiff of violations of the law are mute even if the reset instructions from the 2 websites involved in this case did in fact; describe some method by which an individual may steal cable programming from a digital cable network. Those 2 websites contain information, not the "equipment" that is addressed by Title 47 U.S.C.§ 553 that governs unauthorized access to cable. Again, there exist no laws that make it a crime to direct a person to any information resource in the public domain, regardless of what type of information it is. There are no statues that could, by even the broadest possible interpretation, construe that providing references to information available in the public domain equates to an "intent to assist" a person to gain unauthorized access to cable programming, regardless of whether or not that information did or did not disclose an effective method of cable theft.

While Plaintiff's claims and allegations have been continuously evolving since the case began 2 years ago, and their story seems to change depending on whom they are telling it to. Plaintiff's put out a media release in *Multichannel News* [Exhibit "D"] where their claims changed yet again! This version published in an industry publication never qualifies the filters as "pirate" or "illegal", nor does it call them "descrambling" filters, in fact the article never identifies filters as anything other than filters! Then the article goes on to state that the Defendants were selling the filters at computer shows (true) and by mail (false). The filters were marketed as "reception-improvement devices (true) but then goes on to say that the reset directions blocks billing information (a half-truth) and hides the filter from cable companies (another new claim attributed to the reset instructions. However Plaintiffs did not mention in the article if the reset hid the filter from the cable companies before it damaged the set-top box to the point it needed to be sent back to Motorola for repairs or after.

**3. Digital millennium Copyright Act,17 U.S.C.§ 1201**

In order to be found in violation of Title 17 U.S.C. § 1201, *'two elements must be shown: (1) defendant trafficked in a technology; and (2) the technology was primarily*

*designed or produced to circumvent conditional access controls to protected works, or has limited commercially significant use other than such circumvention.*" [Magistrate Almond: Report and Recommendation.]

Plaintiffs have been reluctant to call the filters at issue in this case what they actually are, high-pass filters, because they are well aware that these filters are federally approved, legitimate and necessary electronics parts that have been around for years and are used for a multitude of interference applications for equipment ranging from audio amplifiers to military radar units. Because most unwanted "noise" or interference signals are in the lower frequency ranges, a high-pass filter is required to block out these unwanted signals. [See filter definition from government agency website – definition from Telecom Glossary Exhibit "E"]. Plaintiffs are also well aware that there are no restrictions on the manufacturing, distribution, sale or use of any high-pass filter other than what is required for any legal electronics part manufactured and sold in the United States. Analog Devices, one of the largest employers in the state of Massachusetts is one of many high-pass filter manufacturers across the country. To find other high-pass filter manufacturers, the 2004 revised edition of the FCC's Interference Handbook lists several on page 38 [DX-RR of Defendant's Evidence].

Mr. Matteo did finally agree during cross that the filters at issue in this case were high-pass filters, then he went on to state that there were many kinds of high-pass filters, which is true. Defendant, Jon Chaffee then pointed out that any high-pass filter with a frequency greater than 30MHz would have the same effect on Cox's digital cable system as the high-pass filters at issue in this case, and Mr. Matteo agreed. Radio Shack sells a high-pass filter [Exhibit "G"] with the same frequency as some of the filters presented as evidence at the damages trial by the Plaintiffs. While the appearance of Radio Shack's filter may differ from the filters at issue in this case, the functionality of Radio Shack's filter is the exact same as some of those high-pass filters presented as evidence. Audio Discounter sells a high-pass filter [Exhibit "H"] that has a similar appearance and the same frequency as some of the filters presented as evidence in the damages trial by the Plaintiffs.

