UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| COXCOM, INC. d/b/a COX COMMUNICATIONS NEW ENGLAND,<br><br>Plaintiff,<br><br>vs.<br><br>JON CHAFFEE, individually and d/b/a ELECTRONIC IMPORTS and CHAFFEE INTERNATIONAL, AMY CHAFFEE, individually and d/b/a ELECTRONIC IMPORTS, RAMALDA BOU, individually and d/b/a ELECTRONIC IMPORTS,<br><br>Defendants. | C.A. No. 05 CV 107 S<br><br>**AFFIDAVIT OF MARK MATTEO IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR <u>SUMMARY JUDGMENT</u>** |

STATE OF RHODE ISLAND)
) ss.:
COUNTY OF PROVIDENCE)

**MARK MATTEO**, being duly sworn, deposes and says:

1. I am the New England Security Supervisor for plaintiff CoxCom, Inc. d/b/a Cox Communications New England ("Cox"). I submit this affidavit in further support of Cox's Motion for summary judgment. I have been the New England Security Supervisor for approximately 5½ years. Prior to that, I was a service technician for Cox, an auditor for the Security Department, and an investigator in the Security Department. In sum, I have been with Cox for nearly ten years, and have worked in the Security Department for over eight years. During that time, I have participated in the technical side of cable service transmission and security from top to bottom. I have wired residences for cable service, installed cable television set-top devices, repaired service problems and audited locations for unauthorized reception of cable service. In my security and investigative roles, I have investigated cable piracy in a variety of forms, including end-user theft of service by means of unauthorized attachments to Cox's

Case 1:05-cv-00107-S-LDA Document 183-3 Filed 03/26/2007 Page 2 of 6

cable system and theft by use of "pirate" cable television descrambling equipment, as well as the harm caused by large-scale distributors of "pirate" cable television decoding devices and approximately ten cases involving the more recent problem of use of digital cable television filters, such as the filters at issue in this case. I have conducted cable piracy investigations similar to that which is the subject of the present action on several prior occasions. I have also worked with local, state and federal law enforcement agencies throughout Rhode Island, Connecticut, and several other locations in the United States regarding theft of cable and telecommunications services and subscriber fraud. Consequently, I have considerable general experience in investigations, and am familiar with the various aspects of the cable television business and unauthorized interception of cable television services.

2. The majority of defendants' opposition to Cox's motion for summary judgment is premised upon the "Expert Report of Gregory D. Girard" (the "Report"). In the Report, Girard, whom I do not know and who I believe does not know me, states that according to my own experience and training, I am not a "technical expert with respect to network engineering and network element design." Report ¶ 28. While I submit this affidavit as a fact witness and not as an expert, his conclusion substantially mischaracterizes my experience and qualifications. In addition to my on-the-job experience described above, I am a trained and certified technician in analog/digital cable, telephony, High Speed Internet, and VOIP (Voice-over Internet Protocol). I also hold a system administrator certification from Motorola, which is the manufacturer of the digital cable boxes used by Cox that lie at the heart of this action. In total, I have over a thousand hours of training regarding cable television service transmission, and security issues. All of this was testified to during my deposition, which Girard claims to have reviewed. Report ¶ 19.

3. Unlike Girard, who may have experience in other areas such as computer technology, and who apparently has done nothing more than read articles about digital cable transmission, security and billing issues, I have years of hands-on experience with these very issues. I have personally tested digital cable boxes, and have personally tested whether filters, such as those sold by the defendants, when used on a digital cable platform such as that utilized by Cox, can allow pay-per-view programming to be ordered and viewed, and yet prevent the billing information pertaining to such programming from being transmitted to Cox. I have found that such devices do indeed have this capability.

4. Girard's total lack of knowledge regarding the issues upon which he opines is highlighted by his assumption that with a filter in place a person would only be able to watch "about eight pay-per-view selections [before] it will no longer be possible to select any more." Report ¶ 29. Girard even refers to the amount of blocked billing information as only a "modest bill." Report ¶ 37. In reality, however, Cox's system currently allows accumulation of approximately $300.00 in charges prior to a set-top device's locking out additional pay-per-view purchases. Thus, by using one of defendants' filters a person could obtain up to $300.00 in unbilled programming.

