UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COXCOM, INC., et al

VS C. A. NO: 05 107 S

JON CHAFFEE, et als

## OBJECTION TO REPORT AND RECOMMENDATION

Now come the defendants Jon Chaffee, Amy Chaffee and Ramalda Bou, pursuant to Local Rule 32 (d) and object to the Report and Recommendation of Magistrate Judge Almond dated April 25, 2006 for the reasons set forth in the memorandum attached hereto.

By their Attorney,

James A. Currier #953
128 Dorrance Street
Suite 400
Providence, RI 02903
(401) 274-3113
Fax (401) 274-3115

## CERTIFICATION

I hereby certify that on the 4th day of May, 2006, I faxed a true and accurate copy of the within to Francis S. Holbrook, II, Esq. (841-8534) and Shaun K. Hogan, Esq., 1 (516) 942-4705.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COXCOM, INC., et al

VS C. A. NO: 05 107 S

JON CHAFFEE, et als

**MEMORANDUM IN SUPPORT OF OBJECTION TO REPORT AND RECOMMENDATION**

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

It is well settled that a court cannot try issues of fact on a Rule 56 motion for summary judgment but only is empowered to determine whether there are issues to be tried. Briggs v. Kerrigan, 431 F. 2d 967, (C.A. 1st, 1970)

Summary judgment cannot be used to deprive a litigant of a full trial of genuine fact issues. Poller v. Columbia Broadcasting Sys., Inc., 82 S.Ct. 486, 368 U.S. 464, 7 L.Ed. 2d 458 (1962)

Indeed, several courts have held that summary judgment would be improper if the existence of material fact issues is uncertain. 10 *Federal Practice and Procedure*, Wright and Miller, Chapt 8, §2712, n.42. p. 383 (1973)

As illustrated below, it is submitted that the Court not only improperly decided questions of fact, it did so based on a misconception of some of those facts.

1. The paragraph at the bottom of page 2 top of page 3 of the Report and Recommendation indicates that an undisputed fact is that " ... the digital cable filters at issue are capable of interfering with the **encoding** of Cox's pay-per-view-channels ... Digital filters interfere with Cox's with the **encoding** mechanism ..."

Same was clearly disputed in defendants' Statement of Material Facts to be Litigated. **(Tab A )** Moreover, it is scientifically inaccurate. Defendants' expert makes that clear in his report. Significantly, plaintiff's expert makes no such claim in his report.

This error is so fundamental to this case that it alone mandates rejection of the Report and Recommendation!

2. The first full paragraph on page 3 suggests that the defendants' displayed a sign which "... clearly explained that the filter would 'block out pay-per-view charges from your cable company, giving you free pay-per-view.' "

Jon Chaffee testified in his deposition that such a sign had never been displayed at any of his shows. **(Tab B)**

The same paragraph goes on to say that web sites were given containing instructions rearding how to reset the cable box, how to block a cable signal from relaying information to the cable provider and how to prevent the cable company from detecting the presence of the filter.

All those deposed by plaintiff acknowledged they had not read the entire contents of the websites. Obviously same was a bad businsess practice, but as to the essential element of intent, such testimony at the very least creates questions of fact.

3. On page 4, the second full paragraph reference is made to the filters intercepting pay-per-view transmissions. Again, no one contends the filters **intercept** transmissions. The filters only

temporarily block receipt of billing information.

4. The last paragraph refers to a e-mail received by Jon Chaffee that the filters worked "great with pay-per-views ..." Defendants sold the filters because they understood the worked great with pay-per-views by filtering out interference. Defendants' expert pointed out that same have been used for that purpose since World War II.