Along with all the misleading and fabricated allegations in their Complaint, Plaintiff custom fit their claims regarding the use of high-pass filters to the requirements of § 1201 by

stating that the filters at issue in this case *"are primarily intended for the purpose of circumventing a technological measure, i.e., digital signal scrambling, that effectively controls access to copyrighted works transmitted by Cox over its cable system."* And *"Defendants' digital signal filters have only limited commercially significant purposes or uses, if any, other than to circumvent digital scrambling of copyrighted pay-per-view programming."* Believing all Plaintiffs' claims, Magistrate Almond wrote in his decision that "*it is evident that the sale of the cable filter* [high-pass filter] *is also a violation of the DMCA.*" However there are several issues with both Plaintiffs claims and allegations and Magistrate Almond's ruling that came out at the damages trial.

1. Mr. Matteo agreed during cross that any high pass filter with a frequency greater than 30MHz will have the same effect on Cox's digital cable system.

2. During direct examination Mr. Hogan asked Mr. Matteo if the filters have any legitimate purpose on a *"digital cable system"*? By confining his question of legitimacy to a digital cable system only, Mr. Hogan is opening up the legitimacy of these filters to every conceivable other application and system. The law requires a device that can only be used to gain unauthorized access to content and offers little or no other functionality beyond that. Therefore high-pass filters are not in violation of Title 17 U.S.C. § 1201.

3. There are 2 different filters offered into evidence at the Damages Trial by the Plaintiff. That supports Defendant's claim that different frequency filters will have the same effect on Plaintiff's digital cable system. If the court examines the filters in evidence, it will verify that while they look similar, there are 54MHz high-pass filters and 42MHz high-pass filters. This presents a dilemma for the court as to which filter it found in violation of the DMCA. Or is it Plaintiff's intent to have every high-pass filter found in violation of Title 17 U.S.C. § 1201?

4. Plaintiffs have not provided any proof or evidence from any federal agency or the FCC to validate their allegations that the high-pass filters at issue in this case are illegal, have limited commercial use and are primarily intended to allow

unauthorized access to Cox's cable programming and copyrighted works. However Mr. Matteo's testimony along with the filters presented as evidence by Plaintiffs supports the fact that there are many different frequency high-pass filters and that they have many non-cable related uses.

In summary, High-pas filters are a common, nationally manufactured and sold necessary electronics part that is used for hundreds of non-cable related applications, therefore the sale of high-pass filters do not meet the criteria necessary to be found in violation of Title 17 U.S.C.§ 1201 as a matter of law.

**4. Points Brought Out at the Damages Trial, March 12, 2007**

During cross-examination, Mr. Matteo testified under oath that there was another filter court case in Maryland. A thorough search using the search tool Pacer found that there is no filter case in Maryland nor is there another filter case anywhere in the country. Mr. Matteo should provide the court with the case file number or be found by the court that he willfully committed perjury.

Contrary to Plaintiffs allegations in their Complaint, Defendant was not pushing the sale of filters, nor was he selling filters nationwide, an allegation that has since been abandoned. In truth, it was Plaintiffs pushing to purchase filters from Defendant. Defendant did not seek out Mr. Clifford, it was this individual who kept contacting the Defendant, insisting on setting up a place to meet to purchase additional filters. While Defendant is sure Mr. Clifford's theatrics on the stand while testifying about having Defendant's daughter in the car when he met Mr. Clifford at Lowe's parking lot was done to impress on the court what a nefarious character the Defendant was, Mr. Clifford was being quite overly dramatic considering Defendant was selling a legal electronics part, not dealing drugs!

Supporting testimony that Defendant was not pushing filters came from Mr. Allard who testified that the Defendant had 6 (SIX) filters on my tables along with flashlights and other products {Exhibits DX-AA, DX-BB in Defendant's evidence binder.] Those other products took up 3-4 eight foot tables at every computer show where my table displays ranged from about 600+ count of various CDs, about 100 different kinds of flashlights, several different kinds of security camera systems, dozens of computer and electronics

accessories for utility and troubleshooting purposes and various seasonal items and gadgets. High-pass filters made up less than 1% of my electronics business. Mr. Allard further testified that when he came back later, there were only 2 left (he had purchased a filter earlier) which proves I was not even restocking them! With full knowledge that my electronics business was comprised of many different products, Plaintiffs deliberately mislead the court in their Complaint by implying that I was the "Tony Soprano" of the cable piracy world running a big-time, national, illegal cable filter business! Allegations in the Complaint that Defendant Jon Chaffee was running a high-volume cable filter business were refuted by Plaintiff's own testimony.