5. In his Report, Girard readily acknowledges that the filters sold by defendants can, in fact, impede the transmittal of billing information to Cox. Report ¶¶ 33, 34. Girard asserts, however, again without (i) any first-hand experience on Cox's system, or (ii) testing any of the devices that defendants sold; that a filter can only delay the transmittal of billing information from a set-top device to Cox. Girard refers to this as a "benign delay," since, according to Girard, Cox will eventually receive the billing information from the set-top box and then bill the user for the pay-per-views. Report ¶¶ 35, 37, 41, 48, 49, 54.

6. In reality, however, during the relevant time period, Cox's digital boxes were set to hold billing information for 60 days. The decision to only hold billing information for 60 days was borne out of both financial concerns regarding accelerating revenues, pragmatic concerns regarding collectability of old charges, and customer relations concerns regarding billing customers for services viewed a long time before. Of course, as Cox's central billing computers "poll" set-top devices frequently, its digital scrambling technology works perfectly well. Thus, the excess age of a pay-per-view bill is never an issue – unless, as in the present case, a device is installed onto the cable system to prevent billing information from being transmitted in a timely manner. Most importantly, after 60 days, the billing information stored in the box is considered "orphaned" by the addressable technology, is not recognized by the system, and ultimately does not result in a bill being created or sent.

7. As a result of the foregoing, a digital filter of the type the defendants sold, if kept on the system for at least 60 days, would prevent the billing information pertaining to those events from being transmitted to Cox's head-end. When the filter ultimately was removed, the billing information would be sent, but due to its age would not be "recognized" by Cox's central computers. Accordingly, Girard's assertion that use of the filters only results in a "benign delay" in billing information being sent to Cox's central billing computers is completely erroneous.

8. While I noted above that by using a digital filter one could obtain approximately $300.00 in charges prior to a set-top device's locking out additional pay-per-view purchases, it is easy to see how, in fact, the amount of pay-per-view services that an individual using one of defendants' filters could steal from Cox could greatly exceed this amount. The reason for this is that the $300.00 amount is <u>per</u> cable box. Thus, a household that had more than one digital set-top box would be able to obtain an additional $300.00 in pay-per-view services for <u>each</u> digital

set-top box in the household upon which one of defendants' filters was attached. Also, if the user of the filter allowed more than 60 days to pass after he last received a pay-per-view service, the history of the receipt of the pay-per-view services and Cox's ability to bill the customer for those blocked pay-per-view services would be extinguished.

9. Girard also asserts, without the benefit of any testing, that there is absolutely no way to reset, purge or erase the billing record on the Motorola boxes used by Cox. See Report ¶¶ 37 ("no way to purge the set-top box of billing records. . ."), 40, 49, 54. Once again, Girard is incorrect.

10. Indeed, it has been my experience that if one were to follow instructions such as those received from support911@aol.com, which is the defendants' email address, see Exhibit "M" to Summary Judgment Motion, a set-top device's memory/internal serial number/unit address would be completely erased. The device would have to be returned to a Motorola repair center to be reprogrammed.

11. Moreover, it is my understanding that in a situation where a customer returned a device to Cox or sought a replacement when the device was in that condition, Cox's policy has been and is to provide a replacement without charge. Cox itself would bear the cost of sending the device to Motorola to be repaired.

12. Finally, I note that attached as Exhibit H to the Report is a document entitled FCC Interference Handbook ("Handbook"). Significantly, it should be noted that this Handbook, upon which Girard has relied and has asked this Court to consider, and which he mistakenly discusses as if it was a recent FCC document, was released in 1993. As noted on page 1 of the document, it is no longer even available on the FCC website. It is my understanding that in 1993, there simply was no digital cable television technology in the United States. Cox

converted from analog to digital in 1998. Thus, any reliance upon this Handbook in a case such as this one, which deals with issues relating to use of filters on a digital cable system, is misplaced.

Mark Matteo

Sworn to before me this
6th day of January, 2006

Notary Public