5. With reference to the "tongue in cheek" quotation at the top of page 5, a fair reading of Jon Chaffee's deposition pages 52, 53 **and** 54 clearly demonstrates there exists at the very least another question of fact as to intent. **(Tab C)**

6. The first full paragraph on page 5 again refers to the "descramble" red herring that the court followed. Additionally, Mrs. Chaffee did not assert a Fifth Amendment privilege. She was instructed, rightly or wrongly, by counsel not to answer a question on that basis. **(Tab D)**

7. The Court repeated the error, in the penultimate paragraph on page 8, as to the purported undisputed fact as to intercepting cable.

8. On page 9, the Court suggests Jon Chaffee omitted names. This ignores the reality of imperfect memory. It also seems to similarly draw a negative connotation from the use of aliases. Again, a fair reading of the deposition reveals at the very least a question of fact. **(Tab E)**

9. The footnote on page 9 is yet another example of fact finding rather that fact indentification.

10. The last paragraph on page 10 incredibly states that the dispute about the Boisvert statements is a non-issue. Not only is it another demonstration of fact finding; it completely misconstrues the Boisvert Declaration, Affidavit and tape recording. **(Tab F)**

## PLAINTIFF'S MOTION TO STRIKE EXPERT REPORT

Disclosure of defendants' expert testimony was made in compliance with Rule 26 (a) (2) (C) and with this Court's Pre-Trial Order dated 4/12/05.

It is submitted, to assess the Report and Recommendation as to this motion, the report of Mr. Girard must be read.

The Court misconstrued the law regarding expert testimony for use at trial in the last paragraph on page 12. The simple reality is that defendants' retained Mr. Girard when they could afford his services. Counsel made a decision to use him as an expert witness only after he (counsel) read the report. **(Tab G)** To require anything else would put a chilling effect on even consulting an expert.

At the bottom of page 13 is stated " Moreover, the Expert Report (defendants') itself impermissably relies upon a hearsay telephone conversation that **purportedly** (emphasis ours) took place ..."

It is submitted that the Court not only misconstrues the law but the implication that the conversation may not have taken place is also improper.

Furthermore, the suggestion at page 15 that Mr. Girard may not have spoken to the proper people or that even if he did they "... could be biased... " is improper speculation. The further **finding** of the " ... inherent unreliability ... " and " ... lack of any reliable corroboration ..." is clearly improper as to a motion for summary judgment.

The Court made yet another impermissable finding at page 16 when it held that the delayed billing theory is " ... simply untenable." Ironically, there is no genuine dispute that the filters, other than filter out interference, do nothing more with respect to cable television than temporarily delay the billing information to the cable company.

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

By dismissing the report of Mr. Girard, the court deprived itself of the opportunity to properly evalute the plaintiff's claims. The filters are not the type of device to which 47 U.S.C. § 553 refers. The reports of Durey and Girard read together make that clear.

Nor do the filters in any way violate the copyright laws as required by 47 U.S.C. § 1201. As the filters are not descramblers, again plaintiff does not even suggest they are, anyone who were to attach a filter to try to get free pay-per-view, would be an authorized recipient of cable transmissions in the first place!

**CONCLUSION**

The defendants' motion for summary judgment should be granted disposing of the matter entirely. Short of that the plaintiff's motions should be denied and the case proceed to trial.

By their Attorney,

James A. Currier #953
128 Dorrance Street
Suite 400
Providence, RI 02903
(401) 274-3113
Fax (401) 274-3115

**CERTIFICATION**

I hereby certify that on the 4th day of May, 2006, I faxed a true and accurate copy of the within to Francis S. Holbrook, II, Esq. (841-8534) and Shaun K. Hogan, Esq., 1 (516) 942-4705.

RECYCLED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COXCOM, INC., et al

VS C. A. NO: 05 107 S

JON CHAFFEE, et als

**DEFENDANTS' STATEMENT OF MATERIAL FACTS TO BE LITIGATED**

In response to individual paragraphs of Plaintiff's statement of material facts as to which there are no genuine issues to be tried, defendants respond as follows:

7. Plaintiff initially claims that:

> "Digital filters circument Cox's efforts to protect the copyrighted pay-per-view events it offers to customers through the technology of **scambling transmissions.**" (emphasis added)

Then it suggests:

> "Without transmission to Cox's computers of this data reflecting pay-per-view events watched, Cox is unable to bill the subscriber for his or her receipt of such programming; thus, the subscriber and/or other members ot the subscribers household view the

A

programming free of charge."