No litigation or action has been brought against any of the identified filter distributors in 2 years! Plaintiff's litigation against the Defendant is based on their claims and allegations of widespread cable theft to the point that they have suffered much harm, incurring substantial revenue losses because of subscribers using high-pass filters. Their allegation in their complaint states that "*an individual could conceivably steal hundreds of dollars worth of Plaintiff's pay-per-view services through the use of a digital filter*" and yet with all their protestations of widespread cable theft and substantial revenue losses due to the use of filters, Plaintiffs have not found it necessary to bring litigation against any of the distributors whom Defendant purchased filters from! Nor has Plaintiff shut them down or taken any action against them what so ever! IN 2 YEARS! And all are still actively selling filters today! Mr. Matteo testified during cross that it is still an ongoing investigation! What more do they need? They have the Defendant, Plaintiff's case against Defendant, and all Defendant's pay-pal records that prove he purchased filters from those distributors. They have more than they had when they went after the Defendant. According to Plaintiff, they found Defendant's name on Mr. Burdsall's computer after thanksgiving in 2004. In less than 4 months, Plaintiff's brought litigation against the Defendant, yet here it is 2 years later and they have done absolutely nothing to a single other distributor! It is beyond unbelievable that Plaintiff would bring litigation against the Defendant, who by their own testimony only had 6 or so filters for sale at weekend computer shows, keeping the Defendant's assets frozen for 2 years under the guise that it was to prevent the Defendant from "continuing running my illegal filter business", yet Plaintiff's do absolutely nothing about the distributors who are selling filters by the hundreds all over the country! **Any objective person, would have to**

**question the credibility of Plaintiff's allegations and their case against the Defendant seeing that in spite of all their claims of revenue losses, they are allowing other distributors free reign to continue selling the "culprit" devices!** Allegations in the Complaint that high-pass filters cause widespread cable theft to the point that Plaintiff has suffered much harm, incurring substantial revenue losses is refuted by Plaintiff's non-action towards identified, high-volume distributors selling filters across the country.

During cross-examination, Mr. Matteo testified that Cox has 2 cable systems, Analog and Digital. He also testified that Plaintiff's case against the Defendant only involves Cox's Digital cable system. However in their Complaint, Plaintiffs deliberately mislead the court into concluding that their case involved both their Analog cable system as well as their Digital able system: *"Each Cox system offers several pay-per-view channels. Hence, an individual could conceivably steal hundreds of dollars worth of Plaintiff's pay-per-view services through the use of a digital filter" – Complaint pg 4:14.* This claim was clearly refuted by Mr. Matteo's testimony, however it shows a willingness by the Plaintiffs to distort the truth to further their cause in the court's eyes. Allegations in the Complaint that the cable theft at issue in this case involves both Cox's Analog and Digital cable systems is refuted by Plaintiff's own testimony.

Mr. Matteo also testified that the high-pass filters are not descramblers! However in their Complaint, Plaintiff labeled the filters at issue in this case as: *"pirate" filters; "pirate" digital signal filters; "pirate" digital cable filters; "pirate" digital cable television filters and "pirate" digital cable television descrambling filters.* It is apparent that Plaintiffs intent in labeling the filters at issue in this case "descrambling" devices was to mislead the court into concluding that filters were a device of the type that is known to be prohibited by law. By alleging filters were "descrambling" devices that had the ability "*to circumvent Cox's digital scrambling*" (in other words had the ability to descramble Cox's digital scrambling) while knowing full well that filters were not descrambling devices, again, shows Plaintiffs total disregard for the truth in order to manipulate the court into doing their bidding. It also shows a blatant callousness towards the court in that there was no concern by the Plaintiff that the court would find out it had been deliberately mislead! Allegations in the Complaint that the high-pass filters at issue in this case are "descrambling" devices are refuted by Plaintiff's own testimony.