Moreover, in support of this motion it has attached the "Expert Report of Stan Durey." (Exhibit A) That report, not signed under the penalties of perjury, **makes no claim that the filters scramble transmissions nor violate the copyright laws.**

9. As set forth in the report of Girard Consulting Partners, the filters in question have a multitude of legitimate uses including filtering out interference from FM broadcast towers, amateur radio users, etc. (Exhibit 1)

12. The sign refered to also states clearly that the filters, as the name implies, filter out interference that can effect reception of digital cable TV programs. (Exhibit L)

14. Unfortunately, none of the defendants ever read the web sites.

15. This paragraph is not an undisputed fact but rather an unsupported conclusion.

17. The website is not defendants' website.

19. The second sentence of this paragraph also makes an unsupported conclusion.

32. This paragraph is ambiguous. It is submitted in this case there is a crucial difference between“did” and “could.”

33. The last sentence of this paragraph also makes an unsupported conclusion not a statement of undisputed fact.

42. Amy was told by counsel, rightly or wrongly, to assert her privlege against self incrimination.

44. A fair reading of selected portions of Chaffee’s deposition testimony reveals this is a mis-characterization of same. He explained why he used the name Sharon and the name Mike may have merely be the result of “cut & paste.” (Tr 55-56, 60, 64, 130)

46. The Declaration of Gerard Boisvert is directly contradicted by the Notarized Affidavit of Gerard Boisvert. (Exhibit 2)

47. This is a mis-characterization of McKenna’s deposition testimony. She had no knowledge as to whether the filters “were” being so used.

50. Cox has not produced any evidence that it lost any money as result of the use of

any filters whether sold by or on behalf of defendants or anyone else.

Defendants

By their Attorney,

______________________________

James A. Currier #953
128 Dorrance Street
Suite 400
Providence, RI 02903
(401) 274-3113
Fax (401) 274-3115

Page 190

her own company name. She does all her own things.
Q. But there came a point when you stopped providing her with products to sell?
A. Yeah, she gets them all directly herself.
Q. And when did that happen?
A. Right after the --
Q. Seizure?
A. Right.
MR. HOGAN: Let's mark Plaintiff's 21.
(Plaintiff's Exhibit 21 marked for ID.)
Q. Plaintiff's 21 has been marked. It's a plastic coded sign, two sides.
A. Yeah.
Q. Do you recognize that?
A. Yeah.
Q. So you do recognize that?
A. Yes.
Q. Is that the sign you displayed at the shows where you sold digital cable filters?
A. The other sheet seems to be missing.
Q. What other sheet?
A. All of the disclaimer stuff.
Q. What disclaimer stuff?
A. Mentioning where the disclaimer -- I'm not

Page 191

familiar with who did that up.
Q. You're not familiar with who printed it but you recognize it to be something you --
A. That, right there, that page right there, yes.
Q. What page?
A. This page right here.
MR. CURRIER: Can we agree that's the back page, Shaun?
MR. HOGAN: Yeah.
THE WITNESS: On there it is but it was really the front page as I ever saw it.
Q. It was always the front page?
A. Yes.
Q. Oh, it sounded like you said French, I'm sorry. So, it's your testimony that when this was -- when Plaintiff's 21 was displayed at these shows, what is on the back would be on the front and what is on the front would be on the back?
A. No, I never saw that on the other side. I never really ever saw that.
Q. You're talking about on the front?
A. Yeah.
Q. With the diagram saying cable in from wall, filter, cable in?
A. I never seen it in that way. I've never had