Plaintiff also deceived the court by their deliberate use of the term *"pirate"* preceding each reference to filters. By labeling filters as such, Plaintiffs willfully conveyed a sense of their illegitimacy and illegality to mislead the court when such is not the case, as does Plaintiff's statements that *"the sale and use of such digital signal filters was prohibited by law..."* and that it is *"illegal to manufacture, sell and/or otherwise distribute "pirate" digital cable television filters..."*. Plaintiffs are well aware that there are no restrictions on the manufacturing, distribution, sale or use of any high-pass filter other than what is required for any legal electronics part manufactured and sold in the United States. Allegations brought forth in the Complaint that the high-pass filters at issue in this case are "illegal", 'pirate", "descrambling" devices is unproven and abandoned by Plaintiffs.

**5. Defendant's Supporting Evidence**

The Defendant, not being a lawyer does not have the skills, knowledge or training to cite cases of law to substantiate his position, therefore as a layman, Defendant can only present the information and documentation that is available to him.

Irrespective of the existence of filters, all authoritative industry experts who have looked at the matter of digital cable theft of content say the same thing: digital cable broadcasting is secure. There is credible industry reports, surveys and articles that dispute Plaintiff's claims that digital cable broadcasting is vulnerable to cable theft.

Nilda Gumbs, Director of the *National Cable and Telecommunications Association* [*NCTA*] Office of Cable Signal Theft, is quoted in several industry publications stating that subscribers using a filter do not get pay-per-view programming for free! The *NCTA* put out a cable theft survey that Cox Communications contributed to, one month after the raid at my home that doesn't even include digital cable theft because it is so insignificant. The survey and goes on to claim that high technology such as digital cable is difficult to steal. The *NCTA* also put out a press release [Exhibit "I"] crediting the increasing number of cable subscribers moving from analog to digital, for reducing cable theft losses by more than half! Yet contrary to Nilda Gumbs and the *NCTA*, Plaintiff claims a readily available, common electronics part [the high-pass filter], easily defeats digital cable's widely publicized high

technology and that cable theft using a filter is widespread and causing, causing substantial revenue losses.

The Washington Post published an article "*High-Stakes Hunt for Cable Pirates*"[Exhibit "J"] that was contributed to by both Cox and Comcast that states in the last paragraph: *"Industry observers say cable theft may diminish as more customers opt for digital cable and the nearly-impossible-to-hack converters [set-top boxes].* Yet Plaintiff claims that Motorola's set-top boxes are vulnerable to filter usage and subscriber tampering, enabling the theft of digital cable's pay-per-view programming causing Cox to suffer substantial revenue losses!

Another compelling pieces of evidence that Plaintiff's claims of cable theft are false is the article "*Pay-Per-View Piracy and The Internet*" [Exhibit "K"] published on the industry online website *SecondsOut.com*, that addresses Pay-per-view theft specifically and pretty much refutes all of Plaintiff's claims "*Through it all, the lawbreakers remained one step ahead of the enforcers. Then, with the development of digital cable, the landscape changed. The integrity of digital signal delivery has remained largely in tact. To avoid piracy, many cable companies no longer even offer pay-per-view features to analog customers.*" Yet Plaintiff is claiming that their digital cable system and equipment is easily compromised and has virtually no security features or capabilities to prevent Cox's digital subscribers from stealing pay-per-view programming!