Page 192

it displayed like that at any of my shows.
Q. Did you ever see it displayed in any shows on which other people for you were working?
A. No.
Q. You've heard the Cox employees testify that this was displayed at the show when they purchased a filter from you?
A. I don't think that they would have had that because I've never seen that before displayed, not in a sheet like that.
Q. When you say not in a sheet like that --
A. Not like this. Not this here. This looks familiar but I just don't know -- I've never seen anybody have this at a show. I mean, it looks familiar but I don't know where it came from.
Q. Referring to the back, to the back side, referring to the content of the back. Let's just stop.
A. Okay.
Q. Are you saying that the plastic holder for the sign wasn't displayed at any of the shows that anyone worked at for Chaffee International?
A. No.
Q. You never used that?
A. Right. No, no, no, no, this was, yeah. This was used at some shows, yes.

Page 193

Q. And at the show when you sold devices, two filters, one to Mark Madeo (phonetic) and one to Ron Allard, it wasn't displayed in that fashion. There was actually a form -- the same form was printed and covered in plastic or laminated sitting down on the table?
A. This was probably straight up and the sheet that's inside the rest of it, the disclaimer portion of it, was inside a plastic -- one of the plastic leafs that sits on the table like a baseball card sheetholder.
Q. And what was on the disclaimer portion of it?
A. Just telling -- just everything. This is the sheet that MarketPro told us that was fine to use. They gave it, it went to their legal department, they said this was fine.
Q. MarketPro gave them to you?
A. No, no, no, no. MarketPro approved of it.
MR. CURRIER: Let the record reflect that the witness is referring to the sheet that has the diagram --
THE WITNESS: Yes.
MR. CURRIER: -- of the filters.
A. And there's another page that's missing, that has the disclaimer information and all.


B

Page 50

A. He sold a few things, yeah.
Q. When you say he sold a few things, what do you mean by that?
A. He sold some of those things that are on that list, I guess.
Q. Referring to Plaintiff's 2?
A. Right.
Q. And now, I want to direct your attention to -- you read the last paragraph?
A. Right.
Q. And specifically I'll just -- you say with respect to the wireless pinhole camera: I had one guy this week tell me that he has it in his bedroom and every time a girl comes over he is videotaping their sex acts. You wrote that; right?
A. I must have.
Q. And this was in 2003; right?
A. Yes.
Q. It's dated December 12, 2003?
A. Yeah.
Q. And until very recently you were still selling these products?
A. Yes.
Q. Would you agree that this person's use of the camera in question is of questionable legality?

Page 51

MR. CURRIER: I object. It's argumentative and it may not even state the law correctly but you can answer it.
A. Yes.
Q. You'd agree with that?
A. Based on that, yeah.
Q. You continued to sell these in 2004 and 2005 knowing that at least some of your clientele was violating the law with these products?
MR. CURRIER: Objection.
A. Yes, since 9/11 that was more for security for watching your cars and everything at night.
MR. HOGAN: Move to strike as nonresponsive.
Q. The question was you continued to sell these things?
A. Yes.
Q. And you knew that some of your clientele were using them for illegal purposes?
MR. CURRIER: Objection. Same objection.
MR. HOGAN: You can answer.
A. Well, I wouldn't really know what they use them for.
Q. Okay. In this case you talk about one of your customers using it to tape someone having their

Page 52

sex acts?
A. That's what they told me.
Q. Do you believe that that is a legal use of the product?
MR. CURRIER: Objection. He's not an attorney.
A. No.
Q. Can you read the last sentence beginning with: People love the products.
MR. CURRIER: Let me see that again first, Jon.
A. People love the products we have because they are legal in the way you are supposed to use them so they are legal to sell such as cable filters but illegal in the way people think of using them. Can you really believe the clientele at a computer show would do anything illegal? No way. I don't believe it.
Q. That's an acknowledgment by you that people who come to these computer shows engage in some illegal conduct with respect to some of the products that are sold at these shows?
MR. CURRIER: Objection to form.
A. They could.
Q. And when you say: Can you really believe that the