Plaintiff's own websites direct visitors and customers to a Cable Anti-theft website for information about cable theft and to anonymously report cable thieves. This website [Exhibit "L"] lists every conceivable device used for both cable and satellite signal theft, however there is no mention of high-pass filters or digital cable filters or any kind of filter!

**6. Plaintiff's purpose for litigation**

While Defendant understands that it is difficult for the court to believe that Plaintiffs have not been forthcoming with the truth, even at times outright lied, and have fabricated their claims and allegations of cable theft and damages, Defendant feels there is enough credible evidence to substantiate the allegation that Plaintiff targeted the Defendant and that their whole litigation against him is an extortion attempt that went awry when Defendant didn't cooperate and give them their demanded $100,000 the night of the raid to "make

everything go away!" While Plaintiff denies any demand for money that night, Lou Marcoux admitted in his deposition testimony [Exhibit "C" pg.58:23-25] that he did ask the U.S. Marshal to step out of the room. Mr. Marcoux then states in his deposition that he told the Defendant that *"Cox's interest is to make this case go away and close this case with him, [Defendant] this complaint."* While Plaintiff's are denying that they demanded any money, common sense says that they weren't going to just *"makes this case go away and close this case…"* without getting compensation! However it has been denied more than once under oath.

Since Defendant didn't comply, Plaintiff and their attorneys have gone into cover-up mode working desperately to make a case where there isn't one out of smoke screens and mirrors, using trickery and guile.

Defendant believes that Cox New England has an elaborate extortion racket going on where they fill a Complaint with fabricated claims and allegations and misrepresentations then they willfully abuse the court system by filing frivolous lawsuits to gain permission to carry out raids, and then using threats of litigation, frighten individuals into paying large settlements. And if by chance they don't succeed in coercing a "settlement" when they pull off the raid, they stack the deck in their favor by keeping the individual's assets frozen so he is unable to adequately defend himself against their contrived claims.

And Defendant was the perfect target for Plaintiff's scheme. After following the Defendant around for a while, Plaintiff observed that Defendant lived in the biggest house on the largest lot in the neighborhood. He drove a late model Lexis (it mentioned several times by Plaintiffs during testimony at the Damages Trial that my car was a Lexis); His wife drove a new, top of the line Honda. Besides the weekend computer show business, Defendant owned a maids cleaning service and had a lucrative 6-figure full time job working for a Japanese publishing company. Undoubtedly Plaintiffs thought $100,000. was a drop in the bucket for me! It is highly doubtful Plaintiff would have gone into someone's home in South Providence demanding that $100,000!

Defendant believes the reasoning behind his allegation is factual and sound and they are stated here below:

Fact: There is not a single other filter case in the country, past or present. While Mr. Matteo testified during cross-examination that there was a filter case in Maryland, a thorough

search using Lexis Nexis and Pacer came up empty. Unless Mr. Matteo can come up with a case number, the filter case he mentions is non-existent,.

Fact: a year before the raid at Defendant's home, in an interview article *Hunting 'Passive' Pirates*, [Exhibit "M"] published in the cable industry's *Multichannel News*, publication, Lou Marcoux was asked about digital cable subscribers getting free pay-per-view if they use a filter; Mr. Marcoux responds filters are a "scam".

Fact: Plaintiffs singled the Defendant out and did not go after any of the other vendors selling filters at the same computer shows Defendant attended in CT.

Fact: a month after the raid at Defendant's home, the NCTA put out a 2004 Cable theft Survey that Cox contributed to that excludes digital cable because digital cable is so insignificant!

Fact: Plaintiff has not filed litigation or taken any action against any of the real "big-time" distributors Defendant purchased filters from after 2 years!

Fact: There are dozens and dozens of filter distributors and vendors (including vendors at the same computer shows where Cox bought filters from me) nationwide who are specifically selling filters as a means to get free pay-per-view, yet not a single cable company has gone after them.