Page 53

clientele at a computer show would do anything illegal, with three question marks after it, and then: No way. I don't believe it! Was that you essentially tongue in cheek?
A. Yes, because --
MR. CURRIER: Listen to the question.
Q. That was tongue in cheek; right?
MR. CURRIER: Objection to the form.
MR. HOGAN: You can answer the question.
A. Yeah.
Q. Do you know what it means when something is said with tongue in cheek?
A. No. Explain what you mean exactly.
Q. It wasn't a sincere statement. You were in fact saying that you understood that people at these computer shows routinely do things like this that are illegal?
MR. CURRIER: Objection to form.
A. Not routinely.
Q. What's the significance of this the way you wrote it?
A. He always said that people at computer shows the introverted socially inept engineers, were --
Q. I'm sorry the introverted?
A. That introverted socially inept engineers that

go to these shows are strange.
Q. How do we get to: Can you believe someone would do something illegal to purchase something from one of these cable shows?
A. It was based on that because he was making fun of some of the people.
Q. Being socially inept and introverted doesn't mean that someone is going to do something illegal, would you agree with that?
A. Oh, that's true, yeah.
Q. Mr. Chaffee, your statement to this effect basically: Can you believe the clientele at the computer show would do anything illegal, with three question marks; am I to understand that you were really surprised that that would happen or that this was meant to be somewhat humorous?
MR. CURRIER: Objection to form.
A. I don't know, that was a long time ago. That was a long time ago.
Q. It doesn't answer the question. You don't know whether or not this was intended to be humorous in some way?
A. No.
Q. But you wrote it?
A. I guess so.



Q. But you don't have any reason to believe that anyone else wrote it using your identity?
A. No.
Q. Does Amy correspond by e-mail with Joe Fontaine?
A. No.
Q. You said Joe Fontaine only sold a few things for you; is that right?
A. I don't really know what he actually sells. He buys everything himself pretty much.
Q. But you have an association with him through your business?
A. I did, yeah, a while ago, yeah.
Q. When did that end?
A. Oh, a while back. I'm not sure exactly what day.
Q. You're not sure when, a while back?
A. Yeah.
Q. What's a while back? Is that a month ago? A week ago?
A. It's been four or five months ago.
Q. And what occurred to have the association between Chaffee International and Mr. Fontaine come to an end?
A. Oh, I don't know.
Q. But prior to that time, he routinely went to these



cable shows for you and sold products for you?
A. No, he had his own company. He sold his own stuff.
Q. Did you provide digital cable filters to him?
A. I think I gave him a few but he got them himself. He got them himself.
Q. Did you ever give him digital cable filters to sell on your behalf?
A. I might have given him a few but he sold them himself.
Q. Going back to Fontaine, did you provide him with digital cable filters to sell?
A. At one point, yes.
Q. Do you know how many you provided him with?
A. Not many.
Q. Isn't it a fact that you provided him with digital cable filters and other products that he sold at these shows and he paid you back a percentage of what he sold?
A. Something like that, yes.
Q. Well, what is it, not something like that?
A. Because he had his own company, he sold his own stuff, he bought his own stuff. He bought flashlights from me. At one time he bought filters but then he bought them from somewhere



else, off of eBay, I guess, he said.
Q. As it related to your, and I say your collectively, I mean, individually and Chaffee International, your interaction with him, you provided him with products to sell?
A. Right.
Q. And he sold them?
A. Right.
Q. Those products included digital cable filters?
A. Right.
Q. He sold some quantity of product at a particular show and then remitted to you a portion of those sales?
A. Right.
Q. And is that portion -- the way it worked with Mr. Fontaine and other people similarly situated was that you would make them buy the product from you; is that correct?
MR. CURRIER: Object to the form.
A. No.
Q. I'm breaking it down. With Mr. Fontaine, did he purchase equipment from you for resale?
A. No, he just asked me to send him some product and then he sent me back what he didn't sell and the money for what he sold.