Fact: there are several news media and industry articles, including articles quoting Plaintiffs, that state digital cable systems are secure and not vulnerable to cable theft like the older Analog systems. There are no news media or industry reports, documentation or research articles that state digital cable at this point in time is susceptible to cable theft by any means

**7. Conclusions**

It is Defendant Jon Chaffee's position that high-pass filters of the type in issue attached to Plaintiff's Motorola's digital set-top boxes on Plaintiff's Digital System, do not allow the **unauthorized reception** of Plaintiff's pay-per-view programming or copyrighted works on Plaintiff's digital cable system.

Plaintiff has not produced any independent industry research or test results or any other technical reports or findings or documentation that validates Plaintiff's claims that the use of high-pass filters of the type in issue, attached to Motorola's digital set-top boxes

resulted in the unauthorized reception of Plaintiff's pay-per-view programming and copyrighted works on Plaintiff's Digital System.

Plaintiff has not produced any evidence: industry research, reports, test results, documentation or information from Motorola or any disinterested 3rd party or source not connected with Cox to validate Plaintiff's allegations that the reset instructions from the 2 websites involved in this case deletes billing records from Motorola's digital set-top boxes.

Plaintiff has not produced any evidence: industry research, reports, test results, documentation or information from Motorola or any disinterested 3rd party or source not connected with Cox to validate Plaintiff's allegations that by following the reset instructions from the 2 websites involved in this case Motorola set-top boxes are damaged to the extent they need to be returned to Motorola for repairs.

Plaintiff has not presented any financial records and/or printouts of electronic records, or financial reporting documentation to verify Plaintiff's claims for damages suffered due to the use of the high-pass filters at issue in this case on their digital cable system.

Plaintiff has not submitted any financial records and/or printouts of electronic records, or financial reporting documentation to verify Plaintiff's claims of non-payment for pay-per-view services on Plaintiff's Digital System due to use of high-pass filters of the type in issue.

Besides not producing any industry or independent documentation to validate their claims and allegations that filters allow the unauthorized access to cable programming and copyrighted works, it is beyond belief that a company involved in a court litigation of the magnitude of this case would not have conducted official tests to support their allegations and meticulously documented both the tests and test results to be presented at court, unless Plaintiff claims are without merit and they could not create or reproduce the results for that which they claim.

*With the material facts in dispute and without any factual, documented proof or evidence to validate that Plaintiff's claims that high-pass filters of the type at issue allow the unauthorized reception of Plaintiff's pay-per-view programming and copyrighted works on Plaintiff's digital cable system are true, Defendant Jon Chaffee feels the evidence to support the allegations against the Defendants was legally insufficient to warrant the Magistrate's recommendation to grant Plaintiff's Motion for Summary Judgment .*

**Therefore Defendant Jon Chaffee states it is categorically wrong to grant damages to Plaintiffs when the evidence is clearly inadequate as it is in this case, and;**

As a result of direct and cross examination of Plaintiff's witnesses at the Damages trial held Monday, March 12, 2007, Defendant, Jon Chaffee reaffirms that the sale of the high-pass filters at issue in this case was not in violation of Title 47 U.S.C.§ 553 and requests that the court dismiss Plaintiffs claims without awarding Plaintiff any damages as a matter of law.

As a result of direct and cross examination of Plaintiff's witnesses at the Damages trial held Monday, march 12, 2007, Defendant, Jon Chaffee reaffirms that the sale of the high-pass filters at issue in this case was not in violation of Title 17 U.S.C.§ 1201 and requests that the court dismiss Plaintiffs claims without awarding Plaintiff any damages as a matter of law.

pro se

By Jon Chaffee (Pro Se)

CERTIFICATION

I hereby certify that on the 26 th day of March 2007, I mailed true and accurate copies of the within to Shaun K. Hogan, Esq., 350 Jericho Turnpike, Suite 300, Jericho, NY 11753 and Frances S. Holbrook, II, Esq., 122 Touro Street, Newport, RI 02840.