billed $500.
MR. CURRIER: Objection to form.
Q. Did you hear that on the tape?
A. Yes, I hear it.
Q. And that's your voice?
A. I believe so that's my voice. It sounds like it.
Q. So, you were instructing the person who was purchasing a filter that if they take the filter off, they could be billed $500?
MR. CURRIER: Objection to form.
A. I don't know what that person was asking me. It was just what I answered.
Q. Do you want to hear a little more of the tape for context?
A. He was asking me about the instructions, how to use it.
Q. Do you hear the portion of the tape in which you just said, that's why you have to reset your box?
A. Yes.
Q. And then you went on to discuss the instructions?
A. Well, he asked me and I told him.
Q. When you testified previously, you said you had no knowledge of --
A. Well, --



Q. Let me finish the question. -- no knowledge of resetting a cable box in connection with the use of a filter.
MR. CURRIER: Objection to form.
A. Not that I remember.
Q. Not that you remembered?
A. Yeah.
Q. This is a conversation that took place in December of 2004?
MR. CURRIER: Objection to form.
A. No, I don't remember that. I mean, a lot of people talk to you daily so I don't remember conversations all the time.
Q. In view of what you heard on the tape, would you agree with me that your affidavit is false?
MR. CURRIER: Objection. I instruct the witness not to answer.
Q. Are you refusing to answer that question on the grounds --
A. Yeah.
Q. Let me finish. -- on the grounds it may incriminate you? You have to say yes if you intend to assert the Fifth.
A. Yes.
Q. Did you submit a false affidavit to the court in



connection with the case against you and your husband?
MR. CURRIER: Objection. I'm instructing the witness not to answer.
Q. Are you refusing to answer that question on the grounds it may incriminate you?
A. Yes.
Q. And the reason you made statements about how to reset a box on this tape was that you knew that these filters could be used to assist people in receiving pay-per-view without paying for it; correct?
MR. CURRIER: Objection to form.
A. Yes.
Q. So you knew that people who were buying these filters --
MR. HOGAN: Let the record reflect that the witness just looked at Mr. Chaffee.
Q. -- you knew that people who were buying these filters were using them to get pay-per-view without paying for it?
A. No.
Q. You didn't know that.
A. I just knew that people knew a little bit about it but I didn't know anything. I only went



to two or three shows, how would I know everything?
Q. Well, you seemed to -- according to the tape, you're heard instructing people how to avoid a $500 payment from the cable company.
MR. CURRIER: Objection to form.
A. I just -- look, it's right here. The symbol on the table, I mean, they know for themselves. They just ask you.
Q. That's not my question, ma'am. Did you listen to the tape?
A. I heard the tape.
Q. You heard your voice?
A. Yeah.
Q. Making statements about how to avoid a $500 payment from the cable company; right?
MR. CURRIER: Objection to form.
A. Yes.
Q. And you also heard yourself speaking to the investigator about using the reset instructions; correct?
MR. CURRIER: Objection to form.
A. I don't know if that was the reset. I didn't work -- for the digital or whatever, I still don't think that was for that, but he was talking about

Q. Where does she live?
A. Second Avenue in Woonsocket.
Q. What number?
A. I'm not sure of the number. They both live at the same address. I'm not sure what the address number is.
Q. How old are they?
A. She's probably 27.
Q. And Christine?
A. 23 or 24.
Q. And Sharon's involvement went beyond working a few shows; isn't that true?
MR. CURRIER: Object to the form.
Q. Isn't that true?
A. No.
Q. She never responded to e-mails on behalf of -- or e-mails sent to aol911, support911, and identified herself as technical support?
THE WITNESS: Actually, could I have a minute with Jim?
MR. HOGAN: Not with a question pending.
A. Amy's sister didn't have access to the computer.
THE WITNESS: Can I have a minute with Jim?



MR. CURRIER: Yeah.
MR. HOGAN: Yes, there's no question pending.
(Short recess was taken at this time.)
Q. BY MR. HOGAN: Which of Amy's sisters are you referring to, Christine or --
A. Sharon.
Q. Sharon McKenna?
A. Right.
Q. Did Christine?
A. No, neither one of them did.
Q. To your knowledge, did they ever respond to e-mails --
A. No.
Q. -- that were sent to Chaffee --
A. No.
Q. You've got to let me finish.
MR. CURRIER: Let him finish, Jon.
Q. Did either of Amy's sisters ever respond to any e-mail that was sent to support911@aol.com?
A. No.
Q. Who had access to the computers that would be used to respond to e-mails that were sent?
A. Just me.
Q. Just you?



A. Yeah.
Q. Did you use any assumed names during the time you corresponded with people as it related to products that you sold?
A. I used the secretary name as Sharon.
Q. So any time that I see Sharon among the e-mails that were downloaded from your computer, that's in fact you?
A. Yes.
Q. And why did you take on the name of Sharon?
A. Well, the problem was when I was on-line doing my work, they would instant message me and say, hey, one of my flashlights doesn't work or something. They would instant message me because you can instant message while you're doing other work and it is kind of annoying. So that's why I came up with the name of Sharon so if they e-mailed me while I was doing my work, I would say to send an e-mail.
Q. Who would you say send an e-mail?
A. To somebody that would send you an instant message. With AOL you can be on-line doing my work, my day job. Somebody can just come right in the middle and just instant message you.
Q. Now, when you say come right in the middle,



there's a side screen for instant messages?
A. It pops right up in the center so then I can't do my work.
Q. So, using an assumed name of Sharon, how does that prohibit people from instant messaging you and interfering with your work?
A. Because then they would just write an e-mail to Sharon and then they would feel at ease that -- I want to answer it but I can't because I'm busy right then and there.
Q. You'd receive an instant message from someone?
A. Right.
Q. That pops up in the middle of your work?
A. Right.
Q. Rather than respond I'll get back to you in five minutes, Jon, or in five hours or tomorrow, you instead take on the guise of being Sharon and what do you say as Sharon as it relates to these individuals?
A. Just like my secretary for support or whatever. I just use that.
Q. I don't follow you. Do you respond by what, saying I'll forward your e-mail or the instant message to Sharon?
A. No, I just said that I'm on-line right now,



E

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

COXCOM, INC., et al

VS C. A. NO: 05 107 S

JON CHAFFEE, et als

AFFIDAVIT

I, Gerard Boisvert, under oath depose and say:

1. My permanent address is 81 Prospect Street, Manville, RI 02838.

2. My summer address is 15 Hunter North, Alburg, VT, 05440.

3. I have known Jon Chaffee for at least four (4) years. Jon is married to my sister's daughter, Amy Chaffee. I have known Amy all her life.

4. From November 2003 through April 2004 I sold various items supplied by Jon at trade shows. Jon would supply the merchandise. I would keep 30-35% of the sale proceeds and give the rest to Jon.

5. A small portion of the merchandise included what Jon described to me as interference filters for cable television. He told me that they filtered out interference to cable television. He also told me that people who have digital cable could use these filters to get pay-per-view without paying for it.

6. I asked Jon if it was legal to sell the filters. He told me it was legal because we sell them as interference filters. He told me they were sold at Radio Shack. Jon also told me - how people who purchase the filters chose to use them was their business.

F

who purchase the filters chose to use them was their business.

7. In May 2005 I received a telephone call from Lucien Marcoux who told me Jon was in trouble for selling the filters. He told me he had confiscated Jon's computers and that is how he got my name. During that call Lucien and I realized that we knew each other. In fact we used to play guitar together when we were teenagers. Lou recorded the conversation with my permission.

8. On July 9, 2005 we met in Warner, NH. Lou handed me a paper called a Declaration. I read it, signed it and handed it back to Lou. He gave me a copy.

9. Five days later I got a telephone call from Jon. He said he had read the Declaration and he asked my why I said that people who have digital cable could use these filters to get pay-per-view without paying for it but failed to mention they could be used for interference. I told him I said that to Lou.

10. I read the Declaration several times again and realized some of it was not correct. It had my zip code wrong and the price Jon suggested I try to sell the filters for was $20.00 not $25.00. **Also, I never said verbatim to Lou "Jon Chaffee made it clear to me that he knew and intended that people who purchased digital cable television filters could and would use them to view pay-per-view programming without paying for it."**

11. **Jon Chaffee never said, nor made it clear to me, that he intended that people who purchased digital cable television filters would use them to view pay-per-view programming without paying for it.**

11. I called Lou on July 18, 2005 and told him that and that I wanted to change the Declaration. Lou said he would talk to the lawyers and get back to me. He did not call me back so I called him two more times and left messages for him to call me back. I then got a call from someone in Lou's office who told me Lou would be meeting with the lawyers. I expected a call back and when I did not get I called a few more times. When I finally spoke to Lou on his cell phone and he told me that the lawyers told him that Cox was not interested in making changes or

Gerard Boisvert

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE

In WOONSOCKET on the 2ND day of NOVEMBER, 2005 before me personally appeared, Gerard Boisvert, to me known and known by me to be the party executing the foregoing instrument, and he acknowledges said instrument, by him executed to be his free act and deed.

Notary Public
My Commission Expires: 7-22-09

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COXCOM, INC., et al

VS C. A. NO: 05 107 S

JON CHAFFEE, et als

AFFIDAVIT

I, Cherie Chaffee under oath depose and say:

1. I am the mother of Jon Chaffee.

2. Shortly after Jon retained an attorney in this case the attorney told us that Jon might need an expert witness. He gave us an approximate cost. We did not have the money to pay an expert.

3. Several times thereafter Jon's attorney again told us we would have to try to get the money to hire an expert.

4. After receiving the report of Stan Durey Jon's attorney told us that we must get an expert to review the report.

5. On September 23, 2005 I was able to find Mr. Girard on the Internet. I called him and explained to him as best I could what was needed.

6. I cashed in my savings and IRA to pay him. I have paid him $35,500.00 to date.

7. I gave a copy of the report, of an interview of Plaintiff's New England Security Manager, Lucien Marcoux given to Steve Donahue of *Multichannel News* on March 8, 2004, to Mr. Currier on January 26, 2006.

Cherie Chaffee

Subscribed and sworn to before me this 20th day of February, 2006.

Notary Public

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COXCOM, INC., et al

VS C. A. NO: 05 107 S

JON CHAFFEE, et als

AFFIDAVIT IN SUPPORT OF OBJECTION TO
MOTION TO STRIKE EXPERT REPORT

I, Jon Chaffee under oath depose and say:

1. Shortly after I retained my attorney in this case he told me I might need an expert witness. He gave me an approximate cost . I did not have the money to pay an expert.

2. Several times thereafter my attorney again told me I would have to try to get the money to hire an expert.

3. After receiving the report of Stan Durey my attorney told me that I must get an expert to review the report.

4. My mother was able to find Mr. Girard and cash in her IRA to pay him as set forth in her affidavit.

5. I received Mr. Girard's report on December 19, 2005.

Jon Chaffee

Subscribed and sworn to before me this 6th day of February, 2006.

James A. Currier
Notary Public

# TRANSMISSION VERIFICATION REPORT

TIME : [illegible]
NAME : [illegible] BERG
FAX : [illegible]
TEL : [illegible]

| | |
|---|---|
| DATE,TIME | 05/04 12:10 |
| FAX NO./NAME | 15169424705 |
| DURATION | 00:06:35 |
| PAGE(S) | 19 |
| RESULT | OK |
| MODE | STANDARD<br>ECM |